**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JULIE A. SU, ACTING SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR<br><br>　　　Plaintiff,<br><br>v.<br><br>MENNONITE MESSIANIC MISSION OF THE EASTERN PENNSYLVANIA MENNONITE CHURCH, doing business as LIBERTY RIDGE FARM, and NELSON MARTIN<br>　　　Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:　Case No. 1:22-cv-01355-YK<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

## DEFENDANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

In accordance with the Court's October 9, 2024, Order, Defendants hereby submit this Supplemental Brief addressing the implications of the Third Circuit's July 11, 2024, precedential opinion, *Johnson v. National Collegiate Athletic Association*, 108 F.4th 163 (3d Cir. 2024), which devised a new method of analysis to be applied when determining the existence of an employer-employee relationship. Based on the undisputed facts of record and the binding nature of this recent opinion, the *Johnson* Court's test is appropriately now analyzed by Defendants in the manner set forth herein.

The *Johnson* Court was tasked with, in summary, assessing whether an employee-employer relationship could exist pursuant to the FLSA between college athletes and their respective NCAA Division I universities. The facts at issue in *Johnson* are similar to the extent that the same test

must be applied, but the result here will differ. [1] Based on the procedural stature[2], the evidence of record and utilizing the *Johnson* framework, Defendants are entitled to Summary Judgment as a matter of law.

In explaining the Court's reasoning for applying a new test rather than one of the many existing multi-factor tests applied in the FLSA context, the *Johnson* Court stated:

> "In the absence of controlling authority providing a specific multifactor test to evaluate whether athletes can be considered 'employees' under the FLSA, the District Court applied the Court of Appeals for the Second Circuit's multifactor test from *Glatt*, 811 F.3d 528, where the Second Circuit Court considered whether unpaid interns must be deemed employees under the FLSA and therefore compensated for their work. . . ."

---

[1] By way of relevant factual context, the facts in Johnson, which are important for consideration in the instant matter, include (in summary) the following:

Appellants in Johnson were thirteen colleges and universities that are members of the NCAA. The NCAA regulates intercollegiate sports and has jurisdiction over approximately 1,100 schools and some 500,000 athletes. The NCAA has multi-year, multi-billion-dollar contracts with ESPN, CBS, and Turner Sports to broadcast athletic competitions between D-I schools, and it distributes shares of those broadcasting fees to its member institutions. In addition to shares of broadcasting fees, D-I schools receive fees from multi-year, multi-million-dollar agreements with television and radio networks that they have entered, either individually or as part of an NCAA conference, to broadcast their athletic competitions.

…

[T]he colleges themselves stand to profit substantially from television contracts, licensing fees, and ticket, concessions, and merchandise sales that their athletic programs generate. Some estimate that college athletes generate roughly $3 billion in annual revenue for their schools, conferences, and the NCAA. And at least 38 NCAA member colleges currently gross more than $100 million annually in sports revenue. The athletic department of the University of Texas, for example, reported $271 million in revenue for 2023, more than the highest-earning National Hockey League team. In 2020, 63 other NCAA member colleges earned more than $25 million from their football programs.

[2] Procedurally significant here is that there exists a well-developed evidentiary record following extensive discovery and numerous depositions. In *Johnson*, the Court was assessing the NCAA and member-schools' interlocutory appeal of the District Court's denial of their Motion to Dismiss.

*Johnson*, 108 F.4th 163. The Court found that the *Glatt* test (and others) were, however, inadequate when analyzing the relationship of the parties at issue. To this point, they further explained that, "determining an employer-employee relationship under the FLSA includes, but is not limited to, a strict application of traditional agency law principles. . . . Put otherwise, common-law agency doctrine, a doctrine largely symmetrical to governing FLSA caselaw, is also a helpful analytical tool in evaluating college athletes' purported employer-employee relationships in either the NLRA or the FLSA context." *Id*. The Court further noted that traditional agency law principles would be particularly useful due to, among other things, the types of educational and vocational benefits that the college athletes theoretically received by participating in their respective programs (i.e., increased discipline, a stronger work ethic, improved strategic thinking, time management, leadership, and goal setting skills, and a greater ability to work collaboratively)[3] – which are strikingly similar to those referenced in the testimony in the matter before this Court. See, *infra*., Depositions of Nelson Martin and Kenton Kreider, Exhibits A and B, respectively. Because the *Johnson* Court found existing tests to be inadequate, the Third Circuit devised the following amalgamation of tests previously applied by our courts:

> "We therefore hold that college athletes may be employees under the FLSA when they (a) perform services for another party, (b) 'necessarily and primarily for the [other party's] benefit,' *Tenn. Coal*, 321 U.S. at 598, (c) under that party's control or right of control, *id*., and (d) in return for 'express' or 'implied' compensation or 'in-kind benefits,' *Tony & Susan Alamo Found.*, 471 U.S. at 301 (quotation omitted). If so, the athlete in question may plainly fall within the meaning of 'employee' as defined in 29 U.S.C. § 203(e)(1). Ultimately, the touchstone remains whether the cumulative circumstances of the relationship between the athlete and college or NCAA reveal an economic reality that is that of an employee-employer."

