IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNYSLVANIA

_____

JULIE A. SU, ACTING SECRETARY OF :

THE UNITED STATES DEPARTMENT    :

OF LABOR                   :

                          :         Case No.

    Plaintiffs,           :        1:22-cv-01355-YK

                          :

v.                         :

                          :

MENNONITE MESSIANIC MISSION OF   :

THE EASTERN PENNYSYLVANIA      :

MENNONITE CHURCH            :

doing business,            :

as LIBERTY RIDGE FARM,       :

and MARTIN NELSON          :

    Defendants.          :

_____:

AUDIO TRANSCRIPTION

OF NELSON MARTIN DEPOSITION

HELD ON JULY 20, 2023



**MAGNA**
LEGAL SERVICES

APPEARANCES

    For Defendants:

        Meghan Wynkoop

        Office: Philadelphia, PA; Mount Laurel, NJ

        Phone: 215-931-5828

        Cell: (813) 380-7699

        Email: mwynkoop@margolisedelstein.com


        Jocelyn M. Mendez

        Office: Philadelphia, PA

        Phone: (215) 931-5812

        Email: jmendez@margolisedelstein.com


    For Plaintiffs:

        Austin Brunson

        Company: U.S. Department Of Labor

        HQ Phone: (866) 487-9243

        Location: 200 Constitution Ave NW,

        Washington, District of Columbia, 20210, United States

        Brunson.austin.s@dol.gov

        Email: smith.john@dol.gov



INDEX

WITNESS                                                              Page No

NELSON MARTIN

Direct examination by Mr. Brunson                                          5



P-R-O-C-E-ED-I-N-G-S

(Recording in progress.)

THEREUPON,

NELSON MARTIN

was called for examination by Counsel for the plaintiff, having been first duly sworn, was examined and testified as follows:

THE REPORTER:    Thank you.

And would counsel state their appearances for the record, please?

MS. WYNKOOP:    Meghan Wynkoop, on behalf of the defendants and Nelson Martin.

MS. MENDEZ:    Jocelyn Mendez on behalf of the defendants and Nelson Martin, also joined by our three law clerks Alissa Seidel, Tony Wang, and Ryan Corbin.

MR. BRUNSON:    And good morning, Austin Brunson on behalf of Secretary, joined by Chris Harvey, an investigator with the Wage and Hour Division.  And Gabriel Mankins is an intern at my office.

MS. WYNKOOP:    Before we start, just a note for the record, as there is no notice of deposition produced today, Mr. Martin is not being produced as a designee in any capacity.  I understand he is a named defendant, so a little bit different than the other days, but just wanted to make a note of that.  And also noting on the record that there is a half hour period today that my colleague, Jocelyn Mendez, will be defending the


MAGNA
LEGAL SERVICES

deposition.  So the transcript will reflect that accordingly.

MR. BRUNSON:   Okay.  Everyone ready?

DIRECT EXAMINATION

BY MR. BRUNSON:

Q.    Good morning, Mr. Martin.  My name is Austin Brunson.  I'm an attorney with the Department of Labor, and we are here in a deposition for the matter of Secretary of labor versus the Mennonite Messianic Mission of the Eastern Pennsylvania Mennonite church, doing business with Liberty Ridge Farm.  And you as well, Nelson Martin.

I'm also joined by Gabriel Nathans, who's down there.  He's an intern in my office.  And Chris Harvey, who's an investigator in waiting in our division.

Mr. Martin, have you been deposed before?

A.    Yes.

Q.    Okay.  So then, you know, at a basic level, a deposition is me asking you questions as the attorney for the plaintiff in this case.  And then you will answer those questions, correct?

A.    Correct.

Q.    Okay.  The Court Reporter asks you that you affirm that all your testimony is true, meaning that you have to tell the truth and nothing but the truth.  Do you understand that?

A.    Yes.

Q.    Okay.  It's also important to remember that the


MAGNA
LEGAL SERVICES

Page 6

reporter is actually saying everything we say.  So please check to make sure that you answer verbally rather than nodding your head and shaking your head; do you understand?

A.    Yes.

Q.    Okay.  I also ask that you please not try to talk. Sorry, please try to not talk while someone else is talking.  I frequently talk over people, and I will do my best not to talk over you.  And I ask that you do the same for me; do you understand?

A.    Yes.

Q.    Okay.  And at any point in time you need to take a break, let me know.  I'm probably going to ask to take a few breaks myself.  However, I'm going to ask you to answer the question that we are on first before you take that break, okay?

A.    Yes.

Q.    All right.  Are you taking any medications or drugs that would prevent you from answering my questions accurately today?

A.    No.

Q.    All right.  Are you feeling well and healthy today?

A.    Yes.

Q.    Good.  Have you ever been convicted of a crime involving dishonesty, such as fraud or perjury?

A.    No.

Q.    Okay.  Is there any reason that you believe you may



Page 7

not be able to give truthful and accurate testimony here today?

A. No.

Q. Okay. What did you do to prep for this deposition today?

A. I think, I looked over my treasure's report.

Q. Okay. Did you look over any other documents?

A. No.

Q. Right. And did you speak to anyone in preparation for this deposition?

A. I spoke with my attorneys.

Q. Did you speak to anyone else besides your attorneys?

A. Spoke a little bit with Kenton Kreider, he called me.

Q. You spoke with Mr. Kreider last night. Did you speak with him last night?

A. Yes.

Q. What did you guys talk about?

A. Basically, nothing we never talked about before. It was just this whole -- what we're facing.

Q. So you talked about -- did he tell you about the deposition that he had yesterday?

A. Very little.

Q. Very little. What did he tell you about it?

A. I don't even remember any real details, just that it's nothing to be scared of.



Page 8

Q.     Nothing to be scared of?

A.     I answer truthfully.  Maybe some of the questions you may have asked him, but I have no idea what they were anymore.

Q.     You don't remember the questions?

A.     No.  I was driving a truck at the time.

Q.     Okay.  And this conversation was last night, correct?

A.     Late afternoon.

Q.     Late afternoon?  Do you know the time?

A.     Not -- I don't know, it was just late afternoon.

Q.     Okay.  But you don't remember the questions that Mr. Kreider told you that I asked him yesterday?

MS. WYNKOOP:   Objection.  Asked and answered (indiscernible).  You can answer.

THE WITNESS:   No, I cannot -- I could not tell you any of it, but I had a lot of background noise, it was hard hearing (indiscernible) the truck, so.

BY MR. BRUNSON:

Q.     Do you have hearing issues?

A.     No.

Q.     Okay.  What is your date of birth?

A.     12/10/63.

Q.     Where do you live?  Sorry.  I didn't mean to ask you while you were drinking water.



A.  Myerstown, Pa

Q.  I'm sorry, where?

A.  Myerstown, Pa

Q.  Okay.  What county is that in?

A.  Lebanon

Q.  And do you work?

A.  Yes.

Q.  What do you do for a living?

A.  Farm and help my sons.

Q.  Your sons?  What do you do to help your sons?

A.  They're farming too.

Q.  Do they own their own farms?

A.  Yes.

Q.  Do they each own their own farm?

A.  The one -- the younger one does not yet, but he's still farming with me.

Q.  So he works on your farm?  Is that fair to say? Your youngest son works on your farm?

A.  Yeah.

Q.  Okay.  Do you have a business?

A.  Yes.

Q.  What's the business called?

A.  Nel-Ray Farms.

Q.  Do you have any other businesses other than Nel-Ray Farms?



A.    No.

THE REPORTER:    Could you spell that, please?

THE WITNESS:    N-E-L - R-A-Y Farms, LLC.

THE REPORTER:    Thank you.

BY MR. BRUNSON:

Q.    How far did you go in school?

A.    Eighth grade.

Q.    Do you have any legal training?

A.    No.

Q.    So today I'll be referring to the Mennonite Messianic Mission of the Eastern Pennsylvania Mennonite church. I'm going to refer to them as the Mission, if that's okay?

A.    Okay.

Q.    So when I say the Mission, you'll know what I'm talking about; is that correct?

A.    Yes.

Q.    All right.  When I talk about the minors who resided at the Liberty Ridge farm, I'm going to refer to them as the residents, okay?

A.    Yes.

Q.    So when I say residents, will you understand what I'm talking about?

A.    Yes.

Q.    All right.  Now, I'm also going to discuss the mentors who were at the Liberty Ridge Farm.  Do you know who the



MAGNA

LEGAL SERVICES

Page 11

mentors were?

A. Yes.

Q. Okay. Just so we'll make sure we're on the same page. Can you tell me who the mentors were at the Liberty Ridge Farm?

A. They are the volunteers that walk beside the residents to help to show them honesty and integrity in order to show them honesty and integrity in our Beliefs.

Q. Okay. Prior to the deposition today, did you review your counsel's responses to the interrogatories that my office sent to them?

A. Yes.

Q. Okay. And did you sign the verification form?

A. No.

Q. So this is Exhibit 21. Please take a look at that document.

(Whereupon, Secretary Exhibit 21, Nelson Martin Verification, was marked for identification.)

MS. WYNKOOP: Can you repeat that?

BY MR. BRUNSON:

Q. Can you please take a look at that document? Did you look at that document?

A. Yes.

Q. Do you recognize that document?



Page 12

A.    Yes.

Q.    What is that document?

A.    This document was what came along with -- what you put together.

Q.    Put in by (indiscernible).

A.    The attorneys.

Q.    The attorneys.  Did your attorneys send you that document?

A.    Not sure.

Q.    Well, did you sign that document?

A.    Yes.

Q.    Okay.  Just to be clear, did you review all the responses that your attorneys wrote in response to my -- the secretary's request for interrogatories?

MS. WYNKOOP:    Objection.  Ask and answer.  You may answer.

THE WITNESS:    Not sure.

BY MR. BRUNSON:

Q.    I'm showing the witness the Secretary Exhibit 22. Also showing the witness Secretary Exhibit 23.  Let's take a look at those documents, Mr. Martin.

(Whereupon, Secretary's Exhibit 23, Defendant's Responses to Plaintiff's First Set of Interrogatories, was marked for identification.)

A.    Just the same.



Page 13

Q.    Did you look at those two documents?

A.    No, I didn't look at the second one yet.

MS. WYNKOOP:    Mean?

MR. BRUNSON:    I mean, I just want to make sure he's even seen these documents before. I'd like him to look at them.

THE WITNESS:    I'm sure I have.

BY MR. BRUNSON:

Q.    Can you please keep reviewing those documents? It doesn't look like you're finished yet. I just have some follow-up questions about them. Yeah.

A.    I'm sorry.

Q.    Have you had an opportunity to look at those documents, Mr. Martin?

A.    State back that question again.

Q.    Have you had an opportunity to look at those documents?

A.    Yeah.

Q.    Okay. What are those documents?

A.    They're the documents that were between your firm and their firm representing us.

Q.    Have you seen those documents before?

A.    Yes.

Q.    Yes. Okay. And you just had an opportunity to thoroughly review those documents, right?

A.    Not thoroughly.



Page 14

Q.    But you read those documents, correct?

A.    Yes.

Q.    You looked at the responses that your attorneys wrote down on the -- to the questions that we asked.  We meaning the Department of Labor, correct?

A.    Yes.

Q.    Were there any answers in there that were not, correct?

A.    No.

Q.    Okay.  And that goes for the request for Production of Documents, document as well.  Were there any errors in those documents?

A.    Not that I'm aware of.

Q.    So everything that was written there, true and accurate to the best of your knowledge.

MS. WYNKOOP:    Objection. Asked and answered.  You can answer.

THE WITNESS:    To the best of my knowledge, yes.

BY MR. BRUNSON:

Q.    Okay.  Do you want to make any changes to anything that is written in those documents?

MS. WYNKOOP:    Objection. Asked and answered.  You can answer again.

THE WITNESS:    No.

BY MR. BRUNSON:



Q.   Okay.  I'm going to talk about the Mission now. What is the Mission?

A.   It's a 501(c)(3) that operates in our church circles to reach out to individuals to present the gospel message to them here and abroad.

Q.   And what church are you referring to?

A.   The churches of the EPMC.

Q.   Can you just actually say the acronym?  It's just -- give the acronym to actually say the name.

A.   Eastern Mennonite -- Eastern Pennsylvania Mennonite Church.

Q.   Okay.  Are you affiliated with the Mission?

A.   No.

Q.   Have you ever been affiliated with the Mission?

A.   No.

Q.   Have you ever served as a board member on the Mission?

A.   No.

Q.   Have you ever been a paid employee of the Mission?

A.   No.

Q.   Have you ever served as a volunteer with the Mission?

A.   Yes.

Q.   Okay.  When did you serve as a volunteer with the Mission?



Page 16

A.     When I was on the Paraguay committee in South America.

Q.     When was that?

A.     From 2004 to 2022.

Q.     Did you serve on any other committees with the Mission?

A.     No.

Q.     How did you get on the Paraguay Committee?

A.     They asked if I would be willing to serve on the Family Support Committee.

Q.     Who are they?

A.     I guess, it would have been the Mission.  I would ask, I guess.

Q.     Would it be the Mission Board who asked you that? Who from the Mission asked you to do that?

A.     my wife's uncle, Harold Good.

Q.     What was his relationship to the Mission?

A.     Bishop.

Q.     Bishop.  Is that like a board position with the Mission?

A.     Yes.

Q.     Okay.  So someone from the board asked you to serve on the Paraguay committee?

A.     They're not actually, bishops are not actually part of the board.  They're just overseers over the board.



Page 17

Q.   Okay.  But I did ask just now, I believe that you said he was a board member?

A.   Not a board member, it is the official aided.

Q.   Sorry.  Can you repeat that?

A.   I think they call them official aided members or whatever.

Q.   And I'm not trying to be difficult.  I really just -- an official aided; is that what you're saying?

A.   Official aided, something like that, yeah.

Q.   Okay.  Can you spell that to us?

A.   No.

Q.   Is that official and then aided, is that what you're saying?

A.   Something like that, yeah.

Q.   Okay.  What exactly -- what does that mean, exactly?  Official aided.

A.   It just means that they can be at the board meetings if they want to be.

Q.   Okay.  So this one Bishop asks for you to be on the Paraguay committee?

A.   If I want to be.

Q.   Okay.  Did you have to get approval from an actual board member from the Mission to be on that committee?

A.   Restate your question.

Q.   Sure.  So was there someone who was actually on the



Page 18

Mission board who asked you to be on that committee, or did you have to be approved by someone from the board to be on that committee?

A.    I wasn't involved in it. I was just asked if I would serve

Q.    Okay.  Are you familiar with the board -- the Mission board?

A.    Yes.

Q.    Okay.  Can you explain to me what the Mission board is?  Like, how is it made up?

A.    It's made up of volunteers that serve for a time frame.

Q.    Do they have actual positions or titles?

A.    Some do.

Q.    Is there a president of the board?

A.    No.

Q.    Is there a chairperson?

A.    The chair.

Q.    Can you list all of the positions of the board?

A.    The chairman, secretary, an assistant secretary, and a treasurer and assistant treasurer.

Q.    Are there any other positions that you know of?

A.    The rest are just members.

Q.    Just members.  Do you know how many members there are?



A.    No.

Q.    Okay.  Were you a member?

A.    No.

Q.    What did you do in your capacity on the Paraguay committee?

A.    Once, I served as secretary for a while.

Q.    You served as secretary of the committee?

A.    Yes.

Q.    Okay.  And was there a chairperson of that committee?

A.    Yes.

Q.    Was there an assistant chairman of that committee?

A.    Yes.

Q.    What other positions were there in that committee?

A.    Assistant secretary.

Q.    Were there any others?

A.    And treasurer.

Q.    And treasurer.  Any others?

A.    No.

Q.    Were the members who served on this committee?

A.    Members

Q.    Okay.  How many members were there?

A.    Varied over the years.

Q.    And you said you were there from 2022, from --
repeat the years that you were there from.  Sorry.  Repeat the



MAGNA
LEGAL SERVICES

Page 20

years that you were on this Paraguay Committee.

A.    2004 to 2022.

Q.    Okay.  So in 2022, how many committee members were there?

A.    Not sure, I have to go back and look.

Q.    Okay.  Why did you stop serving on the committee -- on the Paraguay committee?

A.    I was replaced as -- your terms expire.

Q.    How long are the terms?

A.    I think it's three years.  I have to -- yeah, I think it's three.

Q.    So you were there longer -- you were on this committee longer than three years, though, right?

A.    Yes.

Q.    Okay.

A.    and then you get re-elected.  You can get re-elected at our church-wide meetings.

Q.    Where are these meetings held?

A.    They're held in our congregations.

Q.    Okay.  Are they with the Mission?

A.    Yes.

Q.    Okay.  How come you didn't get re-enacted?

A.    It just -- it goes with time, and I was also -- I was also looking at maybe going to another church group that allows a little more technology.



Page 21

Q.    So you were thinking about leaving the church?

A.    Yes.

Q.    Okay.  What church were you trying to go to?

A.    Another conservative northeast conference.

Q.    Northeast conference.  Still Mennonite though?

A.    Yes.

Q.    Okay.

A.    Yes. Very much just a little more technology.

Q.    Understood.  So just to be clear, you didn't want to -- is the reason why you're not on the committee anymore is because you didn't want to be?

A.    Yes

          MS. WYNKOOP:    Objection.  Asked and answered.

BY MR. BRUNSON:

Q.    To your knowledge, how does -- do you know how the Mission generates income?

          MS. WYNKOOP:    Objection to the word income.  But you can answer.

          THE WITNESS:    Through congregation offerings.

BY MR. BRUNSON:

Q.    Is that the only way the Mission generates income?

A.    I'm not part of the Mission board, so I don't know.

Q.    What is an offering?

A.    It's a free will offering that gets lifted once a month in each congregation.



MAGNA
LEGAL SERVICES

Page 22

Q.    When you say lifted, can you explain that?

A.    In other words, it's a freewill offering that if you want to put some of your money into it, you may, it's a gift.

Q.    Now, are these offerings from like the various churches of the Eastern Pennsylvania Mennonite Church?

A.    Yes.

Q.    Okay.  And they're about 80 of those churches?

A.    Something like that.

Q.    Something like that.  You don't know the exact number?

A.    (No audible response).

Q.    That's okay.  To your knowledge, does the Mission have any business interests?

MS. WYNKOOP:    Objection to business interests. And to the extent that he's already testified that he's not a part of the Mission.  So it would be speculative, but you can answer if you know.

THE WITNESS:    I'm just not part of the Mission board.BY MR. BRUNSON:

Q.    Okay.  Would you consider the Liberty Ridge Farm to be a business interest of the Mission?

MS. WYNKOOP:    Same objection.

THE WITNESS:    No, it's not a business interest.

BY MR. BRUNSON:

Q.    To your knowledge, did the Mission have board


MAGNA
LEGAL SERVICES

Page 23

meetings?

A.    Yes.

Q.    Did you attend those board meetings?

A.    A few.

Q.    A few.  You know when the last time you attended a board meeting was?

A.    No.

Q.    Have you attended one in the last year?

MS. WYNKOOP:    Objection.  To the extent that out of scope of this lawsuit you can answer with.

THE WITNESS:    I'm not sure.

BY MR. BRUNSON:

Q.    So you testified earlier that you're not a member of the Mission, correct?

A.    Correct.

Q.    So why were you able to attend these Mission meetings?

A.    Because we would give reports on the foreign Missions in South America from Paraguay.

Q.    And when you say we, do you mean the Paraguay Committee?

A.    Correct.

Q.    Did you ever give a report to the Mission based on the Liberty Ridge Farm?

A.    Yes.



MAGNA
LEGAL SERVICES

Page 24

Q.    Okay.  So you would go into the board and discuss the Liberty Ridge -- the report based on the Liberty Ridge Farm?

A.    Yes.

Q.    What would be in those reports that you would share to the board?

A.    Basically, the financial report.

Q.    Okay.  What goes into the financial report?

A.    All money in and out.

A.    So in and out you mean, you know, like I would say, profits from pallets sales, would that be something you would discuss with the board?

MS. WYNKOOP:    Objection to the use of the term profits.  But you can answer.

THE WITNESS:    It is just any income and any expenses.

BY MR. BRUNSON:

Q.    So would a pallet sale qualify as an income?

MS. WYNKOOP:    Objection to income.  You can answer.

THE WITNESS:    It would have been part of the financial.  Yes

BY MR. BRUNSON:

Q.    Okay.  Why did you report that information to the Mission?

A.    It was just done on a yearly basis.  Just something


MAGNA
LEGAL SERVICES

Page 25

that we did.  Nothing that they asked for if I can remember correctly.

Q.    Well, if they didn't ask for it; why did you do it?

A.    Just to share what we're doing as a Mission.

Q.    Why was it relevant for them for you to share that information with them?

A.    Because we're operating under 501(c)(3).

Q.    You say you're operating under 501(c)(3) under the Mission?

A.    Correct.

Q.    Okay.  So the Mission does own the Liberty Ridge farm?

MS. WYNKOOP:    Objection to the term, own.  You can answer.

BY MR. BRUNSON:

Q.    I'll rephrase.  Does the Mission own the property that's on -- that the Liberty Ridge Farm is on?

A.    Yes.

Q.    Okay.  Now, there is a fictitious name that was registered with the Pennsylvania Department of State for the Liberty Ridge Farm, right?

A.    Yes.

Q.    Okay.  You were the owner of that fictitious name, correct?

MS. WYNKOOP:    Objection to owner.  You can answer.



Page 26

THE WITNESS:    No.

BY MR. BRUNSON:

Q.    You're not the owner?

A.    No.

Q.    So this is Secretary Exhibit 24.

MS. WYNKOOP:    I should note my objection at the outset, to the extent that you'll be seeking the legal conclusion given this document, I anticipate.

(Whereupon, Secretary Exhibit 24, Screenshot of PA Department of State for LRF, was marked for identification.)

BY MR. BRUNSON:

Q.    Did you have a chance to look at that, Mr. Nelson?

A.    I can't read it.  It's got small print.

Q.    It's got small print?  Oh, no.

MR. BRUNSON:    Well, in that case, Counsel, if you could just -- if I read what's on the page, can you just tell me if it's correct; is that fair?

MS. WYNKOOP:    That's fine.

BY MR. BRUNSON:

Q.    Okay, so on the right-hand corner in blue and white font with a blue background, it says Liberty Ridge Farm; is that correct?

A.    Yes.

Q.    Okay.

MS. WYNKOOP:    Do you want me to answer for him?



Page 27

MR. BRUNSON: Well, he can't read it. That's what I --

THE WITNESS: I mean, that I can see. I just can't see some of the font underneath.

MS. WYNKOOP: The font underneath it is just very, very small.

MR. BRUNSON: I see okay. So --

MS. WYNKOOP: We can stipulate that the document speaks for itself --

MR. BRUNSON: Okay.

MS. WYNKOOP: -- if that's helpful.

MR. BRUNSON: Yeah. Sort of makes this easier.

BY MR. BRUNSON:

Q. Let me ask you this is your I'm not going to say the actual house name, but is your -- do you live on Varner Lane?

A. No.

Q. Did you ever live on Varner Lane?

A. No.

Q. What is 583 Varner Lane, McAlister, PA 17049?

A. That's the farm.

Q. That's the farm. Okay. Now, it says interested individuals underneath it says, owner Nelson Martin. Did you ever live on Flanagan Road?

A. Yes.

Q. Okay. In Richland, Pennsylvania?



Page 28

A.    Yes.

Q.    Okay.  So why does this document say that you are the owner of the fictitious name Liberty Ridge Farm?

MS. WYNKOOP:    I'm going to re-note my objection because you are very clearly seeking legal conclusion.  You can answer if you know.

A.    I was assigned by the Liberty Ridge Committee, which would have been the Planning Support Committee at that time, to register this name.  And I went to the accountant and told him, what we wanted and they registered this name for us, and for some reason they put me in as the owner with my home address, but I never earned a dollar.

Q.    So it was not your intent to be the actual owner?

A.    No.

Q.    Okay, who was supposed to be the owner of the Liberty Ridge Farm fictitious name, then?

MS. WYNKOOP:    Objection.  To the extent it calls for a speculative answer.  But you can answer it, if you know.

THE WITNESS:    The Committee, there was no owner. It was just a fictitious name for-to run for the MMM.

BY MR. BRUNSON:

Q.    So the MMM was the one who directed you to do this, right?

MS. WYNKOOP:    Objection to the term directed.  You can answer.


MAGNA
LEGAL SERVICES

THE WITNESS:    I'm not sure.

BY MR. BRUNSON:

Q.    By the way, the MMM referring to the Mission.  Just to be clear, right?

A.    Yeah.

Q.    You said the Family Support Committee told you to do this; is that correct?

MS. WYNKOOP:    Objection.  Mischaracterization.

BY MR. BRUNSON:

Q.    And we can read back the testimony if you want.

A.    What I'm saying is that Liberty Ridge was not Liberty Ridge. We had a fictitious name. So up to that point, we were the Family Support Committee.

Q.    The Family Support committee.  Was that -- did the mission create the Family Support Committee?

A.    Yes.

Q.    And then what was your role in the Family Support Committee?

A.    Just a member.

Q.    Did you have an official title with a Family Support Committee?

A.    I'm not sure that I did.

Q.    How did you become -- how many people were in this Family Support Committee?


MAGNA
LEGAL SERVICES

Page 30

A.    Four or five.

Q.    Four or five.  Why were you the one who filed the paperwork with the Pennsylvania Department of State?

MS. WYNKOOP:   Objection.  Asked and answered.

THE WITNESS:   Because I guess at that point, I was appointed the treasurer for the meeting -- for the new name.

BY MR. BRUNSON:

Q.    So there was a new, when you say name, you mean new committee?

A.    Yes.  We went from Family Support Committee to Liberty Ridge Farm Committee.

Q.    So at this point in time, you were now the treasurer?

A.    Yes.

Q.    Okay.  And as your role as the treasurer, it was your responsibility to file for this fictitious name.

A.    I was asked to file for this.  Yes.

Q.    And who asked you to do that?

MS. WYNKOOP:   Objection.  Asked and answered.

THE WITNESS:   By Family Support Committee/Liberty Ridge Committee.

BY MR. BRUNSON:

Q.    Do you remember who specifically asked you to do this?

A.    No.



Page 31

Q.    But this was done at the direction of the Mission?

MS. WYNKOOP:    Objection. Asked and answered. And also, the use the term direction.

THE WITNESS:    I'm not sure. By the committee

BY MR. BRUNSON:

Q.    By the committee. Which committee?

A.    The Family Support Committee.

Q.    How did you come about  sorry, I'll rephrase this. How did the Family Support Committee, or -- let me rephrase this. Did -- the Family Support Committee was that the committee that found the land that Liberty Ridge Farm would operate on?

A.    Yes.

Q.    Okay. And then what was your role in the process of obtaining the land that the Liberty Ridge Farm would operate on?

A.    We obtained this as a committee, with no one person that went and bought the property or anything. It was all a committee work.

Q.    Okay. And then did you -- were you looking at other parcels of land that could have been where the Liberty Ridge Farm would have been at?

A.    Yes, many.

Q.    Many. Do you know how many you checked out?

A.    Ten.

Q.    Ten. And then why did you pick this particular



Page 32

piece of land to be the Liberty Ridge Farm?

A.    We felt it best represented our beliefs on a family farm, just like we promote in our circles.

Q.    And then when you found that farm -- the farm that you liked, then what did you do?

A.    We seek advice from the Mission.

Q.    And what did -- who from the Mission did you seek advice from?

A.    The whole Mission Board.

Q.    Okay.  And what did the Mission Board tell you?

A.    That we can move forward with if we can get a farm.

Q.    When you say, move forward.  Did they give you the money to purchase the land?

A.    The Mission Board purchased the land, yes.

Q.    But -- they purchased it themselves, or did they give you the money or someone else the money to buy the land?

A.    They purchased it themselves by gifts and interest free loans from individuals within the church.

Q.    So they received loans, gifts, and would it also be fair to say offerings to purchase the land?

A.    Right.

Q.    Okay.

A.    In fact, it was all paid with offerings.

Q.    I'm sorry.  Can you repeat that?

A.    It was all paid with offerings from the churches.


MAGNA
LEGAL SERVICES

Page 33

Q. Okay. Now, was there an expectation that this new committee would then reimburse the Mission for this property?

A. No.

Q. Does the Mission -- I'm sorry. Does the Liberty Ridge Farm Committee pay the mission back for this property?

A. The only thing that Liberty Ridge did was offerings were taken for Liberty Ridge Farm in our congregations. That was forwarded to the treasurer and the treasurer forwarded that money back to MMM -- the Mission to pay for the property.

Q. I'm going to show you what's marked as Secretary Exhibit 28. That was a good one.

(Whereupon, Secretary Exhibit 28, Liberty Ridge Revenue Account Form 2020, was marked for identification.)

MS. WYNKOOP: That was a good one.

BY MR. BRUNSON:

Q. Please take a look at that document.

MS. WYNKOOP: Do you have another copy here Jocelyn?

MR. BRUNSON: That was a bad one.

BY MR. BRUNSON:

Q. Did you have a chance to look at that document?

A. Yes.

Q. Have you seen that document before?

A. Yes.

Q. Did you prepare that document?



Page 34

A.    Yes.

Q.    Okay.  I'm going to turn your attention -- what is this document?

A.    It's a financial statement -- income statement for Liberty Ridge Farm.

Q.    Okay.  And is it from the years 20 -- January 1st, 2020 to December 31st, 2020?

A.    Yes.

Q.    Okay.  Just going to turn your attention to the second page.  And I'm going to direct your attention to indirect expenses.  Do you see that?

A.    Yes.

Q.    It said, and please tell me if I'm reading this correctly.  MMM loan repayment for $54,671.85; did I read that correctly?

A.    Yes.

Q.    And MMM is the mission?

A.    Yes.

Q.    Okay.  So it does seem like Liberty Ridge Farm would pay.  Well, let me ask you this.  What's that loan for?

A.    For the property at Liberty Ridge.

Q.    Okay.  So it does seem like that the Liberty Ridge Farm would directly pay the Mission for this property, then.  That's fair to say?

MS. WYNKOOP:    Objection.  To the extent, the



Page 35

document speaks for itself. But you can answer.

THE WITNESS: No.

BY MR. BRUNSON:

Q. Explain?

A. Let's go back to the first page.

Q. Okay. Show me where, please?

A. EPMC offers.

Q. Okay.

A. The 19,948.

Q. Okay.

A. That's the offers that came in to Liberty Ridge account. And then this is what went up. And the indirect expense is what got paid out. So it would take -- yeah, it would be paid out what came in or whatever came in through church offerings, we turned around and paid back that to the mission for the property.

Q. I don't -- I'm going to sound snarky, are you not -- that was not my intention. But you would agree with me that $19,948.31 is not the same as $54,671.85, right?

A. Correct.

Q. The loan repayment was higher than these offerings that you're speaking of. This $19,948.31, right?

A. Yes.

Q. Okay. So that balance, where did that money come from? So that balance then was paid to the Mission with Liberty



MAGNA
LEGAL SERVICES

Ridge Fund money then, right?

A. No. You need to go back to all the other offerings that might have been in the prior year in '19, could be reflecting some of these 54. It's not that we -- it's not that we paid out each month or came in. We paid out. But it should hold out that what came in come back in to the Mission.

Q. So you're -- just, so I'm clear, your testimony today is that the only money you ever gave to the mission as your -- in your position as treasurer was offerings that came to Liberty Ridge Farm; is that what you're saying?

A. Yes. That was what we did.

Q. Okay.

A. I'd have to go back and look at all the records in 2004 for the time frame.

Q. And did Liberty Ridge Farm solicit offerings?

A. No.

Q. How did you get these offerings? How did you being Liberty Ridge Farm to get these offerings?

A. Our churches lifted offerings on a yearly basis to support this work.

Q. And to your knowledge was when you say when you were lifting them, was it specifically spoken to them, like these offerings are going to go to the Liberty Ridge Farm Committee?

A. Yes.

Q. Okay. And this would be stated in the various, like


MAGNA
LEGAL SERVICES

Page 37

during the Sunday mass or something like that?

A. Correct.

Q. Okay. We're going to come back to this later. But I do have, just while we're talking about it, what is MMM taxes? If I could direct your attention to the second page?

A. That was -- where do you see that.

Q. So go to the second page under other taxes since.

A. That's a real estate tax.

Q. Okay. And what money -- did you use offerings to pay those taxes, or did you use income that was generated from the Liberty Ridge Farm to pay those taxes?

MS. WYNKOOP: Objection to income. You can answer.

THE WITNESS: Some or both.

BY MR. BRUNSON:

Q. Some or both? Okay.

A. We didn't always, sometimes the Mission paid them. Sometimes Liberty Ridge paid.

Q. Okay. Did you have separate accounts for offerings?

MS. WYNKOOP: Objection. To you.

BY MR. BRUNSON:

Q. Sorry. Did the Liberty Ridge Farm Committee have separate accounts that was only for offerings?

A. Explain yourself, or you mean like a separate checkbook?



Page 38

Q.    Yeah, like a separate checking account, for example.

A.    No.

Q.    Okay.  So all the money that Liberty Ridge Farm got went into one bank account?

A.    Correct.

MR. BRUNSON:    Okay.  If someone needs a break, I know we've been going for about an hour now.

MS. WYNKOOP:    I just figured if we could power through to 10:30 when I have to stop anyway.

MR. BRUNSON:    Sure, that's fine.

BY MR. BRUNSON:

Q.    So what is the purpose of Liberty Ridge?

A.    The purpose is to our churches, our faith.  We just like anyone else, sometimes you have children that become rebellious and the parents can no longer work with them, and instead of handing them over to the state, he has a place to lead

Faith based people who believe that it is better to work with the children ourselves, or help them to teach them Christian character, honesty, integrity, how to be a benefit to others and not a selfish individual.  And also, the purpose of this was is to help these young men become citizens of the United States, good citizens that will be able to hold a job, they will support a family rather than sit behind bars.

Q.    So one of the reasons why then Liberty Ridge is



MAGNA
LEGAL SERVICES

Page 39

important, that they would be able to get a job in the future after they left Liberty Ridge Farm, correct?

A.    It would be part of it, yes.

Q.    So would then be important to that for Liberty Ridge Farm to teach these young men the importance of work and labor?

A.    No, importance of Liberty Ridge was teaching boys vocational skills.  In other words, for sometimes we would take a tractor, rebuild the engine, and we would have training sessions in that whole thing.  It would have been much cheaper and economical to take it to a shop somewhere and pay them to get it done.  But we were training these boys on vocational skills, on mechanics, woodworking and right along with that, helping them in their Christian building character.

Q.    Is pallet building, would you consider that a skill?

A.    Absolutely.

Q.    Have you built a pallet before?

A.    Explain.

Q.    I'm just asking, do you ever personally in your life built a pallet -- made a pallet?

A.    Before Liberty Ridge?  No.

Q.    Okay.  So while at Liberty Ridge, you have built a pallet?

A.    Yeah, I have.

Q.    Okay.  Can you explain the process of what goes into building a pallet?


MAGNA
LEGAL SERVICES

Page 40

A.   Yeah.  And again, we are teaching vocational skills. We are teaching how to pull together as a team, which is very important to get out in society.

Q.   Sure.

A.   And they have to assemble it, they have to make the board the right way.  They have to have the space, the right amount.  And then the volunteers are the ones that do the nailing and all that.  Again, just this -- we don't let any pallets go out the door with nails exposed.

Again, something that you won't find in any other pallet shop, only because we're trying to teach these boys' accuracy, and we're trying to teach these boys laboring together or teamwork, if I must say it.

And yeah, if we want it to be profitable, we wouldn't have those kind of individuals there, because sometimes the whole work -- the whole project stops because we need to work or teach a skill or a safety procedure.  It's not about profitability.  It's about helping these young men that they can go out in society and make a living.

Q.   I understand what you're saying.  So in regards to the actual process, the minor -- the residents, excuse me, would be the ones who laid the boards out for the pallets?

A.   Yes, they would do some of that.

Q.   Okay.  Did they ever hammer any of the nails into the pallets?


MAGNA
LEGAL SERVICES

Page 41

A.    Yes.

Q.    Okay.

A.    Not with the air nailer, but a manual".

Q.    With the traditional metal hammer?

A.    Yeah.

Q.    Okay.  And how big were these pallets?

A.    40 by 40.

Q.    Okay.  And how -- each piece of wood, is it, like two by four?  Like, what are the pieces of wood like?  How long are they?

A.    No, they're very thin.

Q.    Very thin?  Okay.

A.    Very thin.

Q.    Do you know how they're made?

A.    They are made to throw away.

Q.    Okay.  Do you know -- the finished product, do you know how heavy these pallets are?

A.    No, it carries on the moisture and lift.

Q.    Understood.  How long would it take you to build a pallet?

A.    I have no idea.

Q.    No idea.  An hour?

A.    No, no, not that long.

Q.    Okay.  If you're working by yourself, would it take like 30 minutes to build a pallet?



Page 42

A.    Again, I don't know, I just -- that's not what we're worried about as a -- as in teaching because we're teaching them structure and --

Q.    I understand what you're saying.  Would you consider building a pallet work?

MS. WYNKOOP:    Objection to work.  You can answer if you know

THE WITNESS:    I don't consider doing anything different than what I would have done on the farm with my boys.  And that's why today we can feed 40,000 people breakfast every morning.