---

[3] ". . . although athletes do not earn wages, the benefits of participation include payment in other forms, such as increased discipline, a stronger work ethic, improved strategic thinking, time management, leadership, and goal setting skills, and a greater ability to work collaboratively. . . The athletes allege that the soft skills the NCAA and member-schools point to are inadequate compensation for their services and that they were subject to extensive training and performance requirements that regularly interfered with their learning." *Johnson*, 108 F.4th 163.

*Johnson*, 108 F.4th 163. Based on the *Johnson* Court's analysis of each of these elements, we further analyze the case before this Court pursuant to the same framework below.

1. <u>**Performance of Services for Another Party Necessarily and Primarily for the other Party's Benefit**</u>

These first two elements (a. performance of services for another party, that is b. necessarily and primarily for the other party's benefit) are directly derived from the Supreme Court's decision in *Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 598, 64 S. Ct. 698, 88 L. Ed. 949 (1944)) (hereinafter, the "*Tenn. Coal* test"). In the framework developed by the *Johnson* Court, the *Tenn. Coal* test is the first step in analyzing the existence of the employer-employee relationship. In summary, the *Tenn. Coal* test is used to determine whether the actual acts/activities performed by the alleged "employees," can be considered "work" within the meaning of the FLSA.

The *Johnson* Court, relying on the Supreme Court's decision in *Tenn. Coal*, stated with respect to the element that: "The FLSA does not define 'work.' The Supreme Court interprets it as denoting 'physical or mental exertion (whether burdensome or not) **controlled or required by the employer and performed <u>necessarily</u> and <u>primarily</u> for the benefit of the employer and his business**.' (citation omitted), (emphasis added); *Tennessee Coal,* 321 U.S. 590, 598, 64 S. Ct. 698, 88 L. Ed. 949 (1944)). But the dictionary from which the Supreme Court derived that definition **specifically distinguishes work 'from something undertaken primarily for pleasure, sport, or immediate gratification, or as merely incidental to other activities[.]**' *Id*. at 598 n.11 (quoting Websters Int'l Dictionary (2d ed. unabridged)) (emphasis added)."

Thus, we are required to consider, first with respect to the mentors, whether (1) the mentors' actions were controlled or required by Defendants, (2) whether the mentors' actions were necessary to Defendants and Defendants' "business" and (3) whether the mentors' actions were performed primarily for the benefit of Defendants and Defendants' "business." We then similarly consider the

same elements with respect to the residents and their actions when partaking in Liberty Ridge Farm's program.

i.      *The Tenn. Coal Test Applied to the Mentors*

Defendants do not dispute that they "controlled," some aspects of the activit(ies) which would occur at the farm. The reason Plaintiff cannot establish an employment relationship based on this first part of the *Johnson* Court's analysis for purposes of the Cross Motions for Summary Judgment is because the mentors' participation at the farm **was never <u>required</u> by Defendants**, nor was the mentors' participation **<u>primarily</u> for the benefit of Defendants or Defendants' "business**."

Prior to *Johnson*, the Supreme Court first devised the *Tenn. Coal* test in response to an action on behalf of miners who sought wages for time spent traveling underground.[4] See generally, *Tennessee Coal*, 321 U.S. 590. Such travel, the Court found, was not primarily undertaken for the convenience of the miners and had no relation to the miners' needs or to the distance between their homes and the mines. *Id*. Rather, the Court concluded, the miners' travel time was spent for the benefit of defendants' and defendants' iron ore mining operations. *Id*. The extraction of ore from these mines by its very nature necessitates dangerous travel in defendants' underground shafts in order to reach the working faces, where production actually occurs. *Id*. Accordingly, such travel was deemed "essential" to the defendants' mining/iron-ore production. *Id*. In coming to this conclusion, the *Tennessee Coal* Court referred to Section 3 (j) of the FLSA, which expressly

---

[4] For context, the following is an excerpt of relevant facts from *Tennessee Coal*: "At the end of the day's duties at the working faces, the miners lay down their drills, pick up their other equipment and retrace their steps back to the "hoodlums." They wait there until an ore skip or man trip is available to transport them back to the portal. After arriving on the surface, they return their small tools and lamps, pick up their brass checks at the tally house, and proceed to bathe and change their clothes at the bath house. Finally they leave petitioners' property and return to their homes."

provides that "it is sufficient if an employee is engaged in a process or occupation **necessary to production**." *Id*.