BY MR. BRUNSON:

Q.    So farm work is obviously very, I would say, difficult work.  Would you agree with that?

A.    No.

Q.    It's not?  Is -- there's physical labor involved with farm work?

MS. WYNKOOP:    Objection to physical labor, you can answer.

THE WITNESS:    It's some days, but sometimes it's rewarding.

BY MR. BRUNSON:

Q.    I have no doubt that it's rewarding.  But my question, though, is you said there are some parts of your farm work that are physical labor.  Is that fair to say?


MAGNA
LEGAL SERVICES

Page 43

MS. WYNKOOP: Objection. You can answer.

THE WITNESS: That's with anything. This is work today.

BY MR. BRUNSON:

Q. This is work. I wouldn't call this physical work. These documents were pretty heavy. So maybe that is physical work. Yeah. But my question, though, is -- let me ask you this, what parts of your farm job would you consider to be physical work?

A. To pack eggs. You have to use your hands. So anything to use your hands you can classify as that. That's why god gave them to us.

Q. Of course. So then you have to use your hands to build those pallets though, right?

A. Yes.

Q. Okay. So then that would be physical work, then building those pallets then.

MS. WYNKOOP: Objection. You can answer.

THE WITNESS: Depends on what you're looking at.

BY MR. BRUNSON:

Q. I'm looking at building of this as a pallet. Is that physical work? Are you going to say is a physical work, or no?

MS. WYNKOOP: Objection. Asked and answered.

THE WITNESS: It depends on how you look at it.



Page 44

BY MR. BRUNSON:

Q.   How do you look at it?

A.   How I look at it?

Q.   Yeah.

A.   It's training.  It's helping our young men so that they can go and be an asset to society.  That's what it is.

Q.   When you do it by yourself, how do you look at it?

MS. WYNKOOP:   Objection.  You can answer.

THE WITNESS:   Enjoyment.

BY MR. BRUNSON:

Q.   You don't consider it work when you do it by yourself?

MS. WYNKOOP:   Objection.  Asked and answered.

THE WITNESS:   I love to use my hands.

BY MR. BRUNSON:

Q.   Would you agree with me if I said that some people would consider that to be physical work?

MS. WYNKOOP:   Objection to the form.  What are you asking?  You want him to speculate about what other people think?

MR. BRUNSON:   I'll let it pass.  What time is it? Is 1:00.  Okay.  It should not be long.

BY MR. BRUNSON:

Q.   How long has Liberty Ridge been around?

A.   Since beginning of 2011.


MAGNA
LEGAL SERVICES

Q.    Okay.

A.    Give or take.

Q.    And it was the Family Support Committee that was responsible for creating Liberty Ridge Farm; is that correct?

A.    Yes.

Q.    And you said that there was 4 or 5 people on that committee?

A.    Yes.

Q.    And you were one of those people?

A.    Yes.

Q.    And do you remember the other people who were on that committee?

A.    Yes.

Q.    What are their names?

A.    Lamar Garland (phonetic), Scott Martin, and Jacob Brubaker and Ethan Weaver and myself.

Q.    And what did you do -- what did you personally do to set up the Liberty Ridge Farm?

MS. WYNKOOP:    Objection to set up.  But you can answer.

THE WITNESS:    We did nothing on a personal, individual basis. It was all by committee decision or group, we went to visit other facilities that do the same thing. It's not that I went by myself.  This was a committee.

BY MR. BRUNSON:



Page 46

Q.   Where were these other facilities at?

A.   In some of the Midwestern states.

Q.   How did you get there?  Did you fly there?

A.   I believe I did.

Q.   You did fly?  Okay.  Who paid for that air travel?

A.   Myself.

Q.   Were you reimbursed for those expenses?

A.   Not that I remember.

Q.   Do you know if anyone was reimbursed for their expenses?

A.   I don't think so.

Q.   Okay.  Did you ask to be reimbursed for any of your expenses?

A.   Absolutely not.

Q.   Okay.  Is Liberty Ridge Farm is still open today?

MS. WYNKOOP:   Objection, and I'm instructing the witness not to answer.

MR. BRUNSON:   Are you going to serve specific privilege for him?

MS. WYNKOOP:   It's outside of the scope of this lawsuit, and for two, it's subject to a current investigation. So he's not going to answer questions pertaining to the Department of Labor's current investigation and/or other government organizations just going into today.

I think you knew that was going to be an objection.



I think that's the only objection I'm instructing not to answer is actually going to happen today, if anything, about the lawsuit presently or anything that's dealing with the farm presently.

There were some things that we instructed not to answer the past two days that he's going to be allowed to answer because he's an individual defendant. This is the only one that we're sticking with.

MR. BRUNSON: This is the only objection that you're sticking with?

MS. WYNKOOP: As far as, if today goes like the last two days, I'm just not going to allow him to answer questions while there is an investigation currently happening at the farm.

MR. BRUNSON: So, just so I'm clear, is that like a Fifth Amendment privilege that you're asserting for him?

MS. WYNKOOP: I'm not asserting a Fifth Amendment privilege. I'm asserting the fact that you're not entitled to information outside of the scope of the lawsuit. While it may impact an investigation, especially considering that your investigator is sitting next to you.

MR. BRUNSON: Well, so we already filed a complaint onto this case, though, obviously.

MS. WYNKOOP: Right. But there is a investigation still happening as it relates to Liberty Ridge Farm, which is



Page 48

outside of the context of this particular lawsuit.

MR. BRUNSON: Okay.

MS. WYNKOOP: So the scope of this deposition is not going to include that.

MR. BRUNSON: Okay. I may come back to that. We may have to talk to the judge about this, but you're not asserting the privilege of that.

MS. WYNKOOP: That's fine.

MR. BRUNSON: Okay. Just -- I just wanted to -- and we'll --

MS. WYNKOOP: We don't have to assert a privilege, but it's outside the scope.

MR. BRUNSON: Okay. We'll cross that bridge later.

BY MR. BRUNSON:

Q. I'll show you Secretary Exhibit 8. Can you take a look at that document, please? You have a chance to look at that document?

(Whereupon, Secretary Exhibit 8, Handbook of Standard Operating Policy, was marked for identification.)

A. Yes.

Q. What is that document?

A. It's a handbook.

Q. It's a handbook. Have you seen that document before?



A.    Yes.

Q.    Now, you had a -- is that the most recent version of the document of the handbook?

A.    I'm not even sure because this is not what I'm responsible for.

Q.    Okay.  Do you know who is responsible for creating the handbook?

A.    Not totally, I think the chairman Kenton Kreider may have been involved in more of this.

Q.    Do you know anyone else who would have been involved with this handbook?

A.    The committee is kind of looks over it and gives final approval, but I don't know who all wrote this out.

Q.    Okay.  Do you recall this version of the document?

A.    Yes, I think so, but I think it's outside of this scope again, because the 3,800 is being represented here.

Q.    Why do you say that?  Why is that significant?

A.    Because that is something we're working on to get a license.

Q.    So because -- you might correct me to say because this mentions the 3800, this is the most recent version of the document.

A.    Not sure.

Q.    You are not sure?  Okay.  But at one point in time, this was a version of the document that was sent out that was



Page 50

given to residents and their parents; is that fair to say?

MS. WYNKOOP: Objection to form. You can answer.

THE WITNESS: Again, it's outside of my -- I never do any of these things.

BY MR. BRUNSON:

Q. Okay. But you did review them?

A. I've reviewed them.

Q. Okay.

A. But multiple handbooks.

Q. Multiple handbooks. Okay. Do you know how many handbooks they were?

A. Four or 5, it changes.

Q. Okay. But nothing stands out about this handbook as being not, at one point in time, a handbook that would have been sent out, though, right?

MS. WYNKOOP: Objection to form. You can answer.

THE WITNESS: Again, it looks very familiar. Yes, but I can't -- I can't say, yes, this was handed out. That's not my responsibility.

BY MR. BRUNSON:

Q. I understand. It was 10:29, so quickly.

MS. WYNKOOP: Yeah, I'll go check that out.

MR. BRUNSON: And use the restroom.

BY MR. BRUNSON:

Q. All right. Mr. Nelson, I'm going to have you take a


MAGNA
LEGAL SERVICES

Page 51

look at the Secretary Exhibit 10. Just tell me when you're ready.

(Whereupon, Secretary's Exhibit 10, 5/17/22 LRF Committee Meeting Minutes, was marked for identification.)

A. Yeah.

Q. What is this document?

A. It's from the Liberty Ridge Farm Committee.

Q. Okay. And the date, May 17th, 2022?

A. That's what it says.

Q. Okay. And it says that this was a conference call and that you participated in this conference call; is that correct?

A. I believe it is.

Q. Okay. Do you recall this meeting?

A. Yes, I can. There's things on there that I can remember, yes

Q. Okay. I'm going to turn your attention to Paragraph 6, Section 6 agenda and then Paragraph E. It says the handbook is being updated to comply with the licensure requirements. Did I read that correctly?

A. Yes.

Q. Okay. So is it fair to say then that the handbook was then updated after May 17th, 2022?

MS. WYNKOOP: Objection to the extent document speaks for itself, but you can answer if you know.



Page 52

THE WITNESS: Question again?

BY MR. BRUNSON:

Q. Sure. Does this mean that the handbook, the operating policy that you were looking at the Secretary Exhibit, I believe it's eight on my notes?

A. Uh-huh (affirmative).

Q. Yeah. That it was updated after May 17th, 2022.

MS. WYNKOOP: Same objection.

THE WITNESS: I'm not sure if it's referring to this or not.

BY MR. BRUNSON:

Q. Okay. Does this refresh your memory in any way when -- well, let me ask -- strike that? Let me ask you this. Do you recall looking at an updated version of the Operating the Handbook Operating Policy manual after May 17th, 2022?

MS. WYNKOOP: I'm sorry. I didn't hear your question.

MR. BRUNSON: Sure. My question was, do you recall looking at an updated version of the handbook after May 17th, 2022?

MS. WYNKOOP: Okay.

THE WITNESS: I remember looking at updated handbooks, but I can't say it was after May 17th, 2022.

BY MR. BRUNSON:

Q. When these documents were gathered, were you the one



who got these documents to send to your attorneys?  The documents that were requested in this case?

A.   No.

Q.   No, okay.

A.   Well, when you say documents, are you just talking about this document?

Q.   So remember earlier when I had you look at the request for production documents, did you -- were you one of the people who provided those documents to your counsel?

MS. WYNKOOP:   I'm just going to object to the extent that you're seeking information protected by the attorney client privilege.  But outside of the scope of what we would have talked about.  You can answer that.

THE WITNESS:   Yes, I'll give you the treasurer report.BY MR. BRUNSON:

Q.   Okay.  Is that the only document that you provided to your counsel?

MS. WYNKOOP:   Same objection.

THE WITNESS:   Yes.

BY MR. BRUNSON:

Q.   Okay. You did not provide this operating -- the Secretary Exhibit 8 to your counsel.

MS. WYNKOOP:   Same objection and asked and answered.

THE WITNESS:   No, I did not.


MAGNA
LEGAL SERVICES

Page 54

BY MR. BRUNSON:

Q.    Okay.  Is it fair to say that Liberty Ridge takes --
and we kind of talked about this before, but is it fair to say
that Liberty Ridge takes troubled minors to be residents for the
program?

MS. WYNKOOP:    Objection to takes, but you can
answer.

THE WITNESS:    Yes, their parents come to us and
ask if we could help them, and we help.

BY MR. BRUNSON:

Q.    Okay.  How does the Liberty Ridge Farm Committee
identify troubled?

MS. WYNKOOP:    Objection to the extent you're
seeking an institutional response, but you can answer.

THE WITNESS:    That can be a broad answer. But it's
when parents are up against with the parents in our church
circles that are up against with their son and
how to handle them.  They don't listen, they don't cooperate.
That's' what we talk about, we talk about trouble.  Trouble in
the home.

BY MR. BRUNSON:

Q.    Incorrigible, is that fair to say?

MS. WYNKOOP:    Objection to form.  You can answer.

THE WITNESS:    Explain yourself.

BY MR. BRUNSON:



Q.    Specifically, like you know, best way to describe this.  Basically just someone, yeah, just does not listen to their parents.  Someone who, you know, maybe doesn't respect the authority; is that fair?

A.    Yes.

Q.    Okay.  When residents arrive -- and let me ask you this, do you share that definition as well of troubled?

A.    Explain.

Q.    So I asked you for Liberty Ridge -- what the Liberty Ridge Farm Committee's definition of trouble was.  Do you share that definition as well?

A.    Yes.

Q.    Okay.  Now, did you have any -- you personally, did you interview any prospective residents to go to Liberty Ridge Farm?

A.    Very few.  It may have been one or two.

Q.    Do you know when you interviewed those people?

MS. WYNKOOP:    And I'll just object to the term interview.  But you can answer.

THE WITNESS:    I don't have a definite timeframe, no.

BY MR. BRUNSON:

Q.    Within the past two years, you know?

MS. WYNKOOP:    Objection to the scope of the sending -- seeking information outside of the scope of this



MAGNA
LEGAL SERVICES

Page 56

lawsuit.  But you can answer to the extent that it is within the scope of this lawsuit.

BY MR. BRUNSON:

Q.    I'll rephrase my question then.  From 2019 to 2022, did you interview any prospective residents?

A.    I have to go back and look, I'm not sure.

Q.    You're not sure.  But you have previously interviewed prospective residents?

MS. WYNKOOP:    Same objection to interview.

THE WITNESS:    I know I was allowed to work with some parents, yes.

BY MR. BRUNSON:

Q.    Okay.  When a resident arrives at the Liberty Ridge Farm, do they undergo any formal diagnosis or evaluation by a trained medical professional?

A.    Not unless there is a parent request over the committee say that they need it we do get professional help.

Q.    Is there someone on staff at the Liberty Ridge Farm who could -- who's qualified to give that help?

MS. WYNKOOP:    Objection to staff.

THE WITNESS:    We use outside help for that.

BY MR. BRUNSON:

Q.    Okay.  I'm just going to nip this now.  Can I direct your attention back to the handbook, Secretary Exhibit 8?  And can I direct your attention to MMM 2023 3?  And I direct your



MAGNA
LEGAL SERVICES

Page 57

attention to Section F. Are you looking at it?

A. Yes.

Q. What does that say?

A. Section F?

Q. Yeah.

A. It says staff.

Q. Okay. Did the Liberty Ridge Farm have staff?

MS. WYNKOOP: Objection. Document speaks for itself and to the use of the term staff to make that seek for legal conclusion. You can answer.

THE WITNESS: It is more referred to as administrative.

BY MR. BRUNSON:

Q. Administrative what?

A. House administrator.

Q. Those are the staff?

MS. WYNKOOP: Same objection.

BY MR. BRUNSON:

Q. Let me ask you this. Who -- I mean, who encompasses the staff that is referenced in Section F?

MS. WYNKOOP: Objection to the extent that he did not prepare this document as he testified. But can you answer.

THE WITNESS: It's referring to those that have been working with the boys.

BY MR. BRUNSON:


MAGNA
LEGAL SERVICES

Q.   And who are those people that are working with the boys?

A.   The administrators.

Q.   And who are the administrators?

A.   Do you mean as far as names or --

Q.   Let me ask you this, is a houseparent, is that an administrator?

A.   Yes.

Q.   Is a mentor an administrator?

A.   No.

Q.   Is a work coordinator an administrator?

A.   Yes.

Q.   Is a department head an administrator?

A.   Yes.

Q.   Is a guide -- guidance coordinator, is that as an administrator?

A.   Yes.

Q.   Do you have any, when I say you, I mean the Liberty Ridge Farm Committee, do they have any fellows on staff?

A.   Yes.

Q.   Okay.  Who are the fellows?

A.   The administrators.

Q.   Okay.  So if you're an administrator, you're a fellow?

A.   Yes.


MAGNA
LEGAL SERVICES

Page 59

Q.   Why is a -- and you said a mentor is not an administrator, right?

A.   Right.

Q.   Why is a mentor not an administrator?

A.   Because he is there as a volunteer, walking beside the residents I thought a big brother as an example to again help to teach them Christian ethics and standards.  He's a big brother.

Q.   I see.  So if you're an administrator, you're not a volunteer; is that correct?

MS. WYNKOOP:   Objection, to the extent this is asked and answered.  But you can answer it

THE WITNESS:   They could also the volunteer service as well.

BY MR. BRUNSON:

Q.   What comes with being a fellow?

A.   It comes with making -- if they want to come and volunteer and help, they may, they want to leave, they may.

Q.   Are fellows paid?

A.   They are given a token of appreciation.  Yes.

Q.   And do they get that token of appreciation every month?

A.   Yes.

Q.   Okay.  And how much is that token of appreciation?

MS. WYNKOOP:   Objection to the time period.  But



Page 60

you can answer.

THE WITNESS:    Back in this time frame, I think it was 2,300.

BY MR. BRUNSON:

Q.    $2,300 a month?

A.    Yes.

Q.    And who came up with that that figure?

A.    Liberty Ridge Committee.

Q.    And did the Mission have to approve that figure?

A.    No.

Q.    I think we've talked about the committee a little bit.  Sorry, about combining things.  But how many board members are on the Liberty Ridge Committee?

A.    In this time frame I'm not sure, but looking over the minutes, but it's here in the minutes if you want to see their names.

Q.    Which document are you referring to?

A.    Exhibit 10.

Q.    Okay.

A.    And not all of these that are named are Liberty Ridge committee.

Q.    So, if I may, Mr. Kreider.  Kenton Kreider, he's the chairman?

A.    Correct.

Q.    Jacob Brubaker, is he the assistant chairman?



A.      Correct.

Q.      You're the treasurer?

A.      Correct.

Q.      What's Wayne Martin's position?

A.      Just a board member.

Q.      Board member?  What about Gerald Nolt.

A.      Assistant? Not, he's not. He's just a board member

Q.      Board member.  Brian Stauffer?

A.      Assistant treasurer.

Q.      Mark Sensening.

A.      Board member.

Q.      What about Mark Torkelson?

A.      He's just an advisor.

Q.      He's an advisor?

A.      Yeah.

Q.      Lauren Weaver?

A.      Board member.

Q.      Okay.  And Seth Heisey?

A.      Secretary.

Q.      Secretary.  And Mark Torkelson is an official advisor?

A.      He's a what?

Q.      Is he an official advisor?

A.      When you say official, what do you mean by that?



Page 62

Q.    So you're the treasurer, right?

A.    Correct.

Q.    That's an official position?

A.    Correct.

Q.    Is the same true with Mr. Tolkelson?  Is he an official advisor?

MS. WYNKOOP:    I'm going to object to the extent you're seeking of legal (indiscernible).

THE WITNESS:    He was appointed by the MMM just to sit there.

BY MR. BRUNSON:

Q.    Oh, he was appointed by the Mission to sit there? Okay.  Does the Mission have to approve of someone to join the committee?

MS. WYNKOOP:    I'm going to object to the extent that you're seeking information about what the Mission has to do when he's not a part of it, but you can answer if you know.

THE WITNESS:    Again, I don't know what their procedure is for that.

BY MR. BRUNSON:

Q.    Well, let me ask you this.  Did the Liberty Ridge Farm Committee ever submit a name to be approved by the Mission to be on the committee?

A.    Yes.

Q.    Okay.  And that was -- I think, you do that for a


MAGNA
LEGAL SERVICES

Page 63

Mark Burkholder.

MS. WYNKOOP: Objection to you.

BY MR. BRUNSON:

Q. Sorry. Did the Liberty Ridge Farm Committee submit a Mark Burkholder to be a committee member for -- to the Mission?

THE WITNESS: Mark Burkholder is not a committee member.

Q. Was at one he was?

A. No.

Q. May I show you Secretary Exhibit 13? Actually, just to save time and direct your attention to the second page, 665 Paragraph F.

(Whereupon, Secretary Exhibit 13, 2/18/20 LRF Committee Meeting Minutes, was marked for identification.)

A. Okay. What this means is we, as a Liberty Ridge committee, would have presented his name for an additional committee member, but he was never asked.

Q. So you submitted his name to the Mission, but then he was never formally asked to be a committee member?

A. Correct.

Q. Okay. Do you know why?

A. Because his bishop felt he had enough on his plate at the time.

Q. I see.



Page 64

A.    He couldn't give enough time to volunteer (indiscernible) for this?

Q.    I see.  And that was you say the bishops.  Do you still mean like the Mission board?

A.    No, the Mission board is the bishop of this congregation.

Q.    So the bishop of his congregation?

A.    They may give some insight, advice to them, to the Mission.

Q.    To the Mission.  Okay, so just I'm clear.  The -- his bishop of his specific congregation told the Mission board that he was -- just had too much on his plate, and therefore he could not serve in this capacity?

A.    He'd be better -- I shouldn't say he could not, but it'd be better if he wouldn't be asked to serve in this capacity.

Q.    Okay.  And then the Mission then agreed to the suggestion by the bishop?

A.    Yes.

Q.    Okay.

A.    I guess I wasn't there.

Q.    You weren't there.  But to your knowledge, that's what it is?

A.    Yes.

Q.    Okay.  Is there a subcommittee for the Liberty Ridge



Page 65

Committee?

                MS. WYNKOOP:    Objection to form, but you can answer.

                THE WITNESS:    Not a subcommittee.

BY MR. BRUNSON:

        Q.    No Subcommittee?  Is there something?

        A.    There's another committee that works -- another committee that, when the boys leave Liberty Ridge, they help to place them in home to and work with parents.

        Q.    What is that committee called?

        A.    Child Support committee.

        Q.    Child Support Committee.  Does the Liberty Ridge Farm committee, work closely with the Child Support committee?

        A.    I would not say closely, but we do have maybe two meetings a year. Just so we're all on the same page.

        Q.    Are they -- those are joint meetings?

        A.    Yes.

        Q.    Okay.  Does the Child Care committee have any influence on what goes on at the Liberty Ridge Farm?

        A.    No.

        Q.    Okay.  Do you get paid for being a member -- a board member of the Liberty Ridge Farm Committee?

        A.    No, I'm a total volunteer.  You couldn't give me a million dollars to be paid.  I just love working with the boys.

        Q.    Got you.  And I think we've already kind of talked


MAGNA
LEGAL SERVICES

Page 66

about this, but you would attend Liberty Ridge Farm Committee meetings, correct?

A. Yes.

Q. Okay. And there were obviously looked at them minutes generated from these meetings, correct?

A. Yes.

Q. Yes. And if there was -- and if the meeting minutes said that you were present, then that would be fair to say that you were present at these meetings, right?

A. Yes. If my name's at the top. Yes.

Q. Okay. And frequently they were -- these meeting minutes were referred to just Nelson. Are you the Nelson in these meeting minutes?

A. Yes.

Q. Okay. And did you prepare any specifics of these meeting minutes? And I'll be more specific. Did you prepare, like, the farm report of these meeting minutes?

A. No, I prepared no minutes.

Q. You didn't prepare them at all?

A. No.

Q. Okay. Who were these -- well. Strike that. If something was inaccurate about these meeting minutes, how would they go about being fixed?

MS. WYNKOOP: Objection. To the extent you're seeking him to speculate. But you can answer.



Page 67

THE WITNESS:    We usually give committee approval at the next meeting.

BY MR. BRUNSON:

Q.    Okay.  And if something was inaccurate about those meeting minutes, how would that go about being fixed?

MS. WYNKOOP:    Same objection.

THE WITNESS:    We could correct them on our papers.

BY MR. BRUNSON:

Q.    Okay.  And if you know, would there be a new draft created, or would they just edit the original?

A.    Edit the original.

Q.    Edit the original.  Were these meeting minutes shared with the Mission?

A.    Not that I'm aware of.

Q.    Were these meeting minutes shared with anyone in the community?

A.    Not that I'm aware of.

Q.    Okay.  Do you know who they were shared with?

A.    The Liberty Farm committee.

Q.    Okay.  Just because it's in front of you.  I'm going to ask you to look at Secretary Exhibit 10 again.  Are you looking at it?

A.    Mhm.

Q.    At the very top it says the minutes of the last meeting and financial report were read and approved.  Is that



MAGNA
LEGAL SERVICES

Page 68

correct.  The first paragraph. Do you see what I am talking about?

        A.    Yes.

        Q.    Okay.  What is the financial report?

        A.    That's a report that I as a secretary, prepare to share with the whole committee.

        Q.    And what goes into the financial report?

        A.    Every deposit, every check that I make out, for that time frame.

        Q.    And checks goes out.  Would that include payments to fellows?

        A.    Yes.

        Q.    Okay.  And then that would also include income from sales from the pallets.

        MS. WYNKOOP:    Objection to income.

        THE WITNESS:    It includes all income from anything.

BY MR. BRUNSON:

        Q.    Anything.  Okay.  And did you create these financial reports every month?

        A.    Yes.

        Q.    Okay.  Do you still have those financial reports?

        A.    Yes.

        Q.    Sorry.  Were you the only one who prepared this financial reports?


MAGNA
LEGAL SERVICES

Page 69

A.     Yes, because they're on my computer.  But we get audited once a year and auditors get a report back to the Liberty Ridge Farm.

Q.     Who audits you?

A.     They choose different people from the congregation.

Q.     The congregation.  They -- is that the Mission?

A.     No, the Liberty Ridge Farm committee (indiscernible).

Q.     So the Liberty Ridge Farm -- just, so I'm clear, sorry.  The Liberty Ridge Farm committee will select some random person from the congregation to audit your reports?

A.     Correct.

Q.     Okay.  Do you know who from the committee chooses that person to audit your reports?

A.     Anybody can give a name (indiscernible) we have to approve (indiscernible).

Q.     Okay.  Why do you do that?  When I say, why does the Liberty Ridge Farm committee do that?

MS. WYNKOOP:   Objection, to the extent it's an institutional responsibility, but you can answer.

THE WITNESS:   To make sure that I'm being honest with all my financial reports I make, they take my financial reports and check them with bank statements to make sure everything is in and out according to what I have on paper.

BY MR. BRUNSON:



MAGNA
LEGAL SERVICES

Page 70

Q.   Okay.   The other day we heard that the Mission, basically, controls three aspects of the Liberty Ridge Farm. The policy, the personnel, and the major expenditures.   Would you agree with that?

MS. WYNKOOP:   I'm going to object to the form of that question and the mischaracterization of prior testimony, but you can answer.

THE WITNESS:   I don't know about the policy.

BY MR. BRUNSON:

Q.   Okay.

A.   What was the three again.

Q.   Policy, personnel and major expenditures.

MS. WYNKOOP:   And also, once again, note my objection to seeking information about the Mission that he was testified numerous times he's not a part of.

THE WITNESS:   Yes.   I don't know about policy.   I know about expenditures.

BY MR. BRUNSON:

Q.   Okay.

A.   Because I was responsible for that as a treasurer. So anything over a certain given amount go for approval.   Just again, to make sure that nobody is running off and spending money without accountability.

Q.   Understood.   So the Mission would be the one to approve those expenditures, correct?



Page 71

THE WITNESS:   Same objection.

THE WITNESS:   Liberty Ridge Farm Committee first, and then just kind of gives that report back to them.

BY MR. BRUNSON:

Q.   Okay.  To them? Is them the mission.

A.   The Mission. S

Q.   Okay.  And personnel, do you agree that the Mission has -- controls the personnel of Liberty Ridge Farm.

MS. WYNKOOP:   Still noting my objection about what the Mission does.

THE WITNESS:   They advise us.

BY MR. BRUNSON:

Q.   (Indiscernible).  We go into -- I'm going to come back to that in just a second.  All right.  You're obviously the treasurer of the Liberty Ridge Farm Committee, correct?

A.   Correct.

Q.   Do you have any other roles with the Liberty Ridge Farm?

A.   Yes.  The Liberty Ridge Farm committee assigned me to work beside the coordinator, administrator that oversees farm activities.

Q.   So you work directly with the coordinator who oversees the farm activities?

A.   Correct.

Q.   So what do you do in that capacity?



Page 72

A.    Just basically answer the questions that he comes with, you know, about -- regarding, you know, how much do we want to put up?  How much do we -- what do you want to -- what do we want to do?  Again, it's a teamwork.  It's not my personal getting everyone together.

Q.    I understand what you're saying.  So who -- is the coordinator, the work coordinator?  Is that the official title of this person?

A.    Yes.

Q.    And what -- who is this person.  What's his name?

MS. WYNKOOP:    Objection to the extent you're seeking information outside of the scope.

THE WITNESS:    Back in this time frame, it would be David Meck.

Q.    David Meck.  Could you spell his name?

A.    David.

Q.    Traditional David.

A.    And then Meck, M-E-C-K.

Q.    M-E-C-K.  Okay.  Was -- during from 2019 to 2022, were there any other than Mr. Neck, does anyone else serve as a work coordinator?

A.    Not sure we would need.  Go back and look at the records.

Q.    Okay.  And what was the responsibility of the work coordinator?



Page 73

A.    To, again, make sure that everybody is occupied getting their vocational skills and teamwork.

Q.    Would he -- would the work coordinator be responsible for scheduling the residents and the mentors to do pallet building?

MS. WYNKOOP:    Objection on the scheduling.

THE WITNESS:    He has been responsible to whatever they brought forth. If they needed to-need to walk alongside the boys and do a safety class or educational class, whatever, that's his responsibility

BY MR. BRUNSON:

Q.    so would pallet building fall under his umbrella of responsibility as well? And also tending to the chickens, would that also full under his responsibility as well too?

A.    Yes.

Q.    Okay.  And did you -- I know you were assigned to him.  Did you act as like a supervisor to him?

MS. WYNKOOP:    Objection on the supervisor.

THE WITNESS:    Just a volunteer on his team.

BY MR. BRUNSON:

Q.    And he was a fellow, correct?

A.    Correct.

Q.    And so does he get paid the $2,300 a month?

A.    Correct.



Page 74

Q.    Okay.  Do you -- how many hours a week Mr. Meck would work in that capacity?

MS. WYNKOOP:    Objection to work.

THE WITNESS:    We never kept track of any -- it was always looked at more as a volunteer service.

BY MR. BRUNSON:

Q.    Just because we're on it now, we can just cross this off the list.  You didn't keep track of any hours that the mentors worked.

MS. WYNKOOP:    Objection to work.

A.    (Indiscernible).

BY MR. BRUNSON:

Q.    I'm sorry.

A.    We kept track of no hours.

Q.    No hours?

A.    No hours.

Q.    Okay.  Just for anyone at Liberty?

A.    Yes.

Q.    Okay.  If the work coordinator, Mr. Meck, if he, let's say, messed up, he did something wrong, would it be your responsibility to deal with him if you messed up?

MS. WYNKOOP:    Objection to form.  You can answer.

THE WITNESS:    It would not necessarily be my responsibility only, but again, we would work as a team, maybe one of the other committee members-and we work together to work



it all out.

BY MR. BRUNSON:

Q.   And say, work it all out, you know, potentially reprimand him?

A.   Whatever.

Q.   Okay.

A.   Whatever it takes keep teamwork working constantly.

Q.   (Indiscernible).  When Liberty Ridge was being set up, did anyone from the Family Support Committee speak to any attorneys about Liberty Ridge Farm?

MS. WYNKOOP:   I'm going to object to the extent that you're seeking information protected by attorney client privilege.  You can answer if you know with a yes or no only and not about the context.

THE WITNESS:   I don't know.

BY MR. BRUNSON:

Q.   You don't know.  Did you speak to any attorneys about setting up at Liberty Ridge Farm?

MS. WYNKOOP:   Same objection.

THE WITNESS:   Not that I know of.

BY MR. BRUNSON:

Q.   To your knowledge, did anyone from the Mission speak to any attorneys about setting up Liberty Ridge Farm?

MS. WYNKOOP:   Same objection, and also to speculation about what someone in the Mission did.


MAGNA
LEGAL SERVICES

Page 76

THE WITNESS: (Indiscernible) I don't know.

BY MR. BRUNSON:

Q. Did you speak to anyone about the Fair Labor Standards Act when setting up the Liberty Ridge farm?

A. No.

Q. Did anyone from the Family Support committee set up -- excuse me, speak to anyone about the Liberty Ridge farm? Sorry. Did anyone from the Family Support Committee speak to anyone about the Fair Labor Standards Act when setting up the Liberty Ridge farm?

MS. WYNKOOP: Same objection.

THE WITNESS: Not that I know of.

BY MR. BRUNSON:

Q. Okay. Do you know if anyone from the Mission spoke to anyone about the Fair Labor Standards Act on setting up the Liberty Ridge Farm?

MS. WYNKOOP: Same objection.

THE WITNESS: Not that I know of. Because these were all volunteers wanted to come to spend time there.

BY MR. BRUNSON:

Q. I understand. Did -- after Liberty Ridge Farm was set up, did you personally take any affirmative steps to ascertain or to learn the Fair Labor Standards Acts requirements?

MS. WYNKOOP: Objection to the extent you're



Page 77

seeking information protected by the attorney client privilege and also a legal conclusion. You can answer to the extent it doesn't discuss what you dealt with the attorney.

THE WITNESS: The question again.

BY MR. BRUNSON:

Q. So after Liberty Ridge Farm was created, did you take any steps to learn the requirements. When I say you, I mean you personally, did you take

any steps to learn the requirements of the Fair Labor Standards Act?

A. No.

Q. After the Liberty Ridge Farm was created, do you know if anyone from the Liberty Ridge Farm Committee took any steps to learn the requirements of the Fair Labor Standards Act?

MS. WYNKOOP: Same objection.

THE WITNESS: Not that I know of. Again, this was under a 501(c)(3) with all volunteer labor, I mean volunteer.

BY MR. BRUNSON:

Q. So, did you take any steps to know what actually goes into a 501(c)(3)?

MS. WYNKOOP: Same objection.

THE WITNESS: No.

BY MR. BRUNSON:

Q. To your knowledge, what is a 501(c)(3)?

A. It's a nonprofit organization that nobody benefits



from anything in my organization, monetarily wise.

Q.   Is it your understanding, then, that if you work for a 501(c)(3), that the Fair Labor Standards Act does not apply to the workers of the 501(c)(3)?

MS. WYNKOOP:   Objection.  Because that is certainly calling for a legal conclusion.  But you can answer it if you know.

THE WITNESS:   I don't know.

BY MR. BRUNSON:

Q.   Okay.  Is it your understanding, then, that if you work for a 501(c)(3) -- let me strike that.  Is it your understanding that if there is a 501(c)(3), the 501(c)(3) does not have to pay anyone who works or volunteers for that 501(c)(3)?

MS. WYNKOOP:   Same objection.

THE WITNESS:   I don't know.  I don't know what the law said.

BY MR. BRUNSON:

Q.   Did you set up the 501(c)(3) for the Liberty Ridge Farm?

A.   No.

Q.   But the Mission is a 501(c)(3)?

A.   Correct.

Q.   Do you know if anyone from the Mission took any steps to learn what a 501(c)(3) is?



MAGNA
LEGAL SERVICES

Page 79

MS. WYNKOOP: Objection. To the extent you're seeking speculative information about what the Mission members did.

THE WITNESS: Again, I was not part of the Mission so I don't know.

BY MR. BRUNSON:

Q. To your knowledge, did anyone from the Liberty Farm Committee take any steps to learn what a 501(c)(3) is?

A. I don't know.

Q. You don't know. Okay. In consulting and creating the Liberty Ridge Farm. Did anyone from the Family Support Committee speak to any social workers?

A. No, I don't remember.

Q. Did you speak to any social workers?

A. No

Q. Did anyone get any permits -- let me rephrase that. Did anyone from the family Support Committee get any permits to run Liberty Ridge?

A. Yes.

Q. What was this permit?

A. To have a group home from the township.

Q. Do you know what township?

A. Fayete.

Q. Did you apply for these permits?

A. Yes.


MAGNA
LEGAL SERVICES

Page 80

Q.   Okay.  Do you know if anyone else applied for any permits?

A.   No.

Q.   Okay.  Can you -- we've sort of talked about this, but can you just specifically tell me what your responsibilities are as treasurer for the Liberty Ridge Farm Committee?

MS. WYNKOOP:   Objection, to the extent you're seeking information about the scope of this time period.  But you may answer.

THE WITNESS:   My responsibility as a treasurer is to take care of the finances, money coming in and money going out.

BY MR. BRUNSON:

Q.   Did you have any more responsibilities as treasurer?

A.   No, everything is decided by the Committee.

Q.   Was it your responsibility as treasurer to enter any business contracts with private companies?

MS. WYNKOOP:   Objection to the form.

THE WITNESS:   I work with the chicken.  So I would have been talking to those individuals.

BY MR. BRUNSON:

Q.   In the chicken side.  What company is that?

A.   At this time frame, I think it was Clark.

Q.   Clark's Feed?

A.   Clark's Feed.



Page 81

Q.    Did you enter into any other business contracts on behalf of the Ridge Farm?

MS. WYNKOOP:    Objection to business contracts. You may answer.

THE WITNESS:    No signed contracts.