Here, it is undisputed that the mentors of Liberty Ridge were free to come and go from the farm as they pleased. See, ECF 48, Exhibit E, at DOL 110; see also, ECF 48 at Exhibit D, p. 108. Though fully aware of their ability to do so, many of the mentors would opt to stay at the farm for extended periods of time. See, ECF 48, Exhibit E, at DOL 110 ("We did not consider it work. I was serving the church. . . I was able to come and go as I pleased but only did so on weekends. . . [Residents] were sent there by their parents to learn life skills and become better church members."). Mentors were never required to carry out or perform *any* acts at the farm, nor were mentors required or expected to dedicate any amount of their time whatsoever – there were no expectations with respect to the number of hours, days, weeks etc., that a mentor would contribute. On this subject, Nelson Martin testified the following when asked about how long mentors would stay at the farm:

> Q. How long would a -for lack of a better phrase-well, how long would a mentor reside at Liberty Ridge Farm.
>
> MS. WYNKOOP: [Objection].
>
> THE WITNESS: That was totally up to the mentor as to how long a time he felt he could volunteer his service there at the farm. Some would be three months, some would be a year. Again, it was their position to be there on a voluntary basis. It's their decision to leave when they felt they need to leave. It's voluntary.

See, Exhibit A, Martin Dep., 126:10-18. It further, cannot be said that the actions carried out by the mentors are "necessary," to the "business" of the farm, the church or Defendant Martin. When asked about a typical day for a mentor at Liberty Ridge, Kenton Kreider testified a detailed summary of a day on the farm as follows:

> Q. . . .To your knowledge, what does a typical day -- what's a typical day for a mentor who was at Liberty Ridge Farm?

A. He would wake up with a resident, often would go out, take a walk in the woods or in the lanes around the farm there. Just get a good fresh breath of -- good oxygen in their lungs. Come in for breakfast and have family worship, family devotions where they read from the Bible and sing and pray together. There might be some household duties sometimes after meals, like washing dishes, that kind of thing. Just whatever it takes to keep, you know, the normal flow going.

Q. Okay

A. One of the things we seek to teach the residents is that a lot of life is about picking up after yourself and fulfilling your own responsibilities. So laundry, that type of thing. …

So a lot of household responsibilities often fell to the resident and mentor to do together as a team. They would -- often toward the beginning of the day, they would check up on the animals that are on the farm as well, often involved walking through the chicken flock, walking among the birds, making sure the health was good, checking the feed supply. And one value of walking through the flock is to keep the birds motivated and active and nudge them toward the feed and water, just to ensure the health of the birds. Make sure the ventilation and everything was appropriate. They would sometimes also in the summer time, go to the garden and perform whatever gardening there was off the garden. They would -- as part of the -- also in tending to the animals they would -- often there was a small shed where a steer was kept grazing pasture. They would stop by and check, make sure that there was -- give them his feed and water. And then they would head toward the shop, where they would assemble pallets for a -- an activity through the remainder of the morning.

Often, they took a refresher break around 10:00. They would go into the house, have a snack, they drink, use the restroom, just to provide some structure to the day. Then lunchtime there would be a dinner bell prior to a lunch at 12:00. So 10:00 or 10 minutes before 12:00 there would be a bell rung. They would come in for lunch, trying to keep the schedule as prompt as possible. . . . One of the things that the troubled boys often have in common is from home a lack of structure and inability to work with schedule, inability to fulfill responsibilities in a timely way. And so they -- all of these exercises are geared to help him find a place and balance him and create a wholeness with the young man and the mentor. As the question was asked was the mentors place in this, he simply there to walk alongside and model the kind of structure and activity, to provide a moral support to the resident. . . .

After lunch, mentors, volunteers often caught up on voicemails. Did any correspondence with home. Then in the afternoon, there was a Bible class in which the mentors and residents all sat down together around a small table quite like this, but two rows of tables, and they all opened the Bible, and any study books that were associated with that. And learned things from general life skills, how to deal with

emotional responses of anger and that type of thing, how to work through these issues that most troubled boys face. . . . And after that, often there were exercises again resuming in the shop or the projects with either palettes, some of the palettes, or sometimes there were other woodworking projects or sometimes there were -- there may have been some general maintenance items of up keeping the farm equipment, that type of thing.