BY MR. BRUNSON:

Q.    Did you enter into any unsigned contracts with any private businesses?

MS. WYNKOOP:    Objection to contracts.  You can answer.

THE WITNESS:    No to contract.

BY MR. BRUNSON:

Q.    Did you enter into any unsigned agreements with any private companies on behalf of the Liberty Ridge Farm?

A.    Clarify that for me, about unsigned agreements.

Q.    So did you think the best way to describe it is did you have the -- did you speak with a company?  And after speaking with the company, did you come into an agreement that, you know, residents or mentors would perform some tasks for that company?

A.    No, we did not have any agreement where mentors or residents would perform a certain task for them.  It was -- we just -- it's a little bit whatever fit into our day-to-day schedules.  And that could vary from day to day.  And so there was no set of agreement, no set of contract.



Page 82

Q. I'm going to direct your attention to the Secretary Exhibit 23. Specifically, Interrogatory Number 16. Are you looking at it?

A. Exhibit 23. Yes.

Q. Exhibit 23. Interrogatory Number 16. Are you there?

A. Yes.

Q. Okay. If you look at it at the very bottom of the -- sorry. The last sentence says -- tell me if I'm reading this correctly. It says, without waiving the foregoing objections, defendants had agreements with community businesses such as Snyder Gates, Wengerd" Pallet Company, email and Jones Lumber, which would allow the residents to learn vocational skills to better assist them to become productive members of society. Did I read that correctly?

MS. WYNKOOP: And I'll just note my objection to that, as well as Counsel, that already conceded the words as written were the words of the attorney and not the individual. And so any legal terminology here, I'll just make a note to the extent that you're seeking a legal conclusion. But you can answer.

THE WITNESS: Yes, you are very correct.

BY MR. BRUNSON:

Q. Okay. Snyder Gates, did you have a formal business contract with them?



Page 83

MS. WYNKOOP:   Objection to form of business contract.  You can answer.

THE WITNESS:   Not that I'm aware of.  It was more just a -- he was part of our faith as well, and he was very interested in helping these young men again learn the vocational skills and stuff, and there was prior to really no contract.  It was just -- he put a lot of volunteer time in himself.

BY MR. BRUNSON:

Q.   So was it -- did you have an agreement, what -- strike that.  What did the residents do for Snyder Gates?

MS. WYNKOOP:   And I'll just object to the extent that the scope of information outside of the time period of this litigation.  But you can answer.

BY MR. BRUNSON:

Q.   Well can I respond, the interrogatories if I may?  Sorry, sir.  It says please state all companies, business, private individuals, et cetera.  The defense have contract with other mentors and or minors to perform work for during the relevant time period.

MS. WYNKOOP:   That's why I'm saying to the extent, because there's some overlap that happens before.

MR. BRUNSON:   I'm sorry.

THE WITNESS:   Assembly.

BY MR. BRUNSON:

Q.   Assembly?



Page 84

A.    Just light assembly there.

Q.    And what -- assembling of what?

A.    Just laying the rails on a jig.

Q.    You just -- not everyone knows what a jig is.  Can you say what jig is?

A.    A jig is so like this table here.  If we were putting something together, you would have, like, something that's laid here.  But there's a block here and a block here.  So it has to be laid in between.

Q.    Okay.

A.    It's assembly.

Q.    Assembly?  Okay.  Did the residents use tools during this assembly?

A.    No.

Q.    Okay.  And to be clear with the residents, when they would perform tasks that required tools, were those tools provided to them by the Liberty Ridge Farm?

MS. WYNKOOP:    Objection to form.  You can answer.

THE WITNESS:    Yeah.  So they were very limited to the tools.

BY MR. BRUNSON:

Q.    Okay.  But they were provided by -- with the tools themselves?

A.    Yes.

Q.    The residents didn't come to Liberty Ridge Farm with



Page 85

their own tools; is that correct?

A.    Some, but very little.

Q.    Okay.  What tools did they bring?

A.    A hammer and screwdriver.

Q.    Residents would bring their own hammers and screwdrivers.

A.    Yeah.

Q.    Residents will bring their own hammers and screwdrivers?

A.    Sometimes, yes.

Q.    But not always, though?

A.    Yeah.

Q.    And they did have them the Liberty Ridge Farm provide them those tools?

A.    Correct.

Q.    Okay.  What -- did Snyder Gates sell those gates?

MS. WYNKOOP:    Same objection about the scope and speculation, you can answer if you know.

THE WITNESS:    We assembled them (indiscernible) what they did with them.  So it is possible.

BY MR. BRUNSON:

Q.    And it was residents and minors who were assembling these gates?

MS. WYNKOOP:    Objection to form.  Considering you said residents are minors.



MAGNA
LEGAL SERVICES

Page 86

MR. BRUNSON:    Sorry.

BY MR. BRUNSON:

Q.    Residents assembled these gates, correct?

A.    Maybe.  May be alongside Big Brother and whatever they have, whatever they could do.

Q.    And you said, Big Brother, you mean a mentor?

A.    Yes.

Q.    Okay.  And to your knowledge, did the residents receive any payment for their time building these gates for Snyder Gates?

MS. WYNKOOP:    Objection.  Form.  You may answer.

THE WITNESS:    No, but their parents put them there to help them to learn.  Again, the Christian -- ethics of Christian character and also the vocational skills.

BY MR. BRUNSON:

Q.    Did you tell -- I'm asking you in your personal capacity.  Did you ever tell any parents that they -- their children would be working for private companies?

MS. WYNKOOP:    Objection to working.

THE WITNESS:    I'm not sure that I ever said it in that form, but they knew what we were doing.

BY MR. BRUNSON:

Q.    Did they know -- so you're saying that someone told these parents that their children would be working for private companies; is that what you're saying?



MAGNA
LEGAL SERVICES

Page 87

MS. WYNKOOP:    Objection to form.

THE WITNESS:    No, like their children would be assembling gates.

BY MR. BRUNSON:

Q.    So they knew that they would be assembling gates?

A.    Correct.

Q.    But they didn't know that they would be doing it for a private company?

MS. WYNKOOP:    Objection to mischaracterization. But you can answer.

THE WITNESS:    Again, I don't know what was all told to them.

BY MR. BRUNSON:

Q.    Okay.  But you didn't personally tell?

A.    No.

Q.    And to your knowledge, what about Jones Lumber? What did the residents do for Jones Lumber?

A.    That was in our graduation site of the Liberty Ridge, where they would go there as again to learn some more vocational skills, outside of Liberty Ridge, and they would stack boards on a pallet-on a skid.

Q.    Is that all they did at Jones Lumber?

A.    Yes.

Q.    And did you enter in -- was it -- did you have a business card, sorry -- did you, on behalf of Liberty Ridge



Page 88

Farm, enter into a business contract with Jones Lumber?

A.    No.

MS. WYNKOOP:    Objection to business contracts, but you may answer.

THE WITNESS:    No.  It was again one of our church people.  And again, they wanted to see the best of these boys.  That's -- that is whole purpose of this program.

BY MR. BRUNSON:

Q.    I understand what you're saying.  So this was in informal agreement between Liberty Ridge Farm and Jones Lumber?

A.    It was an informal understanding.

Q.    Okay.  And did you enter into that informal understanding with Jones Lumber?

A.    I'm not sure anymore.

Q.    You're not sure?  And do you know how long -- and did the mentors also work at Jones Lumber?

MS. WYNKOOP:    Objection to work.

THE WITNESS:    With nature, with the residents as a team.

BY MR. BRUNSON:

Q.    And it's your knowledge that either the resident or the mentor received any financial compensation for their time at Jones Lumber?

A.    I'd have to back in the record and look.

Q.    You're not sure?


MAGNA
LEGAL SERVICES

Page 89

A.    I'm not sure?

Q.    Who would have given the residents or the mentors financial compensation for their time at Jones Lumber?

MS. WYNKOOP:    Objection to speculation, you can answer if you know.

THE WITNESS:    Well, okay, so the mentors or the residents did not get any compensation.  That I do know.

BY MR. BRUNSON:

Q.    Okay.

A.    But whether or not something came into the Liberty Ridge to cover for some of that expense of running over there and coming back, that's what I said.

Q.    Okay.  So Liberty Ridge Farm -- I'm sorry, didn't mean to interrupt you

A.    Yeah.

Q.    Okay.  So Liberty Ridge Farm may have received some compensation, but not the residents or the mentors?

A.    Correct.

Q.    Okay.  And is it fair to say that Liberty Ridge Farm did have a formal -- a business contract with Wengerd Pallet Company?

MS. WYNKOOP:    Objection to form of business contract.

THE WITNESS:    We had no contract with Wengerd Pallet.


MAGNA
LEGAL SERVICES

Page 90

BY MR. BRUNSON:

Q. Okay. Did you only -- did Liberty Ridge Farm only have a business contract with Clark's Feed Mill?

MS. WYNKOOP: Objection. No formal business contract.

THE WITNESS: We would have -- we would have used a verbal agreement.

BY MR. BRUNSON:

Q. Verbal agreement with who?

A. Records.

Q. Okay. You don't?

A. But I don't know that I have any signed contract pallets?

Q. Okay. And that's the same is true with Wengerd Pallet Company?

A. Correct.

Q. How did you end up having this, is it fair to say, let's call it an agreement with Wengerd Pallet Company?

MS. WYNKOOP: Objection of form. You may answer.

THE WITNESS: The gate assembly was not quite working out the way we would have liked as far teaching them boys. There was too much idleness. Can't keep somebody if they're not involved. And that gate business was going out the door. He was quitting or whatever. I don't know. But anyhow, Wengerd Pallet, again, endorses the same beliefs that we have


MAGNA
LEGAL SERVICES

Page 91

and knows that his interest was, again, to see these young men be helped. Wasn't in it for a dollar, not $1 to donate his time.

BY MR. BRUNSON:

Q.   So the pallet building, when residents and mentors build pallets, they would be sold to Wengerd Pallet; is that correct?

MS. WYNKOOP:   Objection to form.  You can answer.

THE WITNESS:   Yes. Wengerd Pallet would purchase.

BY MR. BRUNSON:

Q.   And how much money did Liberty Ridge Farm sell the pallets for?  Like each pallet, how much did they sell each pallet for?

A.   That varied over the years. COVID-19, as you know, was blowing everything to pieces.

Q.   Do you remember how much the pallets your -- Liberty Ridge Farm was selling the pallets for before March 2020, before the COVID hit?

A.   Again, no, I have to go back and look.  No, I really don't.

Q.   Okay.  Do you know how many pallets would be -- well, strike that.  How long did the residents and mentors work at Jones Lumber?

MS. WYNKOOP:   Objection to form.  Are you talking years, or?



Page 92

MR. BRUNSON:    Yeah, I wasn't --

BY MR. BRUNSON:

Q.    When did it start?  When did it end?  If you know.

A.    I truly don't know that it was a short period of time.

Q.    A short period of time.  Would that be less than a year?

A.    I think so.

Q.    And how long did they work for -- work, I'm sorry. How long did they work for Snyder Gates?  They being the residents and mentors?

MS. WYNKOOP:    Objection to form.

THE WITNESS:    I'm not sure.

BY MR. BRUNSON:

Q.    Okay.  Was it a short amount of time as well?

A.    It was short, but maybe not quite that short.

Q.    Okay.  So more than a year?

A.    Probably more than a year, yeah.

Q.    How --have you been -- you've been to Liberty Ridge, correct?

A.    Yes.

Q.    How often do you go there?

MS. WYNKOOP:    Objection to the scope, but you can answer.  And scope, I mean time period.

THE WITNESS:    It varies from time to time.  But



probably a good average is a day a week.

BY MR. BRUNSON:

Q. Okay.

A. Over the years.

Q. Of course, yeah, I understand what you're saying. I mean, you've kind of talked about this a little bit, but I want to kind of just nail it down a little bit, ask specifics about each position. So for a houseparent, are you familiar with houseparents?

A. Yes.

Q. Would -- if a houseparent -- would the Mission have to approve a houseparent being allowed to work at Liberty Ridge Farm?

MS. WYNKOOP: Objection to form.

THE WITNESS: Yes.

BY MR. BRUNSON:

Q. Okay. And this was a fellowship position?

A. Correct.

Q. All right. And how does one become a houseparent?

A. The Liberty Ridge Committee we compile names from the mother church groups, churches, individuals that we know that could fill this role.

Q. And are these individuals screened then?

A. What do you mean by screen?

Q. Well, do you like -- let me ask you this. Do they



Page 94

have to submit an application to be a houseparent?

MS. WYNKOOP: Objection to application, but you can answer

THE WITNESS: No.

BY MR. BRUNSON:

Q. Okay. So my understanding then is that they -- you get a list of names as potential candidates to be a houseparent?

A. Correct.

Q. Okay. And do you engage the -- like the vetting process of those candidates?

MS. WYNKOOP: Objection to form.

THE WITNESS: Are you asking if I know?

BY MR. BRUNSON:

Q. Yes.

A. No.

Q. Who does?

A. Others on the committee.

Q. Have you ever participated in the vetting process for the houseparents?

MS. WYNKOOP: Objection to form.

THE WITNESS: I may have been involved a few times, but again, it's outside of my responsibilities.

BY MR. BRUNSON:

Q. It wasn't the norm for you to do that.

A. No.



Page 95

Q.   Okay.

MS. WYNKOOP:   Can we -- before you ask the next question, can we take a five --

MR. BRUNSON:   Sure.

MS. WYNKOOP:   I just -- my things here.

MR. BRUNSON:   Sorry.

(Thereupon, the above-entitled matter went off the record.)

Q.   Okay.  I believe we will talk -- we were talking about the Houseparents.  And with the -- who would the houseparents have to -- who would they report to?

A.   To their-one of the committee members, whichever one they're assigned to.

Q.   And I may have misheard you, but I believe you said that you did not -- none of the houseparents report to you?

A.   Not on a regular basis.

Q.   No, but occasionally some --

A.   Occasionally, if something needed fixed in the house or something like that, work that through with the coordinator.

Q.   Okay.  And you were primarily responsible just for the work coordinator?

A.   Yes.

Q.   Were you primarily responsible for any other positions, such as the guidance counselors or teachers, or anything like that?



Page 96

A.     No

Q.     It was just the work coordinator?

A.     (No audible response.)

Q.     Okay.

THE REPORTER:     And is that a yes?  Did you say yes?

THE WITNESS:     Yes.

THE REPORTER:     Thank you.

BY MR. BRUNSON:

Q.     There was -- is there a director position at the Liberty Ridge Farm?

MS. WYNKOOP:     Object to form, you can answer.

THE WITNESS:     Not that I'm aware of.

BY MR. BRUNSON:

Q.     Okay.  If you just look at the Secretary Exhibit 8, the guidebook or the policy manual, and if you go to MMM 2023.

A.     Okay.

Q.     If you look at under Section F staff, Paragraph 4, it says director.  You see what I'm talking about?

A.     Yes.

Q.     Did you -- did Liberty Ridge Farm have a director?

MS. WYNKOOP:     I'll note my objection is that the document speaks for itself and for the relevant time period of this litigation, which has not been established.  You can answer, I'm sorry.



MAGNA
LEGAL SERVICES

THE WITNESS: Yes. This is beyond this time frame. And this is something new, with the new 3800.

BY MR. BRUNSON:

Q. I see, so this document you're saying was not in existence from 20 -- between 2019 and 2022?

A. Correct.

Q. Do you know when this document became existence then?

A. No.

Q. Did it come into existence in 2023 this year?

MS. WYNKOOP: Objection to the scope. And also asked and answered.

BY MR. BRUNSON:

Q. You still don't know when this document came to existence?

A. It's part of when the license found so we didn't get that yet.

Q. I see. Is the same true for the supervisor position?

MS. WYNKOOP: Same objection.

THE WITNESS: As far as I know.

BY MR. BRUNSON:

Q. Okay. So just to be clear, from 2019 to 2022, there was no supervisor position?

MS. WYNKOOP: Objection to form.



Page 98

THE REPORTER:   I didn't hear your answer.

THE WITNESS:   Correct.

THE REPORTER:   Thank you.

BY MR. BRUNSON:

Q.   And then houseparents -- guidance counselors.  Was there a guidance counselor position at Liberty Ridge Farm?

A.   Yes.

Q.   Okay.  And was that qualified as a fellow position?

A.   Yes.

Q.   Okay.  And would a guidance counselor have to be approved by the Mission?

A.   Yes.

Q.   Okay.  And did the guidance counselor also receive $2,300 a month?

A.   Yes.

Q.   And who did the -- were there -- was there more than one guidance counselor?

A.   No.

Q.   Okay.  Who was that guidance counselor during that time period?

A.   Marvin Gehman.  But backing up to your question, was there more than one guidance coordinator I thought you meant at one time.  My answer was no.  It was only one at a time.  I'm not sure if somebody else would have been in that time frame.

Q.   But you do remember that Marvin Gehman served as a



Page 99

guidance coordinator, but you're not sure if there was other people in that position?

A.    Correct.

Q.    Okay.  And did the guidance coordinator position, did that have to get approved by the Mission?

A.    Yes.

Q.    Okay.  Now going to -- how does one become a guidance counselor or a guidance coordinator?  Excuse me.

A.    Again, that's not my field.  So I don't know what all the procedures are, but I know that they're educational and years of teaching, school, that kind of thing.

Q.    Did the guidance coordinator -- did they have to interview for that position?

MS. WYNKOOP:    Objection to the form.

THE WITNESS:    They would have met with him, I don't know what's required.

BY MR. BRUNSON:

Q.    And when you say they, do you mean the Liberty Ridge Farm Committee?

A.    Someone from the Liberty Ridge Farm Committee.

Q.    Did you participate in that interview process for the guidance coordinator position?

A.    Not that I'm aware of.

Q.    Okay.  Did you participate in the interview process for the work coordinator position?



MS. WYNKOOP:   Objection to form.

THE WITNESS:   I would have been along with that, yes.

BY MR. BRUNSON:

Q.   What exactly does that mean, you would have been along for that.

A.   It was probably two of us from the Liberty Ridge Committee that would have met with them.

Q.   Okay.  And did you interview this person?

MS. WYNKOOP:   Objection to form.

THE WITNESS:   Yeah, I would have showed him the form of what all's required.

BY MR. BRUNSON:

Q.   Did you ask him questions about why this person would want to do this position?

MS. WYNKOOP:   Objection to you.  I mean, you personally --

MR. BRUNSON:   I'm asking him personally.

MS. WYNKOOP:   Yeah.

THE WITNESS:   I don't know that I would ask him that question.  But again, he wanted to be a service to God and to the church and to the young men.  He wanted to be there to help, and he loves it.

BY MR. BRUNSON:

Q.   Did you inquire about this person's love for God and



Page 101

willingness to serve when you were speaking with him about being in this position?

A.    Yes, we would have probably covered that.

Q.    Did you do any other screening of this individual for this position?

MS. WYNKOOP:    Objection to form.

THE WITNESS:    Not sure whether I was covered in that.

BY MR. BRUNSON:

Q.    Did you personally run a background check -- a criminal background check on this individual prior to him becoming the work coordinator?

MS. WYNKOOP:    Objection to form.

THE WITNESS:    I'm not sure that I did before he came, but I know I did since he was there.

BY MR. BRUNSON:

Q.    So you ran a subsequent background check on him?

A.    Yes.

Q.    Okay.  Why did you run a subsequent background check?

A.    It's -- again, it's part of coming into compliance with 3800.

Q.    I see.  If the -- if this were coordinator, you know, you call in sick one day.  Would he call you?

MS. WYNKOOP:    Objection, speculation


MAGNA
LEGAL SERVICES

Page 102

(indiscernible) what someone else would do.  You can answer if you know.

THE WITNESS:   Not always.

BY MR. BRUNSON:

Q.   Not always.  But sometimes he would call you if he was sick?

MS. WYNKOOP:   Same objection.

THE WITNESS:   I can't remember getting this.

BY MR. BRUNSON:

Q.   If the work coordinator wanted to take up a personal day, would he ask you for permission to take that personal day?

MS. WYNKOOP:   Same objection.  And also to the term personal day.  You can answer.

THE WITNESS:   Again, that was shared in our weekly meeting.

BY MR. BRUNSON:

Q.   So would the committee then, Liberty Ridge Farm committee make a decision as to whether someone can take -- and do you know what I mean when I say personal day?

A.   A day off.

Q.   Yes.

A.   Yeah.

Q.   So the Liberty Ridge Farm Committee would make a decision whether to approve someone's request to take a personal day?


MAGNA
LEGAL SERVICES

Page 103

A.    At least a part of the committee will.

Q.    Okay.  Were you a part -- were you ever a part of that decision-making process to approve someone taking a personal day?

A.    Yes.

Q.    Okay.  Did the Liberty Ridge Farm have fill in positions?

A.    Yes.

Q.    Okay.  And fill in positions for what roles?

A.    For administration roles.

Q.    For all of the administration roles?

A.    Yes.

Q.    Okay.  I don't think we talked -- there were teachers on staff at Liberty Ridge Farm, correct?

MS. WYNKOOP:    Objection form.

THE WITNESS:    Yes.

BY MR. BRUNSON:

Q.    Okay.  How many teachers were there at Liberty Ridge Farm?

A.    One at a time.

Q.    There's one teacher at a time.  Okay.  And to your knowledge, was that teacher, you know, certified by the Commonwealth of Pennsylvania to teach?

A.    No, we don't -- we don't have our teacher certified by the Commonwealth --


MAGNA
LEGAL SERVICES

Page 104

Q.   Okay.

A.   -- or a parochial school.

Q.   Okay.  Did -- excuse me.  Did the teachers have to be approved by the Mission to serve as a teacher?

MS. WYNKOOP:   Objection.  You can answer.

THE WITNESS:   Not sure on that.

BY MR. BRUNSON:

Q.   Not sure on that one.  Okay.  Did the Liberty Ridge Farm Committee have to approve that someone becoming a teacher?

A.   Yes.

Q.   Okay.  Did you ever participate in the process of approving whether someone would become a teacher?

A.   As a board member, yes.

Q.   Okay.  Just to be clear, all the positions that I -- let me ask this.  Who did the mentors -- if a mentor had an issue or a problem, who would that -- who would the mentor speak to?

A.   That depends if he was at that point in time under the Houseparent, or under the work coordinator.  Depends where they were at that given time.

Q.   How is it determined whether someone was under a work coordinator versus under a Houseparent.

MS. WYNKOOP:   Objection form.  You can answer.

THE WITNESS:   It depended where they were. So if they were in the house for lunch, they were going to meet the



Page 105

house parent. If they were outside doing some chores, feeding the steer, pigs, they were under the work coordinator.

BY MR. BRUNSON:

Q.    So it was literally the location of the farm --

A.    Yeah.

Q.    Let me ask you this then, Let's say resident-or sorry, a mentor wanted to take a personal day, who would the mentor speak to about taking a personal day?

MS. WYNKOOP:    Same objection.

THE WITNESS:    He would speak to the committee member that was responsible for mentors.

BY MR. BRUNSON:

Q.    Okay.  And during this time, between 2019 and 2022, were you ever that committee member who had been responsible for the mentors?

A.    Yeah.

Q.    Okay.  Do you know who was responsible for the mentors during that time?

A.    I have to go back and look.

Q.    Okay.  Where would you look?

A.    On the minutes.

Q.    On the minutes?

A.    Somewhere or --

Q.    Okay.  Was it ever -- was this information, to your knowledge, ever written somewhere other than the minutes?



MAGNA
LEGAL SERVICES

Page 106

A.    Not that I'm aware of, it's just something that we were working on our committee or board.

Q.    And just to be clear, all the positions that I listed, did any of these individuals ever -- were any of these individuals ever paid an hourly rate?

MS. WYNKOOP:    Objection to form.  You can answer.

THE WITNESS:    No.

BY MR. BRUNSON:

Q.    And do you know if any of these individuals ever paid overtime if they worked more than 40 hours a week?

MS. WYNKOOP:    Objection to form and to the extent of the legal conclusion.  You can answer.

THE WITNESS:    No.

BY MR. BRUNSON:

Q.    Okay.  And the mentors -- so just so I'm clear, the only non-fellow positions were the mentors and the residents; is that correct?

MS. WYNKOOP:    Objection to form.

THE WITNESS:    That would be correct, along with the committee members.

BY MR. BRUNSON:

Q.    And the committee members as well.  So -- and then the mentors, my understanding is that they would be given $250 a month as a -- as an allowance; is that correct?

MS. WYNKOOP:    Objection to allowance and



Page 107

mischaracterization.  You can answer.

THE WITNESS:    It was more of a token of appreciation for your time there (indiscernible).

BY MR. BRUNSON:

Q.    Did they always get each month that they were there to earn $250 a month?

A.    Yes.

Q.    Okay.

A.    Well, let me back up on that.

Q.    Sure.

A.    It wasn't always 250.  It was a little less than that earlier on.  But again, I don't know when that timeframe was.

Q.    I see.  But they always received some money?

A.    Right.

Q.    Okay.  How did you come up with the figure, whether it be $250 or whatever it was beforehand?  How did you come up with that figure?

MS. WYNKOOP:    Objection to you.

BY MR. BRUNSON:

Q.    Let me ask again.  Did you set that figure of $250?

A.    No.

Q.    Okay.  Was it the Liberty Ridge Farm Committee who set that figure?

A.    Yes.



MAGNA
LEGAL SERVICES

Page 108

Q.    Okay.  How did the Liberty Ridge Farm committee come to, let's say, $250 for now?  Because we don't know how much it was before.  How did they come up to that figure?

A.    We looked at it more as a token of appreciation for their travel time.  Some came from the Midwest, some had airplane tickets to pay.  So this was kind of just a token of appreciation.

Q.    Okay.  And did they -- let me ask you this.  For the mentors who were there, they were provided shelter and food, right?

A.    Correct.

Q.    Was it told to them that, you know, in exchange for volunteering with the Liberty Ridge Farm that they would be provided food and shelter?

A.    No.  Again, not that I'm aware of.  Again, it comes back to the fact that these young men, this is what they want to do.  They want to volunteer -- they want to give their time and service to this program, to God's work, to the church.  This is nothing about money.

Q.    And I'm not talking about money.  I'm talking about food and shelter, though.  Well, let me ask you this.  You said that there were some people who came from the Midwest, right?

A.    Correct.

Q.    Were they expected to find their own shelter?

A.    No.  They knew that that was part of -- they're



Page 109

going to be living there and being with the boys.  So that's all covered.

Q.    Okay.  So they knew that they would be staying at the Liberty Ridge Farm?

A.    Correct.

Q.    Okay.  And then they also knew that the Liberty Ridge provided the meals as well; is that fair?

A.    Yes.

Q.    Okay.  And they were also told that they would be receiving this extra, it's called payment for now.  They were told that?

MS. WYNKOOP:    Objection form.

THE WITNESS:    Some were, some weren't.

BY MR. BRUNSON:

Q.    Some were, some weren't.  Okay.  Well, they eventually found out that, right?

A.    Yes.

Q.    Yeah.  Okay.  Did any of the fellows, did they ever receive any formal training?

MS. WYNKOOP:    Objection to form.

THE WITNESS:    Not more than from the Liberty Ridge Farm committee.

BY MR. BRUNSON:

Q.    Okay.  And what training did the Liberty Ridge Farm Committee provide?



MAGNA

LEGAL SERVICES

Page 110

A. Basically, and again, I was really not involved in this. So it was just going over the procedures.

Q. What procedures are you referring to?

A. Just like, you know, when they're going to get up in the morning, and they're going to go to bed.

Q. So, like the details of the program?

A. Details of the program.

Q. Okay. And when you say wake up and go to bed, are you referring to the mentors?

A. Everybody with the, the program.

Q. Did the fellows live on site, too?

A. Yes.

Q. Okay. All the fellows.

A. For the most part.

Q. Who didn't live on site?

A. Teachers.

Q. Teachers? Teachers would live in their own personal homes?

A. Correct.

Q. Okay. I want to talk about how minors ended up at Liberty Ridge. Can you explain to me how a prospective resident arrived at Liberty Ridge?

MS. WYNKOOP: Objection to form. You can answer.

THE WITNESS: So the parents -- the parents would go to their ministry and talk about it. And then the parents



with the ministry would try and give them some advice, maybe what to do.  And eventually the parents would come to the Liberty Ridge Committee and make a request to have their child there.

BY MR. BRUNSON:

Q.    Okay.  And who received these requests from the Liberty Ridge Farm Committee?

A.    That varied over the years.  And again, I'm not sure who it was in this timeframe (indiscernible).

Q.    Did you ever receive these requests?

A.    If I received a verbal request, I always forwarded to -- I always requested that they talk to the person that's responsible for that.  So I never received any.  Just a verbal request.  That's it.

Q.    Okay.  And so my understanding is that you would receive a verbal request and then send it off to the appropriate person?

A.    I will have them call the appropriate person.

Q.    Them being the --

A.    The parents.

Q.    The parents.  Okay.  And you don't remember who the appropriate person was at this time?

A.    I know Kenton was one of them.

Q.    Okay.

A.    And Ethan Weaver was one of them.



Page 112

Q.    Okay.

A.    I don't know timeframes.

Q.    Do you remember any other besides Kenton and Ethan?

A.    No, they were the ones that were responsible for that.

Q.    Okay.

A.    That I know of.

Q.    Sure.

A.    I can think of.

Q.    To your knowledge, did the Liberty Ridge Farm Committee ever advertise to recruit minors to reside at Liberty Ridge?

MS. WYNKOOP:    Objection form.

THE WITNESS:    No.

BY MR. BRUNSON:

Q.    Okay.  Do you know if anyone from the Mission ever engaged in any recruitment of potential residents for Liberty Ridge Farm?

MS. WYNKOOP:    Objection to speculation.

THE WITNESS:    I don't know.

MR. BRUNSON:    Okay.

MS. WYNKOOP:    Sorry?

THE WITNESS:    I don't know.  Sorry.

BY MR. BRUNSON:

Q.    Did the -- if a resident were to stay, let's say



MAGNA
LEGAL SERVICES

that the Liberty Ridge Farm Committee approved of a prospective resident. Would the Mission have to approve the resident residing at Liberty Ridge Farm?

MS. WYNKOOP: Objection once again, same as before. You can answer if you know.

THE WITNESS: No.

BY MR. BRUNSON:

Q. No. What were the age ranges of the minors that resided at Liberty Ridge Farm?

MS. WYNKOOP: Objection to the time period. You can answer.

THE WITNESS: I'm not sure what it was in this timeframe.

BY MR. BRUNSON:

Q. How long did a resident usually stay at Liberty Ridge Farm during this time period?

A. It's dependent on their progress in the program and where they were at on the -- on their character.

Q. Who made the decision, whether a minor or whether a resident was ready to leave Liberty Ridge Farm.

A. The whole committee -- the whole Liberty Ridge Committee.

Q. So your personal capacity did, I guess, vote on, for lack of better phrasing or discuss whether someone -- whether a resident was ready to leave?



Page 114

A.      (Indiscernible).

Q.      Okay.  Could the Mission override the Liberty Ridge Farm's decision on whether a resident was ready to leave Liberty Ridge Farm?

MS. WYNKOOP:    Same objection.

THE WITNESS:    I don't know if they could or not. They never did.

BY MR. BRUNSON:

Q.      They never did.  Okay.  What factors would you use to determine whether a resident was ready to leave the Liberty Ridge Farm?

MS. WYNKOOP:    Objection to the extent it takes an institutional response.  But you can answer.

THE WITNESS:    Again, it varied from individual to individual, but basically, you know, are they respectful to authority? Are they a team player? Are they-all those Christian ethics and vocational skills.

BY MR. BRUNSON:

Q.      Did the Liberty Ridge Farm Committee employ like milestones for a resident that the resident needed to achieve before they could be deemed ready to leave?

A.      No.

Q.      No.  Was it just, I guess, the Liberty Ridge's Farm Committee's personal opinion at that moment, whether or not a resident was ready to leave?


MAGNA
LEGAL SERVICES

Page 115

MS. WYNKOOP:    Same objection.

THE WITNESS:    Yes.  Along with the home structure.

BY MR. BRUNSON:

Q.    What do you mean by home structure?

A.    Where they would go from Liberty Ridge on their-their home, back home, where they were going after that, after they graduate.

Q.    I see.  So if a resident was under the age of 18 and let's say the home situation, did it meet the committee's standards, would then they -- would the committee not agree to letting the resident leave then?

MS. WYNKOOP:    Same objection.

THE WITNESS:    That was basically, again, we could give some advice on that, but that was the childcare committee's responsibility (indiscernible).

BY MR. BRUNSON:

Q.    Okay.  So the -- so would the childcare committee be the final decision maker on whether or not a resident was ready to leave Liberty Ridge?

MS. WYNKOOP:    Objection to speculation.  You can answer if you know.

THE WITNESS:    Pretty much.

BY MR. BRUNSON:

Q.    Pretty much.  Okay.

A.    After we gave our approval to graduate.



Page 116

Q.   I see.  So the Liberty Ridge Farm Committee would give approval for a resident to graduate, and then the child care committee would then make that decision whether the child would leave or not.  Yes?

A.   Yes.

Q.   Okay.  And then the Mission created the child care committee, correct?

A.   Yes.

MR. BRUNSON:   Okay.

THE REPORTER:   Quick note off the record.

MR. BRUNSON:   Sure.

THE REPORTER:   I know we had mentioned that you're planning on going long enough that we need a lunch for purposes of ordering.  When do we want to do that?

MR. BRUNSON:   So we're actually talking about that while you were gone.

THE REPORTER:   Okay.

MR. BRUNSON:   Yeah.  Okay.  We're back.

BY MR. BRUNSON:

Q.   I believe we left off in discussing how long a resident would stay at Liberty Ridge.  Mr. Nelson, if a -- Mr. Martin, excuse me, if a parent wanted their child to leave Liberty Ridge, would the parent be allowed to have that child removed?

MS. WYNKOOP:   Objection to speculation.  But you



can answer.

THE WITNESS:    Absolutely.

BY MR. BRUNSON:

Q.    Okay.  Regarding medical decisions, if there was a non-serious non-emergency medical situation for a resident while they were staying at Liberty Ridge, who would make that decision?  Would it be the parents or guardians, or would it be someone from the Liberty Ridge Farm?

MS. WYNKOOP:    I'm going to object to speculation, again, you can answer.

THE WITNESS:    For the most part, the Liberty Ridge -- someone from the Liberty Ridge Committee would contact the parent and get the parents okay to go wherever they want medical help.

BY MR. BRUNSON:

Q.    If a resident had, let's say, a dentist appointment or something like that, something fairly routine, who would be responsible to take the resident to that appointment?  Someone from Liberty Ridge Farm or the parent or guardian?

MS. WYNKOOP:    Same objection.

THE WITNESS:    It could be either or.

BY MR. BRUNSON:

Q.    Okay.  When would the parent do it?

A.    When they're in close enough proximity to do it right there in Illinois or wherever if it's too far to travel.



MAGNA
LEGAL SERVICES

Page 118

Q.    So if parents or guardians were local, it was their responsibility for medical situations.  But if they were out of state, Liberty Ridge Farm would take care of it.  You have to say yes.

A.    Yes.

Q.    Yeah.  When a resident arrived at Liberty Ridge Farms, was there a period of time where they were not allowed to contact their parents or guardians?

MS. WYNKOOP:    Objection to the extent that seeks information outside of the scope of this litigation, but you can answer.

THE WITNESS:    Will you restate your statement again, please?

MR. BRUNSON:    Sure.

BY MR. BRUNSON:

Q.    When a resident first arrived at Liberty Ridge Firm, was there a period of time where the resident was not allowed to speak or contact their parents or guardians?

MS. WYNKOOP:    Same objection.

THE WITNESS:    Yes.

BY MR. BRUNSON:

Q.    Okay.  How long was that period for?

A.    I'm not sure when it happened.

Q.    Why was that policy in place?

MS. WYNKOOP:    Objection to the extent, it seeks



Page 119

for an institutional response.  But you can answer.

THE WITNESS:   It was basically something that we discovered that other institutions were doing because of the child playing on the emotions of the parents.

BY MR. BRUNSON:

Q.    You said the child playing on the emotions of the parents?

A.    Nonverbal answer.

Q.    Is that yes or?

A.    Yes.

Q.    I know, it's -- we're all tired, nodding here, but unfortunately, you still have to say it.  Yeah.  What do you mean by playing on the emotions of the parents?

A.    Well, we all know what it's like when a child sometimes get homesick to go back home to our family. And so, it's from that standpoint, it's not that the parents cannot make any contact with the Liberty Ridge staff and our committee and find out how the child is doing. It's done all the time.

Q.    If a resident said, I do not want to be here, let me leave.  Will a resident be allowed to leave?

MS. WYNKOOP:   Same objection to time and speculation.  But you can answer.

THE WITNESS:   Yes (indiscernible).

BY MR. BRUNSON:

Q.    Were residents allowed to send letters to their



Page 120

parents or guardians?

MS. WYNKOOP:    Same objection.

THE WITNESS:    Yes.

BY MR. BRUNSON:

Q.    Did the Liberty Ridge -- anyone from the Liberty Ridge staff read those letters?

MS. WYNKOOP:    Same objection.