. . . But then at supper time, what we call supper, many people refer to it as dinner, but what we call supper. At 10 minutes till 6:00 the bell rang, and then they would enter the house in that time frame between 10:06 and 6:00. And then they'd be all ready to sit down at 6:00 as well. So at the end they'd have probably the most leisurely time at supper takes an extra time to visit, chat and just keep up their social relationships. After supper was a good opportunity for reading. There would have been -- it could be some hobby projects. Often, games were played. And then for bedtime, a mentor would sit down with his resident on a one-on-one basis and open their Bibles and read and pray together. Talk about the day, how things went, and how you feel. Just a little bit of a regrouping calibration type thing. And then, often around nine o'clock, they'd head upstairs to bed.

See, Exhibit B, Kreider Dep., 79-82.

In stark contrast to the facts assessed by the *Tenn. Coal* Court, here, it is undisputed that Defendants are not a pallet manufacturer or seller, they are not chicken breeders, they are not chicken sellers, they are not chicken-egg sellers, they are not firewood sellers, nor are they a gate installation company or manufacturer. Plaintiff tries to paint the picture of a child labor camp, which could not be further from the truth and is a far cry from what is shown by the evidence and undisputed facts of record.

Finally, with respect to assessing the mentors' participation at the farm and whether their actions were "primarily for the benefit of the Defendants and Defendants' 'business'" (see, *Tenn. Coal*, 321 U.S. at 598), it is pertinent to the analysis to consider how Liberty Ridge came into existence based on the undisputed evidence and testimony of record. First and foremost, we address the "why" behind the farm's origination:

Q. So what is the purpose of Liberty Ridge?

A. The purpose is to our churches, our faith. We, just like anyone else, sometimes you have children that become rebellious and the parents can no longer work with them, and instead of handing them over to the state, he has a place to lead faith based people who believe that it is better to work with the children ourselves, or help them to teach them Christian character, honesty, integrity, how to be a benefit to others and not a selfish individual. And also, the purpose of this was is to help these young men become citizens of the United States, good citizens that will be able to hold a job, they will support a family rather than sit behind bars.

See, Exhibit A, Martin Dep., at 38:12-24.

Q. So one of the reasons why then Liberty Ridge is important, that they would be able to get a job in the future after they left Liberty Ridge Farm, correct?

A. It would be part of it, yes.

Q. So would then be important to that for Liberty Ridge Farm to teach these young men the importance of work and labor?

A. No, importance of Liberty Ridge was teaching boys vocational skills. In other words, for sometimes we would take a tractor, rebuild the engine, and we would have training sessions in that whole thing. It would have been much cheaper and economical to take it to a shop somewhere and pay them to get it done. But we were training these boys on vocational skills, on mechanics, woodworking and right along with that, helping them in their Christian building character."

Id. at pp. 38-39.

When asked about what goes into building a pallet, Nelson Martin explained:

A. . . . And again, we are teaching vocational skills. We are teaching how to pull together as a team, which is very important to get out in society.

Q. Sure.

A. And they have to assemble [the pallet], they have to make the board the right way. They have to have the space, the right amount. And then the volunteers are the ones that do the nailing and all that. Again, just this -- we don't let any pallets go out the door with nails exposed. . . .

And yeah, if we want it to be profitable, we wouldn't have those kind of individuals there, because sometimes the whole work -- the whole project stops because we need to work or teach a skill or a safety procedure. It's not about profitability. It's about helping these young men that they can go out in society and make a living.

Id. at pp. 40:1-19.[5]

The simple fact of the matter is that the farm and the church would exist regardless of pallet building, tending to chickens, preparing firewood, and other vocational training discussed in discovery. If the aforementioned activities ceased operations today, there are no facts in the record, by either side, to suggest that the Defendants or the farm would cease as a result, thereby ensuring there is no genuine issue of material fact on this issue. In fact, Plaintiff has not (and cannot) identified any undisputed fact of record which points to the activities at the farm being necessary to the farm or Defendants' existence. It therefore **cannot** be true that such participation by the mentors (or residents) are required by Defendants or carried out primarily for the benefit of Defendants or Defendants' "business."

Thus, based on the evidence of record and as a matter of law, where it cannot be said that the mentors' activities at the farm are "required," by Defendants, nor can it be said that such are "necessary" to Defendants and Defendants' "business," and further where the mentors'

---

[5] Further evidencing the intent and purpose of the farm is its origination with the church's "family support committee":

A. What I'm saying is that Liberty Ridge was not Liberty Ridge. . . . So up to that point, we were the Family Support Committee.