THE WITNESS:    Yes.

BY MR. BRUNSON:

Q.    Why was that?

A.    Just to see the content of the letter.

Q.    For what reasons?

A.    I appreciate insight to what you were dealing with from the child's perspective.

Q.    Did you read those letters?

A.    No.

Q.    Okay.

A.    No. I take that back. I was not responsible for reading those letters. I'm not going to say I've never read any.

Q.    You're not sure if you read any of those letters?

A.    No.

Q.    But it is possible you may have read some of those letters?

A.    It's possible I may have read one or something like that.


MAGNA
LEGAL SERVICES

Page 121

Q.    Who would read those letters from the Liberty Ridge Farm?

MS. WYNKOOP:    Objection.  Speculation, but you can answer.

THE WITNESS:    Whoever was responsible for that at that point, it wasn't my responsibility.  So I'm not sure. Somebody from the committee or administration would.

BY MR. BRUNSON:

Q.    So would it be a committee person who read them, or would it be a fellow who read them?

MS. WYNKOOP:    Same objection.

THE WITNESS:    It could be both.

BY MR. BRUNSON:

Q.    Do you know whether it be a houseparent who read that, or would it be guidance counselor, coordinator, excuse me, who would?

MS. WYNKOOP:    Same objection.

THE WITNESS:    I'm not sure.

BY MR. BRUNSON:

Q.    Not sure.  Okay.  Parents and guardians had to pay a fee for their children to stay at Liberty Ridge, correct?

A.    Correct.

Q.    How much was that fee?

A.    1,700.

Q.    A month?



MAGNA
LEGAL SERVICES

Page 122

A.    A month.

Q.    Okay.  What did that money cover?

A.    It would have helped to cover some of the expenses of their child being there.  And it was a suggested donation.

Q.    Was the -- this money each month expected to cover the total costs of the residents who were staying there?

A.    Probably not quite.

Q.    Probably not quite.  Okay.  Was there ever a period of time where the parents did not have to pay the tuition costs for their child to reside at Liberty Ridge?

MS. WYNKOOP:    Objection to the time period.  You can answer.

THE WITNESS:    There's quite a few of the parents that financially could not pay that.  And again, the church asked a church group through freewill offers to cover the expenses.

BY MR. BRUNSON:

Q.    Was there ever a time that you -- that the Liberty Ridge Farm Committee basically allow the parents and guardians not to pay anything for a particular month.

MS. WYNKOOP:    Objection to time period, and also to the form.  You can answer.

THE WITNESS:    Yes.  Theres oftentimes that the parents couldn't pay it, but again, it was a suggested donation, so we did not send a collection agency after them.


MAGNA
LEGAL SERVICES

Page 123

(Whereupon, Secretary Exhibit 4, 10/17/2021 LRF Committee Meeting Minutes, was marked for identification.)

BY MR. BRUNSON:

Q.    I'm going to ask you to look at the Secretary Exhibit 4.  Have you had a chance to look at that document?

A.    Yes.

Q.    Have you seen that document before?

A.    I probably have, yeah.

Q.    What is that document?

A.    It's the minutes of the Liberty Ridge Farm.

Q.    And this is from August 17th, 2021.

A.    Yes.

Q.    I'm going to turn your attention to Section 4, agenda, Paragraph A.  It says that we move, that Nelson send the resident's parents an invoice of zero for the month of July, with an explanation of how we arrived at this conclusion.  Did I read that correctly?

A.    Yes.

Q.    Why did you send the parents -- and when it says Nelson, are they referring to you?

A.    Yes.

Q.    Okay, why did you send the parents an invoice of zero for the month of July 2021?

A.    I am not sure.  Except for this resident was of a single mother.  I shouldn't say a single -- yes.  No, it's a



Page 124

single parent, if I remember correctly, where her husband left her.  There's just no way she could have, so we decide to forgive her.

Q.    Understood.  All right.  I'm going to ask you to look at the Secretary Exhibit 8A, The Operating Policy Manual. I mean, direct your attention to Page 5.  Are you there?

MS. WYNKOOP:    Objection.  At the outset, about the time period of this document, but you can go ahead.

MR. BRUNSON:    Okay.

BY MR. BRUNSON:

Q.    All right.  Mr. Martin, I'm going to direct your attention to paragraph three at the very top of the page.  Do you see where I'm looking at?

A.    Yes.

Q.    Okay.  Tell me if I'm reading this correctly.  It says while tending chickens and building pallets do have strong therapeutic value.  These activities are also productive and help to offset the costs of the program, thereby allowing the boys to contribute to their own keep.  Did I read that correctly?

A.    I did not hear.  You're in paragraph -- I was on the line -- on Number 3.

Q.    Oh, I apologize.  Yeah.  Three at the top of the page.

A.    At the top?



Page 125

Q. Yes. You want to read that to yourself and see if I read that correctly.

A. Yes, I think you have.

Q. Okay. So while the residents were building pallets was -- I understand that previously you have testified that they learned skills from building pallets, correct?

A. Correct.

Q. But was another reason why they were building those pallets was to offset the costs of their-- of them being at the Liberty Ridge Farm?

A. So you need to understand that, again, in our faith and in our settings, this is a family farm, which I said earlier on, we wanted this to feel like a family farm. And in our family farms, our children do not live at home for nothing. They contribute by whatever way they can. So this is no different.

Q. So by them doing this, they would contribute to their livelihood at the farm, basically?

MS. WYNKOOP: Objection to form. But you can answer.

THE WITNESS: Yes, from a family farm standpoint, you don't work, you don't eat. It's a very powerful principle.

BY MR. BRUNSON:

Q. I understood. I understand that. Did Liberty Ridge Farm Committee ever fire a mentor?


MAGNA
LEGAL SERVICES

Page 126

MS. WYNKOOP: Objection in the time period and fire. But you can answer.

BY MR. BRUNSON:

Q. Do you know what I mean when I say fire? (indiscernible).

A. I can't remember.

Q. To your knowledge, was there ever any disciplinary actions taken against the mentor while between 2019 and 2022?

A. No.

Q. How long would a -for lack of a better phrase-well, how long would a mentor reside at Liberty Ridge Farm.

MS. WYNKOOP: Objection to form and time grade.

THE WITNESS: That was totally up to the mentor as to how long a time he felt he could volunteer his service there at the farm. Some would be three months, some would be a year. Again, it was their position to be there on a voluntary basis. It's their decision to leave when they felt they need to leave. It's voluntary.

BY MR. BRUNSON:

Q. So a mentor be like, look, I can do this for four months. Sound good? Yeah.

A. Correct.

Q. There was no-the Liberty Ridge Farm Committee never said, no, you need to work six months or a year or anything like that?



Page 127

A.    No, it was our preference that they could do maybe six months just for the benefit of the boys, again, you know, so they could get to know each other as brothers.

Q.    How long is a normal stay for a mentor at the Liberty Ridge Farm?

MS. WYNKOOP:    Objection to form and time period.

THE WITNESS:    Six months to a year.

BY MR. BRUNSON:

Q.    Six months to a year.  Okay.  Kind of hop back a bit.  I'm going to show you Exhibit 26.  I don't need you to read the whole document.  Well, I'll tell you what.  Take a look at that document, please, and -- okay, let's take a look at it.

(Whereupon, Secretary Exhibit 26, Power of Attorney Form, was marked for identification.)

A.    Okay.

Q.    Okay.  So is this a well?  What is this document?

A.    It's a power of attorney from the parents to deliver the power of attorney when their child is there.

Q.    So am I going to go into the actual names of the children and parents?  But was this a standard power of attorney form that would be given to the parents of the residents of Liberty form?

MS. WYNKOOP:    Objection to the extent you're thinking of legal conclusion, but you can answer, and also the time period.


MAGNA
LEGAL SERVICES

Page 128

THE WITNESS:     Yes.

BY MR. BRUNSON:

Q.     Okay.  Did anyone -- did you, come up with this power of attorney form?

A.     No.  Again, it was the Liberty Ridge Farm Committee.

Q.     The Liberty Ridge Farm Committee drafted this form?

A.     Along with, yes, some other forms that we've seen like this.

Q.     Okay.  And did the mission have any input in drafting this plan?

A.     No.

Q.     No.  Was there any discussions with, and I don't need the actual specifics of the discussion, but did anyone from the Liberty Reform committee speak to an attorney about these forms?

MS. WYNKOOP:     Same privilege.  Objection.  But you can answer.

THE WITNESS:     I really don't know.

MR. BRUNSON:     Okay.  There you go.

BY MR BRUNSON

Q.     Well, let me ask you, do you even know if these are legally valid power of attorney forms?

MS. WYNKOOP:     Objection to legal conclusion.

THE WITNESS:     I don't know.

BY MR BRUNSON



MAGNA
LEGAL SERVICES

Q.   I think we kind of touched on this, but were the --
when I say basic necessities, I'm referring to food, clothing,
shelter.  Were the mentor with -- the residents told that while
they would be at Liberty Ridge, they would be provided these
basic necessities.

MS. WYNKOOP:   Objection.  Asked and answered.  And
time period.

THE WITNESS:   I'm not sure what they were told,
but their parents provided clothing.

MR. BRUNSON:   (Indiscernible).

BY MR BRUNSON

Q.   but the Liberty Ridge Farm provided the shelter and
food for the residents? Correct?

A.   Yes.

Q.   And was that also-were the parents also told that
their-parents and guardians told that their children would be
provided shelter and food during their stay at the Liberty Ridge
Farm?

MS. WYNKOOP:   Objection.

THE WITNESS:   Yes they were. And they were also
told that they will be responsible for their meds and for their
clothing, the parents.

BY MR BRUNSON

Q.   The parents will be responsible for their medicine.

A.   Yes.


MAGNA
LEGAL SERVICES

Page 130

Q.    Okay.  Can you just tell us what a typical day would be for a resident who was residing at the Liberty Ridge Farm?

MS. WYNKOOP:    Objection, a time period?

THE WITNESS:    There probably there is no real typical day.

BY MR BRUNSON

Q.    I'm sorry I couldn't hear you.

A.    There probably is no real typical day, but everything goes the same day after day, after day.  But basically, you get up in the morning to have it there.  First of all, they go for a walk with their mentors just for the exercise, and then they have their personal devotions or family devotions.  They have, they have schooling, they have Bible study, and maybe work, maybe work.  And then the rest of the day is filled with activities.

Q.    You say activities.  What type of activities?

A.    Chores.  Chores.

Q.    And what are.  What are chores that they meaning the residents would have to do?

A.    It's anything that happens on the family farm, from gardening to feeding a dog, to playing with the dog, to feeding the cattle, pigs, watering the chickens, building some pallets.

Q.    Was there a -- You know, when I was growing up, that was like my parents were like a chore list on the refrigerator.  Was there something like that, that would be a list of chores


MAGNA
LEGAL SERVICES

Page 131

that the residents would have to do.

A.    It wasn't that the residents had to do, but it was more that the mentors, along with whoever they were responsible for, had to complete. And yes, that was-they would be responsible to feed the steer, the dog for a week and somebody else.

Q.    Would it be written down? So it would it say Mentor one and resident one would have to feed the dog this week?

A.    Yeah.  Something like that.  Yeah.  It's not that I never did that.  Yeah.

Q.    And it was it's the work coordinator who would create that chore list?

A.    Not sure.

Q.    Okay.  Do you know who created the chore list?

A.    One of the work coordinator or house parent. Depends which field.

Q.    I'm sorry.

A.    Depends which -- who was responsible for it or not. So just do the dishes in the house after meal.  That's house parent.

Q.    I see.  So if there were household chores that would fall under the umbrella of the houseparent to dictate who was doing what's right, okay, but it was a chore outside the home, then the work coordinator would be the one who set the schedule.

A.    Along with the house parent.  They worked together.


MAGNA
LEGAL SERVICES

Page 132

Q.    How much time during the day would a resident spend doing chores?

MS. WYNKOOP:    Objection in the time period and ask and answer.

THE WITNESS:    There was no specific time.  Amount of time.  It was.  It was again.  Bible study, Bible teaching and all that came first.  So however that played out in the day, the rest just filled in the cracks.

BY MR BRUNSON

Q.    Do you know how?  How much time, on average, a resident would spend each day performing chores?

MS. WYNKOOP:    An objection.

THE WITNESS:    It just -- it varies from day to day.  It depends on the chores, you know.  Is washing dishes a chore?

BY MR BRUNSON

Q.    I think washing dishes are a chore.  I don't like doing the dishes.  You can talk to my wife about that.  Well, how much time would a resident spend doing the schooling aspect of it?  The Bible study, the actual school, so on and so forth.

A.    Again, it varies, that could be-that could be five, six hours-about six hours a day maybe. Six, seven.  Yeah.

Q.    Yeah.  Okay.  So let's say seven hours a day, let's say on the high end.  And then I would assume that they also spent time, you know, meals.  How long would they spend.  How



MAGNA
LEGAL SERVICES

Page 133

much time would they get for meals each day.

A.    Basically an hour for each meal. So that's three.

Q.    Okay.  And did the residents have any recreational time during the week?

A.    Absolutely.

Q.    So how much recreational time each day would they get?

A.    Pretty much every evening.  They could do some recreational and.  During the day they might take that might take the place of the evening recreational.  Yeah.  So it could be an hour.

Q.    An hour?

A.    An hour or two in the evening.  Yeah.

Q.    Let's say two hours, then round up then.  So 12 hours and then they.  Well, they sleep for 8hrs.

A.    Yeah.

Q.    So it seems like they would spend about four hours a day if I was doing my math right, doing chores.

MS. WYNKOOP:    Objection of work and speculation. These.

THE WITNESS:    Yeah, that could vary again from day to day. Yeah. Okay.

BY MR BRUNSON

Q.    And did the residents, did they ever work on the weekends?


MAGNA
LEGAL SERVICES

MS. WYNKOOP:    Objection of work.

THE WITNESS:    Well, our faith does not believe in working on Sundays, so absolutely not on Sundays unless it's an emergency where the water runoff on the chickens won't be the chickens on the feed or on the water.  But.  Sometimes, and they have done some chores, some things on the Saturday because they had a day off going on a hike or something that week or whatever.  But normally Saturdays and Sundays are pretty much preparing for Sunday.

BY MR. BRUNSON:

Q.    So occasional the occasional Saturday the resident might have to do some chores, is what you're saying?

A.    Well, they'll do some cleaning and things like that to prepare for something.

Q.    Okay.  But occasionally residents would build some pallets on Saturdays.  Is that fair to say?

MS. WYNKOOP:    Objection of work.

THE WITNESS:    Yeah, they probably have if they needed something to do.

BY MR. BRUNSON:

Q.    Okay.  Did residents ever go to individuals' private homes to do any work?

MS. WYNKOOP:    Objection in the work and time period.

THE WITNESS:    Yes, they have.  They came to my


MAGNA
LEGAL SERVICES

Page 135

place when they moved from the farm to the house where I live now, and they came down to spend a day there to help us move in return of-they wanted to do that in return of everything that I did for them up there.

BY MR. BRUNSON:

Q.   So some of the residents helped you move into your new home?

A.   Yes.

Q.   Do you know when that was?

A.   Five years ago.  January, February.

Q.   And were they, did they receive any financial compensation for helping you move?

A.   No.  Okay.

Q.   Did you ask them?

A.   No.  Why would I ask?

Q.   Did the residents ever chop firewood?

MS. WYNKOOP:   Objection of time period.

THE WITNESS:   Yes, they helped with firewood.

BY MR. BRUNSON:

Q.   Did any of the residents use an axe?

MS. WYNKOOP:   Same objection.

THE WITNESS:   Yes, they probably have.

BY MR. BRUNSON:

Q.   Do you know what age they were when they were using the axe?


MAGNA
LEGAL SERVICES

MS. WYNKOOP: Objection.

THE WITNESS: No, I'm not sure if they used the axe as much as a splitting off.

BY MR. BRUNSON:

Q. I'm sorry. Splitting a maul?

A. Maul.

Q. A Maul. Can you describe what that is?

A. Maul, you just put it on top of a piece of firewood, and then you hit it with a hammer.

Q. Oh. So you're not sure if they use an axe, though?

A. I'm not sure that they use an axe, yeah. I think it was more the splitting that.

MS. WYNKOOP: We're not splitting a maul. M - A and L or M-U.

THE WITNESS: I think it's M-U-A-L.

MS. WYNKOOP: Okay. All right. Thanks. I haven't heard of that before.

THE WITNESS: Yeah, that's. We play it off.

BY MR. BRUNSON:

Q. If I could direct -- Mr. Martin, if I could direct your attention to -- I already showed you Secretary Exhibit 28, please. Have you taken a look at it?

MS. WYNKOOP: Okay. You already to 28, right? You can see.

MR. BRUNSON: Quite the mess. I feel you. I feel


MAGNA
LEGAL SERVICES

your pain.

BY MR. BRUNSON:

Q.    Are you taking a look at it?

A.    Yes.

Q.    Great.  All right.  So you already previously testified that you drafted this document.  Correct?

A.    Correct.

Q.    All right.  And just so I'm clear, it looks like that Liberty farm generated $655,675.96 in pallet income.  Is that correct?

MS. WYNKOOP:    Objection.  To the extent, the document speaks for itself.

A.    Yes.

BY MR. BRUNSON:

Q.    Okay.  And additionally, it looks like for the year from January 1st, 2020 to December 31st, 2020, Liberty Ridge Farm generated $55,541.31 in chicken income; is that correct?

MS. WYNKOOP:    Objection.

THE WITNESS:    Yes.

BY MR. BRUNSON:

Q.    Okay.  In total, it looks like for the year 2020, Liberty Ridge Farm generated $881,231.85 in revenue.  Is that correct?

MS. WYNKOOP:    Same objection.

THE WITNESS:    That's what it says.  Okay.



Page 138

MR BRUNSON

Q.    Do you have any reason to believe that this document is inaccurate?

A.    No.

Q.    Okay.  And again, it looks like it's going into expenses.  There is a $120,031.75 in administrative expense; is that correct?

MS. WYNKOOP:    I'm just going to note the objection generally, so I don't have to say it every time.  And yeah.  Go ahead.

THE WITNESS:    Yes.

BY MR. BRUNSON:

Q.    Okay.  And what, just so I'm clear, what were all the administrative expenses?

A.    It's for the house-the fellow --

Q.    The fellowship.

A.    Fellowship pay.

Q.    Okay.

A.    Okay.

Q.    Was there any other expenses other than the fellowship that qualify as an administrative expense?

A.    Not that I'm aware of.

Q.    Okay.  And then it looks like the mentor allowance that Liberty Ridge Farm paid $26,200; is that correct?

A.    Yes.


MAGNA
LEGAL SERVICES

Page 139

Q.   And that would be just the monthly, what you described as the token of appreciation for the mentors.  Is that correct?

A.   Correct.

Q.   And -- all right.  I'm going to show you Exhibit 29.

(Whereupon, Secretary Exhibit 29, Liberty Ridge Revenue Account Form 2021 was marked for identification.)

MS. WYNKOOP:   Once again, my objection to the extended document speaks for itself.

BY MR. BRUNSON:

Q.   Yeah.  Look at this.

A.   Yeah.

Q.   Okay.  What is this document?

A.   This is an income statement for Liberty Ridge Farm for the year of 2021.

Q.   And did you draft this document?

A.   Yes.

Q.   Okay.  Looking at this document, it looks like at the top, it looks like that Liberty farm generated $1,010,322.46 in pallet income.  Is that correct?

A.   Yes.

Q.   And also, they generated $66,440.58 in chicken income, Is that correct?

A.   Yes.

Q.   There's also it looks like $91,657.77 in resident



Page 140

contributions, correct?

A. Yes.

Q. And there was also firewood income for $2,660. Is that correct?

A. Yes.

Q. So it looks like the total revenue for the year from January 1st, 2021 to December 31st, 2021 is $1,212,450.83. Is that correct?

A. Yes.

Q. Again, I'm going to direct your attention to the back. This is the second page. Excuse me. And if I could direct your attention to indirect expenses. Do you see where I'm looking at?

A. Yes.

Q. Okay. It says MMM loan repayment for $55,732.89. Did I read that correctly?

A. Yes.

Q. What was that payment for?

A. For the MMM, for the real estate of the church offerings that we got in from the different churches going back to the Mission.

Q. And was this -- did the Liberty Ridge Farm Committee -- strike that. Was any of this money that was used to pay back the Mission for the -- for (indiscernible) land, did that come from any, or where did that money come from?



Page 141

A.    It came through church offerings for the most part, if not all of it.

Q.    Now again though, if I direct your attention back to the first page, to the EPMC offerings are $24,403.52, correct?

A.    Yes.

Q.    So again, those are not -- I'm not trying to be snarky, but that is less than what was paid back to the Mission for the loan repayment?

A.    Yes.

Q.    So why is that?

A.    Right.  It depends again, yeah, it's not that -- so I may have got in a number of offerings in December of 2020, that were not reflected in here, but I added those when I go to pay MMM pay the Mission, I would have taken that amount along with what I got in this current year to pay it back.

Q.    So are you saying then that Secretary Exhibit 28 the income statement from January 1st, 2020 to December 31st, 2020 might not be accurate, then?

MS. WYNKOOP:    Objection.  Mischaracterization of testimony.

BY MR. BRUNSON:

Q.    Well, let me go back, then.  In the -- if I could direct your attention to Secretary Exhibit 28, it lists how much offerings that Liberty Ridge Farm Committee received, right?

MS. WYNKOOP:    I'm going to object to the form of



Page 142

the question to the extent that that's EPMC's offerings.

BY MR. BRUNSON:

Q.   I'll ask a clarifying question.  All the offerings that you have been referring to have been listed as EPMC offerings, correct?

A.   Yes.

Q.   Okay.  So then I guess my question then is, is that -- are you saying then that this document, Secretary Exhibit 28 might not be accurate because you did not list all the offerings that were received by the Liberty Ridge Farm Committee?

MS. WYNKOOP:   Objection.

THE WITNESS:   I would have to go back in my computer and double check it. As far as I'm concerned, they were accurate.

BY MR. BRUNSON:

Q.   As far as you're concerned they're accurate.

A.   I mean, yeah, it could vary from year to year.  But that was what we were doing.  Offerings were coming in, going back to the Mission.

Q.   Sure.  I guess what I'm confused about, though, is that obviously we talked about Secretary Exhibit 2020, and the offerings did not match the payment that was made to the mission for the loan repayment, right?

A.   Yes.

Q.   And then you said that could be because you used



Page 143

offerings from previous years, right?

A.    Yes.

Q.    But now we go back to -- now we're up to, you know, 2021, and it's the same issue again.  The offerings don't match what the payment of the loan was?

MS. WYNKOOP:    Object to the extent that this document (indiscernible).

THE WITNESS:    I'd have to go in and get a detailed account.

BY MR. BRUNSON:

Q.    So are you saying it's possible that these documents may not be accurate?

MS. WYNKOOP:    Objection.  Misrepresentation, testimony and asked and answered.  Come on.

THE WITNESS:    I don't know if they were accurate.

BY MR. BRUNSON:

Q.    Okay.  Did Liberty Ridge produce any pallets that were not made by either a resident or a mentor?

MS. WYNKOOP:    Objection to form and time period.

THE WITNESS:    Probably.

BY MR. BRUNSON:

Q.    Do you know what a percentage of those would be that weren't made by either a mentor or a resident?

MS. WYNKOOP:    Objection.  Sorry.  Go ahead.

THE WITNESS:    No idea.


MAGNA
LEGAL SERVICES

Page 144

BY MR. BRUNSON:

Q.   Would it be fair to say the majority of pallets that were made by Liberty Ridge were made by either a resident or a mentor?

MS. WYNKOOP:   Objection.

THE WITNESS:   No, because both department heads had to make pallets all the time.

BY MR. BRUNSON:

Q.   Department heads would make them as well, too?

A.   Absolutely.

Q.   Okay.  What all did a department head do?

A.   Whatever needs to be done. Same thing a mentor would do.

Q.   They acted as a mentor as well?

A.   Yeah.  They get in there and help, just like the mentor.

Q.   Did they have any other responsibilities other than what a mentor would do?

A.   Yes, to make sure that everybody's safe in the --

Q.   So they would act as sort of like a safety supervisor, making sure everyone didn't hurt themselves or anything; is that what you mean?

MS. WYNKOOP:   Objection to form of safety supervisor.  You can answer.

THE WITNESS:   They're there giving oversight just


MAGNA
LEGAL SERVICES

Page 145

like any-they're just there giving oversight and helping wherever they have to be.

BY MR. BRUNSON:

Q. So they're kind of like a fill in for pretty much everything?

A. Yes.

Q. Okay. And these department heads were also fellows, correct?

A. Yes.

Q. I'm going to ask you to look at Secretary Exhibit 12. So you actually weren't at this meeting, apparently. But I'm going to ask that you -- oh, you were. I apologize. You were at the meeting, I apologize. I mean, direct your attention just to save time to the farm report.

(Whereupon, Secretary Exhibit 12, 9/22/2023 LRF Committee Meeting Minutes, was marked for identification.)

A. Yes.

Q. Have you seen this document before?

A. Yes.

Q. Okay. And what is this document?

A. Liberty Ridge Farm Committee minutes.

Q. Okay. And did you actually participate in this meeting via telephone?

A. That's what it says.

Q. Okay. Do you recall doing that?



Page 146

A.    I have no idea.  I mean, it's not the first time I did that.

Q.    Understood.  I'm going to direct your attention to Paragraph 2, the farm or Section 2 of the farm report. Paragraph D, it says the income from the chickens seems to be dropping, Nelson will research this.  Did I read that correctly?

A.    Yes.

Q.    Are you Nelson in this paragraph or sentence?

A.    Yes.

Q.    All right.  Was there -- can you explain that, was there a concern about the price of chickens dropping?

A.    We don't get paid for chickens.

Q.    So what was the issue that you had to research?

A.    Didn't know if more chickens died than what normally should have, and that happens from time to time with the heat.

Q.    And you had a contract with Clark's Feed for the chickens, right?

MS. WYNKOOP:    Objection.  Form.

THE WITNESS:    We had a verbal agreement instead of signing a binding contract.

BY MR. BRUNSON:

Q.    A verbal agreement with Clark Feed to raise chickens -- well, let me backtrack -- strike that.  What exactly did you do for Clark's Feed, you being the Liberty Ridge Farm.  What did the Liberty Ridge Farm do for Clark's Feed?



A.    Basically gave housing for the birds to be raised in and overseeing how they were raised.

Q.    And then the Liberty Ridge Farm took care of the birds while they were there?

A.    Yes.

Q.    And then, with these birds, would they be shipped back to Clark's Feed?

A.    No idea really.

Q.    Okay.

A.    It wasn't my responsibility.

Q.    Where did the bird -- who came and took the birds?

A.    They came in and took the birds. We had nothing to do with removing the birds.

Q.    I see, so Clark's Feed will come and take the birds. Okay. Did you -- did Liberty Ridge Farm have any opportunities from any other individuals or businesses to raise farm -- to raise chickens for?

MS. WYNKOOP:    Objection to time period. You can answer.

THE WITNESS:    Clarify your statement?

BY MR. BRUNSON:

Q.    Sure. Actually, let me see if I can -- I'll give you an example. You look at Secretary Exhibit 15. Have you had an opportunity to look at this document?

(Whereupon, Secretary Exhibit 15, 12/15/2020 LRF



Page 148

Committee Meeting Minutes, was marked for identification.)

A.    Yes.

Q.    Have you seen this document before?

A.    Probably.

Q.    Okay.  I'm going direct -- what is this document?

A.    It's the minutes from the Liberty Ridge Committee.

Q.    Okay.  The December 15th, 2020 meeting?

A.    Yes.

Q.    Okay.  I'm going to direct your attention to Section 2, the farm report.  Section or Paragraph B says we enjoy working with Clark's Feed Mill for the broilers and plan to keep working with them instead of accepting Kevin Noel's (phonetic) offer.  Did I read that correctly?

A.    Yes.

Q.    What was Kevin Noel's offer?

A.    Kind of the same thing like Clark's Feed does.

Q.    Why did you choose to stick with Clark's Feed instead of Kevin Noel's?

MS. WYNKOOP:   Objection to you.

BY MR. BRUNSON:

Q.    Why did the Liberty Ridge Farm Committee decide to stick with Clark's Feed instead of Kevin Noel's offer?

A.    Because we had a good relationship with Clark's Feed and they also really -- they were probably working with these young men that someday they can be farmers themselves and be an


MAGNA
LEGAL SERVICES

Page 149

asset to society. Instead of sitting on the streets and buying (indiscernible).

Q. And did you know Kevin Noel?

A. Yes.

Q. Okay. Is he in the community?

A. Yes.

Q. Okay. Did Clark's Feed Mill offer you better financial terms than Kevin Noel's offer?

A. I don't remember.

Q. Did the Liberty Ridge Farm Committee ever give the Mission any money that was not documented in these revenue reports that we reviewed specifically? Well, yeah.

MS. WYNKOOP: Objection to the time period. But you can answer.

THE WITNESS: Not that I'm aware of.

BY MR. BRUNSON:

Q. Okay. And so there you have the authority to write checks on behalf of Liberty Ridge?

A. Yes.

Q. All right. Does Liberty Ridge have any other banks other than Ephrata National Bank?

A. We did.

Q. Okay. You provided us -- you personally were the one who provided your attorneys the bank records from the Liberty Ridge Farm, correct?



Page 150

A.    Yes.

MS. WYNKOOP:    Objection to the extent you're seeking information protected by attorney client privilege.  But you can answer.

BY MR. BRUNSON:

Q.    You know, I noticed that there wasn't any -- when reviewing the documents, there was no images of the checks that were deposited into Liberty Ridge Farm accounts.  I was only able to see deposit slips.  Do you have any information on that?

A.    I have a pile of slips, and on those pile of slips I have written in where each one came from.

Q.    I guess my question for you is for -- because I don't use personally Ephrata National bank.  But when -- let me ask you this.  Did you ever deposit a check into Liberty Ridge Farm account?

A.    Yes.

Q.    Okay.  And when you deposited a check, would you be able to actually see an image of that check on your account?

A.    I don't think so.

Q.    You don't think so?  But you can only see images of checks that the Liberty -- that was written on behalf of the Liberty Ridge Farm account?

A.    Yes.

Q.    Okay.

MS. WYNKOOP:    If it would help for courtesy



purposes, I can affirm that we tried to get pictures of the checks that the bank does not do that for it's only, I think, the ones -- it's one way or the other.

MR. BRUNSON: That's why we just said was that they were deposited.

MS. WYNKOOP: Yeah. We did try to be responsive to discovery requests. We would have liked them as well. They don't exist.

MR. BRUNSON: Okay. Sounds good. That's fine.

MS. WYNKOOP: Yep. No problem. I just figured I'd make life easy.

BY MR. BRUNSON:

Q. I know we talked about a typical day for a resident -- I mean, yes, for a resident. Could you explain a typical day for a mentor?

MS. WYNKOOP: Objection to the time period as well and to the part of the question. But you may answer.

THE WITNESS: No difference than the resident, except for school.

BY MR. BRUNSON:

Q. They weren't doing school work?

A. No, sir.

Q. Okay. So would it be fair to say that a resident was, probably participating with -- participating in the Liberty Ridge program for like 12 hours a day?



MS. WYNKOOP:    Objection to form and (indiscernible).  You may answer.

THE WITNESS:    Say that again.  I didn't quite follow your (indiscernible).

BY MR. BRUNSON:

Q.    And I didn't do a good job explaining it.  How many hours a day on average would a mentor be doing activities for the Liberty Ridge program?

MS. WYNKOOP:    Same objection.

THE WITNESS:    They're there as volunteers, so they're there to provide their service to the Liberty Ridge Farm for whatever.

BY MR. BRUNSON:

Q.    Sure.  So let's say, though, that they sleep eight hours a day, right?

A.    Yeah.

Q.    And then they get an hour for a meal, right?

A.    Yeah.

Q.    So we're at 11 hours, stuff like that. School I believe you said was about how long for a resident? Like five hours?

A.    For a resident?

Q.    Like five hours?

A.    Five or six or whatever.

Q.    Okay.



Page 153

A.    That would be a little -- you know, that'd be a little different because the mentors are in some of that bible study and things, school hours.

Q.    I see.  So some mentors actually did participate in the Bible study?

A.    Yeah, they all do.

Q.    So I guess my question is, you know, how much time each day were they engaged in activities on behalf of the Liberty Ridge Farm program.

MS. WYNKOOP:    An objection.

THE WITNESS:    Maybe a couple of hours longer than the residents.  There's been residents are in school, they are doing things chores, five.

BY MR. BRUNSON:

Q.    You think five hours a day?

A.    Five, six, maybe if they're not in Bible study or classes.

Q.    Okay.  And would they also perform these activities on Saturdays too?

MS. WYNKOOP:    Same objection.

THE WITNESS:    Not on Saturdays for it's more just relaxing day.  Sometimes people came in and gave talks and things like that on Saturdays.

BY MR. BRUNSON:

Q.    Could a mentor do whatever they wanted to do on a


MAGNA
LEGAL SERVICES

Page 154

Saturday?

A.    Not totally. Had to be with his resident.

Q.    You still had to be with this resident?

A.    Yes.

Q.    Okay.  How many hours was he expected to be with this resident on Saturdays?

MS. WYNKOOP:    An objection.

THE WITNESS:    There was supposed to be the residents all the time.  There was a township requirement.

BY MR. BRUNSON:

Q.    There was a township requirement?

A.    Yeah.  I mean, we told them at that time it's going to be.

Q.    So at what township was this now?

A.    Fayette Township.

Q.    Fayette township.  So Fayette Township said that the residents had to be with a mentor 24/7?

A.    Yes.  We said that's the way it's going to be.  And they like that because they want these boys out running around the town.

Q.    Were you the person who spoke with the representative from Fayette Township?

A.    I was one of them.

Q.    Okay.  Who else spoke with this person?

A.    Maybe the committee.



Page 155

Q.    Was it the entire committee?

A.    Pretty much at that time.

Q.    Okay.  Do you know when this was?

A.    2010, 2009.

Q.    Okay.  You already spoke to from the township?

A.    Supervisors.

Q.    Do you remember who you spoke to from the township?

A.    No

Q.    I'm going to ask you to -- I know your vision is not great.  I apologize in advance.  I'm going to ask you to look at just some of your documents.  I'll try to make it easy.  This is technically Secretary Exhibit 25.

          (Whereupon, Secretary Exhibit 25, Bank Records from Ephrata National Bank, was marked for identification.)

Q.    Try to swap the ones that are relevant.  Sorry.

A.    Whenever you feel like (indiscernible).

Q.    Do you need a break?

          MS. WYNKOOP:   I was just asking while you were taking the second, but he's fine.

          MR. BRUNSON:   Okay.  All right.  I'm going to -- this is Secretary Exhibit 25, though I did pull pages out of it just --

          MS. WYNKOOP:   Is this all the exhibit together?

          MR. BRUNSON:   So I just pulled the relevant.

          MS. WYNKOOP:   So just each.  All right.


MAGNA
LEGAL SERVICES

MR. BRUNSON: It was one exhibit. It was the bank records.

MS. WYNKOOP: But these are multiple copies of the same thing, it's one.

MR. BRUNSON: No, that's all just one, that's correct.

MS. WYNKOOP: And you want me to mark this with the sticker?

MR. BRUNSON: Yes, please.

MS. WYNKOOP: Is this?

MR. BRUNSON: That's all the bank records that were provided to us.

MS. WYNKOOP: Which pages did you take?

MR. BRUNSON: So I pulled out 248, 255, 257.

MS. WYNKOOP: And 248?

MR. BRUNSON: Yes.

MS. WYNKOOP: (Indiscernible). Okay.

MR. BRUNSON: 255, 257, 302 and 335.

MS. WYNKOOP: I'll just get another container.

MR. BRUNSON: These are really small, so.

MS. WYNKOOP: And before we get into this line of questioning, I'll just note my objection from the beginning. Documents speak for themselves, and either they are kept in the course of business for Ephrata National Bank. So with that in mind.



Page 157

MR. BRUNSON:   Thanks.

BY MR. BRUNSON:

Q.   Mr. Martin, I know your vision is not great, and it's hard to look at.  I mean, mine's not great, it's hard.  But if you could look at first that 248 and to make it easier, if the -- if on the right-hand side, it's the second check down.

A.   Yeah.

Q.   You see it?  It looks like the check was for $9,214.27.  Do you see that?

A.   Yes.

Q.   And it was paid to the Mission, correct?

A.   Right.

Q.   Do you know what that check was for?

A.   To the best of my knowledge, it would be for real estate payment.

Q.   Real estate?  Okay.  I'm to then turn your attention again to Page 255.  And this one's the top one on the right-hand side.  Do you see what I'm talking about?