Q. The Family Support committee. Was that -- did the mission create the Family Support Committee?

A. Yes.

Q. And then what was your role in the Family Support Committee?

A. Just a member.

Exhibit A, pp. 28-30. The family support committee then became the liberty ridge farm committee, further evidencing the purpose being to support families within the church: "A. Yes. We went from Family Support Committee to Liberty Ridge Farm Committee." Id.

actions/activities are undisputably **not** performed primarily for the benefit of Defendants nor for Defendants' "business," Plaintiff cannot establish the requisite employer-employee relationship.

We now similarly consider the same elements with respect to the residents.

ii.    *The Tenn. Coal Test Applied to the Residents*

The "control" element of residents' activities at the farm is in many ways similar to that of the control over the mentors discussed *infra*. Defendants' relationships with the residents are, however, different due to the nature of the quasi-parental role Defendants assumed at the behest of the resident-participants' parents. See, Exhibit C, DOL00056-58; 61-62; 68-69. However, insofar as the activities the residents were **required** by Defendants to carry out were dependent on each residents' individual circumstances. By the very nature of the program Defendants offered to families within the church, each resident presented with different needs.

In an application filled out by the parents of one resident, for example, the "situation that led you to contact Liberty Ridge," prompt reads: "[Resident] has been living with his brother Matthew and his wife, and they discovered he was using a smartphone. Matthew confronted him and he seems to be genuine this time because he has confessed things that he never did before, but we believe he needs some intense help to retrain his thought patterns." Then when asked to "describe [the resident's] pattern of misbehavior," the response reads: "[Resident] has had a long pattern of hiding sin in his life and lying about it until he is caught. When caught he will readily confess and repent but we have long suspected there was more that was never confessed." See, Exhibit D, DOL0202.

Defendants' relationships with their "remote residents," is a strong indicator of the true lack of "requirements," Defendants impose upon residents. See, Exhibit E, May 2022 LRF Committee Report. Residents who are "remote," cannot by the very definition of their remote

status, participate in any of the activities Plaintiff identifies as "work," (i.e., pallet building, tending to chickens, etc.).

Significantly with respect to both the mentors and the residents, the analysis can simply end with the *Tenn. Coal.* test based on all the undisputed evidence pointing to the fact that the Church would exist regardless of the continuation of operations at the farm, and the farm would exist regardless of continuation of the sale of pallets, chickens, fences or other agricultural activities thereon. It is an undisputable matter of fact that none of the profitable activities at the farm are essential to the operation of the church, and neither are they essential to the operation of the farm.

The money which would be irregularly generated by the farm's activities was not the sole means of financial support for the farm's programming. The farm receives monetary donations from the local community, local and national Anabaptist Congregations, donated supplies, donated materials, donated machinery, donated animals among other donations from the church's local, national and international communities and congregations.[6] For example, Wengerd Pallet (a market "competitor," according to Plaintiff) donated a sawmill to the farm to assist with the farm's instructional pallet building. See, Exhibit F, Sept. 2019 LRF Committee Report. In the same September 2019 Committee Report, one of the items on the agenda was having brother Kenton Kreider bring speakers to the farm once or twice a month on Saturdays to give informative, character-building talks to the residents. Further, in this same report, the Agenda discusses plans

---

[6] Although residents' families were encouraged to donate to support the programming at the farm, residents were not turned away or sent home if their families could not afford to do so. When Mr. Martin was questioned about an "invoice of zero" that was sent to the parent of a resident, Mr. Martin testified that, to the best of his recollection, that parent was a single mother whose husband had left her, so the committee was letting her know she would not be expected to make the donation. Exhibit A, p. 23.

for field trips with the residents and mentors and providing better clothes for residents who are not well off.

Plaintiffs primarily focus on the fact that one of the many activities at the farm, the instructional pallet building process, resulted in profit for Defendants.[7] However, this is just one of many instructional opportunities the farm provides to residents, and also significant is that a vast portion of the activities and vocational trainings the residents would participate in at the farm did not generate *any* money because financial gain is not and never was the purpose or goal of Defendants. In fact, Defendants had agreements with many local businesses such as Clark's Feed, Snyder Gates, Wengerd Pallet Company, and Jones Lumber, which provided opportunities for residents of the farm to learn vocational skills to better assist them to become productive members of society. See, Exhibit G, Defendants responses to interrogatories, no. 16.