A.   Yes.

Q.   It looks like there was a check made to the Mission for $12,210.65?

A.   Yes.

Q.   What was that check for?

A.   Again, to the best of my knowledge, it was before the loan repayment (indiscernible).



Page 158

Q. Okay. And if I can direct your attention to Page 257.

A. Well, let me back up there.

Q. Yeah.

A. One of the -- it was either for a loan repayment or for real estate taxes.

Q. Real estate taxes. Okay. If you could look at 257, please?

A. Yes.

Q. If you could actually look on third check down on the right.

A. Uh-huh (affirmative).

Q. There's a check for $20,188.50. Do you know what that check was for?

A. Again, to the best of my knowledge, it would be for real estate repayment.

Q. Okay. And by the way, you have signed all of these checks, correct?

A. Yes.

Q. These are your signatures on those checks?

A. Yes.

Q. Okay. Just out of curiosity, stay on that page. If you go to the left-hand side, last check, there is a check for looks like $24.93 to the Eastern Mennonite Publications. Do you see that?



Page 159

A.    Yes.  What was that for?

MS. WYNKOOP:    I think it says 74.

MR. BRUNSON:    74.  I'm sorry, $74.

THE WITNESS:    That's for some schooling material.

BY MR. BRUNSON:

Q.    Schooling materials.  Okay.  Did you buy, or did Liberty Ridge Farm by schooling materials -- is that where they got their schooling materials from?

A.    Some, yes.

Q.    Okay.

A.    Or Bible curriculum or something for the school.

Q.    And did you buy -- did Liberty Ridge Farm buy school material from Christian Light Publications?

A.    Yes.

Q.    Okay.  Direct your attention at 302.  Are you there? The second check on the right-hand side, it's for $15,920.66. Do you know what this check was for?

A.    Best to my knowledge, it would have been for real estate loan repayment.

Q.    And the last one, turn your attention to 335, the bottom two checks.  One of these checks is for $9,527.55, also paid to the mission; is that correct?

A.    Yes.

Q.    And then also there's another one for $42,500 that was also paid to the mission; is that correct?



Page 160

A.   Yes.

Q.   And what were these checks for?

A.   I would say the first one, again, to the best of my knowledge, would have been for church offerings that came in and going out for the real estate.

Q.   When you say the first one, you mean the 9,000?

A.   9,500.  The 42,500, may have been --

MS. WYNKOOP:   (Indiscernible) I don't want you to assume.

THE WITNESS:   Yeah.

BY MR. BRUNSON:

Q.   You don't know what were given?

A.   Just don't know off the top of my head.

Q.   Did you take notes of what each check was for?

A.   Yes, I'm sure I did.

Q.   Okay.  So you -- okay.  Did any residents ever complain to you personally that they were not getting paid for their -- the work that they were doing at the Liberty Ridge Farm?

MS. WYNKOOP:   Objection to time period and work but (indiscernible).

THE WITNESS:   No.

BY MR. BRUNSON:

Q.   Did any mentor ever make a complaint that they were not getting paid enough for their work at the Liberty Ridge



MAGNA
LEGAL SERVICES

Farm?

MS. WYNKOOP:    Same objection.

THE WITNESS:    No.

BY MR. BRUNSON:

Q.    To your knowledge, were the -- did -- was there ever any complaints made by a mentor or a resident to the Liberty Ridge Farm Committee about not getting paid for their work?

MS. WYNKOOP:    Same objection.

THE WITNESS:    No.  And again, they wanted to come serve as volunteers.

BY MR. BRUNSON:

Q.    I understand.  I may have already asked this, I'm sorry, but I just wanted to be clear.  Just to be clear, the residents were not paid -- do you know what minimum wage is in Pennsylvania?

MS. WYNKOOP:    Objection.  (Indiscernible) seeking legal conclusion, but you can answer if you know.

THE WITNESS:    No.

BY MR. BRUNSON:

Q.    You don't know what it is?

A.    No.

Q.    Are you familiar with minimum wage laws?

MS. WYNKOOP:    Same objection.

THE WITNESS:    Not really.

BY MR. BRUNSON:



Page 162

Q.   So you do not know that in the United States and in Pennsylvania, if you are working at a job that you must be paid at least a minimum wage or an hourly minimum wage for every hour that you work?

MS. WYNKOOP:   Same objection as to the form.

THE WITNESS:   Yes.

BY MR. BRUNSON:

Q.   You do know that?

A.   Yes.

Q.   Okay.  And just to be clear, no residents who was at Liberty Ridge during -- from 2019 to 2022 was paid an hourly wage for their work?

A.   Say that again.

Q.   Sure.  During the relevant time period, from 2019 to 2022, is it correct when I say that no resident was ever paid an hourly rate for the work that they did while at the Liberty Ridge farm?

A.   Yes.

Q.   Yes, that is correct?

A.   Yes, they were never paid.

Q.   Okay.  And is it also correct that the mentors were also not paid a minimum wage for the hours that they worked while at Liberty Ridge Farm?

A.   Once again, note my objection to the word worked, but you can answer.



MAGNA
LEGAL SERVICES

Page 163

Q.   They did not want to be paid, they want to be there or a voluntary service to serve their church and people.  These young boys to make a difference in their lives.  So no, they were not paid.

Q.   Okay.  And trying to wrap this up so we can be done soon, but neither resident nor a mentor was ever paid for overtime -- sorry no resident received any overtime compensation for -- oh, I forgot something here.  Did -- no resident ever receive payment for hours worked in excess of 40 hours while they were at the Liberty Ridge Farm?

MS. WYNKOOP:   Same objection.  You can answer.

THE WITNESS:   No (indiscernible).

BY MR. BRUNSON:

Q.   Okay.  And no mentor was ever paid for their time working at the Liberty Ridge Farm in excess of 40 hours from 2019 to 2022?

MS. WYNKOOP:   Same objection.

THE WITNESS:   No, they were never paid that.

BY MR. BRUNSON:

Q.   Were residents given any incentives to work hard?

MS. WYNKOOP:   Objection to form in time period.

THE WITNESS:   Not any different than what we do in our families.  There may have been times when they did a good job of picking peas or shelling peas, so we would say, you'll get an ice cream, so we'd take them to the ice cream shop.



MAGNA

LEGAL SERVICES

Page 164

BY MR. BRUNSON:

Q. So they were told, okay, you do a good job picking peas, we'll take you to the ice cream shop today?

A. No, it was more just that they did a good job, so department heads give them a reward.

Q. I see. So are you saying they were never told, like, hey, if you work extra hard today, you'll get to -- you'll get some reward?

Q. I don't know if they ever did.

Q. Okay.

THE REPORTER: Do you have to take a five-minute air conditioning break?

MR. BRUNSON: Sure. That is a little warm in here.

THE REPORTER: It's just because the doors are closed.

MR. BRUNSON: Yeah. I'm not going to be much longer. I hope to be done relatively soon. I will try my best to be as efficient as possible.

THE REPORTER: Perfect.

BY MR. BRUNSON:

Q. Mr. Martin, were there any -- did any of the residents have any quotas in that they had to build so many pallets?

A. Not that I'm aware of.



Page 165

Q.    Did any mentors have any quotas that they had to build so many pallets?

A.    Not that I'm aware of, but we would have put to them.  But out of fun they would do that between each other just to see what they could do, but not --

Q.    The mentors would just build some pallets for fun, is what you're saying?

A.    Mentors or residents, you know, well how many they will build today in an hour just trying to do it faster than somebody else (indiscernible).

Q.    And did you -- did -- or did anyone at the Liberty Ridge Farm Committee keep track of how many pallets were made?

MS. WYNKOOP:    Objection to time period.  But you can answer.

THE WITNESS:    I have some items on the record of what's done, but nothing-nothing real accurate.

BY MR. BRUNSON:

Q.    Nothing.

A.    Just like an inventory sheet or something (indiscernible).

Q.    Understood.  And did any -- I think you might have already said this, but there was no documentation of how many hours the residents or minors worked each day, correct?

MS. WYNKOOP:    Objection to time period, form and asked and answered.



Page 166

THE WITNESS:    That's correct, we kept no time.

BY MR. BRUNSON:

Q.    What would happen if a resident said, I don't want to work today?

MS. WYNKOOP:    Objection to time.  You can answer.

THE WITNESS:    We would-when I say we, department heads, would just take him to the side and sit down and talk to him and find out if he's not feeling good or something, why he doesn't want to be part of the team today and hear him out.

BY MR. BRUNSON:

Q.    What if the resident is just very persistent and says I'm not working?

MS. WYNKOOP:    (Indiscernible) objection and speculation, but you can answer.

THE WITNESS:    Then they didn't work or didn't perform or not perform, just.

BY MR. BRUNSON:

Q.    So a resident can choose whether or not they wanted to work on a particular day?

MS. WYNKOOP:    Objection to form.

THE WITNESS:    Yes, they could choose what they want to do if they want to or not or didn't want to.  We didn't take them by force and make them.

BY MR. BRUNSON:

Q.    What if a mentor, it's the same thing, I don't work


MAGNA
LEGAL SERVICES

Page 167

today.  What would happen to that mentor?

                MS. WYNKOOP:    Objection to form.

                THE WITNESS:    We have a little talk with him, but it never happened.

BY MR. BRUNSON:

     Q.    Would a mentor be reprimanded for saying I don't want to work today?

                MS. WYNKOOP:    Same objection and speculation.

                THE WITNESS:    I never had to cross that bridge.

BY MR. BRUNSON:

     Q.    During your -- were residents ever put on restrictive diets while at Liberty Ridge Farm?

                MS. WYNKOOP:    Objection to time period, but you can answer.

                THE WITNESS:    Yes.

BY MR. BRUNSON:

     Q.    Why would they be put on a restrictive diet?

                MS. WYNKOOP:    Same objection.  You can answer.

                THE WITNESS:    For rebellion not wanting to respect authority, anger, those kinds of things.

BY MR. BRUNSON:

     Q.    What would the restricted diet be?

     A.    It was basically rice and beans.

     Q.    Okay.  And were you -- in your personal capacity, were you the one who would issue that punishment?



Page 168

A.    No.

Q.    Who would issue that punishment?

MS. WYNKOOP:    Objection to form. You can answer.

THE WITNESS:    It was basically would have been approved by someone from the Liberty Ridge Committee.

BY MR. BRUNSON:

Q.    But you were on the committee, though, right?

A.    (Indiscernible).

Q.    So did you ever approve one of these punishments?

A.    I'm not sure.

Q.    You don't recall?

A.    No.

Q.    So you were aware about these punishments though, right?

MS. WYNKOOP:    Objection of form and time period.

THE WITNESS:    I was aware of the diets, yes.

BY MR. BRUNSON:

Q.    Did you ever take any steps to stop those punishments from occurring?

MS. WYNKOOP:    Same objection to form and time period.

THE WITNESS:    No, because it's a diet that will not hurt in any way.

BY MR. BRUNSON:

Q.    How do you know that?



Page 169

A.    From the nutritionist standpoint.

Q.    Have you studied nutrition?

A.    I personally didn't, but we had an EMS center do.

Q.    EMS.  What is the EMS?

A.    I think it's a-it's for a paramedic. I mean, not paramedic, ran on the ambulance for years as.

Q.    Emergency medical staff.  Is that what you're referring to?

A.    Yeah.

Q.    So did you consult with emergency medical staff about this diet?

MS. WYNKOOP:    Objection to you.

MR. BRUNSON:    I'm actually asking him his personal capacity.

MS. WYNKOOP:    Thank you.

THE WITNESS:    Yes, we talked about it. And also, the one doctor that we were going to also said we're not-has all the nutrients you need for-has the nutrients you need to sustain life.

BY MR. BRUNSON:

Q.    What doctor did you speak to?

A.    Dr.  Walker?

Q.    You know his first name?

A.    James.

Q.    And is he -- where is he located at?



Page 170

A.    Palmyra.

Q.    I'm sorry, where?

A.    Palmyra, Pennsylvania.

Q.    Okay.  I thought it was Pahlmeyer (indiscernible) how long would a resident be on this rice and beans diet?

        MS. WYNKOOP:    Objection to time period and form. You can answer.

        THE WITNESS:    It varied. A couple of days on the average.

BY MR. BRUNSON:

Q.    What's the longest a resident will be on that diet for?

A.    I don't know.

Q.    You said that it was a couple of days?

A.    Yes.

Q.    Did a resident ever have to eat peppers?

        MS. WYNKOOP:    Objection to time period and form. But you can answer.

        THE WITNESS:    I never know (indiscernible) peppers.

BY MR. BRUNSON:

Q.    Were you aware of that residents had to eat peppers as punishments?

A.    I'm not sure.

Q.    I'll show you what's marked as Secretary Exhibit 19.



Page 171

Have you had a chance to look at this document?

(Whereupon, Secretary Exhibit 19, 5/25/2021 LRF Committee Meeting Minutes, was marked for identification.)

A.    Yes.

Q.    What is this document?

A.    The minutes for Liberty Ridge Committee, May 25th, 2021.

Q.    I'm going to direct your attention to -- first off, were you present for this meeting?

A.    Yes.

Q.    Okay.  Let me direct your attention to Section 3 -- Paragraph 3, Section D at this point, says we favor waiting to give Jayden peppers as a consequence for backtalk, and start with something less painful.  We are seeing some improvement. Did I read that correctly?

A.    Yes.

Q.    So would residents get peppers if they backtalk?

MS. WYNKOOP:    I'm going to object to the document speaking for itself.  You can answer within the scope of the time period.

THE WITNESS:    According to this, it says that the committee wasn't given permission for any peppers.

BY MR. BRUNSON:

Q.    Well, says we favor waiting to give Jayden peppers as a consequence for backtalk and start with something less



Page 172

painful. So I understand that in this particular situation, you did not -- the Liberty Ridge Committee agree not to do it. But my question, though, is, were -- during the relevant time from 2019 to 2022, were residents ever given peppers as a consequence for some infraction?

MS. WYNKOOP: Objection. Asked and answered.

THE WITNESS: Again, I can't -- I don't know.

BY MR. BRUNSON:

Q. You don't know.

A. I never had any consequences with peppers.

Q. Did you ever approve any consequences with peppers?

MS. WYNKOOP: Objection. Asked and answered and time period. You can answer.

THE WITNESS: Not that I know of.

BY MR. BRUNSON:

Q. Did you ever -- sorry. Did Liberty Ridge Farm Committee ever have residents drag chains as a consequence for an infraction?

MS. WYNKOOP: Objection to a time period and form. You can answer.

THE WITNESS: Yes, but I'm not sure if it was through this timeframe or not.

BY MR. BRUNSON:

Q. Did you ever personally approve a resident having to drag chains?


MAGNA
LEGAL SERVICES

MS. WYNKOOP:    Same objection.

THE WITNESS:    Yes, I did and I helped him.

BY MR. BRUNSON:

Q.    You helped him?

A.    Yes.  Right beside him, pulled the chain right with him.

Q.    Do you know when this was?

A.    No.

Q.    Okay.  And you said you don't remember if this was during the -- this was not during -- sorry.  You don't remember if a resident ever had to drag chains for a punishment between 2019 and 2022?

MS. WYNKOOP:    Objection to form.

THE WITNESS:    Again the question?

BY MR. BRUNSON:

Q.    Do you remember -- do you not remember having a resident drag chains as a punishment between 2019 and 2022?

MS. WYNKOOP:    Objection.  Asked and answered.

THE WITNESS:    I do not know without looking back.

BY MR. BRUNSON:

Q.    Okay.  Well, can you look at Secretary Exhibit 15, please?

A.    Okay.

Q.    Can you look at resident reports and Paragraph E. It says Jacob's DMI review on Friday went well.  He recognizes



Page 174

that he has some things to forgive his father for.  He did resist direction on combing his hair and needed to do five laps of chains for that.

MS. WYNKOOP:    I'm sorry, where are you -- which exhibit are you on?

MR. BRUNSON:    Secretary Exhibit 15.

MS. WYNKOOP:    15, sorry.

MR. BRUNSON:    Yeah.  That's okay.

MS. WYNKOOP:    You can go ahead.  I'll catch up.

BY MR. BRUNSON:

Q.    Did I read that correctly?

A.    Yes.

Q.    Do you remember that incident?

A.    I don't remember the incident.

Q.    Would it be common for residents to have to drag chains if they didn't comb their hair?

MS. WYNKOOP:    Objection to form.  You can answer.

THE WITNESS:    A little bit rare in my opinion.

BY MR. BRUNSON:

Q.    But it did happen.

A.    I don't know.

Q.    What are you saying that this didn't happen in 2020?

MS. WYNKOOP:    Objection, mischaracterization.

THE WITNESS:    I don't know if it happened or not, I wasn't there.



BY MR. BRUNSON:

Q. Do you remember who drafted this? Did Seth Heisey draft this committee report?

A. Yes.

Q. Okay. Do you have any reason to suspect that you would write something inaccurate in one of these reports?

A. No.

Q. Okay. Did Liberty Ridge Farm Committee ever warned from the Commonwealth of Pennsylvania about the punishments that were being doled out to the residents?

MS. WYNKOOP: I'm going to object to the extent you're seeking information outside the time period, and to the extent you'll ultimately be seeking something protected by attorney client privilege. You can answer.

THE WITNESS: Please repeat your question.

MR. BRUNSON: Sure.

MS. WYNKOOP: Sorry.

BY MR. BRUNSON:

Q. Was the Liberty Ridge Farm Committee ever warned about the consequences that were being doled out to the residents?

MS. WYNKOOP: Same objection.

THE WITNESS: Juniata Child and Youth has been there two or three times and gave us full clearance every time.

BY MR. BRUNSON:


MAGNA
LEGAL SERVICES

Page 176

Q.    Was the Department of Human Services ever at Liberty Ridge Farm?

MS. WYNKOOP:    Same objection.  Go ahead.

THE WITNESS:    Yes.

BY MR. BRUNSON:

Q.    Okay.  And did the Department of Human Services warn the Liberty Ridge Farm Committee about physically strenuous consequences?

MS. WYNKOOP:    Same objection, asked and answered, but you can answer again.

THE WITNESS:    Yes.  They talked to us, but they again, they gave us approval to continue operating they way we are.  Yeah.

BY MR. BRUNSON:

Q.    And after DHS became involved with the Liberty Ridge Farm Committee, did the Liberty Ridge Farm Committee implement less strenuous consequences, such as writing assignments and tedious and boring work?

MS. WYNKOOP:    I am going to object to the extent you're seeking information protected by attorney client privilege and also the time period.  You can answer.

THE WITNESS:    I'm just not sure what it has to do with the DOL.

BY MR. BRUNSON:

Q.    So can you answer the question?  Could you still



Page 177

answer the question, though?

MS. WYNKOOP:   You can answer, I'm sorry.

THE WITNESS:   Repeat your question.

BY MR. BRUNSON:

Q.   Sure.  After DHS got involved with the Liberty Ridge Farm Committee, did the Liberty Ridge Farm Committee implement less physically strenuous consequences, such as writing assignments and tedious and boring work?

MS. WYNKOOP:   I'm going to instruct you to only answer as it pertains to the time period in question.

MR. BRUNSON:   And to be clear, this was well --

THE WITNESS:   In this time period, my answer would be no.

BY MR. BRUNSON:

Q.   So now -- so that means you -- Liberty Ridge Farm Committee did not implement DHS's recommendations for punishments; is that what you're saying?

MS. WYNKOOP:   I'm going to object to the form of that question because you're assuming that DHS made recommendations.

MR. BRUNSON:   That's fair.

BY MR. BRUNSON:

Q.   so it might just be easier to show the document. I'm going to show you Secretary exhibit 18. Have you had a chance to look at that document?



Page 178

(Whereupon, Secretary Exhibit 18, 12/21/2021, LRF Committee Meeting Minutes, was marked for identification.)

A.    Yes.

Q.    Okay.  And have you seen that document before?

A.    Probably, yes.

Q.    Okay.  And what is this document?

A.    It's the minutes of the Liberty Ridge Farm Committee.

Q.    December 21st, 2021?

A.    Yes.

Q.    Okay.  I'm going to turn your attention to Page 63, the back page.  There's a section that says titled Department of Human Services comments; is it correct?  Am I reading that, it says no consequences should require great physical exertion?

A.    Yes.

Q.    And so does that mean did -- in response to that concern by DHS, did the Liberty Ridge Farm Committee change its punishments that were being doled out to the residents?

MS. WYNKOOP:   I'm going to object to the form of the question.  It assumes a concern and also for the same time period.

THE WITNESS:   We took Christmas break right at this point and there were no minors on the farm, so.

BY MR. BRUNSON:

Q.    There have been no minors on the farm since December



Page 179

2021, that is it?

MS. WYNKOOP:   Object to the extent that it deals with information from December 2021 to the time period of this litigation ending, I'd instruct my client not to answer anything after that.

THE WITNESS:   Can you repeat.  You said?

MS. WYNKOOP:   I'm instructing you only to answer to his question, is anything outside of December?  But this took place.  I'm just asking you to limit your answer into the scope of this lawsuit, which ends in July 2022, I believe.

THE WITNESS:   Correct.  Thank you.

MS. WYNKOOP:   So go ahead and answer.

THE WITNESS:   Sir, your question?

BY MR. BRUNSON:

Q.   So were there any residents at Liberty Ridge Farm between, let's say, Christmas, December 25th, -- between December 25th, 2021, and July 2022?

A.   Again, it was like going back and looking, I would say no, but definitely no minors.

Q.   There were no minors?

A.   Yes.

Q.   And so is it fair to say that during that time there were no punishments -- were there any punishments doled out? During that time, between December 25th -- December 21st, 2021 and July 2022?



Page 180

A.    Not to my knowledge.

Q.    Why was Children Youth Services at Liberty Ridge?

MS. WYNKOOP:    I'm going to instruct him not to answer anything that's protected by attorney client privilege, and to anything outside the scope of this time period, and by instructing on standard answer, I do object.

THE WITNESS:    Because of the filing of the lawsuit.  If I remember correctly.

BY MR. BRUNSON

Q.    Which lawsuit are you referring to?

A.    The civil lawsuit.

Q.    The one in the Eastern District of Pennsylvania?

A.    Yes.

MR. BRUNSON:    Okay.  It's okay with you, yesterday, Jocelyn, let us use the conference room.  We could kind of just --

MS. WYNKOOP:    Yeah.  Let me find you one.

BY MR. BRUNSON:

Q.    Okay.  Just want to wrap this up.  We're almost done here.  Were any W2s given to any of the fellows?

A.    Yes.

Q.    And did a mentor, they also received W2s?

A.    Yes.

Q.    Okay.  Why did they receive W2s?

A.    Different accountants were asking us for some kind



Page 181

of legal document that for the money that they received.

Q. Okay. And were you who generated those W2s for the Liberty Ridge Farm?

A. Martin Accounting.

Q. Okay. And were you the one who was in contact with Martin accounting?

A. Yes.

Q. Okay.

MS. WYNKOOP: Sorry Martin what?

THE WITNESS: Accounting. Martin Accounting.

MS. WYNKOOP: Accounting?

THE WITNESS: Yeah.

MS. WYNKOOP: Okay. That's not his last name?

THE WITNESS: No.

MS. WYNKOOP: Okay.

THE WITNESS: It's Martin Accounting Services.

MS. WYNKOOP: Oh, okay. Sorry. Thanks.

BY MR. BRUNSON:

Q. And these pallets were they sent to Maryland?

MS. WYNKOOP: Objection to the time period.

THE WITNESS: We-our pallets went from our shop to the person that bought them. Where they went from there, we had no control.

BY MR. BRUNSON:

Q. Do you know where they went, though?



A.   I know some went to the Myerstown Plant and the broker can send some to Baltimore.

Q.   Baltimore.  Maryland?

A.   Maryland.

Q.   Okay.

A.   But we had no -- that was not ours.  We did not do any of the whatever you want to call it, the sales of that or anything.  We had no control of that.

Q.   Who's -- do you know who Kenton Kreider is?

A.   Yes.

Q.   What's his role with Liberty Ridge?

A.   Chairman.

Q.   Does he have any role with the Mission?

A.   None.

Q.   Who is Ethan Weaver?  Do you know who he is?

A.   Yes.

Q.   Does he have a role with Liberty Ridge?

A.   Yes.

Q.   What's his role?

A.   Assistant Secretary and board member.

Q.   Okay.  Does he have a role with the Mission?

A.   No.

Q.   All right.  Are there any answers that you gave today that you would like to change?

A.   Not that I can remember.


MAGNA
LEGAL SERVICES

Page 183

Q.    And is there anything that you -- they asked you, and you answered that you didn't remember?  But now you do remember.

A.    No.

MR. BRUNSON:    Okay.  No more questions?

MS. MENDEZ:    I don't have anything for you. (indiscernible).

THE WITNESS:    (Indiscernible).

MS. WYNKOOP:    To talk transcript for this one. You're not -- you can't order one.

MR. BRUNSON:    I'd have to get --

MS. WYNKOOP:    Yeah, you have to go get.  Got you

MS. MENDEZ:    Have you ever made an order on transcript?

MR. BRUNSON:    Yeah.  I plain but wait (indiscernible) without permission.

MS. MENDEZ:    That is bananas.

MR. BRUNSON:    Yeah.

MS. WYNKOOP:    But you said yesterday that you want to all three I'm just going to have you fill out a form for this one, too.

MS. MENDEZ:    Perfect.

MS. WYNKOOP:    All right.

MS. MENDEZ:    Bye.

(Recording stopped.)



Page 184

(Thereupon, the above-entitled deposition was concluded).



**MAGNA**
**LEGAL SERVICES**

CERTIFICATE

         I, David Frisco, certify that I was authorized to and did transcribe the above hearing and that the transcript is a true and correct record of the audio provided.

         I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

                   Dated this 27th day of November 2023.


*David Frisco*

David Frisco

Transcriber



# Magna
## Key Contacts

Schedule a Deposition:
Scheduling@MagnaLS.com | 866-624-6221

Order a Transcript:
CustomerService@MagnaLS.com | 866-624-6221

General Billing Inquiries:
ARTeam@MagnaLS.com | 866-624-6221

Scheduling Operations Manager:
Patricia Gondor (E: PGondor@MagnaLS.com | C: 215-221-9566)

Customer Care:
Cari Hartley (E: CHartley@MagnaLS.com | C: 843-814-0841)

Director of Production Services:
Ron Hickman (E:RHickman@MagnaLS.com | C: 215-982-0810)

National Director of Discovery Support Services:
Carmella Mazza (E: CMazza@MagnaLS.com | C: 856-495-1920)

Billing Manager:
Maria Capetola (E: MCapetola@MagnaLS.com | C: 215-292-9603)

Director of Sales Operations:
Kristina Moukina (E: KMoukina@MagnaLS.com | C: 215-796-5028)



**A**

**able**
7:1 23:16 38:23 39:1
 150:9,18
**above-entitled**
95:7 184:1
**abroad**
15:5
**absolutely**
39:15 46:14 117:2
 133:5 134:3 144:10
**accepting**
148:12
**account**
33:13 35:12 38:1,4
 139:7 143:9 150:15
 150:18,22
**accountability**
70:23
**accountant**
28:9
**accountants**
180:25
**accounting**
181:4,6,10,10,11,16
**accounts**
37:19,23 150:8
**accuracy**
40:12
**accurate**
7:1 14:15 141:18
 142:9,14,16 143:12
 143:15 165:16
**accurately**
6:17
**achieve**
114:20
**acronym**
15:8,9
**act**
73:18 76:4,9,15
 77:10,14 78:3
 144:20
**acted**
144:14

**ACTING**
1:4
**action**
185:9,10
**actions**
126:8
**activities**
71:21,23 124:17
 130:15,16,16 152:7
 153:8,18
**Acts**
76:23
**actual**
17:22 18:13 27:15
 28:13 40:21 127:19
 128:13 132:20
**added**
141:13
**additional**
63:17
**additionally**
137:15
**address**
28:11
**administration**
103:10,11 121:7
**administrative**
57:12,14 138:6,14,21
**administrator**
57:15 58:7,9,11,13
 58:16,23 59:2,4,9
 71:20
**administrators**
58:3,4,22
**advance**
155:10
**advertise**
112:11
**advice**
32:6,8 64:8 111:1
 115:14
**advise**
71:11
**advisor**
61:14,15,22,24 62:6
**affiliated**

15:12,14
**affirm**
5:21 151:1
**affirmative**
52:6 76:22 158:12
**afternoon**
8:9,10,11
**age**
113:8 115:8 135:24
**agency**
122:25
**agenda**
51:18 123:14
**ago**
135:10
**agree**
35:18 42:14 44:16
 70:4 71:7 115:10
 172:2
**agreed**
64:17
**agreement**
81:18,21,25 83:9
 88:10 90:7,9,18
 146:19,22
**agreements**
81:13,15 82:11
**ahead**
124:8 138:10 143:24
 174:9 176:3 179:12
**aided**
17:3,5,8,9,12,16
**air**
41:3 46:5 164:12
**airplane**
108:6
**Alissa**
4:14
**allow**
47:12 82:13 122:19
**allowance**
106:24,25 138:23
**allowed**
47:6 56:10 93:12
 116:23 118:7,17
 119:20,25

**allowing**
124:18
**allows**
20:25
**all's**
100:12
**alongside**
73:8 86:4
**also-were**
129:15
**ambulance**
169:6
**Amendment**
47:16,17
**America**
16:2 23:19
**amount**
40:7 70:21 92:15
 132:5 141:14
**and/or**
46:23
**anger**
167:20
**answer**
5:18 6:2,13 8:2,15
 12:15,16 14:17,23
 21:18 22:17 23:10
 24:13,19 25:14,25
 26:25 28:6,18,18,25
 35:1 37:13 42:6,19
 43:1,18 44:8 45:20
 46:17,22 47:1,6,6
 47:12 50:2,16 51:25
 53:13 54:7,14,15,23
 55:19 56:1 57:10,22
 59:12 60:1 62:17
 65:3 66:25 69:20
 70:7 72:1 74:22
 75:13 77:2 78:6
 80:9 81:4,10 82:21
 83:2,13 84:18 85:18
 86:11 87:10 88:4
 89:5 90:19 91:8
 92:24 94:3 96:12,25
 98:1,23 102:1,13
 104:5,23 106:6,12



107:1 110:23 113:5 113:11 114:13 115:21 117:1,10 118:11 119:1,8,22 121:4 122:12,22 125:20 126:2 127:24 128:17 132:4 144:24 147:19 149:14 150:4 151:17 152:2 161:17 162:25 163:11 165:14 166:5,14 167:14,18 168:3 170:7,18 171:19 172:13,20 174:17 175:14 176:10,21,25 177:1 177:2,10,12 179:4,7 179:9,12 180:4,6

**answered**
8:14 14:16,22 21:13 30:4,19 31:2 43:24 44:13 53:24 59:12 97:12 129:6 143:14 165:25 172:6,12 173:18 176:9 183:2

**answering**
6:17

**answers**
14:7 182:23

**anticipate**
26:8

**Anybody**
69:15

**anymore**
8:4 21:10 88:14

**anyway**
38:9

**any-they're**
145:1

**apologize**
124:23 145:12,13 155:10

**apparently**
145:11

**appearances**

2:1 4:8

**application**
94:1,2

**applied**
80:1

**apply**
78:3 79:24

**appointed**
30:6 62:9,12

**appointment**
117:16,18

**appreciate**
120:13

**appreciation**
59:20,21,24 107:3 108:4,7 139:2

**appropriate**
111:16,18,22

**approval**
17:22 49:13 67:1 70:21 115:25 116:2 176:12

**approve**
60:9 62:13 69:16 70:25 93:12 102:24 103:3 104:9 113:2 168:9 172:11,24

**approved**
18:2 62:22 67:25 98:11 99:5 104:4 113:1 168:5

**approving**
104:12

**arrive**
55:6

**arrived**
110:22 118:6,16 123:16

**arrives**
56:13

**ascertain**
76:23

**asked**
8:3,13,14 14:4,16,22 16:9,14,15,22 18:1 18:4 21:13 25:1

30:4,17,18,19,23 31:2 43:24 44:13 53:23 55:9 59:12 63:18,20 64:15 97:12 122:15 129:6 143:14 161:12 165:25 172:6,12 173:18 176:9 183:1

**asking**
5:17 39:18 44:19 86:16 94:12 100:18 155:18 169:13 179:9 180:25

**asks**
5:21 17:19

**aspect**
132:19

**aspects**
70:2

**assemble**
40:5

**assembled**
85:19 86:3

**assembling**
84:2 85:22 87:3,5

**assembly**
83:23,25 84:1,11,12 84:13 90:20

**assert**
48:11

**asserting**
47:16,17,18 48:7

**asset**
44:6 149:1

**assigned**
28:7 71:19 73:17 95:13

**assignments**
176:17 177:8

**assist**
82:14

**assistant**
18:20,21 19:12,15 60:25 61:7,10 182:20

**assume**

132:24 160:9

**assumes**
178:20

**assuming**
177:19

**attend**
23:3,16 66:1

**attended**
23:5,8

**attention**
34:2,9,10 37:5 51:17 56:24,25 57:1 63:12 82:1 123:13 124:6 124:12 136:21 140:10,12 141:3,23 145:13 146:3 148:9 157:16 158:1 159:15,20 171:8,11 178:11

**attorney**
5:6,17 53:11 75:12 77:1,3 82:18 127:13 127:17,18,20 128:4 128:14,22 150:3 175:14 176:20 180:4 185:7

**attorneys**
7:10,11 12:6,7,7,13 14:3 53:1 75:10,17 75:23 149:24 185:8

**audible**
22:11 96:3

**audio**
1:22 185:5

**audit**
69:11,14

**audited**
69:2

**auditors**
69:2

**audits**
69:4

**August**
123:11

**Austin**
2:15 4:15 5:5



**authority**
55:4 114:16 149:17
167:20
**authorized**
185:3
**Ave**
2:18
**average**
93:1 132:10 152:7
170:9
**aware**
14:13 67:14,17 83:3
96:13 99:23 106:1
108:15 138:22
149:15 164:25
165:3 168:13,16
170:22
**axe**
135:20,25 136:3,10
136:11
**a-it's**
169:5

---

**B**

**B**
148:10
**back**
13:14 20:5 29:10
33:5,9 35:5,15 36:2
36:6,13 37:3 48:5
56:6,24 60:2 69:2
71:3,14 72:13,22
88:24 89:12 91:19
105:19 107:9
108:16 115:6
116:18 119:15
120:18 127:9
140:11,20,23 141:3
141:7,15,22 142:12
142:19 143:3 147:7
158:3 173:19
178:12 179:18
**background**
8:17 26:21 101:10,11
101:17,19
**backing**

98:21
**backtalk**
171:13,17,25
**backtrack**
146:23
**bad**
33:19
**balance**
35:24,25
**Baltimore**
182:2,3
**bananas**
183:17
**bank**
38:4 69:23 149:21,24
150:13 151:2
155:13,14 156:1,11
156:24
**banks**
149:20
**bars**
38:24
**based**
23:23 24:2 38:18
**basic**
5:16 129:2,5
**basically**
7:18 24:6 55:2 70:2
72:1 110:1 114:15
115:13 119:2
122:19 125:18
130:10 133:2 147:1
167:23 168:4
**basis**
24:25 36:19 45:22
95:16 126:16
**beans**
167:23 170:5
**becoming**
101:12 104:9
**bed**
110:5,8
**beginning**
44:25 156:22
**behalf**
4:10,12,16 81:2,14

87:25 149:18
150:21 153:8
**beliefs**
11:9 32:2 90:25
**believe**
6:25 17:1 38:18 46:4
51:13 52:5 95:9,14
116:20 134:2 138:2
152:20 179:10
**benefit**
38:20 127:2
**benefits**
77:25
**best**
6:7 14:15,18 32:2
55:1 81:16 88:6
157:14,24 158:15
159:18 160:3
164:18
**better**
38:18 64:14,15 82:14
113:24 126:10
149:7
**beyond**
97:1
**be-that**
132:21
**bible**
130:13 132:6,6,20
153:2,5,16 159:11
**big**
41:6 59:6,7 86:4,6
**binding**
146:20
**bird**
147:11
**birds**
147:1,4,6,11,12,13
147:14
**birth**
8:22
**bishop**
16:18,19 17:19 63:23
64:5,7,11,18
**bishops**
16:24 64:3

**bit**
4:22 7:12 60:12
81:23 93:6,7 127:10
174:18
**block**
84:8,8
**blowing**
91:15
**blue**
26:20,21
**board**
15:16 16:14,19,22,25
16:25 17:2,3,17,23
18:1,2,6,7,9,15,19
21:22 22:25 23:3,6
24:1,5,11 32:9,10
32:14 40:6 60:12
61:5,6,7,9,12,18
64:4,5,11 65:21
104:13 106:2
182:20
**boards**
40:22 87:21
**board.BY**
22:19
**boring**
176:18 177:8
**bottom**
82:8 159:21
**bought**
31:17 181:22
**boys**
39:6,11 40:11,12
42:9 57:24 58:2
65:8,24 73:9 88:6
90:22 109:1 124:19
127:2 154:19 163:3
**break**
6:12,14 38:6 155:17
164:12 178:22
**breakfast**
42:10
**breaks**
6:13
**Brian**
61:9