One of the many learning opportunities offered at the farm is teaching the residents how to care for chickens. At the deposition of Nelson Martin, Plaintiff asked Mr. Martin about a document identified as "LRF Committee Meeting Minutes dated 9-22-2023," as follows:

Q. All right. Was there -- can you explain that, was there a concern about the price of chickens dropping?

A. We don't get paid for chickens.

Q. So what was the issue that you had to research?

A. Didn't know if more chickens died than what normally should have, and that happens from time to time with the heat.

Q. And you had a contract with Clark's Feed for the chickens, right?

---

[7] Also to this point, it is disingenuous for Plaintiff to argue that Liberty Ridge had an advantage over other "businesses," (see, Plaintiff's Brief in Support of their Motion for Summary Judgment; see also, Plaintiff's Opposition to Defendants' Motion) due to their "free labor pool" when other businesses were donating machinery and supplies to the farm and similarly offered residents the opportunity to learn trades and skills. See, Exhibit F, Sept. 2019 LRF Committee report.

MS. WYNKOOP: [Objection.]

THE WITNESS: We had a verbal agreement instead of signing a binding contract.

BY MR. BRUNSON:

Q. A verbal agreement with Clark Feed to raise chickens -- well, let me backtrack -- strike that. What exactly did you do for Clark's Feed, you being the Liberty Ridge Farm. What did the Liberty Ridge Farm do for Clark's Feed?

A. Basically gave housing for the birds to be raised in and overseeing how they were raised.

Q. And then the Liberty Ridge Farm took care of the birds while they were there?

A. Yes.

Exhibit A, pp. 146-147. When discussing the residents' training with Snyder Gates, Mr. Martin testified that residents would be taught and then complete assembly of gates. Id., p. 83. Mr. Martin could not testify for certain that these gates would be subsequently sold by Snyder Gates, but it is clear based on his testimony that they were not sold by Defendants:

Q. Okay. What -- did Snyder Gates sell those gates?

MS. WYNKOOP: [objection].

THE WITNESS: We assembled them (indiscernible) what they did with them. So it is possible
…

Q. Okay. And to your knowledge, did the residents receive any payment for their time building these gates for Snyder Gates?

MS. WYNKOOP: [Objection].

THE WITNESS: No, but their parents put them there to help them to learn. Again, the Christian -- ethics of Christian character and also the vocational skills.

Id., p. 86.

Aside from the vocational training offered, it is undisputed that a large focus for residents is religious studies and self-reflections. For example, residents would complete daily moral inventories (see, Exhibit H, DOL0036-54) where they reflected on devotional Bible passages, the day's lessons and victories, as well as any regrets/failures.

The farm's undisputable purpose is to help develop and teach the youth of Defendants' church-community vocational skills while simultaneously building their moral character, their relationship with God, and ultimately assist them in finding a job. See, Exhibit D, DOL0202; see also, Exhibit A, p. 86; see also, Exhibit B, pp. 79-82. Although not guaranteed, the church assists the residents with finding employment upon their "graduation," from Liberty Ridge. See, Exhibit I, LRF Committee Report, July 2019 ("[Redacted]'s graduation is the end of July and Nelson reported that the [redacted] family from Kralltown is willing to give [redacted] both a home and employment."); see also, Exhibit J, DOL0021-0023, (containing detailed information regarding Defendants' efforts to identify post-Liberty Ridge homes and jobs for the residents.).

Regardless of any resulting profit from the sale of the wood pallets or other productive activities at the farm, in no uncertain circumstances can the activities at the farm be considered necessarily and primarily for the Defendants' benefit. In fact, it is clear from all evidence of record that the **only** reason the farm and everything therein exists and operates is for the benefit of young church-members who struggled at home. See, Exhibit D, DOL0202; see also, Exhibit A, p. 86; see also, Exhibit B, pp. 79-82. Based upon all the foregoing, when applying this prong of the *Johnson* Court's test to the facts at bar, it cannot be found as a matter of law that the activities and operations at the farm are primarily for the benefit of Defendants when the farm's *sole purpose for existing* is for the benefit of the residents.

**2.** <u>**Under that Party's Control or Right of Control in Return for "Express" or "Implied" Compensation or "In-Kind Benefits"**</u>

Elements (c) and (d) of the *Johnson* Court's test are directly derived from *Tony & Susan Alamo Found.*, 471 U.S. at 30, and the related line of cases, including *Acosta v. Cathedral Buffet, Inc.*, 887 F.3d 761 (6th Cir. 2018), (see, *Johnson*, 108 F.4th 163, n.61) which is particularly significant to the analysis currently before this Court. For the sake of consistency, Defendants will analyze these elements separately with respect to their application to the mentors and then subsequently, as applied to the residents.

  a.  *Mentors' Expectation of Compensation*

With respect to the analysis of a party's control or right of control in return for "express" or "implied" compensation or "in-kind benefits", specifically analyzing similar facts involving a religious institution and volunteers the *Acosta* Court held:

> "[A] volunteer's expectation of compensation is a threshold inquiry that must be satisfied before we assess the economic realities of the working relationship. The Supreme Court held as much in *Portland Terminal* when it defined a volunteer as a 'person who, without promise or expectation of compensation, but solely for his personal purpose or pleasure, worked in activities carried on by other persons either for their pleasure or profit.' *Portland Terminal*, 330 U.S. at 152. The *Alamo* Court reiterated this test, making clear that when a religious organization undertakes a commercial endeavor, its workers are only covered under the FLSA if they 'engage in those activities **in expectation of compensation**.' *Alamo*, 471 U.S. at 302 (emphasis added). We are, of course, bound by the Supreme Court's interpretation of the FLSA. See *Rivers v. Roadway Exp., Inc.*, 511 U.S. 298, 312, 114 S. Ct. 1510, 128 L. Ed. 2d 274 (1994) ('It is this Court's responsibility to say what a statute means, and once the Court has spoken, it is the duty of other courts to respect that understanding of the governing rule of law.')."

*Acosta*, 887 F.3d 761. First and foremost, the mentors themselves refer to their participation at Liberty Ridge as volunteering, calling their time at the farm "service to God and service to Church," specifically going so far as to state that it is not "work," but rather, a "missionary activity." See, ECF 48, Exhibit E, at DOL 0009; See, ECF 48, Exhibit E, at DOL 110; see also,

ECF 48 at Exhibit D, p. 108. These statements were made by the mentors *themselves* when questioned by the Wage and Hour investigator(s) during private interviews.[8]

In support of their argument that the mentors' actions were carried out in return for express or implied or in-kind benefits, Plaintiff relies heavily on what the Defendants referred to as "tokens of appreciation." Defendants offered these small payments to mentors who volunteered their time at the farm, which, as clearly explained in the deposition testimony[9], $250 stipends were offered to offset the mentors' costs of traveling to/from the farm (some by car, some by plane), among other expenses while they took leave from their "real jobs" to volunteer.[10]

> Q. . . . How did the Liberty Ridge Farm committee come to, let's say, $250 for now? Because we don't know how much it was before. How did they come up to that figure?
>
> A. We looked at it more as a token of appreciation for their travel time. Some came from the Midwest, some had airplane tickets to pay. So this was kind of just a token of appreciation.
>
> Exhibit A, 108:1-8.

Accordingly, based upon the undisputed facts discussed herein, Plaintiff plainly cannot establish that mentors had any expectation of compensation when all evidence of record supports a completely converse finding.

### b. Residents' Expectation of Compensation

Plaintiff's prior briefing attempts to take and apply testimony out of context in a manner which suggests that the residents were forced to work in exchange for food and shelter, thus

---

[8] It is worth noting that the identities of these mentors who offered these statements in support of the Liberty Ridge program and its goals, are still unknown to Defendants to date as the identities of the same are still being withheld from Defendants.

[9] Also supported by mentor interviews, i.e. "I got a $250 stipend while I was there to cover expenses since I wasn't working." See, Exhibit K, DOL0206.

[10] See, fn. 6.

supporting their theory that the residents expected in kind benefits or other compensation in exchange for work performed. Not only is this a clear mischaracterization of the testimony and evidence but it is further a patently false and dangerous accusation against Defendants and the families of the residents involved.

On this issue, Mr. Martin testified to the following:

Q. What would happen if a resident said, I don't want to work today?

MS. WYNKOOP: [Objection].

THE WITNESS: We would-when I say we, department heads, would just take him to the side and sit down and talk to him and find out if he's not feeling good or something, why he doesn't want to be part of the team today and hear him out.

BY MR. BRUNSON:

Q. What if the resident is just very persistent and says I'm not working?

MS. WYNKOOP: [objection].

THE WITNESS: Then they didn't work or didn't perform or not perform, just.

BY MR. BRUNSON:

Q. So a resident can choose whether or not they wanted to work on a particular day?

MS. WYNKOOP: [Objection].

THE WITNESS: Yes, they could choose what they want to do if they want to or not or didn't want to. We didn't take them by force and make them.

See, Exhibit A, at 166. Plaintiff's attempts to characterize the LRF Committee Meeting Reports in a manner that fits their "labor camp" narrative was unsuccessful during depositions and repeatedly contradicted by their own investigation and the undisputed documents of record as described in detail throughout the instant Supplemental Brief.