MAGNA
LEGAL SERVICES

bridge
48:13 167:9
bring
85:3,5,8
broad
54:15
broilers
148:11
broker
182:2
brother
59:6,8 86:4,6
brothers
127:3
brought
73:8
Brubaker
45:16 60:25
Brunson
2:15 3:4 4:15,15 5:2
5:4,6 8:19 10:5
11:21 12:18 13:4,7
14:19,25 21:14,20
22:19,24 23:12
24:16,22 25:15 26:2
26:11,15,19 27:1,7
27:10,12,13 28:21
29:2,9 30:7,22 31:5
33:15,19,20 35:3
37:15,21 38:6,10,11
42:12,22 43:4,20
44:1,10,15,21,23
45:25 46:18 47:9,15
47:22 48:2,5,9,13
48:15 50:5,20,23,24
52:2,11,18,24 53:15
53:20 54:1,10,21,25
55:22 56:3,12,22
57:13,18,25 59:15
60:4 62:11,20 63:3
65:5 67:3,8 68:18
69:25 70:9,18 71:4
71:12 73:11,21 74:6
74:12 75:2,16,21
76:2,13,20 77:5,18
77:23 78:9,18 79:6

80:13,21 81:6,12
82:23 83:8,14,22,24
84:21 85:21 86:1,2
86:15,22 87:4,13
88:8,20 89:8 90:1,8
91:4,10 92:1,2,14
93:2,16 94:5,13,23
95:4,6 96:9,14 97:3
97:13,22 98:4 99:17
100:4,13,18,24
101:9,16 102:4,9,16
103:17 104:7 105:3
105:12 106:8,14,21
107:4,20 109:14,23
111:5 112:15,21,24
113:7,14 114:8,18
115:3,16,23 116:9
116:11,15,18,19
117:3,15,22 118:14
118:15,21 119:5,24
120:4,9 121:8,13,19
122:17 123:3 124:9
124:10 125:23
126:3,19 127:8
128:2,19,20,25
129:10,11,23 130:6
132:9,16 133:23
134:10,20 135:5,19
135:23 136:4,19,25
137:2,14,20 138:1
138:12 139:10
141:21 142:2,15
143:10,16,21 144:1
144:8 145:3 146:21
147:21 148:20
149:16 150:5 151:4
151:9,12,20 152:5
152:13 153:14,24
154:10 155:20,24
156:1,5,9,11,14,16
156:18,20 157:1,2
159:3,5 160:11,23
161:4,11,19,25
162:7 163:13,19
164:1,13,17,21
165:17 166:2,10,17

166:24 167:5,10,16
167:21 168:6,17,24
169:13,20 170:10
170:21 171:23
172:8,15,23 173:3
173:15,20 174:6,8
174:10,19 175:1,16
175:18,25 176:5,14
176:24 177:4,11,14
177:21,22 178:24
179:14 180:9,14,18
181:18,24 183:5,11
183:15,18
Brunson.austin.s@...
2:21
build
41:19,25 43:14 91:6
134:15 164:23
165:2,6,9
building
39:13,14,25 42:5
43:17,21 73:5,12
86:9 91:5 124:16
125:4,6,8 130:22
built
39:16,19,21
Burkholder
63:1,5,7
business
1:15 5:9 9:20,22
22:13,14,21,23
80:17 81:1,3 82:24
83:1,16 87:25 88:1
88:3 89:20,22 90:3
90:4,23 156:24
businesses
9:24 81:8 82:11
147:16
buy
32:16 159:6,12,12
buying
149:1
Bye
183:24

call
17:5 43:5 51:10,11
90:18 101:24,24
102:5 111:18 182:7
called
4:5 7:12 9:22 65:10
109:10
calling
78:6
calls
28:17
candidates
94:7,10
capacity
4:21 19:4 64:13,16
71:25 74:2 86:17
113:23 167:24
169:14
card
87:25
care
65:18 80:11 116:3,6
118:3 147:3
carries
41:18
case
1:7 5:18 26:15 47:23
53:2
catch
174:9
cattle
130:22
Cell
2:6
center
169:3
certain
70:21 81:22
certainly
78:6
CERTIFICATE
185:1
certified
103:22,24
certify
185:3,6

—————————————
C
—————————————



cetera
83:17
chain
173:5
chains
172:17,25 173:11,17
174:3,16
chair
18:18
chairman
18:20 19:12 49:8
60:23,25 182:12
chairperson
18:17 19:9
chance
26:12 33:21 48:17
123:5 171:1 177:24
change
178:17 182:24
changes
14:20 50:12
character
38:20 39:13 86:14
113:18
cheaper
39:9
check
6:1 50:22 68:8 69:23
101:10,11,17,20
142:13 150:14,17
150:18 157:6,8,13
157:20,23 158:10
158:13,14,23,23
159:16,17 160:14
checkbook
37:25
checked
31:23
checking
38:1
checks
68:10 149:18 150:7
150:21 151:2
158:18,20 159:21
159:21 160:2
chicken

80:19,22 137:17
139:22
chickens
73:13 124:16 130:22
134:4,5 146:5,11,12
146:14,17,22
147:17
child
65:11,12,13,18 111:3
116:2,3,6,22,23
119:4,6,14,18 122:4
122:10 127:18
175:23
childcare
115:14,17
children
38:14,19 86:18,24
87:2 121:21 125:14
127:20 129:16
180:2
child's
120:14
choose
69:5 148:17 166:18
166:21
chooses
69:13
chop
135:16
chore
130:24 131:12,14,23
132:15,17
chores
105:1 130:17,17,18
130:25 131:21
132:2,11,14 133:18
134:6,12 153:13
Chris
4:16 5:12
Christian
38:20 39:13 59:7
86:13,14 114:16
159:13
Christmas
178:22 179:16
church

1:14 5:9 10:11 15:3,6
15:11 20:24 21:1,3
22:5 32:18 35:15
54:16 88:5 93:21
100:22 108:18
122:14,15 140:19
141:1 160:4 163:2
churches
15:7 22:5,7 32:25
36:19 38:13 93:21
140:20
church-wide
20:17
circles
15:3 32:3 54:17
citizens
38:22,23
civil
180:11
Clarify
81:15 147:20
clarifying
142:3
Clark
80:23 146:22
Clark's
80:24,25 90:3 146:16
146:24,25 147:7,14
148:11,16,17,22,23
149:7
class
73:9,10
classes
153:17
classify
43:11
cleaning
134:13
clear
12:12 21:9 29:4 36:7
47:15 64:10 69:9
84:15 97:23 104:14
106:3,15 137:8
138:13 161:13,13
162:10 177:11
clearance

175:24
clearly
28:5
clerks
4:14
client
53:12 75:12 77:1
150:3 175:14
176:20 179:4 180:4
close
117:24
closed
164:16
closely
65:13,14
clothing
129:2,9,22
colleague
4:25
collection
122:25
Columbia
2:19
comb
174:16
combing
174:2
combining
60:12
come
20:22 31:8 35:24
36:6 37:3 48:5 54:8
59:17 71:13 76:19
81:18 84:25 97:10
107:16,17 108:1,3
111:2 128:3 140:24
140:25 143:14
147:14 161:9
comes
59:16,17 72:1 108:15
coming
80:11 89:12 101:21
142:18
comments
178:13
committee


MAGNA
LEGAL SERVICES

16:1,8,10,23 17:20
17:23 18:1,3 19:5,7
19:10,12,14,20 20:1
20:3,6,7,13 21:10
23:21 28:7,8,19
29:6,14,15,16,19,22
29:25 30:9,10,11,21
31:4,6,6,6,7,9,10,11
31:16,18 33:2,5
36:23 37:22 45:3,7
45:12,22,24 49:12
51:4,7 54:11 56:17
58:19 60:8,11,13,21
62:14,22,23 63:4,5
63:7,15,17,18,20
65:1,7,8,10,11,12
65:13,13,18,22 66:1
67:1,19 68:6 69:7
69:10,13,18 71:2,15
71:19 74:25 75:9
76:6,8 77:13 79:8
79:12,17 80:6,15
93:20 94:17 95:12
99:19,20 100:8
102:17,18,23 103:1
104:9 105:10,14
106:2,20,22 107:23
108:1 109:22,25
111:3,7 112:11
113:1,21,22 114:19
115:10,17 116:1,3,7
117:12 119:17
121:7,9 122:19
123:2 125:25
126:23 128:5,6,14
140:22 141:24
142:10 145:16,21
148:1,6,21 149:10
154:25 155:1 161:7
165:12 168:5,7
171:3,6,22 172:2,17
175:3,8,19 176:7,16
176:16 177:6,6,16
178:2,8,17

**committees**
16:5

**committee's**
55:10 114:24 115:9
115:14

**Committee/Liberty**
30:20

**common**
174:15

**Commonwealth**
103:23,25 175:9

**community**
67:16 82:11 149:5

**companies**
80:17 81:14 83:16
86:18,25

**company**
2:16 80:22 81:17,18
81:20 82:12 87:8
89:21 90:15,18

**compensation**
88:22 89:3,7,17
135:12 163:7

**compile**
93:20

**complain**
160:17

**complaint**
47:23 160:24

**complaints**
161:6

**complete**
131:4

**compliance**
101:21

**comply**
51:19

**computer**
69:1 142:13

**conceded**
82:17

**concern**
146:11 178:17,20

**concerned**
142:13,16

**concluded**
184:2

**conclusion**

26:8 28:5 57:10 77:2
78:6 82:20 106:12
123:16 127:24
128:23 161:17

**conditioning**
164:12

**conference**
21:4,5 51:10,11
180:15

**confused**
142:20

**congregation**
21:19,25 64:6,7,11
69:5,6,11

**congregations**
20:19 33:7

**connected**
185:9

**consequence**
171:13,25 172:4,17

**consequences**
172:10,11 175:20
176:8,17 177:7
178:14

**conservative**
21:4

**consider**
22:20 39:14 42:4,8
43:8 44:11,17

**considering**
47:20 85:24

**constantly**
75:7

**Constitution**
2:18

**consult**
169:10

**consulting**
79:10

**contact**
117:12 118:8,18
119:17 181:5

**container**
156:19

**content**
120:11

**context**
48:1 75:14

**continue**
176:12

**contract**
81:11,25 82:25 83:2
83:6,17 88:1 89:20
89:23,24 90:3,5,12
146:16,20

**contracts**
80:17 81:1,3,5,7,9
88:3

**contribute**
124:19 125:15,17

**contributions**
140:1

**control**
181:23 182:8

**controls**
70:2 71:8

**conversation**
8:7

**convicted**
6:22

**cooperate**
54:18

**coordinator**
58:11,15 71:20,22
72:7,7,21,25 73:3
74:19 95:19,21 96:2
98:22 99:1,4,8,12
99:22,25 101:12,23
102:10 104:19,22
105:2 121:15
131:11,15,24

**copies**
156:3

**copy**
33:17

**Corbin**
4:14

**corner**
26:20

**correct**
5:19,20 8:8 10:15
14:1,5,8 23:14,15


MAGNA
LEGAL SERVICES

23:22 25:10,24 26:17,22 29:7 35:20 37:2 38:5 39:2 45:4 49:20 51:12 59:10 60:24 61:1,3 62:2,4 63:21 66:2,5 67:7 68:1 69:12 70:25 71:15,16,24 73:22 73:23,25 78:23 82:22 85:1,15 86:3 87:6 89:18 90:16 91:7 92:20 93:18 94:8 97:6 98:2 99:3 103:14 106:17,19 106:24 108:11,23 109:5 110:19 116:7 121:21,22 125:6,7 126:22 129:13 137:6,7,10,17,23 138:7,24 139:3,4,20 139:23 140:1,4,8 141:4 142:5 145:8 149:25 156:6 157:11 158:18 159:22,25 162:15 162:19,21 165:23 166:1 178:13 179:11 185:5

**correctly**
25:2 34:14,15 51:20 82:10,15 123:17 124:1,15,20 125:2 140:16 146:6 148:13 171:15 174:11 180:8

**costs**
122:6,9 124:18 125:9

**counsel**
4:5,8 26:15 53:9,17 53:22 82:17 185:7,8

**counselor**
98:6,10,13,17,19 99:8 121:15

**counselors**
95:24 98:5

**counsel's**

11:11

**county**
9:4

**couple**
153:11 170:8,14

**course**
43:13 93:5 156:24

**Court**
1:1 5:21

**courtesy**
150:25

**cover**
89:11 122:2,3,5,15

**covered**
101:3,7 109:2

**COVID**
91:18

**COVID-19**
91:14

**cracks**
132:8

**cream**
163:25,25 164:3

**create**
29:16 68:19 131:12

**created**
67:10 77:6,12 116:6 131:14

**creating**
45:4 49:6 79:10

**crime**
6:22

**criminal**
101:11

**cross**
48:13 74:7 167:9

**curiosity**
158:22

**current**
46:21,23 141:15

**currently**
47:13

**curriculum**
159:11

———— **D** ————

**D**
146:5 171:12

**date**
8:22 51:8

**Dated**
185:12

**David**
72:14,15,16,17 185:3 185:14,15

**day**
70:1 81:24,24 93:1 101:24 102:11,11 102:13,19,20,25 103:4 105:7,8 130:1 130:5,8,9,9,9,14 132:1,7,11,13,14,22 132:23 133:1,6,9,18 133:21,22 134:7 135:2 151:13,14,25 152:7,15 153:8,15 153:22 165:23 166:19 185:12

**days**
4:23 42:20 47:6,12 170:8,14

**day-to-day**
81:23

**deal**
74:21

**dealing**
47:3 120:13

**deals**
179:2

**dealt**
77:3

**December**
34:7 137:16 140:7 141:12,17 148:7 178:9,25 179:3,8,16 179:17,24,24

**decide**
124:2 148:21

**decided**
80:15

**decision**
45:22 102:18,24

113:19 114:3 115:18 116:3 117:7 126:17

**decisions**
117:4

**decision-making**
103:3

**deemed**
114:21

**defendant**
4:22 47:7

**defendants**
1:18 2:2 4:11,13 82:11

**Defendant's**
12:22

**defending**
4:25

**defense**
83:17

**definite**
55:20

**definitely**
179:19

**definition**
55:7,10,11

**deliver**
127:17

**dentist**
117:16

**department**
1:5 2:16 5:6 14:5 25:20 26:10 30:3 46:23 58:13 144:6,9 144:11 145:7 164:5 166:6 176:1,6 178:12

**depended**
104:24

**dependent**
113:17

**depends**
43:19,25 104:18,19 131:15,18 132:14 141:11

**deposed**



MAGNA
LEGAL SERVICES

5:14
**deposit**
68:8 150:9,14
**deposited**
150:8,17 151:5
**deposition**
1:23 4:20 5:1,7,17
7:3,9,21 11:10 48:3
184:1
**describe**
55:1 81:16 136:7
**described**
139:2
**designee**
4:21
**detailed**
143:8
**details**
7:24 110:6,7
**determine**
114:10
**determined**
104:21
**devotions**
130:12,13
**DHS**
176:15 177:5,19
178:17
**DHS's**
177:16
**diagnosis**
56:14
**dictate**
131:22
**died**
146:14
**diet**
167:17,22 168:22
169:11 170:5,11
**diets**
167:12 168:16
**difference**
151:18 163:3
**different**
4:22 42:9 69:5
125:16 140:20

153:2 163:22
180:25
**difficult**
17:7 42:14
**direct**
3:4 5:3 34:10 37:5
56:23,25,25 63:12
82:1 124:6,11
136:20,20 140:10
140:12 141:3,23
145:13 146:3 148:5
148:9 158:1 159:15
171:8,11
**directed**
28:22,24
**direction**
31:1,3 174:2
**directly**
34:23 71:22
**director**
96:10,19,21
**disciplinary**
126:7
**discovered**
119:3
**discovery**
151:7
**discuss**
10:24 24:1,11 77:3
113:24
**discussing**
116:20
**discussion**
128:13
**discussions**
128:12
**dishes**
131:19 132:14,17,18
**dishonesty**
6:23
**District**
1:1,2 2:19 180:12
**division**
4:17 5:13
**DMI**
173:25

**doctor**
169:17,21
**document**
11:17,22,23,25 12:2
12:3,8,10 14:11
26:8 27:8 28:2
33:16,21,23,25 34:3
35:1 48:17,18,22,24
49:3,14,22,25 51:6
51:24 53:6,16 57:8
57:22 60:17 96:23
97:4,7,14 123:5,7,9
124:8 127:11,12,16
137:6,12 138:2
139:9,13,16,18
142:8 143:7 145:18
145:20 147:24
148:3,5 171:1,5,18
177:23,25 178:4,6
181:1
**documentation**
165:22
**documented**
149:11
**documents**
7:6 12:21 13:1,5,8,13
13:16,18,19,21,24
14:1,11,12,21 43:6
52:25 53:1,2,5,8,9
143:11 150:7
155:11 156:23
**dog**
130:21,21 131:5,8
**doing**
1:15 5:9 25:4 42:8
86:21 87:7 105:1
119:3,18 125:17
131:23 132:2,18,19
133:18,18 142:18
145:25 151:21
152:7 153:13
160:18
**DOL**
176:23
**doled**
175:10,20 178:18

179:23
**dollar**
28:12 91:2
**dollars**
65:24
**donate**
91:2
**donation**
122:4,24
**door**
40:9 90:24
**doors**
164:15
**double**
142:13
**doubt**
42:23
**Dr**
169:22
**draft**
67:9 139:16 175:3
**drafted**
128:6 137:6 175:2
**drafting**
128:10
**drag**
172:17,25 173:11,17
174:15
**drinking**
8:25
**driving**
8:6
**dropping**
146:6,11
**drugs**
6:16
**duly**
4:6

_____
E
_____
**E**
51:18 173:24
**earlier**
23:13 53:7 107:12
125:12
**earn**


MAGNA
LEGAL SERVICES

107:6
earned
28:12
easier
27:12 157:5 177:23
Eastern
1:13 5:8 10:11 15:10
15:10 22:5 158:24
180:12
easy
151:11 155:11
eat
125:22 170:16,22
economical
39:10
edit
67:10,11,12
educational
73:10 99:10
efficient
164:19
eggs
43:10
eight
52:5 152:14
Eighth
10:7
either
88:21 117:21 143:18
143:23 144:3
156:23 158:5
email
2:7,12,22 82:12
emergency
134:4 169:7,10
emotions
119:4,6,13
employ
114:19
employee
15:19 185:7,8
EMS
169:3,4,4
encompasses
57:19
ended

110:20
endorses
90:25
ends
179:10
engage
94:9
engaged
112:17 153:8
engine
39:8
enjoy
148:10
Enjoyment
44:9
enter
80:16 81:1,7,13
87:24 88:1,12
entire
155:1
entitled
47:18
Ephrata
149:21 150:13
155:14 156:24
EPMC
15:7 35:7 141:4
142:4
EPMC's
142:1
errors
14:11
especially
47:20
established
96:24
estate
37:8 140:19 157:15
157:16 158:6,7,16
159:19 160:5
et
83:17
Ethan
45:16 111:25 112:3
182:15
ethics

59:7 86:13 114:17
evaluation
56:14
evening
133:8,10,13
eventually
109:16 111:2
everybody
73:1 110:10
everybody's
144:19
exact
22:9
exactly
17:15,15 100:5
146:23
examination
3:4 4:5 5:3
examined
4:6
example
38:1 59:6 147:23
excess
163:9,15
exchange
108:12
excuse
40:21 76:7 99:8
104:3 116:22
121:15 140:11
exercise
130:12
exertion
178:14
exhibit
11:16,18 12:19,20,22
26:5,9 33:11,12
48:16,19 51:1,3
52:4 53:22 56:24
60:18 63:11,14
67:21 82:2,4,5
96:15 123:1,5 124:5
127:10,13 136:21
139:5,6 141:16,23
142:8,21 145:10,15
147:23,25 155:12

155:13,21,23 156:1
170:25 171:2
173:21 174:5,6
177:24 178:1
exist
151:8
existence
97:5,7,10,15
expectation
33:1
expected
108:24 122:5 154:5
expenditures
70:3,12,17,25
expense
35:13 89:11 138:6,21
expenses
24:15 34:11 46:7,10
46:13 122:3,16
138:6,14,20 140:12
expire
20:8
explain
18:9 22:1 35:4 37:24
39:17,24 54:24 55:8
110:21 146:10
151:14
explaining
152:6
explanation
123:16
exposed
40:9
extended
139:9
extent
22:15 23:9 26:7
28:17 34:25 51:24
53:11 54:13 56:1
57:21 59:11 62:7,15
66:24 69:19 72:11
75:11 76:25 77:2
79:1 80:7 82:20
83:11,20 106:11
114:12 118:9,25
127:23 137:11



| | | | |
|---|---|---|---|
| 142:1 143:6 150:2 175:11,13 176:19 179:2 | 79:17 119:15 125:12,13,14,21 130:12,20 | 125:13,18,21,25 126:11,15,23 127:5 128:5,6 129:12,18 | 131:5,8 134:5 146:16,22,24,25 147:7,14 148:11,16 |

**extra**
109:10 164:7

---

**F**

**F**
57:1,4,20 63:13 96:18

**facilities**
45:23 46:1

**facing**
7:19

**fact**
32:23 47:18 108:16

**factors**
114:9

**fair**
9:17 26:17 32:20 34:24 42:25 50:1 51:22 54:2,3,22 55:4 66:8 76:3,9,15 76:23 77:9,14 78:3 89:19 90:17 109:7 134:16 144:2 151:23 177:21 179:22

**fairly**
117:17

**faith**
38:13,18 83:4 125:11 134:2

**fall**
73:12 131:22

**familiar**
18:6 50:17 93:8 161:22

**families**
163:23

**family**
16:10 29:6,13,15,16 29:18,21,25 30:10 30:20 31:7,9,10 32:2 38:24 45:3 75:9 76:6,8 79:11

**far**
10:6 47:11 58:5 90:21 97:21 117:25 142:13,16

**farm**
1:16 5:10 9:9,14,17 9:18 10:18,25 11:5 22:20 23:24 24:2 25:12,17,21 26:21 27:20,21 28:3,16 30:11 31:11,15,21 32:1,3,4,4,11 33:5,7 34:5,19,23 36:10,15 36:18,23 37:11,22 38:3 39:2,5 42:9,13 42:17,24 43:8 45:4 45:18 46:15 47:3,14 47:25 51:7 54:11 55:10,15 56:14,18 57:7 58:19 62:22 63:4 65:13,19,22 66:1,17 67:19 69:3 69:7,9,10,18 70:2 71:2,8,15,18,19,20 71:23 75:10,18,23 76:4,7,10,16,21 77:6,12,13 78:20 79:7,11 80:6 81:2 81:14 84:17,25 85:13 88:1,10 89:13 89:16,19 90:2 91:11 91:17 93:13 96:11 96:21 98:6 99:19,20 102:17,23 103:6,14 103:19 104:9 105:4 107:23 108:1,13 109:4,22,24 111:7 112:10,18 113:1,3,9 113:16,20 114:4,11 114:19,23 116:1 117:8,19 118:3 121:2 122:19 123:10 125:10,12

| |
|---|
| 125:13,18,21,25 126:11,15,23 127:5 128:5,6 129:12,18 130:2,20 135:1 137:9,17,22 138:24 139:14,19 140:22 141:24 142:10 145:14,21 146:4,4 146:24,25 147:3,15 147:16 148:10,21 149:10,25 150:8,15 150:22 152:11 153:9 159:7,12 160:19 161:1,7 162:17,23 163:10 163:15 165:12 167:12 172:16 175:8,19 176:2,7,16 176:16 177:6,6,15 178:7,17,23,25 179:15 181:3 |

**farmers**
148:25

**farming**
9:11,16

**farms**
9:12,23,25 10:3 118:7 125:14

**Farm's**
114:3

**faster**
165:9

**father**
174:1

**favor**
171:12,24

**Fayete**
79:23

**Fayette**
154:15,16,16,22

**February**
135:10

**fee**
121:21,23

**feed**
42:10 80:24,25 90:3

**feeding**
105:1 130:21,21

**feel**
125:13 136:25,25 155:16

**feeling**
6:20 166:8

**fellow**
58:24 59:16 73:22 98:8 121:10 138:15

**fellows**
58:19,21 59:19 68:11 109:18 110:11,13 145:7 180:20

**fellowship**
93:17 138:16,17,21

**felt**
32:2 63:23 126:14,17

**fictitious**
25:19,23 28:3,16,20 29:12 30:16

**field**
99:9 131:16

**Fifth**
47:16,17

**figure**
60:7,9 107:16,18,21 107:24 108:3

**figured**
38:8 151:10

**file**
30:16,17

**filed**
30:2 47:22

**filing**
180:7

**fill**
93:22 103:6,9 145:4 183:20

**filled**
130:15 132:8

**final**



MAGNA
LEGAL SERVICES

49:13 115:18
**finances**
80:11
**financial**
24:6,7,21 34:4 67:25
68:4,7,19,22,25
69:22,22 88:22 89:3
135:11 149:8
**financially**
122:14 185:9
**find**
40:10 108:24 119:18
166:8 180:17
**fine**
26:18 38:10 48:8
151:9 155:19
**finished**
13:9 41:16
**fire**
125:25 126:2,4
**firewood**
135:16,18 136:8
140:3
**firm**
13:19,20 118:16
**first**
4:6 6:14 12:23 35:5
68:1 71:2 118:16
130:10 132:7 141:4
146:1 157:5 160:3,6
169:23 171:8
**fit**
81:23
**five**
30:1,2 95:3 132:21
135:10 152:20,23
152:24 153:13,15
153:16 174:2
**five-minute**
164:11
**fixed**
66:23 67:5 95:18
**Flanagan**
27:23
**fly**
46:3,5

**follow**
152:4
**follows**
4:6
**follow-up**
13:10
**font**
26:21 27:4,5
**food**
108:9,14,21 129:2,13
129:17
**force**
166:23
**foregoing**
82:10
**foreign**
23:18
**forgive**
124:3 174:1
**forgot**
163:8
**form**
11:14 33:13 44:18
50:2,16 54:23 65:2
70:5 74:22 80:18
83:1 84:18 85:24
86:11,21 87:1 89:22
90:19 91:8,24 92:12
93:14 94:11,20
96:12 97:25 99:14
100:1,10,12 101:6
101:13 103:15
104:23 106:6,11,18
109:12,20 110:23
112:13 122:22
125:19 126:12
127:6,14,21,22
128:4,6 139:7
141:25 143:19
144:23 146:18
152:1 162:5 163:21
165:24 166:20
167:2 168:3,15,20
170:6,17 172:19
173:13 174:17
177:18 178:19

183:20
**formal**
56:14 82:24 89:20
90:4 109:19
**formally**
63:20
**forms**
128:7,15,22
**forth**
73:8 132:20
**forward**
32:11,12
**forwarded**
33:8,8 111:11
**for-has**
169:18
**for-to**
28:20
**found**
31:11 32:4 97:16
109:16
**four**
30:1,2 41:9 50:12
126:20 133:17
**frame**
18:12 36:14 60:2,14
68:9 72:13 80:23
97:2 98:24
**fraud**
6:23
**free**
21:24 32:18
**freewill**
22:2 122:15
**frequently**
6:7 66:11
**Friday**
173:25
**Frisco**
185:3,14,15
**front**
67:20
**full**
73:14 175:24
**fun**
165:4,6

**Fund**
36:1
**further**
185:6
**future**
39:1

---

**G**

**Gabriel**
4:17 5:11
**gardening**
130:21
**Garland**
45:15
**gate**
90:20,23
**gates**
82:12,24 83:10 85:16
85:16,23 86:3,9,10
87:3,5 92:10
**gathered**
52:25
**Gehman**
98:21,25
**generally**
138:9
**generated**
37:10 66:5 137:9,17
137:22 139:19,22
181:2
**generates**
21:16,21
**Gerald**
61:6
**getting**
72:5 73:2 102:8
160:17,25 161:7
**gift**
22:3
**gifts**
32:17,19
**give**
7:1 15:9 23:18,23
32:12,16 45:2 53:14
56:19 64:1,8 65:23
67:1 69:15 108:17



111:1 115:14 116:2
147:22 149:10
164:5 171:13,24
**given**
26:8 50:1 59:20
70:21 89:2 104:20
106:23 127:21
160:12 163:20
171:22 172:4
180:20
**gives**
49:12 71:3
**giving**
144:25 145:1
**go**
10:6 20:5 21:3 24:1
35:5 36:2,13,23
37:7 40:9,19 44:6
50:22 55:14 56:6
66:23 67:5 70:21
71:13 72:22 87:19
91:19 92:22 96:16
105:19 110:5,8,25
115:5 117:13
119:15 124:8
127:19 128:19
130:11 134:21
138:9 141:13,22
142:12 143:3,8,24
158:23 174:9 176:3
179:12 183:12
**god**
43:12 100:21,25
**God's**
108:18
**goes**
14:10 20:23 24:7
39:24 47:11 65:19
68:7,10 77:20 130:9
**going**
6:12,13 10:12,18,24
15:1 20:24 27:14
28:4 33:10 34:2,9
34:10 35:17 36:23
37:3 38:7 43:22
46:18,22,24,25 47:2

47:6,12 48:4 50:25
51:17 53:10 56:23
62:7,15 67:20 70:5
71:13 75:11 80:11
82:1 90:23 99:7
104:25 109:1 110:2
110:4,5 115:6
116:13 117:9
120:19 123:4,13
124:4,11 127:10,19
134:7 138:5,8 139:5
140:10,20 141:25
142:18 145:10,12
146:3 148:5,9
154:12,18 155:9,10
155:20 160:5
164:17 169:17
171:8,18 175:11
176:19 177:9,18,24
178:11,19 179:18
180:3 183:20
**good**
4:15 5:5 6:22 16:16
33:11,14 38:23 93:1
126:21 148:23
151:9 152:6 163:23
164:2,4 166:8
**gospel**
15:4
**government**
46:24
**grade**
10:7 126:12
**graduate**
115:7,25 116:2
**graduation**
87:18
**great**
137:5 155:10 157:3,4
178:14
**group**
20:24 45:22 79:21
122:15
**groups**
93:21
**growing**

130:23
**guardian**
117:19
**guardians**
117:7 118:1,8,18
120:1 121:20
122:19 129:16
**guess**
16:12,13 30:5 64:21
113:23 114:23
142:7,20 150:12
153:7
**guidance**
58:15 95:24 98:5,6
98:10,13,17,19,22
99:1,4,8,8,12,22
121:15
**guide**
58:15
**guidebook**
96:16
**guys**
7:17

---
**H**
---

**hair**
174:2,16
**half**
4:24
**hammer**
40:24 41:4 85:4
136:9
**hammers**
85:5,8
**handbook**
48:19,23,24 49:3,7
49:11 50:13,14
51:18,22 52:3,15,19
56:24
**handbooks**
50:9,10,11 52:23
**handed**
50:18
**handing**
38:16
**handle**

54:18
**hands**
43:10,11,13 44:14
**happen**
47:2 166:3 167:1
174:20,22
**happened**
118:23 167:4 174:24
**happening**
47:13,25
**happens**
83:21 130:20 146:15
**hard**
8:17 157:4,4 163:20
164:7
**Harold**
16:16
**Harvey**
4:16 5:12
**head**
6:3,3 58:13 144:11
160:13
**heads**
144:6,9 145:7 164:5
166:7
**healthy**
6:20
**hear**
52:16 98:1 124:21
130:7 166:9
**heard**
70:1 136:17
**hearing**
8:18,20 185:4
**heat**
146:15
**heavy**
41:17 43:6
**Heisey**
61:19 175:2
**held**
1:24 20:18,19
**help**
9:9,10 11:7 38:19,22
54:9,9 56:17,19,21
59:7,18 65:8 86:13



100:23 117:14
124:18 135:2
144:15 150:25

**helped**
91:2 122:3 135:6,18
173:2,4

**helpful**
27:11

**helping**
39:13 40:18 44:5
83:5 135:12 145:1

**hey**
164:7

**high**
132:24

**higher**
35:21

**hike**
134:7

**hit**
91:18 136:9

**hold**
36:6 38:23

**home**
28:11 54:20 65:9
79:21 115:2,4,6,6,9
119:15 125:14
131:23 135:7

**homes**
110:18 134:22

**homesick**
119:15

**honest**
69:21

**honesty**
11:7,8 38:20

**hop**
127:9

**hope**
164:18

**hour**
4:17,24 38:7 41:22
133:2,11,12,13
152:17 162:3 165:9

**hourly**
106:5 162:3,11,16

**hours**
74:1,8,14,15,16
106:10 132:22,23
133:14,15,17
151:25 152:7,15,19
152:21,23 153:3,11
153:15 154:5
162:22 163:9,9,15
165:23

**hours-about**
132:22

**house**
27:15 57:15 95:18
104:25 105:1
131:15,19,19,25
135:1

**household**
131:21

**houseparent**
58:6 93:8,11,12,19
94:1,7 104:19,22
121:14 131:22

**houseparents**
93:9 94:19 95:10,11
95:15 98:5

**house-the**
138:15

**housing**
147:1

**HQ**
2:17

**Human**
176:1,6 178:13

**hurt**
144:21 168:23

**husband**
124:1

---

**I**

**ice**
163:25,25 164:3

**idea**
8:3 41:21,22 143:25
146:1 147:8

**identification**
11:19 12:24 26:10

33:13 48:20 51:4
63:15 123:2 127:14
139:7 145:16 148:1
155:14 171:3 178:2

**identify**
54:12

**idleness**
90:22

**Illinois**
117:25

**image**
150:18

**images**
150:7,20

**impact**
47:20

**implement**
176:16 177:6,16

**importance**
39:5,6

**important**
5:25 39:1,4 40:3

**improvement**
171:14

**inaccurate**
66:22 67:4 138:3
175:6

**incentives**
163:20

**incident**
174:13,14

**include**
48:4 68:10,13

**includes**
68:16

**income**
21:16,17,21 24:14,17
24:18 34:4 37:10,12
68:13,15,16 137:9
137:17 139:14,20
139:23 140:3
141:17 146:5

**Incorrigible**
54:22

**INDEX**
3:1

**indirect**
34:10 35:12 140:12

**indiscernible**
8:15,18 12:5 62:8
64:2 69:8,15,16
71:13 74:11 75:8
76:1 85:19 102:1
107:3 111:9 114:1
115:15 119:23
126:5 129:10
140:24 143:7 149:2
152:2,4 155:16
156:17 157:25
160:8,21 161:16
163:12 165:10,20
166:13 168:8 170:4
170:19 183:7,8,16

**individual**
38:21 45:22 47:7
82:18 101:4,11
114:14,15

**individuals**
15:4 27:22 32:18
40:15 80:20 83:17
93:21,23 106:4,5,9
134:21 147:16

**influence**
65:19

**informal**
88:10,11,12

**information**
24:23 25:6 47:19
53:11 55:25 62:16
70:14 72:12 75:12
77:1 79:2 80:8
83:12 105:24
118:10 150:3,9
175:12 176:20
179:3

**infraction**
172:5,18

**input**
128:9

**inquire**
100:25

**insight**



64:8 120:13
**institutional**
54:14 69:20 114:13
119:1
**institutions**
119:3
**instruct**
177:9 179:4 180:3
**instructed**
47:5
**instructing**
46:16 47:1 179:7
180:6
**integrity**
11:7,8 38:20
**intent**
28:13
**intention**
35:18
**interest**
22:21,23 32:17 91:1
**interested**
27:21 83:5 185:9
**interests**
22:13,14
**intern**
4:18 5:12
**interrogatories**
11:11 12:14,23 83:15
**Interrogatory**
82:2,5
**interrupt**
89:14
**interview**
55:14,19 56:5,9
99:13,21,24 100:9
**interviewed**
55:17 56:8
**inventory**
165:19
**investigation**
46:21,23 47:13,20,24
**investigator**
4:16 5:13 47:21
**invoice**
123:15,22

**involved**
18:4 42:16 49:9,10
90:23 94:21 110:1
176:15 177:5
**involving**
6:23
**issue**
104:16 143:4 146:13
167:25 168:2
**issues**
8:20
**items**
165:15
**it'd**
64:15

---
### J
**Jacob**
45:15 60:25
**Jacob's**
173:25
**James**
169:24
**January**
34:6 135:10 137:16
140:7 141:17
**Jayden**
171:13,24
**jig**
84:3,4,5,6
**jmendez@margoli...**
2:12
**job**
38:23 39:1 43:8
152:6 162:2 163:24
164:2,4
**Jocelyn**
2:9 4:12,25 33:18
180:15
**join**
62:13
**joined**
4:13,16 5:11
**joint**
65:16
**Jones**

82:12 87:16,17,22
88:1,10,13,16,23
89:3 91:23
**judge**
48:6
**JULIE**
1:4
**July**
1:24 123:15,23
179:10,17,25
**Juniata**
175:23

---
### K
**keep**
13:8 74:8 75:7 90:22
124:19 148:11
165:12
**Kenton**
7:12 49:8 60:22
111:23 112:3 182:9
**kept**
74:4,14 156:23 166:1
**Kevin**
148:12,15,18,22
149:3,8
**kind**
40:15 49:12 54:3
65:25 71:3 93:6,7
99:11 108:6 127:9
129:1 145:4 148:16
180:16,25
**kinds**
167:20
**knew**
46:25 86:21 87:5
108:25 109:3,6
**know**
5:16 6:12 8:10,11
10:14,25 18:22,24
21:15,22 22:9,17
23:5 24:9 28:6,18
31:23 38:7 41:14,16
41:17 42:1,7 46:9
49:6,10,13 50:10
51:25 55:1,3,17,23