Despite Plaintiff's insistence to the contrary, there are no facts of record which suggest that any resident would be deprived of food or shelter if they did not want to work.[11] During Mr. Martin's deposition, he was asked about consequences that were administered or considered among the committee – however, Mr. Martin explains that "consequences," were sometimes administered to residents in circumstances consistent with the Defendants' communities' core religious beliefs involving, for example, "backtalk," which is perceived as a display of disrespect (id., pp. 167-168) and anger (id.). The full testimony Plaintiff's rely on when they suggest in prior briefs that if residents "don't work, they don't eat," is as follows:

> Q. But was another reason why they were building those pallets was to offset the costs of their-- of them being at the Liberty Ridge Farm?
>
> A. So you need to understand that, again, in our faith and in our settings, this is a family farm, which I said earlier on, we wanted this to feel like a family farm. And in our family farms, our children do not live at home for nothing. They contribute by whatever way they can. So this is no different
>
> Q. So by them doing this, they would contribute to their livelihood at the farm, basically?
>
> MS. WYNKOOP: Objection to form. But you can answer.
>
> THE WITNESS: Yes, from a family farm standpoint, you don't work, you don't eat. It's a very powerful **<u>principle</u>**.

Id., at p. 125, emphasis added. Plaintiff conveniently ignores the full context of this testimony for the sake of developing a creative argument. This is especially important because the full context supports the stance Defendants have had since the investigation by the Wage and Hour Division first began – Liberty Ridge runs like any other family farm in the Defendants' religious-

---

[11] No matter the leaps, bounds or acrobatics which Plaintiff takes in an attempt to develop a favorable narrative, consequences for rebellious behavior (notably not consequences for not wanting to "work") by way of limiting a child/young adult's diet to rice and beans instead of what a typical child would prefer to eat (i.e., ice cream, cookies, cheese burgers, pizza, etc.) certainly cannot be reasonably interpreted as "depriving someone of food."

community. Contributing to the family farm is a matter of **principle,** important to both Defendants' religion and their culture. This is a repeating theme seen throughout the entirety of the testimony of all witnesses and is clear in the documentation of record. As such, it is undisputed that the residents were not "working" for "express" or "implied" compensation or "in-kind benefits," as required to categorize individuals as employees under *Acosta* or *Alamo*.

### 3.  Conclusion

Under the *Johnson* framework, the employer-employee relationship does not depend on only isolated factors (such as the *Glatt* test) but rather upon the circumstances of the whole activity, which is what the newly devised framework is intended to capture. *Johnson*, 108 F.4th 163, citing, *McComb*, 331 U.S. at 730; see also *Haybarger v. Lawrence Cnty. Adult Prob. & Parole*, 667 F.3d 408, 418 (3d Cir. 2012) (holding that "whether a person functions as an employer depends on the totality of the circumstances rather than on 'technical concepts of the employment relationship'") (citation omitted).

The economic reality of the situation here when looking at the facts as a whole is that Defendants devised an economically sensible means of assisting the families in their small faith-based community, financially supported by church and community donations, with additional contributions made by money generated from the vocational training activities run at the farm. This system allowed for any families within their community, including low-income families, to benefit from the guidance and teachings of fellow church members by way of having their child learn vocational skills, in a faith-based environment with the support of experienced senior church members (i.e. fellows) and young church members close to their own age in a role model type fashion (i.e. mentors).

The answer here, as it pertains to the *Johnson* framework, is straightforward based on the undisputed facts: (1) neither the mentors nor the residents were ever "required" by Defendants to perform or engage in activities at the farm, (2) neither the mentors' nor the residents' actions were necessary to Defendants and Defendants' "business" and (3) neither the mentors' nor the residents' actions were performed primarily for the benefit of Defendants and Defendants' "business." Accordingly, Defendants are entitled to summary judgment as a matter of law.

**MARGOLIS EDELSTEIN**

BY: _____

MEGHAN WYNKOOP, ESQUIRE
ANASTASIA BARANOWSKI, ESQ.
Identification No. 324242
The Curtis Center, Suite 400E
170 S. Independence Mall W.
Philadelphia, PA 19106-3337
Telephone: (215) 922-1100
mwynkoop@margolisedelstein.com
Date:   October 30, 2024        Attorney for Defendant

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the Defendants' Supplemental Brief in Support of their Motion for Summary Judgment was filed this day through, and is available for viewing and downloading from, the Court's ECF system, which will electronically serve counsel for all parties via a Notice of Electronic Filing (NEF). There are no parties that are non-registered ECF participants or who have otherwise not consented to electronic service.

**MARGOLIS EDELSTEIN**

*/s/ Meghan Wynkoop, Esq.*
Meghan Wynkoop (PA 324242)
Anastasia Baranowski (PA 329297)
mwynkoop@margolisedelstein.com
abaranowski@margolisedelstein.com
The Curtis Center – Suite 400E
170 S. Independence Mall W.
Philadelphia, PA 19106-3337
T: (267) 931-5828

Dated: October 30, 2024

*Attorneys for Defendants*