56:10 62:17,18
63:22 67:9,18 69:13
70:8,16,17 72:2,2
73:17 75:3,13,15,17
75:20 76:1,12,14,18
77:13,16,19 78:7,8
78:16,16,24 79:5,9
79:10,22 80:1 81:19
85:18 86:23 87:7,11
88:15 89:5,7 90:12
90:24 91:14,21 92:3
92:4 93:21 94:12
97:7,14,21 99:9,10
99:16 100:20
101:15,24 102:2,19
103:22 105:17
106:9 107:12 108:2
108:12 110:4
111:23 112:2,7,16
112:20,23 113:5
114:6,15 115:21
116:12 119:11,14
121:14 126:4 127:2
127:3 128:18,21,24
130:23 131:14
132:10,14,25 135:9
135:24 143:3,15,22
146:14 149:3 150:6
151:13 153:1,7
155:3,9 157:3,13
158:13 159:17
160:12,13 161:14
161:17,20 162:1,8
164:9 165:8 168:25
169:23 170:13,19
172:7,9,14 173:7,19
174:21,24 181:25
182:1,9,15
**knowledge**
14:15,18 21:15 22:12
22:25 36:21 64:22
75:22 77:24 79:7
86:8 87:16 88:21
103:22 105:25
112:10 126:7
157:14,24 158:15


MAGNA
LEGAL SERVICES

159:18 160:4 161:5 180:1
**knows**
84:4 91:1
**Kreider**
7:12,14 8:13 49:8 60:22,22 182:9

---

**L**

**L**
136:14
**labor**
1:6 2:16 5:6,7 14:5 39:5 42:16,18,25 76:3,9,15,23 77:9 77:14,17 78:3
**laboring**
40:12
**Labor's**
46:23
**lack**
113:24 126:10
**laid**
40:22 84:8,9
**Lamar**
45:15
**land**
31:11,15,20 32:1,13 32:14,16,20 140:24
**Lane**
27:15,17,19
**laps**
174:2
**late**
8:9,10,11
**Laurel**
2:4
**Lauren**
61:17
**law**
4:13 78:17
**laws**
161:22
**lawsuit**
23:10 46:21 47:3,19 48:1 56:1,2 179:10

180:8,10,11
**laying**
84:3
**lead**
38:17
**learn**
76:23 77:7,9,14 78:25 79:8 82:13 83:5 86:13 87:19
**learned**
125:6
**leave**
59:18 65:8 113:20,25 114:3,10,21,25 115:11,19 116:4,22 119:20,20 126:17 126:17
**leaving**
21:1
**Lebanon**
9:5
**left**
39:2 116:20 124:1
**left-hand**
158:23
**legal**
10:8 26:7 28:5 57:10 62:8 77:2 78:6 82:19,20 106:12 127:24 128:23 161:17 181:1
**legally**
128:22
**letter**
120:11
**letters**
119:25 120:6,15,19 120:20,23 121:1
**letting**
115:11
**let's**
12:20 35:5 74:20 90:18 105:6 108:2 112:25 115:9 117:16 127:12 132:23,23 133:14

152:14 179:16
**level**
5:16
**Liberty**
1:16 5:9 10:18,25 11:4 22:20 23:24 24:2,2 25:11,17,21 26:21 28:3,7,16 29:11,12 30:11 31:11,15,20 32:1 33:4,6,7,12 34:5,19 34:21,22 35:11,25 36:10,15,18,23 37:11,18,22 38:3,12 38:25 39:2,4,6,20 39:21 44:24 45:4,18 46:15 47:25 51:7 54:2,4,11 55:9,9,14 56:13,18 57:7 58:18 60:8,13,20 62:21 63:4,16 64:25 65:8 65:12,19,22 66:1 67:19 69:3,7,9,10 69:18 70:2 71:2,8 71:15,17,19 74:17 75:8,10,18,23 76:4 76:7,10,16,21 77:6 77:12,13 78:19 79:7 79:11,18 80:6 81:14 84:17,25 85:13 87:18,20,25 88:10 89:10,13,16,19 90:2 91:11,16 92:19 93:12,20 96:11,21 98:6 99:18,20 100:7 102:17,23 103:6,14 103:18 104:8 107:23 108:1,13 109:4,6,21,24 110:21,22 111:3,7 112:10,11,17 113:1 113:3,9,15,20,21 114:2,3,10,19,23 115:5,19 116:1,21 116:23 117:6,8,11 117:12,19 118:3,6

118:16 119:17 120:5,5 121:1,21 122:10,18 123:10 125:10,24 126:11 126:23 127:5,22 128:5,6,14 129:4,12 129:17 130:2 137:9 137:16,22 138:24 139:6,14,19 140:22 141:24 142:10 143:17 144:3 145:21 146:24,25 147:3,15 148:6,21 149:10,18,20,25 150:8,14,21,22 151:24 152:8,11 153:9 159:7,12 160:18,25 161:6 162:11,16,23 163:10,15 165:11 167:12 168:5 171:6 172:2,16 175:8,19 176:1,7,15,16 177:5 177:6,15 178:7,17 179:15 180:2 181:3 182:11,17
**license**
49:19 97:16
**licensure**
51:19
**life**
39:18 151:11 169:19
**lift**
41:18
**lifted**
21:24 22:1 36:19
**lifting**
36:22
**light**
84:1 159:13
**liked**
32:5 90:21 151:7
**limit**
179:9
**limited**
84:19



MAGNA
LEGAL SERVICES

line
124:22 156:21
list
18:19 74:8 94:7
130:24,25 131:12
131:14 142:9
listed
106:4 142:4
listen
54:18 55:2
lists
141:23
literally
105:4
litigation
83:13 96:24 118:10
179:4
little
4:22 7:12,22,23
20:25 21:8 60:11
81:23 85:2 93:6,7
107:11 153:1,2
164:13 167:3
174:18
live
8:24 27:15,17,23
110:11,15,17
125:14 135:1
livelihood
125:18
lives
163:3
living
9:8 40:19 109:1
LLC
10:3
loan
34:14,20 35:21
140:15 141:8
142:23 143:5
157:25 158:5
159:19
loans
32:18,19
local
118:1

located
169:25
location
2:18 105:4
long
20:9 41:9,19,23
44:22,24 88:15
91:22 92:9,10
113:15 116:13,20
118:22 126:10,11
126:14 127:4
132:25 152:20
170:5
longer
20:12,13 38:15
153:11 164:18
longest
170:11
look
7:6 11:16,22,23
12:21 13:1,2,5,9,12
13:15 20:5 26:12
33:16,21 36:13
43:25 44:2,3,7
48:17,17 51:1 53:7
56:6 67:21 72:22
82:8 88:24 91:19
96:15,18 105:19,20
123:4,5 124:5
126:20 127:11,12
136:22 137:3
139:11 145:10
147:23,24 155:10
157:4,5 158:7,10
171:1 173:21,24
177:25
looked
7:5 14:3 66:4 74:5
108:4
looking
20:24 31:19 43:19,21
52:4,14,19,22 57:1
60:14 67:22 82:3
124:13 139:18
140:13 173:19
179:18

looks
49:12 50:17 137:8,15
137:21 138:5,23
139:18,19,25 140:6
157:8,20 158:24
lot
8:17 83:7
love
44:14 65:24 100:25
loves
100:23
LRF
26:10 51:3 63:14
123:1 145:15
147:25 171:2 178:1
Lumber
82:12 87:16,17,22
88:1,10,13,16,23
89:3 91:23
lunch
104:25 116:13

———————————
M
———————————
M
2:9 136:13
major
70:3,12
majority
144:2
maker
115:18
making
59:17 144:21
Mankins
4:17
manual
41:3 52:15 96:16
124:5
March
91:17
mark
61:11,13,21 63:1,5,7
156:7
marked
11:19 12:24 26:10
33:10,13 48:20 51:4

63:15 123:2 127:14
139:7 145:16 148:1
155:14 170:25
171:3 178:2
Martin
1:17,23 3:3 4:4,11,13
4:21 5:5,10,14
11:18 12:21 13:13
27:22 45:15 116:22
124:11 136:20
157:3 164:22 181:4
181:6,9,10,16
Martin's
61:4
Marvin
98:21,25
Maryland
181:19 182:3,4
mass
37:1
match
142:22 143:4
material
159:4,13
materials
159:6,7,8
math
133:18
matter
5:7 95:7
maul
136:5,6,7,8,13
McAlister
27:19
meal
131:19 133:2 152:17
meals
109:7 132:25 133:1
mean
8:24 13:3,4 17:15
23:20 24:9 27:3
30:8 37:24 52:3
57:19 58:5,18 61:25
64:4 77:7,17 86:6
89:14 92:24 93:6,24
99:18 100:5,16



102:19 115:4 119:13 124:6 126:4 142:17 144:22 145:13 146:1 151:14 154:12 157:4 160:6 169:5 178:16

**meaning**
5:22 14:4 130:18

**means**
17:17 63:16 177:15

**meant**
98:22

**mechanics**
39:12

**Meck**
72:14,15,18 74:1,19

**medical**
56:15 117:4,5,13 118:2 169:7,10

**medications**
6:16

**medicine**
129:24

**meds**
129:21

**meet**
104:25 115:9

**meeting**
23:6 30:6 51:4,14 63:15 66:7,11,13,16 66:17,22 67:2,5,12 67:15,25 102:15 123:2 145:11,13,16 145:23 148:1,7 171:3,9 178:2

**meetings**
17:17 20:17,18 23:1 23:3,17 65:15,16 66:2,5,9

**Meghan**
2:3 4:10

**member**
15:16 17:2,3,23 19:2 23:13 29:20 61:5,6 61:7,9,12,18 63:5,8

63:18,20 65:21,22 104:13 105:11,14 182:20

**members**
17:5 18:23,24,24 19:20,21,22 20:3 60:12 79:2 82:14 95:12 106:20,22

**members-and**
74:25

**memory**
52:12

**men**
38:22 39:5 40:18 44:5 83:5 91:1 100:22 108:16 148:25

**Mendez**
2:9 4:12,12,25 183:6 183:13,17,22,24

**Mennonite**
1:12,14 5:8,9 10:10 10:11 15:10,10 21:5 22:5 158:24

**mentioned**
116:12

**mentions**
49:21

**mentor**
58:9 59:1,4 86:6 88:22 104:15,16 105:7,8 125:25 126:8,11,13,20 127:4 129:3 131:7 138:23 143:18,23 144:4,12,14,16,18 151:15 152:7 153:25 154:17 160:24 161:6 163:6 163:14 166:25 167:1,6 180:22

**mentors**
10:25 11:1,4 73:4 74:9 81:19,21 83:18 88:16 89:2,6,17 91:5,22 92:11

104:15 105:11,15 105:18 106:15,16 106:23 108:9 110:9 130:11 131:3 139:2 153:2,4 162:21 165:1,6,8

**mess**
136:25

**message**
15:4

**messed**
74:20,21

**Messianic**
1:12 5:8 10:11

**met**
99:15 100:8

**metal**
41:4

**Mhm**
67:23

**MIDDLE**
1:2

**Midwest**
108:5,22

**Midwestern**
46:2

**milestones**
114:20

**Mill**
90:3 148:11 149:7

**million**
65:24

**mind**
156:25

**mine's**
157:4

**minimum**
161:14,22 162:3,3,22

**ministry**
110:25 111:1

**minor**
40:21 113:19

**minors**
10:17 54:4 83:18 85:22,25 110:20 112:11 113:8

165:23 178:23,25 179:19,20

**minutes**
41:25 51:4 60:15,15 63:15 66:5,7,12,13 66:16,17,18,22 67:5 67:12,15,24 105:21 105:22,25 123:2,10 145:16,21 148:1,6 171:3,6 178:2,7

**mischaracterization**
29:8 70:6 87:9 107:1 141:19 174:23

**misheard**
95:14

**Misrepresentation**
143:13

**mission**
1:12 5:8 10:11,12,14 15:1,2,12,14,17,19 15:22,25 16:6,12,14 16:15,17,20 17:23 18:1,7,9 20:20 21:16,21,22 22:12 22:16,18,21,25 23:14,16,23 24:24 25:4,9,11,16 29:3 29:16 31:1 32:6,7,9 32:10,14 33:2,4,5,9 34:17,23 35:16,25 36:6,8 37:17 60:9 62:12,13,16,22 63:6 63:19 64:4,5,9,10 64:11,17 67:13 69:6 70:1,14,24 71:5,6,7 71:10 75:22,25 76:14 78:22,24 79:2 79:4 93:11 98:11 99:5 104:4 112:16 113:2 114:2 116:6 128:9 140:21,24 141:7,14 142:19,22 149:11 157:11,20 159:22,25 182:13 182:21

**Missions**



23:19
**MMM**
28:20,22 29:3 33:9
  34:14,17 37:4 56:25
  62:9 96:16 140:15
  140:19 141:14
**moisture**
41:18
**moment**
114:24
**monetarily**
78:1
**money**
22:3 24:8 32:13,16
  32:16 33:9 35:24
  36:1,8 37:9 38:3
  70:23 80:11,11
  91:11 107:14
  108:19,20 122:2,5
  140:23,25 149:11
  181:1
**month**
21:25 36:5 59:22
  60:5 68:20 73:24
  98:14 106:24 107:5
  107:6 121:25 122:1
  122:5,20 123:15,23
**monthly**
139:1
**months**
126:15,21,24 127:2,7
  127:9
**morning**
4:15 5:5 42:11 110:5
  130:10
**mother**
93:21 123:25
**Mount**
2:4
**move**
32:11,12 123:14
  135:2,6,12
**moved**
135:1
**muchjust**
21:8

**multiple**
50:9,10 156:3
**mwynkoop@marg...**
2:7
**Myerstown**
9:1,3 182:1
**M-E-C-K**
72:18,19
**M-U**
136:14
**M-U-A-L**
136:15

---
**N**
---

**nail**
93:7
**nailer**
41:3
**nailing**
40:8
**nails**
40:9,24
**name**
5:5 15:9 25:19,23
  27:15 28:3,9,10,16
  28:20 29:12 30:6,8
  30:16 62:22 63:17
  63:19 69:15 72:10
  72:15 169:23
  181:13
**named**
4:22 60:20
**names**
45:14 58:5 60:16
  93:20 94:7 127:19
**name's**
66:10
**Nathans**
5:11
**National**
149:21 150:13
  155:14 156:24
**nature**
88:18
**necessarily**
74:23

**necessities**
129:2,5
**Neck**
72:20
**need**
6:11 36:2 40:16
  56:17 72:22 116:13
  125:11 126:17,24
  127:10 128:13
  155:17 169:18,18
**needed**
73:8 95:18 114:20
  134:19 174:2
**needs**
38:6 144:12
**neither**
163:6
**Nelson**
1:17,23 3:3 4:4,11,13
  5:10 11:18 26:12
  27:22 50:25 66:12
  66:12 116:21
  123:14,20 146:6,8
**Nel-Ray**
9:23,24
**never**
7:18 28:12 50:3
  63:18,20 74:4
  111:13 114:7,9
  120:19 126:23
  131:10 162:20
  163:18 164:6 167:4
  167:9 170:19
  172:10
**new**
30:6,8,8 33:1 67:9
  97:2,2 135:7
**night**
7:14,15 8:7
**nip**
56:23
**NJ**
2:4
**nodding**
6:2 119:11
**Noel**

149:3
**Noel's**
148:12,15,18,22
  149:8
**noise**
8:17
**Nolt**
61:6
**nonprofit**
77:25
**Nonverbal**
119:8
**non-emergency**
117:5
**non-fellow**
106:16
**non-serious**
117:5
**norm**
94:24
**normal**
127:4
**normally**
134:8 146:14
**northeast**
21:4,5
**note**
4:19,23 26:6 70:13
  82:16,19 96:22
  116:10 138:8
  156:22 162:24
**notes**
52:5 160:14
**nothing-nothing**
165:16
**notice**
4:20
**noticed**
150:6
**noting**
4:24 71:9
**not-has**
169:17
**November**
185:12
**no-the**



126:23
**number**
22:10 82:2,5 124:22
141:12
**numerous**
70:15
**nutrients**
169:18,18
**nutrition**
169:2
**nutritionist**
169:1
**NW**
2:18
**N-E-L**
10:3

**O**

**object**
53:10 55:18 62:7,15
70:5 75:11 83:11
96:12 117:9 141:25
143:6 171:18
175:11 176:19
177:18 178:19
179:2 180:6
**objection**
8:14 12:15 14:16,22
21:13,17 22:14,22
23:9 24:12,18 25:13
25:25 26:6 28:4,17
28:24 29:8 30:4,19
31:2 34:25 37:12,20
42:6,18 43:1,18,24
44:8,13,18 45:19
46:16,25 47:1,9
50:2,16 51:24 52:8
53:18,23 54:6,13,23
55:24 56:9,20 57:8
57:17,21 59:11,25
63:2 65:2 66:24
67:6 68:15 69:19
70:14 71:1,9 72:11
73:6,19 74:3,10,22
75:19,24 76:11,17
76:25 77:15,21 78:5

78:15 79:1 80:7,18
81:3,9 82:16 83:1
84:18 85:17,24
86:11,19 87:1,9
88:3,17 89:4,22
90:4,19 91:8,24
92:12,23 93:14 94:2
94:11,20 96:22
97:11,20,25 99:14
100:1,10,16 101:6
101:13,25 102:7,12
103:15 104:5,23
105:9 106:6,11,18
106:25 107:19
109:12,20 110:23
112:13,19 113:4,10
114:5,12 115:1,12
115:20 116:25
117:20 118:9,19,25
119:21 120:2,7
121:3,11,17 122:11
122:21 124:7
125:19 126:1,12
127:6,23 128:16,23
129:6,19 130:3
132:3,12 133:19
134:1,17,23 135:17
135:21 136:1
137:11,18,24 138:8
139:8 141:19
142:11 143:13,19
143:24 144:5,23
146:18 147:18
148:19 149:13
150:2 151:16 152:1
152:9 153:10,20
154:7 156:22
160:20 161:2,8,16
161:23 162:5,24
163:11,17,21
165:13,24 166:5,13
166:20 167:2,8,13
167:18 168:3,15,20
169:12 170:6,17
172:6,12,19 173:1
173:13,18 174:17

174:23 175:22
176:3,9 181:20
**objections**
82:10
**obtained**
31:16
**obtaining**
31:15
**obviously**
42:13 47:23 66:4
71:14 142:21
**occasional**
134:11,11
**occasionally**
95:17,18 134:15
**occupied**
73:1
**occurring**
168:19
**offer**
148:13,15,22 149:7,8
**offering**
21:23,24 22:2
**offerings**
21:19 22:4 32:20,23
32:25 33:6 35:15,21
36:2,9,15,17,18,19
36:23 37:9,19,23
140:20 141:1,4,12
141:24 142:1,3,5,9
142:18,22 143:1,4
160:4
**offers**
35:7,11 122:15
**office**
2:4,10 4:18 5:12
11:11
**official**
17:3,5,8,9,12,16
29:21 61:21,24,25
62:3,6 72:7
**offset**
124:18 125:9
**oftentimes**
122:23
**of-they**

135:3
**oh**
26:14 62:12 124:23
136:10 145:12
163:8 181:17
**okay**
5:2,16,21,25 6:5,11
6:14,25 7:3,6 8:7,12
8:22 9:4,20 10:12
10:13,19 11:3,10,14
12:12 13:18,23
14:10,20 15:1,12,24
16:22 17:1,10,15,19
17:22 18:6,9 19:2,9
19:22 20:3,6,15,20
20:22 21:3,7 22:7
22:12,20 24:1,7,23
25:11,19,23 26:20
26:24 27:7,10,21,25
28:2,15 30:15 31:14
31:19 32:10,22 33:1
34:2,6,9,19,22 35:6
35:8,10,24 36:12,25
37:3,9,16,19 38:3,6
39:21,24 40:24 41:2
41:6,8,12,16,24
43:16 44:22 45:1
46:5,12,15 48:2,5,9
48:13 49:6,14,24
50:6,8,10,13 51:8
51:10,14,17,22
52:12,21 53:4,16,21
54:2,11 55:6,13
56:13,23 57:7 58:21
58:23 59:24 60:19
61:19 62:13,25
63:16,22 64:10,17
64:20,25 65:18,21
66:4,11,15,21 67:4
67:9,18,20 68:4,13
68:19,22 69:13,17
70:1,10,19 71:5,7
72:19,24 73:17 74:1
74:17,19 75:6 76:14
78:10 79:10 80:1,4
82:8,24 84:10,12,15



84:22 85:3,16 86:8 87:14 88:12 89:6,9 89:13,16,19 90:2,11 90:14 91:21 92:15 92:17 93:3,17 94:6 94:9 95:1,9,20 96:4 96:15,17 97:23 98:8 98:10,13,19 99:4,7 99:24 100:9 101:19 103:2,6,9,13,18,21 104:1,3,8,11,14 105:13,17,20,24 106:15 107:8,16,23 108:1,8 109:3,6,9 109:15,18,24 110:8 110:13,20 111:6,15 111:21,24 112:1,6 112:16,21 114:2,9 115:17,24 116:6,9 116:17,18 117:4,13 117:23 118:22 120:17 121:20 122:2,8 123:22 124:9,15 125:4 127:9,12,15,16 128:3,9,19 130:1 131:14,23 132:23 133:3,22 134:15,21 135:13 136:16,23 137:15,21,25 138:5 138:13,18,19,23 139:13,18 140:15 142:7 143:17 144:11 145:7,20,22 145:25 147:9,15 148:5,7,9 149:5,7 149:17,23 150:17 150:24 151:9,23 152:25 153:18 154:5,24 155:3,5,20 156:17 157:16 158:1,7,17,22 159:6 159:10,15 160:16 160:16 162:10,21 163:5,14 164:2,10 167:24 170:4

171:11 173:9,21,23 174:8 175:5,8 176:6 178:4,6,11 180:14 180:14,19,24 181:2 181:5,8,13,15,17 182:5,21 183:5

**once** 19:6 21:24 69:2 70:13 113:4 139:8 162:24

**ones** 40:7,22 112:4 151:3 155:15

**one's** 157:17

**open** 46:15

**operate** 31:12,15

**operates** 15:3

**operating** 25:7,8 48:20 52:4,14 52:15 53:21 124:5 176:12

**opinion** 114:24 174:18

**opportunities** 147:15

**opportunity** 13:12,15,23 147:24

**order** 11:7 183:10,13

**ordering** 116:14

**organization** 77:25 78:1

**organizations** 46:24

**original** 67:10,11,12

**outset** 26:7 124:7

**outside** 46:20 47:19 48:1,12 49:15 50:3 53:12

55:25 56:21 72:12 83:12 87:20 94:22 105:1 118:10 131:23 175:12 179:8 180:5

**overlap** 83:21

**override** 114:2

**overseeing** 147:2

**overseers** 16:25

**oversees** 71:20,23

**oversight** 144:25 145:1

**overtime** 106:10 163:7,7

**owner** 25:23,25 26:3 27:22 28:3,11,13,15,19

---

## P

**Pa** 2:4,10 9:1,3 26:9 27:19

**pack** 43:10

**page** 3:2 11:4 26:16 34:10 35:5 37:5,7 63:12 65:15 124:6,12,24 140:11 141:4 157:17 158:1,22 178:11,12

**pages** 155:21 156:13

**Pahlmeyer** 170:4

**paid** 15:19 32:23,25 35:13 35:14,15,25 36:5,5 37:17,18 46:5 59:19 65:21,24 73:24 106:5,10 138:24

141:7 146:12 157:11 159:22,25 160:17,25 161:7,14 162:2,11,15,20,22 163:1,4,6,14,18

**pain** 137:1

**painful** 171:14 172:1

**pallet** 24:17 39:14,16,19,19 39:22,25 40:11 41:20,25 42:5 43:21 73:5,12 82:12 89:20 89:25 90:15,18,25 91:5,6,9,12,13 137:9 139:20

**pallets** 24:10 40:9,22,25 41:6,17 43:14,17 68:14 90:13 91:6,12 91:16,17,21 124:16 125:4,6,9 130:22 134:16 143:17 144:2,7 164:24 165:2,6,12 181:19 181:21

**pallet-on** 87:21

**Palmyra** 170:1,3

**paper** 69:24

**papers** 67:7

**paperwork** 30:3

**paragraph** 51:17,18 63:13 68:1 96:18 123:14 124:12,21 146:4,5,8 148:10 171:12 173:24

**Paraguay** 16:1,8,23 17:20 19:4 20:1,7 23:19,20



paramedic
169:5,6
parcels
31:20
parent
56:16 105:1 116:22
116:23 117:13,19
117:23 124:1
131:15,20,25
parents
38:15 50:1 54:8,16
54:16 55:3 56:11
65:9 86:12,17,24
110:24,24,25 111:2
111:20,21 117:7,13
118:1,8,18 119:4,7
119:13,16 120:1
121:20 122:9,13,19
122:24 123:15,19
123:22 127:17,20
127:21 129:9,15,22
129:24 130:24
parochial
104:2
part
16:24 21:22 22:16,18
24:20 39:3 62:17
70:15 79:4 83:4
97:16 101:21 103:1
103:2,2 108:25
110:14 117:11
141:1 151:17 166:9
participate
99:21,24 104:11
145:22 153:4
participated
51:11 94:18
participating
151:24,24
particular
31:25 48:1 122:20
166:19 172:1
parties
185:7,8
parts
42:24 43:8

pass
44:21
pay
33:5,9 34:20,23
37:10,11 39:10
78:13 108:6 121:20
122:9,14,20,24
138:17 140:23
141:14,14,15
payment
86:9 109:10 140:18
142:22 143:5
157:15 163:9
payments
68:10
peas
163:24,24 164:3
Pennsylvania
5:9 10:11 15:10 22:5
25:20 27:25 30:3
103:23 161:15
162:2 170:3 175:9
180:12
PENNYSLVANIA
1:2
PENNYSYLVANIA
1:13
people
6:7 29:24 38:18
42:10 44:16,19 45:6
45:9,11 53:9 55:17
58:1 69:5 88:6 99:2
108:22 153:22
163:2
peppers
170:16,20,22 171:13
171:17,22,24 172:4
172:10,11
percentage
143:22
Perfect
164:20 183:22
perform
81:19,22 83:18 84:16
153:18 166:16,16
performing

132:11
period
4:24 59:25 80:8
83:12,19 92:4,6,24
96:23 98:20 113:10
113:16 118:7,17,22
122:8,11,21 124:8
126:1 127:6,25
129:7 130:3 132:3
134:24 135:17
143:19 147:18
149:13 151:16
160:20 162:14
163:21 165:13,24
167:13 168:15,21
170:6,17 171:20
172:13,19 175:12
176:21 177:10,12
178:21 179:3 180:5
181:20
perjury
6:23
permission
102:11 171:22
183:16
permit
79:20
permits
79:16,17,24 80:2
persistent
166:11
person
31:16 69:11,14 72:8
72:10 100:9,14
111:12,17,18,22
121:9 154:21,24
181:22
personal
45:21 72:4 86:16
102:10,11,13,19,24
103:4 105:7,8
110:17 113:23
114:24 130:12
167:24 169:13
personally
39:18 45:17 55:13

76:22 77:8 87:14
100:17,18 101:10
149:23 150:13
160:17 169:3
172:24
personnel
70:3,12 71:7,8
person's
100:25
perspective
120:14
pertaining
46:22
pertains
177:10
Philadelphia
2:4,10
Phone
2:5,11,17
phonetic
45:15 148:12
phrase-well
126:10
phrasing
113:24
physical
42:16,18,25 43:5,6,9
43:16,22,22 44:17
178:14
physically
176:7 177:7
pick
31:25
picking
163:24 164:2
pictures
151:1
piece
32:1 41:8 136:8
pieces
41:9 91:15
pigs
105:2 130:22
pile
150:10,10
place



38:16 65:9 118:24
133:10 135:1 179:9
**plain**
183:15
**plaintiff**
4:5 5:18
**Plaintiffs**
1:8 2:14
**Plaintiff's**
12:23
**plan**
128:10 148:11
**planning**
28:8 116:13
**Plant**
182:1
**plate**
63:23 64:12
**play**
136:18
**played**
132:7
**player**
114:16
**playing**
119:4,6,13 130:21
**please**
4:9 6:1,5,6 10:2
11:16,22 13:8 33:16
34:13 35:6 48:17
83:16 118:13
127:12 136:22
156:9 158:8 173:22
175:15
**point**
6:11 29:12 30:5,12
49:24 50:14 104:18
121:6 171:12
178:23
**policy**
48:20 52:4,15 70:3,8
70:12,16 96:16
118:24 124:5
**position**
16:19 36:9 61:4 62:3
93:8,17 96:10 97:19

97:24 98:6,8 99:2,4
99:13,22,25 100:15
101:2,5 126:16
**positions**
18:13,19,22 19:14
95:24 103:7,9
104:14 106:3,16
**possible**
85:20 120:22,24
143:11 164:19
**potential**
94:7 112:17
**potentially**
75:3
**power**
38:8 127:13,17,18,20
128:4,22
**powerful**
125:22
**preference**
127:1
**prep**
7:3
**preparation**
7:8
**prepare**
33:25 57:22 66:15,16
66:19 68:5 134:14
**prepared**
66:18 68:24
**preparing**
134:9
**present**
15:4 66:8,9 171:9
**presented**
63:17
**presently**
47:3,4
**president**
18:15
**pretty**
43:6 115:22,24 133:8
134:8 145:4 155:2
**prevent**
6:17
**previous**

143:1
**previously**
56:7 125:5 137:5
**price**
146:11
**primarily**
95:20,23
**principle**
125:22
**print**
26:13,14
**prior**
11:10 36:3 70:6 83:6
101:11
**private**
80:17 81:8,14 83:17
86:18,24 87:8
134:21
**privilege**
46:19 47:16,18 48:7
48:11 53:12 75:13
77:1 128:16 150:3
175:14 176:21
180:4
**probably**
6:12 92:18 93:1
100:7 101:3 122:7,8
123:8 130:4,8
134:18 135:22
143:20 148:4,24
151:24 178:5
**problem**
104:16 151:10
**procedure**
40:17 62:19
**procedures**
99:10 110:2,3
**process**
31:14 39:24 40:21
94:10,18 99:21,24
103:3 104:11
**produce**
143:17
**produced**
4:20,21
**product**

41:16
**production**
14:10 53:8
**productive**
82:14 124:17
**professional**
56:15,17
**profitability**
40:18
**profitable**
40:14
**profits**
24:10,13
**program**
54:5 88:7 108:18
110:6,7,10 113:17
124:18 151:25
152:8 153:9
**progress**
4:2 113:17
**project**
40:16
**promote**
32:3
**property**
25:16 31:17 33:2,5,9
34:21,23 35:16
**prospective**
55:14 56:5,8 110:21
113:1
**protected**
53:11 75:12 77:1
150:3 175:13
176:20 180:4
**provide**
53:21 85:14 109:25
152:11
**provided**
53:9,16 84:17,22
108:9,14 109:7
129:4,9,12,17
149:23,24 156:12
185:5
**proximity**
117:24
**Publications**



158:24 159:13
**pull**
40:2 155:21
**pulled**
155:24 156:14 173:5
**punishment**
167:25 168:2 173:11
173:17
**punishments**
168:9,13,19 170:23
175:9 177:17
178:18 179:23,23
**purchase**
32:13,20 91:9
**purchased**
32:14,15,17
**purpose**
38:12,13,21 88:7
**purposes**
116:13 151:1
**put**
12:4,5 22:3 28:11
72:3 83:7 86:12
136:8 165:3 167:11
167:17
**putting**
84:7
**P-R-O-C-E-ED-I-...**
4:1

**Q**

**qualified**
56:19 98:8
**qualify**
24:17 138:21
**question**
6:14 13:14 17:24
42:24 43:7 52:1,17
52:18 56:4 70:6
77:4 95:3 98:21
100:21 142:1,3,7
150:12 151:17
153:7 172:3 173:14
175:15 176:25
177:1,3,10,19
178:20 179:8,13

**questioning**
156:22
**questions**
5:17,19 6:17 8:2,5,12
13:10 14:4 46:22
47:13 72:1 100:14
183:5
**Quick**
116:10
**quickly**
50:21
**quite**
90:20 92:16 122:7,8
122:13 136:25
152:3
**quitting**
90:24
**quotas**
164:23 165:1

**R**

**rails**
84:3
**raise**
146:22 147:16,17
**raised**
147:1,2
**ran**
101:17 169:6
**random**
69:10
**ranges**
113:8
**rare**
174:18
**rate**
106:5 162:16
**reach**
15:4
**read**
14:1 26:13,16 27:1
29:10 34:14 51:20
67:25 82:15 120:6
120:15,19,20,22,24
121:1,9,10,14
123:17 124:19

125:1,2 127:11
140:16 146:6
148:13 171:15
174:11
**reading**
34:13 82:9 120:19
124:15 178:13
**ready**
5:2 51:2 113:20,25
114:3,10,21,25
115:18
**real**
7:24 37:8 130:4,8
140:19 157:14,16
158:6,7,16 159:18
160:5 165:16
**really**
17:7 83:6 91:19
110:1 128:18 147:8
148:24 156:20
161:24
**reason**
6:25 21:10 28:11
125:8 138:2 175:5
**reasons**
38:25 120:12
**rebellion**
167:19
**rebellious**
38:15
**rebuild**
39:8
**recall**
49:14 51:14 52:14,19
145:25 168:11
**receive**
86:9 98:13 109:19
111:10,16 135:11
163:9 180:24
**received**
32:19 88:22 89:16
107:14 111:6,11,13
141:24 142:10
163:7 180:22 181:1
**receiving**
109:10

**recognize**
11:25
**recognizes**
173:25
**recommendations**
177:16,20
**record**
4:9,20,24 88:24 95:8
116:10 165:15
185:5
**Recording**
4:2 183:25
**records**
36:13 72:23 90:10
149:24 155:13
156:2,11
**recreational**
133:3,6,9,10
**recruit**
112:11
**recruitment**
112:17
**refer**
10:12,18
**referenced**
57:20
**referred**
57:11 66:12
**referring**
10:10 15:6 29:3 52:9
57:23 60:17 110:3,9
123:20 129:2 142:4
169:8 180:10
**reflect**
5:1
**reflected**
141:13
**reflecting**
36:4
**Reform**
128:14
**refresh**
52:12
**refrigerator**
130:24
**regarding**



72:2 117:4
**regards**
40:20
**register**
28:9
**registered**
25:20 28:10
**regular**
95:16
**reimburse**
33:2
**reimbursed**
46:7,9,12
**relates**
47:25
**relationship**
16:17 148:23
**relative**
185:6,8
**relatively**
164:18
**relaxing**
153:22
**relevant**
25:5 83:19 96:23
155:15,24 162:14
172:3
**remember**
5:25 7:24 8:5,12 25:1
30:23 45:11 46:8
51:16 52:22 53:7
79:13 91:16 98:25
102:8 111:21 112:3
124:1 126:6 149:9
155:7 173:9,10,16
173:16 174:13,14
175:2 180:8 182:25
183:2,3
**removed**
116:24
**removing**
147:13
**repayment**
34:14 35:21 140:15
141:8 142:23
157:25 158:5,16

159:19
**repeat**
11:20 17:4 19:25,25
32:24 175:15 177:3
179:6
**rephrase**
25:16 31:8,9 56:4
79:16
**replaced**
20:8
**report**
7:5 23:23 24:2,6,7,23
66:17 67:25 68:4,5
68:7 69:2 71:3
95:11,15 145:14
146:4 148:10 175:3
**reporter**
4:7 5:21 6:1 10:2,4
96:5,8 98:1,3
116:10,12,17
164:11,15,20
**reports**
23:18 24:4 68:20,22
68:25 69:11,14,22
69:23 149:12
173:24 175:6
**report.BY**
53:15
**representative**
154:22
**represented**
32:2 49:16
**representing**
13:20
**reprimand**
75:4
**reprimanded**
167:6
**request**
12:14 14:10 53:8
56:16 102:24 111:3
111:11,14,16
**requested**
53:2 111:12
**requests**
111:6,10 151:7

**require**
178:14
**required**
84:16 99:16 100:12
**requirement**
154:9,11
**requirements**
51:19 76:24 77:7,9
77:14
**research**
146:6,13
**reside**
112:11 122:10
126:11
**resided**
10:17 113:9
**resident**
56:13 88:21 110:21
112:25 113:2,2,15
113:20,25 114:3,10
114:20,20,25 115:8
115:11,18 116:2,21
117:5,16,18 118:6
118:16,17 119:19
119:20 123:24
130:2 131:8 132:1
132:11,19 134:11
139:25 143:18,23
144:3 151:13,14,18
151:23 152:20,22
154:2,3,6 161:6
162:15 163:6,7,8
166:3,11,18 170:5
170:11,16 172:24
173:11,17,24
**residents**
10:19,21 11:7 40:21
50:1 54:4 55:6,14
56:5,8 59:6 73:4
81:19,22 82:13
83:10 84:12,15,25
85:5,8,22,25 86:3,8
87:17 88:18 89:2,7
89:17 91:5,22 92:11
106:16 112:17
119:25 122:6 125:4

127:21 129:3,13
130:19 131:1,2
133:3,24 134:15,21
135:6,16,20 153:12
153:12 154:9,17
160:16 161:14
162:10 163:20
164:23 165:8,23
167:11 170:22
171:17 172:4,17
174:15 175:10,21
178:18 179:15
**resident's**
123:15
**resident-or**
105:6
**residing**
113:3 130:2
**resist**
174:2
**respect**
55:3 167:19
**respectful**
114:15
**respond**
83:15
**response**
12:13 22:11 54:14
96:3 114:13 119:1
178:16
**responses**
11:11 12:13,23 14:3
**responsibilities**
80:5,14 94:22 144:17
**responsibility**
30:16 50:19 69:20
72:24 73:10,13,15
74:21,24 80:10,16
115:15 118:2 121:6
147:10
**responsible**
45:4 49:5,6 70:20
73:4,7 95:20,23
105:11,14,17
111:13 112:4
117:18 120:18



121:5 129:21,24
131:3,5,18
**responsive**
151:6
**rest**
18:23 130:14 132:8
**restate**
17:24 118:12
**restricted**
167:22
**restrictive**
167:12,17
**restroom**
50:23
**return**
135:3,3
**revenue**
33:13 137:22 139:7
140:6 149:11
**review**
11:10 12:12 13:24
50:6 173:25
**reviewed**
50:7 149:12
**reviewing**
13:8 150:7
**reward**
164:5,8
**rewarding**
42:21,23
**re-elected**
20:16,16
**re-enacted**
20:22
**re-note**
28:4
**rice**
167:23 170:5
**Richland**
27:25
**Ridge**
1:16 5:9 10:18,25
11:4 22:20 23:24
24:2,2 25:11,17,21
26:21 28:3,7,16
29:11,12 30:11,21

31:11,15,20 32:1
33:5,6,7,12 34:5,19
34:21,22 35:11 36:1
36:10,15,18,23
37:11,18,22 38:3,12
38:25 39:2,4,6,20
39:21 44:24 45:4,18
46:15 47:25 51:7
54:2,4,11 55:9,10
55:14 56:13,18 57:7
58:19 60:8,13,21
62:21 63:4,16 64:25
65:8,12,19,22 66:1
69:3,7,9,10,18 70:2
71:2,8,15,17,19
75:8,10,18,23 76:4
76:7,10,16,21 77:6
77:12,13 78:19
79:11,18 80:6 81:2
81:14 84:17,25
85:13 87:19,20,25
88:10 89:11,13,16
89:19 90:2 91:11,17
92:19 93:12,20
96:11,21 98:6 99:18
99:20 100:7 102:17
102:23 103:6,14,18
104:8 107:23 108:1
108:13 109:4,7,21
109:24 110:21,22
111:3,7 112:10,12
112:18 113:1,3,9,16
113:20,21 114:2,4
114:11,19 115:5,19
116:1,21,23 117:6,8
117:11,12,19 118:3
118:6,16 119:17
120:5,6 121:1,21
122:10,19 123:10
125:10,24 126:11
126:23 127:5 128:5
128:6 129:4,12,17
130:2 137:16,22
138:24 139:6,14
140:22 141:24
142:10 143:17

144:3 145:21
146:24,25 147:3,15
148:6,21 149:10,18
149:20,25 150:8,14
150:22 151:25
152:8,11 153:9
159:7,12 160:18,25
161:7 162:11,17,23
163:10,15 165:12
167:12 168:5 171:6
172:2,16 175:8,19
176:2,7,15,16 177:5
177:6,15 178:7,17
179:15 180:2 181:3
182:11,17
**Ridge's**
114:23
**right**
6:16,20 7:8 10:17,24
13:24 20:13 25:21
28:23 29:4 32:21
35:19,22 36:1 39:12
40:6,6 43:14 47:24
50:15,25 59:2,3
62:1 66:9 71:14
93:19 107:15
108:10,22 109:16
117:25 124:4,11
131:23 133:18
136:16,23 137:5,8
139:5 141:11,24
142:23 143:1
146:10,17 149:20
152:15,17 155:20
155:25 157:12
158:11 168:7,14
173:5,5 178:22
182:23 183:23
**right-hand**
26:20 157:6,17
159:16
**Road**
27:23
**role**
29:18 30:15 31:14
93:22 182:11,13,17

182:19,21
**roles**
71:17 103:9,10,11
**room**
180:15
**round**
133:14
**routine**
117:17
**run**
28:20 79:18 101:10
101:19
**running**
70:22 89:11 154:19
**runoff**
134:4
**Ryan**
4:14
**R-A-Y**
10:3

---

**S**

**s**
71:6 185:14
**safe**
144:19
**safety**
40:17 73:9 144:20,23
**sale**
24:17
**sales**
24:10 68:14 182:7
**Saturday**
134:6,11 154:1
**Saturdays**
134:8,16 153:19,21
153:23 154:6
**save**
63:12 145:14
**saying**
6:1 17:8,13 29:11
36:10 40:20 42:4
72:6 83:20 86:23,25
88:9 93:5 97:4
134:12 141:16
142:8 143:11 164:6


**MAGNA**
**LEGAL SERVICES**

165:7 167:6 174:22 177:17

**says**
26:21 27:21,22 51:9 51:10,18 57:6 67:24 82:9,10 83:16 96:19 123:14,19 124:16 137:25 140:15 145:24 146:5 148:10 159:2 166:12 171:12,21 171:24 173:25 178:12,14

**scared**
7:25 8:1

**schedule**
131:24

**schedules**
81:24

**scheduling**
73:4,6

**school**
10:6 99:11 104:2 132:20 151:19,21 152:19 153:3,12 159:11,12

**schooling**
130:13 132:19 159:4 159:6,7,8

**scope**
23:10 46:20 47:19 48:3,12 49:16 53:12 55:24,25 56:2 72:12 80:8 83:12 85:17 92:23,24 97:11 118:10 171:19 179:9 180:5

**Scott**
45:15

**screen**
93:24

**screened**
93:23

**screening**
101:4

**Screenshot**

26:9

**screwdriver**
85:4

**screwdrivers**
85:6,9

**second**
13:2 34:10 37:5,7 63:12 71:14 140:11 155:19 157:6 159:16

**secretary**
1:4 4:16 5:7 11:18 12:19,20 18:20,20 19:6,7,15 26:5,9 33:10,12 48:16,19 51:1 52:4 53:22 56:24 61:20,21 63:11,14 67:21 68:5 82:1 96:15 123:1,4 124:5 127:13 136:21 139:6 141:16,23 142:8,21 145:10,15 147:23 147:25 155:12,13 155:21 170:25 171:2 173:21 174:6 177:24 178:1 182:20

**secretary's**
12:14,22 51:3

**section**
51:18 57:1,4,20 96:18 123:13 146:4 148:9,10 171:11,12 178:12

**see**
27:3,4,7 34:11 37:6 59:9 60:15 63:25 64:3 68:2 88:6 91:1 96:19 97:4,18 101:23 107:14 115:8 116:1 120:11 124:13 125:1 131:21 136:24 140:12 147:14,22 150:9,18,20 153:4

157:8,9,18 158:25 164:6 165:5

**seeing**
171:14

**seek**
32:6,7 57:9

**seeking**
26:7 28:5 53:11 54:14 55:25 62:8,16 66:25 70:14 72:12 75:12 77:1 79:2 80:8 82:20 150:3 161:16 175:12,13 176:20

**seeks**
118:9,25

**seen**
13:5,21 33:23 48:24 123:7 128:7 145:18 148:3 178:4

**Seidel**
4:14

**select**
69:10

**selfish**
38:21

**sell**
85:16 91:11,12

**selling**
91:17

**send**
12:7 53:1 111:16 119:25 122:25 123:14,19,22 182:2

**sending**
55:25

**Sensening**
61:11

**sent**
11:12 49:25 50:15 181:19

**sentence**
82:9 146:8

**separate**
37:19,23,24 38:1

**serve**

15:24 16:5,9,22 18:5 18:11 46:18 64:13 64:15 72:20 101:1 104:4 161:10 163:2

**served**
15:16,21 19:6,7,20 98:25

**service**
59:14 74:5 100:21 108:18 126:14 152:11 163:2

**Services**
176:1,6 178:13 180:2 181:16

**serving**
20:6

**sessions**
39:9

**set**
12:23 45:18,19 75:8 76:6,22 78:19 81:25 81:25 107:21,24 131:24

**Seth**
61:19 175:2

**setting**
75:18,23 76:4,9,15

**settings**
125:12

**seven**
132:22,23

**shaking**
6:3

**share**
24:4 25:4,5 55:7,10 68:6

**shared**
67:13,15,18 102:14

**sheet**
165:19

**shelling**
163:24

**shelter**
108:9,14,21,24 129:3 129:12,17

**shipped**



147:6
**shop**
39:10 40:11 163:25
164:3 181:21
**short**
92:4,6,15,16,16
**show**
11:7,8 33:10 35:6
48:16 63:11 127:10
139:5 170:25
177:23,24
**showed**
100:11 136:21
**showing**
12:19,20
**sick**
101:24 102:6
**side**
80:22 157:6,18
158:23 159:16
166:7
**sign**
11:14 12:10
**signatures**
158:20
**signed**
81:5 90:12 158:17
**significant**
49:17
**signing**
146:20
**single**
123:25,25 124:1
**sir**
83:16 151:22 179:13
**sit**
38:24 62:10,12 166:7
**site**
87:18 110:11,15
**sitting**
47:21 149:1
**situation**
115:9 117:5 172:1
**situations**
118:2
**six**

126:24 127:2,7,9
132:22,22,22
152:24 153:16
**skid**
87:21
**skill**
39:14 40:17
**skills**
39:7,12 40:1 73:2
82:13 83:6 86:14
87:20 114:17 125:6
**sleep**
133:15 152:14
**slips**
150:9,10,10
**small**
26:13,14 27:6 156:20
**smith.john@dol.gov**
2:22
**snarky**
35:17 141:7
**Snyder**
82:12,24 83:10 85:16
86:10 92:10
**social**
79:12,14
**society**
40:3,19 44:6 82:14
149:1
**sold**
91:6
**solicit**
36:15
**somebody**
90:22 98:24 121:7
131:5 165:10
**someday**
148:25
**someone's**
102:24
**son**
9:18 54:17
**sons**
9:9,10,10
**soon**
163:6 164:18

**sorry**
6:6 8:24 9:2 13:11
17:4 19:25 31:8
32:24 33:4 37:22
52:16 60:12 63:4
68:24 69:10 74:13
76:8 82:9 83:16,22
86:1 87:25 89:13
92:9 95:6 96:25
105:7 112:22,23
130:7 131:17 136:5
143:24 155:15
159:3 161:13 163:7
170:2 172:16
173:10 174:4,7
175:17 177:2 181:9
181:17
**sort**
27:12 80:4 144:20
**sound**
35:17 126:21
**Sounds**
151:9
**South**
16:1 23:19
**space**
40:6
**speak**
7:8,11,15 75:9,17,22
76:3,7,8 79:12,14
81:17 104:16 105:8
105:10 118:18
128:14 156:23
169:21
**speaking**
35:22 81:18 101:1
171:19
**speaks**
27:9 35:1 51:25 57:8
96:23 137:12 139:9
**specific**
46:18 64:11 66:16
132:5
**specifically**
30:23 36:22 55:1
80:5 82:2 149:12

**specifics**
66:15 93:7 128:13
**speculate**
44:19 66:25
**speculation**
75:25 85:18 89:4
101:25 112:19
115:20 116:25
117:9 119:22 121:3
133:19 166:14
167:8
**speculative**
22:16 28:18 79:2
**spell**
10:2 17:10 72:15
**spend**
76:19 132:1,11,19,25
133:17 135:2
**spending**
70:22
**spent**
132:25
**splitting**
136:3,5,12,13
**spoke**
7:10,12,14 76:14
154:21,24 155:5,7
**spoken**
36:22
**stack**
87:21
**staff**
56:18,20 57:6,7,9,16
57:20 58:19 96:18
103:14 119:17
120:6 169:7,10
**standard**
48:20 127:20 180:6
**standards**
59:7 76:4,9,15,23
77:9,14 78:3 115:10
**standpoint**
119:16 125:21 169:1
**stands**
50:13
**start**


MAGNA
LEGAL SERVICES

4:19 92:3 171:13,25
**state**
4:8 13:14 25:20
26:10 30:3 38:16
83:16 118:3
**stated**
36:25
**statement**
34:4,4 118:12 139:14
141:17 147:20
**statements**
69:23
**states**
1:1,5 2:20 38:23 46:2
162:1
**Stauffer**
61:9
**stay**
112:25 113:15
116:21 121:21
127:4 129:17
158:22
**staying**
109:3 117:6 122:6
**steer**
105:2 131:5
**steps**
76:22 77:7,9,14,19
78:25 79:8 168:18
**stick**
148:17,22
**sticker**
156:8
**sticking**
47:8,10
**stipulate**
27:8
**stop**
20:6 38:9 168:18
**stopped**
183:25
**stops**
40:16
**streets**
149:1
**strenuous**

176:7,17 177:7
**strike**
52:13 66:21 78:11
83:10 91:22 140:23
146:23
**strong**
124:16
**structure**
42:3 115:2,4
**studied**
169:2
**study**
130:14 132:6,20
153:3,5,16
**stuff**
83:6 152:19
**SU**
1:4
**subcommittee**
64:25 65:4,6
**subject**
46:21
**submit**
62:22 63:4 94:1
**submitted**
63:19
**subsequent**
101:17,19
**suggested**
122:4,24
**suggestion**
64:18
**Sunday**
37:1 134:9
**Sundays**
134:3,3,8
**supervisor**
73:18,19 97:18,24
144:21,24
**Supervisors**
155:6
**support**
16:10 28:8 29:6,13
29:15,16,18,21,25
30:10,20 31:7,9,10
36:20 38:24 45:3

65:11,12,13 75:9
76:6,8 79:11,17
**supposed**
28:15 154:8
**sure**
6:2 11:3 12:9,17 13:4
13:6 17:25 20:5
23:11 29:1,23 31:4
38:10 40:4 49:4,23
49:24 52:3,9,18
56:6,7 60:14 69:21
69:23 70:22 72:22
73:1 86:20 88:14,15
88:25 89:1 92:13
95:4 98:24 99:1
101:7,14 104:6,8
107:10 111:8 112:8
113:12 116:11
118:14,23 120:20
121:6,18,20 123:24
129:8 131:13 136:2
136:10,11 142:20
144:19,21 147:22
152:14 160:15
162:14 164:13
168:10 170:24
172:21 175:16
176:22 177:5
**suspect**
175:5
**sustain**
169:18
**swap**
155:15
**sworn**
4:6

---
**T**
---

**table**
84:6
**take**
6:11,12,14 11:16,22
12:20 33:16 35:13
39:7,10 41:19,24
45:2 48:16 50:25
69:22 76:22 77:7,8

77:19 79:8 80:11
95:3 102:10,11,18
102:24 105:7
117:18 118:3
120:18 127:11,12
133:9,10 147:14
156:13 160:14
163:25 164:3,11
166:7,23 168:18
**taken**
33:7 126:8 136:22
141:14
**takes**
54:2,4,6 75:7 114:12
**talk**
6:5,6,7,7 7:17 10:17
15:1 48:6 54:19,19
95:9 110:20,25
111:12 132:18
166:7 167:3 183:9
**talked**
7:18,20 53:13 54:3
60:11 65:25 80:4
93:6 103:13 142:21
151:13 169:16
176:11
**talking**
6:6 10:15,22 37:4
53:5 68:2 80:20
91:24 95:9 96:19
108:20,20 116:15
157:18
**talks**
153:22
**task**
81:22
**tasks**
81:19 84:16
**tax**
37:8
**taxes**
37:4,7,10,11 158:6,7
**teach**
38:19 39:5 40:11,12
40:17 59:7 103:23
**teacher**



103:21,22,24 104:4
104:9,12
**teachers**
95:24 103:14,18
104:3 110:16,17,17
**teaching**
39:6 40:1,2 42:2,2
90:21 99:11 132:6
**team**
40:2 73:20 74:24
88:19 114:16 166:9
**teamwork**
40:13 72:4 73:2 75:7
**technically**
155:12
**technology**
20:25 21:8
**tedious**
176:18 177:8
**telephone**
145:23
**tell**
5:22 7:20,23 8:16
11:4 26:16 32:10
34:13 51:1 80:5
82:9 86:16,17 87:14
124:15 127:11
130:1
**Ten**
31:24,25
**tending**
73:13 124:16
**term**
24:12 25:13 28:24
31:3 55:18 57:9
102:13
**terminology**
82:19
**terms**
20:8,9 149:8
**testified**
4:6 22:15 23:13
57:22 70:15 125:5
137:6
**testimony**
5:22 7:1 29:10 36:7

70:6 141:20 143:14
**Thank**
4:7 10:4 96:8 98:3
169:15 179:11
**Thanks**
136:16 157:1 181:17
**that'd**
153:1
**their-one**
95:12
**their-parents**
129:16
**their-their**
115:6
**therapeutic**
124:17
**Theres**
122:23
**they-all**
114:16
**thin**
41:11,12,13
**thing**
33:6 39:9 45:24
99:11 144:12
148:16 156:4
166:25
**things**
47:5 50:4 51:15
60:12 95:5 134:6,13
153:3,13,23 167:20
174:1
**think**
7:5 17:5 20:10,11
44:20 46:11,25 47:1
49:8,15,15 60:2,11
62:25 65:25 80:23
81:16 92:8 103:13
112:9 125:3 129:1
132:17 136:11,15
150:19,20 151:2
153:15 159:2
165:21 169:5
**thinking**
21:1 127:24
**third**

158:10
**thoroughly**
13:24,25
**thought**
59:6 98:22 170:4
**three**
4:13 20:10,11,13
70:2,11 124:12,23
126:15 133:2
175:24 183:20
**throw**
41:15
**tickets**
108:6
**time**
6:11 8:6,10 18:11
20:23 23:5 28:8
30:12 36:14 44:21
49:24 50:14 59:25
60:2,14 63:12,24
64:1 68:9 72:13
76:19 80:8,23 83:7
83:12,19 86:9 88:22
89:3 91:2 92:5,6,15
92:24,25,25 96:23
97:1 98:20,23,23,24
103:20,21 104:18
104:20 105:13,18
107:3 108:5,17
111:22 113:10,16
118:7,17 119:18,21
122:9,11,18,21
124:8 126:1,12,14
127:6,25 129:7
130:3 132:1,3,5,6
132:10,19,25 133:1
133:4,6 134:23
135:17 138:9
143:19 144:7
145:14 146:1,15,15
147:18 149:13
151:16 153:7 154:9
154:12 155:2
160:20 162:14
163:14,21 165:13
165:24 166:1,5

167:13 168:15,20
170:6,17 171:20
172:3,13,19 175:12
175:24 176:21
177:10,12 178:20
179:3,22,24 180:5
181:20
**timeframe**
55:20 107:12 111:9
113:13 172:22
**timeframes**
112:2
**times**
70:15 94:22 163:23
175:24
**tired**
119:11
**title**
29:21 72:7
**titled**
178:12
**titles**
18:13
**today**
4:20,25 6:18,20 7:1,4
10:10 11:10 36:8
42:10 43:3 46:15,24
47:2,11 164:3,7
165:9 166:4,9 167:1
167:7 182:24
**token**
59:20,21,24 107:2
108:4,6 139:2
**told**
8:13 28:9 29:6 64:11
86:23 87:12 108:12
109:9,11 129:3,8,15
129:16,21 154:12
164:2,6
**Tolkelson**
62:5
**Tony**
4:14
**tools**
84:12,16,16,20,22
85:1,3,14



**top**
66:10 67:24 124:12
  124:23,25 136:8
  139:19 157:17
  160:13
**Torkelson**
61:13,21
**total**
65:23 122:6 137:21
  140:6
**totally**
49:8 126:13 154:2
**touched**
129:1
**town**
154:20
**township**
79:21,22 154:9,11,14
  154:15,16,16,22
  155:5,7
**to-need**
73:8
**track**
74:4,8,14 165:12
**tractor**
39:8
**traditional**
41:4 72:17
**trained**
56:15
**training**
10:8 39:8,11 44:5
  109:19,24
**transcribe**
185:4
**Transcriber**
185:16
**transcript**
5:1 183:9,14 185:4
**TRANSCRIPTION**
1:22
**travel**
46:5 108:5 117:25
**treasurer**
18:21,21 19:17,18
  30:6,13,15 33:8,8

36:9 53:14 61:2,10
  62:1 70:20 71:15
  80:6,10,14,16
**treasure's**
7:5
**tried**
151:1
**trouble**
54:19,19 55:10
**troubled**
54:4,12 55:7
**truck**
8:6,18
**true**
5:22 14:14 62:5
  90:14 97:18 185:5
**truly**
92:4
**truth**
5:23,23
**truthful**
7:1
**truthfully**
8:2
**try**
6:5,6 111:1 151:6
  155:11,15 164:18
**trying**
17:7 21:3 40:11,12
  141:6 163:5 165:9
**tuition**
122:9
**turn**
34:2,9 51:17 123:13
  157:16 159:20
  178:11
**turned**
35:15
**two**
13:1 41:9 46:21 47:6
  47:12 55:16,23
  65:14 100:7 133:13
  133:14 159:21
  175:24
**type**
130:16

**typical**
130:1,5,8 151:13,14

---
**U**
---

**Uh-huh**
52:6 158:12
**ultimately**
175:13
**umbrella**
73:12 131:22
**uncle**
16:16
**undergo**
56:14
**underneath**
27:4,5,22
**understand**
4:22 5:23 6:3,9 10:21
  40:20 42:4 50:21
  72:6 76:21 88:9
  93:5 125:5,11,24
  161:12 172:1
**understanding**
78:2,10,12 88:11,13
  94:6 106:23 111:15
**understood**
21:9 41:19 70:24
  124:4 125:24 146:3
  165:21
**unfortunately**
119:12
**United**
1:1,5 2:19 38:23
  162:1
**unsigned**
81:7,13,15
**updated**
51:19,23 52:7,14,19
  52:22
**use**
24:12 31:3 37:9,10
  43:10,11,13 44:14
  50:23 56:21 57:9
  84:12 114:9 135:20
  136:10,11 150:13
  180:15

**usually**
67:1 113:15
**U.S**
2:16

---
**V**
---

**v**
1:10
**valid**
128:22
**value**
124:17
**varied**
19:23 91:14 111:8
  114:14 170:8
**varies**
92:25 132:13,21
**various**
22:4 36:25
**Varner**
27:15,17,19
**vary**
81:24 133:21 142:17
**verbal**
90:7,9 111:11,13,16
  146:19,22
**verbally**
6:2
**verification**
11:14,19
**version**
49:2,14,21,25 52:14
  52:19
**versus**
5:8 104:22
**vetting**
94:9,18
**vision**
155:9 157:3
**visit**
45:23
**vocational**
39:7,11 40:1 73:2
  82:13 83:5 86:14
  87:20 114:17
**voluntary**



126:16,18 163:2
**volunteer**
15:21,24 59:5,10,13
59:18 64:1 65:23
73:20 74:5 77:17,17
83:7 108:17 126:14
**volunteering**
108:13
**volunteers**
11:6 18:11 40:7
76:19 78:13 152:10
161:10
**vote**
113:23

---

**W**

**wage**
4:17 161:14,22 162:3
162:3,12,22
**wait**
183:15
**waiting**
5:13 171:12,24
**waiving**
82:10
**wake**
110:8
**walk**
11:6 73:8 130:11
**Walker**
169:22
**walking**
59:5
**Wang**
4:14
**want**
13:4 14:20 17:18,21
21:9,11 22:3 26:25
29:10 40:14 44:19
59:17,18 60:15 72:3
72:3,4 93:6 100:15
108:16,17,17
110:20 116:14
117:13 119:19
125:1 154:19 156:7
160:8 163:1,1 166:3

166:9,22,22,22
167:7 180:19 182:7
183:19
**wanted**
4:23 28:10 48:9
76:19 88:6 100:21
100:22 102:10
105:7 116:22
125:13 135:3
153:25 161:9,13
166:18
**wanting**
167:19
**warm**
164:13
**warn**
176:6
**warned**
175:8,19
**washing**
132:14,17
**Washington**
2:19
**wasn't**
18:4 64:21 91:2 92:1
94:24 107:11 121:6
131:2 147:10 150:6
171:22 174:25
**was-they**
131:4
**water**
8:25 134:4,5
**watering**
130:22
**way**
21:21 29:3 40:6
52:12 55:1 81:16
90:21 124:2 125:15
151:3 154:18
158:17 168:23
176:12
**Wayne**
61:4
**Weaver**
45:16 61:17 111:25
182:15

**week**
74:1 93:1 106:10
131:5,8 133:4 134:7
**weekends**
133:25
**weekly**
102:14
**Wengerd**
82:12 89:20,24 90:14
90:18,25 91:6,9
**went**
28:9 30:10 31:17
35:12 38:4 45:23,24
95:7 173:25 181:21
181:22,25 182:1
**weren't**
64:22 109:13,15
143:23 145:11
151:21
**we'll**
11:3 48:10,13 164:3
**we're**
7:19 11:3 25:4,7 37:3
37:4 40:11,12 42:1
42:2 47:8 49:18
65:15 74:7 116:15
116:18 119:11
136:13 143:3
152:19 169:17
180:19
**we've**
38:7 60:11 65:25
80:4 128:7
**We-our**
181:21
**whichever**
95:12
**white**
26:20
**wife**
132:18
**wife's**
16:16
**willing**
16:9
**willingness**

101:1
**wise**
78:1
**witness**
3:2 8:16 10:3 12:17
12:19,20 13:6 14:18
14:24 21:19 22:18
22:23 23:11 24:14
24:20 26:1 27:3
28:19 29:1 30:5,20
31:4 35:2 37:14
42:8,20 43:2,19,25
44:9,14 45:21 46:17
50:3,17 52:1,9,22
53:14,19,25 54:8,15
54:24 55:20 56:10
56:21 57:11,23
59:13 60:2 62:9,18
63:7 65:4 67:1,7
68:16 69:21 70:8,16
71:1,2,11 72:13
73:7,20 74:4,23
75:15,20 76:1,12,18
77:4,16,22 78:8,16
79:4 80:10,19 81:5
81:11 82:22 83:3,23
84:19 85:19 86:12
86:20 87:2,11 88:5
88:18 89:6,24 90:6
90:20 91:9 92:13,25
93:15 94:4,12,21
96:7,13 97:1,21
98:2 99:15 100:2,11
100:20 101:7,14
102:3,8,14 103:16
104:6,24 105:10
106:7,13,19 107:2
109:13,21 110:24
112:14,20,23 113:6
113:12 114:6,14
115:2,13,22 117:2
117:11,21 118:12
118:20 119:2,23
120:3,8 121:5,12,18
122:13,23 125:21
126:13 127:7 128:1



128:18,24 129:8,20 130:4 132:5,13 133:21 134:2,18,25 135:18,22 136:2,15 136:18 137:19,25 138:11 142:12 143:8,15,20,25 144:6,25 146:19 147:20 149:15 151:18 152:3,10 153:11,21 154:8 159:4 160:10,22 161:3,9,18,24 162:6 163:12,18,22 165:15 166:1,6,15 166:21 167:3,9,15 167:19 168:4,16,22 169:16 170:8,19 171:21 172:7,14,21 173:2,14,19 174:18 174:24 175:15,23 176:4,11,22 177:3 177:12 178:22 179:6,11,13 180:7 181:10,12,14,16,21 183:8

**wood**
41:8,9

**woodworking**
39:12

**word**
21:17 162:24

**words**
22:2 39:7 82:17,18

**work**
9:6 31:18 36:20 38:15,19 39:5 40:16 40:17 42:5,6,13,14 42:17,25 43:2,5,5,7 43:9,16,22,22 44:11 44:17 56:10 58:11 65:9,13 71:20,22 72:7,21,24 73:3 74:2,3,10,19,24,25 74:25 75:3 78:2,11 80:19 83:18 88:16

88:17 91:22 92:9,9 92:10 93:12 95:19 95:21 96:2 99:25 101:12 102:10 104:19,22 105:2 108:18 125:22 126:24 130:14,14 131:11,15,24 133:19,24 134:1,17 134:22,23 151:21 160:18,20,25 161:7 162:4,12,16 163:20 164:7 166:4,15,19 166:25 167:7 176:18 177:8

**worked**
74:9 106:10 131:25 162:22,24 163:9 165:23

**workers**
78:4 79:12,14

**working**
41:24 49:18 57:24 58:1 65:24 75:7 86:18,19,24 90:21 106:2 134:3 148:11 148:12,24 162:2 163:15 166:12

**works**
9:17,18 65:7 78:13

**worried**
42:2

**wouldn't**
40:15 43:5 64:15

**would-when**
166:6

**wrap**
163:5 180:19

**write**
149:17 175:6

**writing**
176:17 177:7

**written**
14:14,21 82:18 105:25 131:7 150:11,21

**wrong**
74:20

**wrote**
12:13 14:4 49:13

**Wynkoop**
2:3 4:10,10,19 8:14 11:20 12:15 13:3 14:16,22 21:13,17 22:14,22 23:9 24:12 24:18 25:13,25 26:6 26:18,25 27:5,8,11 28:4,17,24 29:8 30:4,19 31:2 33:14 33:17 34:25 37:12 37:20 38:8 42:6,18 43:1,18,24 44:8,13 44:18 45:19 46:16 46:20 47:11,17,24 48:3,8,11 50:2,16 50:22 51:24 52:8,16 52:21 53:10,18,23 54:6,13,23 55:18,24 56:9,20 57:8,17,21 59:11,25 62:7,15 63:2 65:2 66:24 67:6 68:15 69:19 70:5,13 71:9 72:11 73:6,19 74:3,10,22 75:11,19,24 76:11 76:17,25 77:15,21 78:5,15 79:1 80:7 80:18 81:3,9 82:16 83:1,11,20 84:18 85:17,24 86:11,19 87:1,9 88:3,17 89:4 89:22 90:4,19 91:8 91:24 92:12,23 93:14 94:2,11,20 95:2,5 96:12,22 97:11,20,25 99:14 100:1,10,16,19 101:6,13,25 102:7 102:12 103:15 104:5,23 105:9 106:6,11,18,25 107:19 109:12,20

110:23 112:13,19 112:22 113:4,10 114:5,12 115:1,12 115:20 116:25 117:9,20 118:9,19 118:25 119:21 120:2,7 121:3,11,17 122:11,21 124:7 125:19 126:1,12 127:6,23 128:16,23 129:6,19 130:3 132:3,12 133:19 134:1,17,23 135:17 135:21 136:1,13,16 136:23 137:11,18 137:24 138:8 139:8 141:19,25 142:11 143:6,13,19,24 144:5,23 146:18 147:18 148:19 149:13 150:2,25 151:6,10,16 152:1,9 153:10,20 154:7 155:18,23,25 156:3 156:7,10,13,15,17 156:19,21 159:2 160:8,20 161:2,8,16 161:23 162:5 163:11,17,21 165:13,24 166:5,13 166:20 167:2,8,13 167:18 168:3,15,20 169:12,15 170:6,17 171:18 172:6,12,19 173:1,13,18 174:4,7 174:9,17,23 175:11 175:17,22 176:3,9 176:19 177:2,9,18 178:19 179:2,7,12 180:3,17 181:9,11 181:13,15,17,20 183:9,12,19,23

**W2s**
180:20,22,24 181:2

**Y**



yeah
9:19 13:10,17 17:9
17:14 20:10 27:12
29:5 35:13 38:1
39:23 40:1,14 41:5
43:7 44:4 50:22
51:5 52:7 55:2 57:5
61:16 84:19 85:7,12
89:15 92:1,18 93:5
100:11,19 102:22
105:5,16 109:18
116:18 118:6
119:12 123:8
124:23 126:21
131:9,9,10 132:22
132:23 133:10,13
133:16,21,22
134:18 136:11,18
138:9 139:11,12
141:11 142:17
144:15 149:12
151:6 152:16,18
153:6 154:12 157:7
158:4 160:10
164:17 169:9 174:8
176:13 180:17
181:12 183:12,15
183:18
year
23:8 36:3 65:15 69:2
92:7,17,18 97:10
126:15,24 127:7,9
137:15,21 139:15
140:6 141:15
142:17,17
yearly
24:25 36:19
years
19:23,25 20:1,10,13
34:6 55:23 91:14,25
93:4 99:11 111:8
135:10 143:1 169:6
Yep
151:10
yesterday
7:21 8:13 180:15

183:19
young
38:22 39:5 40:18
44:5 83:5 91:1
100:22 108:16
148:25 163:3
younger
9:15
youngest
9:18
Youth
175:23 180:2

_____ Z _____

zero
123:15,23

_____ $ _____

$1
91:2
$1,010,322.46
139:19
$1,212,450.83
140:7
$12,210.65
157:21
$120,031.75
138:6
$15,920.66
159:16
$19,948.31
35:19,22
$2,300
60:5 73:24 98:14
$2,660
140:3
$20,188.50
158:13
$24,403.52
141:4
$24.93
158:24
$250
106:23 107:6,17,21
108:2
$26,200

138:24
$42,500
159:24
$54,671.85
34:14 35:19
$55,541.31
137:17
$55,732.89
140:15
$655,675.96
137:9
$66,440.58
139:22
$74
159:3
$881,231.85
137:22
$9,214.27
157:9
$9,527.55
159:21
$91,657.77
139:25

_____ 1 _____

1st
34:6 137:16 140:7
141:17
1,700
121:24
1:00
44:22
1:22-cv-01355-YK
1:8
10
51:1,3 60:18 67:21
10/17/2021
123:1
10:29
50:21
10:30
38:9
11
152:19
12
133:14 145:11,15

151:25
12/10/63
8:23
12/15/2020
147:25
12/21/2021
178:1
13
63:11,14
15
147:23,25 173:21
174:6,7
15th
148:7
16
82:2,5
17th
51:8,23 52:7,15,20
52:23 123:11
17049
27:19
18
115:8 177:24 178:1
19
36:3 170:25 171:2
19,948
35:9

_____ 2 _____

2
146:4,4 148:10
2,300
60:3
2/18/20
63:14
20
1:24 34:6 97:5
200
2:18
2004
16:4 20:2 36:14
2009
155:4
2010
155:4
2011



44:25
**2019**
56:4 72:19 97:5,23
105:13 126:8
162:11,14 163:16
172:4 173:12,17
**2020**
33:13 34:7,7 91:17
137:16,16,21
141:12,17,17
142:21 148:7
174:22
**2021**
123:11,23 139:7,15
140:7,7 143:4 171:7
178:9 179:1,3,17,24
**20210**
2:19
**2022**
16:4 19:24 20:2,3
51:8,23 52:7,15,20
52:23 56:4 72:19
97:5,23 105:13
126:8 162:11,15
163:16 172:4
173:12,17 179:10
179:17,25
**2023**
1:24 56:25 96:16
97:10 185:12
**21**
11:16,18
**21st**
178:9 179:24
**215**
2:11
**215-931-5828**
2:5
**22**
12:19
**23**
12:20,22 82:2,4,5
**24**
26:5,9
**24/7**
154:17

**248**
156:14,15 157:5
**25**
155:12,13,21
**25th**
171:6 179:16,17,24
**250**
107:11
**255**
156:14,18 157:17
**257**
156:14,18 158:2,7
**26**
127:10,13
**27th**
185:12
**28**
33:11,12 136:21,23
141:16,23 142:8
**29**
139:5,6

---
**3**
---

**3**
56:25 124:22 171:11
171:12
**3,800**
49:16
**30**
41:25
**302**
156:18 159:15
**31st**
34:7 137:16 140:7
141:17
**335**
156:18 159:20
**380-7699**
2:6
**3800**
49:21 97:2 101:22

---
**4**
---

**4**
45:6 96:18 123:1,5
123:13

**40**
41:7,7 106:10 163:9
163:15
**40,000**
42:10
**42,500**
160:7
**487-9243**
2:17

---
**5**
---

**5**
3:4 45:6 50:12 124:6
**5/17/22**
51:3
**5/25/2021**
171:2
**501(c)(3)**
15:3 25:7,8 77:17,20
77:24 78:3,4,11,12
78:12,14,19,22,25
79:8
**54**
36:4
**583**
27:19

---
**6**
---

**6**
51:18,18
**63**
178:11
**665**
63:12

---
**7**
---

**74**
159:2,3

---
**8**
---

**8**
48:16,19 53:22 56:24
96:15
**8A**
124:5
**8hrs**

133:15
**80**
22:7
**813**
2:6
**866**
2:17

---
**9**
---

**9,000**
160:6
**9,500**
160:7
**9/22/2023**
145:15
**931-5812**
2:11

