Pl. Ex. 2

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNYSLVANIA

_____

JULIE A. SU, ACTING SECRETARY OF :

THE UNITED STATES DEPARTMENT     :

OF LABOR                         :

                                 :          Case No.

     Plaintiffs,                 :          1:22-cv-01355-YK

                                 :

v.                               :

                                 :

MENNONITE MESSIANIC MISSION OF   :

THE EASTERN PENNYSYLVANIA        :

MENNONITE CHURCH                 :

doing business,                  :

as LIBERTY RIDGE FARM,           :

and MARTIN NELSON                :

     Defendants.                 :

_____:

AUDIO TRANSCRIPTION OF KENTON KREIDER

ON JULY 20, 2023



APPEARANCES

FOR DEFENDANTS

Meghan Wynkoop

Office: Philadelphia, PA; Mount Laurel, NJ

Phone: 215-931-5828

Cell: (813) 380-7699

Email: mwynkoop@margolisedelstein.com

Jocelyn M. Mendez

Office: Philadelphia, PA

Phone: (215) 931-5812

Email: jmendez@margolisedelstein.com

FOR PLAINTIFFS

Austin Brunson

Company: U.S. Department Of Labor

HQ Phone: (866) 487-9243

Location: 200 Constitution Ave NW,

Washington, District of Columbia, 20210, United

States

Brunson.austin.s@dol.gov

Email: smith.john@dol.gov



INDEX

WITNESS                                                    Page No

KENTON KREIDER

Direct examination by Mr. Brunson                              5


MAGNA
LEGAL SERVICES

P-R-O-C-E-ED-I-N-G-S

(Recording in progress.)

THE REPORTER:    Sir, would you raise your comfortable hand, please?

THE WITNESS:    I use affirm.

THE REPORTER:    We'll have you affirm -- yes, I always use swear or affirm.

THE WITNESS:    Okay.

THEREUPON,

KENTON KREIDER

was called for examination by Counsel for the Plaintiff, having been first duly sworn, was examined and testified as follows:

THE REPORTER:    Thank you.

And could counsel state your appearances for the record.

MS. MENDEZ:    Jocelyn Mendez on behalf of the defendants.

MS. WYNKOOP:    Meghan Wynkoop, on behalf of the defendants.

MR. BRUNSON:    Good morning.  Austin Brunson, on behalf of Plaintiff.

THE REPORTER:    Okay.

MS. MENDEZ:    And just so the record is clear on our side, we have some clerks with us.  I'll just state their presence quickly.  We are joined by Alyssa Spadel (phonetic),



Tony Wang, and Ryan Corbin. They are interns from our office that will be observing this deposition.

MR. BRUNSON: And I guess just to be clear on our side, I have Christopher Harvey here, who's the investigator of Wage and Hour Division. I also have (indiscernible) who's an intern with our office.

MS. MENDEZ: Right. And just quickly, I'll put on the record before Austin begins his questioning. Mr. Kreider here has been produced as a fact witness, not a designee. So I'll be reserving the right to object to any questions that would require response on behalf of an entity or institution.

MR. BRUNSON: Okay. Are you ready to begin?

MS. MENDEZ: Yeah.

MR. BRUNSON: Okay.

DIRECT EXAMINATION

BY MR. BRUNSON:

Q. Good morning, Mr. Kreider. Is that how I pronounce your name?

A. Kreider.

Q. Kreider.

A. Sorry.

Q. I will do my best to say that correctly.

A. No problem.

Q. I'm an attorney with the Department of Labor. We are here for a deposition in the matter of Secretary Labor v.



Page 6

The Mennonite Messianic Mission of the Eastern Pennsylvania Mennonite Church, doing business as Liberty Ridge Farm and Nelson Martin.

I am also joined by Gabriel Nathans, who is an intern in my office, as well as Chris Harvey, who is an investigator with the Wage and Hour Division.

Q.    Mr. Kreider, have you ever been deposed before?

A.    No.

Q.    Okay.  Ever in any case?

A.    No.

Q.    Okay.  So what a deposition is then basically just me asking you questions as an attorney for the plaintiff, and then you answer those questions.  Okay?

Now, the court reporter has asked you to affirm that you swear -- you affirm that you will tell the truth and nothing but the truth.  Do you understand that?

A.    Yes.

Q.    All right.  It is also important to remember that the court reporter is, I guess, mouthing everything down that we say, so please make sure to answer verbally rather than nodding your head or shaking your head.  So you're just doing it just now.  So you have to say yes.  Do you understand that?

A.    Yes.

Q.    Okay.  Also, please try not to talk while someone else is talking.  I frequently will talk over people, and I will



MAGNA
LEGAL SERVICES

Page 7

do my best not to talk over you. And I ask that you do the same for me. Do you understand?

A.   Yes.

Q.   Okay. If at any point you need a break, please let me know. I'm probably going to ask to take a few breaks myself. However, if I'm asking you a question, and you want to take a break, I'm going to ask that you answer the question first, and then you can go and take the break. Do you understand?

A.   Yes.

Q.   All right. Are you taking any medications or drugs that would prevent you from answering my questions accurately?

A.   No.

Q.   Okay. How -- are you feeling well and healthy today?

A.   Yes.

Q.   That's good. Have you ever been convicted of a crime involving dishonesty, such as fraud or perjury?

A.   No.

Q.   All right. Is there any reason to believe that you may not be able to give truthful and accurate testimony here today?

A.   No.

Q.   Okay. What did you do to prep for this deposition?

A.   I gave thought to the rationale and the beliefs behind the Liberty Ridge Farm. Also, I got general guidelines



of instruction from our attorneys.

Q.   Okay.  Did you review any documents prior to testifying today?

A.   I read some of the minutes related to the timeframe involved.

Q.   Do you know what minutes you read?

A.   Various minutes from 2019 to 2022.

Q.   Okay.  Did you review any other documents?

A.   Not that I can think of.

Q.   Okay.  Where do you live now?

A.   Lancaster, Pennsylvania.

Q.   Okay.  And what's your date of birth?

A.   April 15th, 1981.

Q.   Okay.  How far did you go in school?

A.   To 10th grade.

Q.   10th grade.  Do you have any legal training?

A.   No.

Q.   Okay.  What do you do for a living now?

A.   I'm a farmer.

Q.   A farmer.  Okay.  Do you own your farm?

A.   Yes.

Q.   Okay.  Do you do anything else?

A.   I produce seed for other farmers.

Q.   Okay.  Do you have a business that does that?

A.   Yes.



Page 9

Q.    All right.  What's the business called?

A.    Leabrook Ag.

Q.    Okay.  Do you work for any other businesses?

A.    I own a few other businesses or entities, but not working for them necessarily.

Q.    Okay.  Do you generate income from those businesses?

A.    Yes.

Q.    Okay.  What are those businesses?

A.    Leabrook transport.

Q.    Okay.

A.    Pine Creek Farmstead.

Q.    Any other?

A.    Kanona Ag.

Q.    Do you have any other businesses?

A.    No.

Q.    Okay.  Today, I'm going to be referring to the Mennonite Messianic Mission of the Eastern Pennsylvania, Mennonite Church as the Mission.  Is that okay?

A.    Could you restate that?

Q.    Sure.  So I am going -- one of the named defendants is the Mennonite Messianic Mission of the Eastern Pennsylvania Mennonite Church.  To save us all time and my voice, I'm going to refer to them as the Mission.  Do you understand that?

A.    Yes.

Q.    Okay.  So when I say the Mission, you'll know what



I'm talking about?

A. Yes.

Q. Okay. I'm also going to refer to the minors who resided at Liberty Ridge as the residents. Okay?

A. Yes.

Q. Okay. So when I refer to the residents, you will know what I'm talking about, right?

A. Yes.

Q. Okay. I'm also going to say that there are -- I'm going to refer to the mentors at Liberty Ridge as well. Okay?

A. Yes.

Q. Do you know who I'm talking about when I refer to the mentors?

A. Yes.

Q. Okay. Just to be clear, can you say who I'm talking about just to make sure we're on the same page? Tell me who the mentors are.

A. The mentors are volunteers that come to the farm to assist in helping the residents grow.

Q. Okay. So I think then we'll be on the same page when I refer to the mentors, you'll know who I'm talking about?

A. Yes.

Q. Okay. Great. Let's start off with the Mission. Do you know what the mission is?

A. Yes.



MAGNA
LEGAL SERVICES

Page 11

Q.    Okay.  What is the Mission?

A.    The Mission would be a collective arm of the church to direct the charitable time and money for efforts to help others.

Q.    Okay.  Is the -- to your knowledge, is the Mission registered with the Pennsylvania Department of State?

A.    Yes.

Q.    Okay.  Do you know if it has an employer ID number?

A.    It is my understanding that it does.

Q.    All right.  Do you know how long the Mission has been around?

A.    I believe since 1972.

Q.    1972.  Are you affiliated with the Mission?

A.    No.

Q.    Okay.  Why not?

A.    Maybe I should ask what you mean by affiliated.

Q.    Well, let's say, do you have any positions within the Mission?

A.    No.

Q.    Do you do any work on behalf of the Mission?

A.    No.

Q.    Do you do any volunteer work on behalf of the Mission?

A.    Maybe I should ask if my volunteering at the Liberty Ridge Farm is included in volunteering for the Mission?



Page 12

Q. Well, yes. So do you consider that to be volunteering on behalf of the Mission, your work with the Liberty Ridge Farm?

Q. I consider it volunteering for the farm, not necessarily for the Mission itself.

Q. Okay. Why do you think that?

A. I look at volunteering for the farm as the on the ground the visible site.

Q. I'm sorry, what? You said you view that as like being on the site. That's what you mean? Let me back up. Let me strike that. Let me ask you a question. Is Liberty to your knowledge -- does the Mission own the Liberty -- the property that the Liberty Ridge Farm is on?

A. Yes.

Q. Okay. And it is -- correct me if I'm wrong, but it's my understanding that there is a Liberty Ridge Farm Committee. Is that correct?

A. Yes.

Q. Okay. And is it also correct when I say that the Mission created that Liberty Ridge Farm Committee?

A. The Mission organized the initial committee.

Q. Okay. And when you say organized, what do you mean by organized?

A. Mission would have asked various individuals to serve on that committee.



MAGNA
LEGAL SERVICES

Page 13

Q. Okay. Did the mission appoint people to be on that committee?

A. It is my understanding that -- I'm not sure what you mean by appoint, but it's my understanding that they would have asked individuals to serve.

Q. And that's a very basic question. Would the Liberty Ridge Farm Committee exist without the Mission?

A. It easily could.

Q. It easily could? To your knowledge, what role does the Mission have? Let me rephrase. Let's strike that, please. Does the Mission direct the Liberty Ridge Farm Committee to do anything?

A. I cannot recall specific direction.

Q. Okay. Well, let me ask you this. The Liberty Ridge Farm Committee, do they have to provide any documentation to the Mission?

A. No.

Q. Does the Liberty Ridge Farm Committee have to get permission to hire anyone.

MS. MENDEZ: Objection. Form. You can answer.

THE WITNESS: Often there is a review process as volunteers are accepting in serving at the Liberty Ridge Farm.

BY MR. BRUNSON:

Q. So you're saying that the Mission then has a say in who volunteers at the Liberty Ridge Farm? Is that what you're



MAGNA
LEGAL SERVICES

Page 14

saying?

A.    The Mission would have opportunity to comment on the volunteers that would serve.

Q.    So could the Mission then say, no, Liberty Ridge Farm Committee, they can't hire that person.

MS. MENDEZ:    Objection.  Form.  You can answer.

THE WITNESS:    It's my understanding that the mission would have opportunity to provide input on the volunteers under consideration.

BY MR. BRUNSON:

Q.    Okay, but you're not really answering my question, though. My question, though, is could the Mission, you know, overrule a hiring decision or a decision to have a volunteer come and work for them? Them being the Liberty Ridge Farm.

A.    I don't know that that has ever been tested.

Q.    So you don't know -- can you just answer my question?  Like, could they say no, you cannot have this volunteer work at Liberty Ridge Farm Committee.

A.    I don't know.

Q.    You don't know?  Okay.  I have jumped ahead of myself.  We're going to circle back to some of that stuff a little later.  Going back to your involvement, or lack thereof, with the Mission, were you ever -- did you ever serve as a volunteer with the Mission?

A.    Are you speaking of an area other than at Liberty



Ridge Farm?

Q.    Yes.

A.    Not that I can remember.

Q.    Did you ever attend any Mission board meetings?

A.    Yes.

Q.    Okay.  When did you attend those meetings?

A.    Do you want to know each date and approximate time?

Q.    Whatever you know.  So you actually know that you attended a board meeting on September 1st, you know, 2019 then say, you know, but you remember years that you went to.  Fine. Just tell me what you know.

A.    I can't recall each time that I was there.

Q.    Okay.  When was the last time you went to a Mission board meeting?

A.    I am going to estimate in May of this year.

Q.    In May of '23.  Okay.  Do you attend-how often do you attend these meetings?  Do you attend them monthly, annually?

A.    Once or twice a year.

Q.    Okay.  Why do you attend those meetings?

A.    To share any reports or discussion related to Liberty Ridge.

Q.    Okay.  So you would go to these meetings to share reports about Liberty Ridge?

A.    The most likely reason to go would be if there's a


MAGNA
LEGAL SERVICES

Page 16

special matter that Liberty Ridge was -- had under consideration.

Q. Why would you go to these meetings to present something that Liberty Ridge had under consideration?

A. For an advisory input.

Q. Okay. And could the Mission then approve whatever was being considered by the Liberty Ridge Farm Committee?

A. Would have opportunity to.

Q. But when you say opportunity to, what does that mean?

A. Could you restate your question?

Q. So the Liberty Ridge Farm you just said, correct me if I'm wrong, I'm misstating anything you said, that you would go to these mission board meetings to present things that the Liberty Ridge Farm Committee had under consideration. Am I correct when I say that?

A. Correct.

Q. Right. So when you present this, could the Mission then approve or disapprove whatever the Liberty Ridge Farm Committee had under consideration?

A. Yes.

Q. Okay did they ever disapprove something that was under consideration by the Liberty Ridge Farm Committee?

A. Not that I can recall.

Q. But they did approve things that were under


MAGNA
LEGAL SERVICES

consideration by the Liberty Ridge Farm Committee.

A.    Yes.

Q.    Okay.  Did you ever have a formal position with the Mission?

A.    No.

Q.    Okay.  Why did you have to go present these reports or things under consideration to the Mission board?

A.    To keep communication open.

Q.    Okay.  Why was it important to keep communication open?  And I'm assuming it's between the Mission and the Liberty Ridge Farm Committee, that's who we're trying to keep communication open with?

A.    Correct.  Yes.

Q.    Okay.  Why were you trying to keep communication open?

A.    So that the Mission had an accurate picture of what was happening.

Q.    Okay.  Why did the Mission need to have an accurate picture of what was happening at the Liberty Ridge Farm Committee?

MS. MENDEZ:    I'm going to object to the form of question.  You may answer if you know.

THE WITNESS:    So they could advise knowledgeably and speak on the issues with understanding.

BY MR. BRUNSON:



MAGNA
LEGAL SERVICES

Page 18

Q.    Okay.  Let me pivot slightly.  Yesterday we heard that the Mission had control over the policy of Liberty Ridge Farm, major expenditures and personnel.  Am I correct when I say that?

MS. MENDEZ:    I'm going to object (indiscernible).

THE WITNESS:    It's my understanding they had input on personnel.  Looking at it in reverse order and input on personnel --

MR. BRUNSON:    Okay.

THE WITNESS:    -- as we discussed.  Major expenditures as well.  I'm not aware of specific direction on policy.

BY MR. BRUNSON:

Q.    Did you ever take any steps to learn what the Mission -- Let me rephrase that.  Did you ever take any steps to learn what Liberty Ridge Farm Committee had to get permission or approval from -- for from the mission?

A.    Are you asking if there's particular rules that would designate whether permission is needed or not needed?

Q.    Yes.

A.    On the major expenditures question, the Liberty -- it's my understanding that the Liberty Ridge Farm would seek approval from the Mission on Expenditures over $2,000.  That number was changed at some point to $6,000, I believe.

Q.    Okay.


MAGNA
LEGAL SERVICES

Page 19

A.     That's the most defined threshold that I can think of.

Q.     And so are you aware of any mission policy or role, whatever you would like to describe it as, that, you know, Liberty -- say Liberty Ridge is trying to either have a volunteer work for them or hire someone that they would need to get permission or approval from the Mission.

MS. MENDEZ:    I'm going to object to the terms hire and work, but you can answer.

THE WITNESS:    It is our common practice to pass the names of volunteers prospective volunteers past the Mission for their approval.

BY MR. BRUNSON:

Q.     Was this common practice ever memorialized in any document or anything like that?

A.     Not that I'm aware of.

Q.     Was this common practice ever spoken to someone from the Mission to the Liberty Ridge Farm Committee?

A.     I can't think of anything specific.

Q.     Okay.  So how did you know to do this common practice then?

MS. MENDEZ:    I'm going to object to use the term common practice as a term of work but you may answer.

THE WITNESS:    It was more of a tradition than a standing rule.



Page 20

BY MR. BRUNSON:

Q.   So where did this tradition come from?  Were there other institutions similar to Liberty Ridge that did things like this, and therefore that's how you knew how to do it?

A.   It would be my understanding that that is correct.

Q.   Okay.  How did you learn about this tradition then?

A.   I can't say.

Q.   Do you know who controls -- let me strike that.  Is there a board that runs the Mission?

A.   Yes.

Q.   Okay.  Have you ever served as a board member with the Mission?

A.   No.

Q.   What are all the positions with the board -- with the Mission board?  So, for example, president, secretary, stuff like that.

A.   It's my understanding that there is a chairman, a vice chairman, a secretary and assistant secretary, a treasurer and an assistant treasurer.

Q.   Okay.  Are there any other positions with the board?

A.   Not that I'm aware of.

Q.   And going to these board meetings, are they open to the public?  The Mission board meetings?

A.   I can't say what their standard policy is.  I have not seen anyone there that does not pertain to one of the


MAGNA
LEGAL SERVICES

Page 21

Mission efforts of the church.

Q.   So when you went to these Mission board meetings, were you personally invited to attend?

A.   I cannot recall personal invitation.

Q.   So how did you know to go to the Mission board on a particular day?

A.   That was determined with an item that needed discussion from the farm.

Q.   So I'm clear if there was an item that needed to be discussed with the farm, then you would then go to the next Mission board meeting.

A.   Yes.  If it was an item that I had particular input on.

Q.   Okay.  Now, did you tell anyone from the Mission that you were going to this meeting?

A.   Often I did.

Q.   Okay.  Who did you tell?

A.   Either the secretary or chairman.

Q.   Chairman?  Okay.

A.   Chairman.

Q.   Do you know the names of those people?

A.   Yes.

Q.   What are their names?

A.   Mark Torkelson, and Martin Cooper.

Q.   Okay.  Regarding Torkelson -- well, strike that for


MAGNA
LEGAL SERVICES

Page 22

now.  Did you ever receive a W-2 from the Mission?

(Indiscernible) to back track?  Do you know what a W-2 form is?

        A.    Yes.

        Q.    Okay.  Did you ever see the W-2 from the Mission?

        A.    Not that I'm aware of.

        Q.    Okay.  To your knowledge, how -- or to your knowledge how does the Mission generate any income?

            MS. MENDEZ:    I'm going to object to the extent that Mr. Kreider is not answering on behalf of the Mission.  However, if you know, you may answer.

            THE WITNESS:    As I understand, there are free will offerings lifted across our congregations.

BY MR. BRUNSON:

        Q.    Is that the -- an offering -- just, so I'm clear, can you explain what an offering is?

        A.    An offering is a voluntary contribution from the constituency of the church to support the charitable efforts of the Mission.

        Q.    My understanding, there's about 80 churches that will provide offerings to the Mission; is that correct?

        A.    Yes, approximately.

        Q.    Okay.  Does the Mission generate any income any other way other than these offerings?

            MS. MENDEZ:    I'm going to object the same objection, but you may answer if you know.



THE WITNESS: I don't know.

BY MR. BRUNSON:

Q. To your knowledge, did Liberty Ridge Farm ever give money to the Mission?

A. I don't know that.

Q. Let me ask you this. You do know that the Mission owns the property of Liberty Ridge Farm, correct?

A. Yes.

Q. To your knowledge, did the Liberty Ridge Farm Committee ever reimburse the Mission for that -- for that property?

A. It's my understanding there were funds passed from Liberty Ridge Farm to the Mission for reimbursement.

Q. To your knowledge, do you or can you recall any other times where the Liberty Ridge Farm reimbursed the Mission for any expenses?

A. I can't.

Q. So your recollection is only just the reimbursement for the sale of the property?

A. Correct.

Q. Okay. Do you know who owns the business entity of the Liberty Ridge Farm that is registered with the Pennsylvania Department of State?

A. It's my understanding that Nelson Martin's name is on that form, but that the form was filed outside of full



Page 24

awareness of what that really meant.

Q. Can you elaborate more on that?

A. Because I understand Nelson as the treasurer of Liberty Ridge needed to file for an entity name and -- since he was the one filing his name was put as the owner, when really that may not have been accurate.

Q. Okay. Were any steps taken to correct that?

MS. MENDEZ: I'm going to object to the extent that you're seeking a legal conclusion as it pertains to business formation. However, if you have an answer, you may provide.

THE WITNESS: I cannot say.

BY MR. BRUNSON:

Q. Who is supposed to be the correct owner of the farm?

MS. MENDEZ: I'm going to renew my same objection.

THE WITNESS: We would need legal advice to guide us in that.

BY MR. BRUNSON:

Q. And was there any participation -- let me rephrase that. Did the Mission have any involvement with this decision to register the Liberty Ridge Farm with the Pennsylvania Department of State?

A. Not that I'm aware of.

Q. Okay. I've jumped ahead a bit, but I need to establish a little more basis. What is the Liberty Ridge Farm



Page 25

Committee?

A.   Could you clarify your question?

Q.   I mean, it's kind of a broad question, like what is it?  Does it -- is it a governing body of the Liberty Ridge Farm?  Like what's its purpose?  Let me ask you this, do you know the Liberty Ridge Farm Committee exists?

A.   Yes.

Q.   Okay.  Are you on the Liberty Ridge Farm Committee?

A.   Yes.

Q.   What is your position for Liberty Ridge Farm Committee?

A.   Chairman.

Q.   Okay.  What do you do as a chairman?

A.   Organize the meetings of the farm committee, coordinate decisions that need to be made.

Q.   Anything else?

A.   Not that I can think of as being significant to this discussion.

Q.   What is your -- the chairman like -- seems like a president with the highest one, the highest ranking member?

A.   He's simply an organizer of the effort.

Q.   And -- go ahead.  I'm sorry.  Is that it?  Are you finished answering?

A.   (No audible response).

Q.   Okay.  I'm sorry.



Page 26

THE REPORTER: Is that a yes? You nodded your head, is that a yes. I just need to be verbal.

THE WITNESS: Yes.

THE REPORTER: Thank you.

BY MR. BRUNSON:

Q. What other positions are there with the Liberty Ridge Farm Committee?

A. Assistant chairman, secretary, assistant secretary, treasurer, and assistant treasurer.

Q. How did you become the chairman?

A. By voting within the Liberty Ridge Farm Committee.

Q. Can you explain how that election process worked?

A. Yes. On an annual basis, the Liberty Ridge Farm Committee elects the chairman, assistant chairman and other officers by majority member.

Q. Did you campaign for chairman position?

A. No.

Q. How did you end up with the chairman, then?

A. Pardon?

Q. How did you end up as chairman?

A. That was all other's doings.

Q. Okay. Do you want to be chairman?

A. Most days, no.

Q. Why is that?

A. Because of the responsibility involved.



Page 27

Q.    What is that responsibility?

A.    To keep everyone pulling together and everyone happy.

Q.    How did you originally get?

A.    Just like that.

Q.    Did someone from the Mission ask you to be on the Liberty Ridge Farm Committee?

A.    Yes.

Q.    Do you know who from the Mission asked you to be on the Liberty Ridge Farm Committee?

A.    I can't recall.

Q.    When you're asked to be on the Liberty Ridge volunteer -- sorry.  On the Liberty Ridge Farm Committee, is it a, like, a voluntold type of thing, or is it --

A.    Yes.

Q.    It's a voluntold.  Okay.

MS. MENDEZ:    I'm going to object to that question.  I'm sorry, can you rephrase that, please?

MR. BRUNSON:    He answered it.

BY MR. BRUNSON:

Q.    Is it a -- when you were asked to be on the Liberty Ridge Farm Committee, is it like a voluntold type of thing?

MS. MENDEZ:    Objection to the extent -- sorry.  Objection to the term voluntold, please.

THE WITNESS:    Could I ask what the definition of


MAGNA
LEGAL SERVICES

Page 28

voluntold is?

BY MR. BRUNSON:

Q.    It's one of those I would say the -- the normal understanding of it is that you're asked to do this, but you really don't have much of a choice in doing it.

A.    Oh, I need to re-answer that question.  I had full choice.  I could have accepted or declined either way, without any obligation.

Q.    Okay.  Did anyone assert any pressure on you to be on this committee?

MS. MENDEZ:    Objection to the form of that question, you may answer.

THE WITNESS:    I do not recall pressure.

BY MR. BRUNSON:

Q.    Okay.  What are the responsibilities of the Liberty Ridge Farm Committee?

MS. MENDEZ:    Objection.  To the extent that you're seeking an organizational response, however, you may answer to the extent you know.

THE WITNESS:    It is my understanding that the Liberty Ridge Farm Committee responsibility is to see to the details of making the charitable efforts efficient and effective.

BY MR. BRUNSON:

Q.    The charitable effort of who or what?

A.    Of the Liberty Ridge Farm Committee.

Q.    And I'm just going to go through some questions. Was -- the Liberty Ridge Farm Committee, are they responsible for selecting volunteers who would participate in Liberty Ridge's program?

A.    Yes.

Q.    Does the Liberty Ridge Farm Committee negotiate or enter into contracts with private businesses?  Yeah.  So let me ask you a question.  Liberty Ridge Farm works with Snyder Gates, for example.  Who -- did Liberty Ridge Farm Committee enter into that contract as an organization?  How did that come about?

MS. MENDEZ:    I'm going to object to the extent you're asking for an institutional response.  Again, if you know the answer, you may answer.  And to the term works.  I'm sorry.

THE WITNESS:    I don't recall the particulars related to Snyder Gates.

BY MR. BRUNSON:

Q.    What about any Wengerd Pallets for example.  Do you know Wengerd Pallets?

A.    Yes.

Q.    Okay.  Who, to your knowledge, from the Liberty Ridge Farm Committee entered into a business deal with Wengerd Pallets?

MS. MENDEZ:    I'm going to renew my objection to the extent you're seeking an institutional response.  However,



if you know, you may answer. I have to put another objection on the record to the term business deal.

THE WITNESS: As I recall, Nelson Martin would have been the one that would have spoken with Wengerd Pallets.

BY MR. BRUNSON:

Q. To your knowledge, was Nelson Martin, the one who had the authority to enter into those business deals on behalf of the Liberty Ridge Farm Committee?

MS. MENDEZ: I'm going to renew my objection to the term business deals. And to the extent you're seeking an institutional response.

THE WITNESS: It would be my knowledge that Nelson made arrangements with Wengerd Pallets to provide them with pallets.

BY MR. BRUNSON:

Q. Did the Liberty Ridge Farm Committee have any say in that arrangement?

A. Yes.

MS. MENDEZ: I'm going to object. (Indiscernible) your client for an institutional response. However, it's fine to answer.

THE WITNESS: Yes. It is my knowledge they did.

MR. BRUNSON: Okay. And so the Liberty --actually might take a time out. Would it be easier for a standing objection? I'm just trying to save your voice and



MAGNA
LEGAL SERVICES

Page 31

stuff like that. You don't. It's up to you. I was just trying to say --

MS. MENDEZ: I'm not concerned about my voice, I'm trying to just do it whenever.

MR. BRUNSON: Okay. That's fine. Just wanted to --

MS. MENDEZ: I appreciate it.

MS. MENDEZ: Yeah.

BY MR. BRUNSON:

Q. So is it your -- so I lost my train of thought -- did the liberty -- so the Liberty Ridge Farm Committee approved the deal with the Wengerd Pallet Company?

MS. MENDEZ: Once again going to object to the use of deal. And again to the extent you're calling for an institutional response. However, you may answer if you know.

THE WITNESS: As I understand, Nelson Martin would have communicated options to the Liberty Ridge Farm Committee, and the committee would have approved that arrangement.

BY MR. BRUNSON:

Q. Okay. Do you remember or do you know of any other arrangements that Nelson Martin entered into, that the Liberty Ridge Farm Committee approved of?

MS. MENDEZ: Renewed objection. To the extent you're calling for an institutional response, which you may answer if you know.



Page 32

THE WITNESS: As I recall, Nelson would have been involved in the arrangement with Clark's Feed Mill in the poultry project.

BY MR. BRUNSON:

Q. And is it then correct when I said that the Liberty Ridge Farm Committee approved of that arrangement between Liberty Ridge Farm and Clark's feed?

MS. MENDEZ: Same objection to the extent you're calling for an institutional response. However, you may answer if you know.

THE WITNESS: Okay. It is my understanding they did approve that.

BY MR. BRUNSON:

Q. Okay. And when you say they, you were a part of that committee?

A. Yes.

Q. So you also approved that deal Liberty had with Clark's Feed?

MS. MENDEZ: Objection. Asked and answered. But you may answer.

THE WITNESS: The Liberty Ridge Farm Committee as a committee approved that.

BY MR. BRUNSON:

Q. Did you vote on it? Did the Liberty Ridge Farm Committee vote on it?



Page 33

A.    I don't recall.

Q.    Okay.  Do you know how -- well -- oh.  Never mind.
Strike that.

MR. BRUNSON:   This might be a nice break if
someone wants to take a break at this point.

MS. MENDEZ:   Sure.

MR. BRUNSON:   Thanks, everyone.  All right.
BY MR. BRUNSON:

Q.    All right.  I'm going to just talk about actually
Liberty Ridge now.  So what is the Liberty Ridge Farm?

A.    The farm is a base for an organized way to help
young men or boys to grow in specific areas of character
development and spiritual growth that the parents are requesting
help for.

Q.    Would it be fair to say that Liberty Farm is usually
-- is for troubled, I use the word troubled minors?

A.    Yes.

Q.    Okay.  And who came up with the idea for Liberty
Ridge Farm?

A.    I cannot say specifically who all was involved in
the brainchild or the initial idea.  I do recall that there was
a small group of brethren, men from our church that were
assigned to look into the needs of troubled boys, and requests
that came from parents to address these needs.

They sought to find a solution in such avenues as


MAGNA
LEGAL SERVICES

Page 34

could these boys be taken by their parents to another home and assisted in that home. The conclusion was that there are some cases that are too intense for that arrangement.

Therefore, an organized effort such as Liberty Ridge was seen as needed, and hence the farm was purchased by the Mission Board -- by the Mission, and the committee was set up to give direction to that work.

Q.   And the Mission set up that committee, just to be clear?

MS. MENDEZ:   I'm going to object to the extent you're calling for an institutional response, but you may answer if you want.

THE WITNESS:   To what extent the Mission set it up, I am not able to say, but the Mission was involved in the initial start.

BY MR. BRUNSON:

Q.   Okay. And when you said your church, what church are you referring to?

A.   Eastern Pennsylvania Mennonite church.

Q.   How long has Liberty Ridge been around for?

A.   As I recall, as an organized effort, the first residents would have arrived at the farm in 2011.

Q.   Okay. Did you have any participation in forming the Liberty Ridge Farm?

A.   No.  I entered after it was formed.


MAGNA
LEGAL SERVICES

Page 35

Q.   Okay.  Do you know if Mark Torkelson had any involvement in the preparation of the Liberty Ridge Farm?

A.   I don't know.

Q.   Okay.  Is Liberty Ridge still open today?

MS. MENDEZ:   I'm going to object and instruct my client not to answer.  That is wholly outside of the scope of the current litigation.

BY MR. BRUNSON:

Q.   I'm going to show you what's marked as Secretary Exhibit 12.  Let's take a look at that document, please.

(Whereupon, Secretary's Exhibit 12, LRF Handbook of Standard Operating Policy, was marked for identification.)

You got the opportunity to look at it?

A.   Yes.

Q.   What is that document?

A.   This is the handbook of standard operating policy.

Q.   Okay.  Have you seen that document before?

A.   Yes.

Q.   Okay.  Did you have any involvement in drafting that document?

A.   Yes.

Q.   Who else was involved in drafting that document?

A.   As I recall, Marvin Gehman would have given some assistance.  Do not recall specific involvement for sure beyond that.


MAGNA
LEGAL SERVICES

Q.   You know if Mark Torkelson was involved in drafting that document?

A.   He may have been involved in some of the thought processes behind it, even as far as drafting.  I don't know that he contributed to writing it.

Q.   So when you say thought processes, do you mean that he expressed some ideas and then conveyed them to you?  Is that what you're saying?

A.   That may be.  I don't recall specifics of those thoughts expressed.

Q.   You're just saying that he expressed some thoughts about the operating policy that I'm showing you?

A.   Yes.  He did.  Yes.

Q.   Okay.  So I want to go back to the troubled minors. How does Liberty Ridge -- how does the Liberty Ridge Farm Committee define trouble?

MS. MENDEZ:   I'm going to object, to the extent you're seeking an institutional response and information outside of the scope of this litigation.  However, you can answer if you know.

THE WITNESS:   I am not aware of the definition for trouble ascribed by the farm.

BY MR. BRUNSON:

Q.   Okay.  How would you define troubled?

A.   Troubled would often entail unruliness disrespect



Page 37

and disobedience to parents in the home setting.  Along with emotional feelings of insecurity.

Q.    Anything else?

A.    Not that I can think of.

Q.    Did Liberty Ridge have any -- strike that.  When a resident arrived at Liberty Ridge, did they undergo any mental health evaluations by a trained professional?

MS. MENDEZ:    I'm going to renew my objection that this line of questioning is outside of the scope of the current litigation.  However, you can answer if you know.

THE WITNESS:    As I recall, there would have been various residents that had a mental health professional involved in their case prior to and during their stay at Liberty Ridge.

BY MR. BRUNSON:

Q.    Did -- do you know if that Liberty Ridge have any psychiatrist on staff?

MS. MENDEZ:    Once again renewing my objection.  You may answer.

THE WITNESS:    To my knowledge, no.

BY MR. BRUNSON:

Q.    What about psychologists?

MS. MENDEZ:    I'm going to renew my objection again.

THE WITNESS:    To my knowledge, no.

BY MR. BRUNSON:



MAGNA
LEGAL SERVICES

Page 38

Q.    Were there any medical professionals on staff at all at Liberty Ridge?

MS. MENDEZ:    I'm going to renew my objection and also object to the use of the term staff.  You may answer if you know.

THE WITNESS:    To my knowledge, no.

BY MR. BRUNSON:

Q.    Okay.  Regarding staff, I ask that you look at Secretary Exhibit 12 again and look at MMM 2023 3, and Section F, please.  Have you had an opportunity to look at it?

A.    Yes.

Q.    What is Section F titled?

A.    Staff.

Q.    Okay.  Am I correct when I read Paragraph 1, when I read Liberty Ridge Farm is to be staffed by people who love the Lord and sincerely put their love into action through unselfish service in the form of tender loving care, training and teaching?

The qualifications of our staff are of utmost importance to us.  We do a thorough evaluation of each member's history, relationships and qualifications prior to engaging.  Did I read that correctly?

A.    Yes.

Q.    So am I correct when I say that you had -- that the Liberty Ridge Farm Committee had staff working or staff at



Page 39

Liberty Ridge Farm?

MS. MENDEZ: I'm going to object to the extent this document speaks for itself. You may answer.

THE WITNESS: The term staff in this context is not intended to be a technical or legal term.

BY MR. BRUNSON:

Q. What -- how do you find staff then? Sorry.

A. Personnel.

Q. That's how you define them as personnel?

A. To the best of my knowledge.

Q. Okay. Did the Liberty Ridge Farm Committee hire these personnel?

MS. MENDEZ: I'm going to object to the extent you're asking for an institutional response to the use of the term or hire. You may answer.

THE WITNESS: I believe that question should be more specific.

BY MR. BRUNSON:

Q. What do you mean? I don't understand.

A. There are many of the individuals that are serving at Liberty Ridge Farm that are volunteers and had full awareness that they are coming as a volunteer.

Q. I understand. So when you say many, that means not everyone at Liberty Ridge Farm was a volunteer. Am I correct when I say that?



Page 40

A.    Correct.

Q.    Okay.  So who were the people who were not volunteers at the Liberty Ridge Farm?

A.    There would be three positions.  That would be the houseparents, the work coordinator, and the guidance coordinator, somewhat like a counselor who would have been in a place of a fellowship position.

Q.    A fellowship position?  How do you define a fellowship position?

A.    A position that a monthly salary may be granted -- would be granted to, no hours are recorded in that position.

Q.    So Liberty Ridge did have some salaried employees. Is that what you're saying?

MS. MENDEZ:    I'm going to object to the form and to the use of the term employee.  You may answer?

THE WITNESS:    It's my understanding they'd be considered a fellowship.  Rather, how a fellowship relates to an employee.  I technically -- I can't speak on the technical side of that.

BY MR. BRUNSON:

Q.    I understood. But there were, to your knowledge, individuals who received salaries at the Liberty Ridge farm?

A.    If the word salary means an agreed upon amount that is paid on a regular monthly basis, yes.

Q.    Okay.  Just to -- while you're -- what we're looking


MAGNA
LEGAL SERVICES

Page 41

at it right now, I'm going to turn your attention to Paragraph 4. It says the director. Do you see that?

A. Yes.

Q. And again, just for the record is clear, MMM 2023-3; is the director a position that one could get a salary?

A. No, the director is a volunteer.

Q. Okay. Did the director receive any financial compensation for their time at Liberty Ridge Farm?

MS. MENDEZ: I'm going to object to the form of that question. The use of word -- the term compensation, sorry. But you may answer.

THE WITNESS: To my knowledge, no.

BY MR. BRUNSON:

Okay. Did the director position have to be approved by the Mission?

MS. MENDEZ: I'm going to object to the extent you're seeking an institutional response. However, you may answer if you know.

THE WITNESS: To my knowledge, no.

BY MR. BRUNSON:

Q. Okay. So then the Liberty Ridge Farm Committee was the one who -- was the group that selected the person who would be the director?

A. Yes.

MS. MENDEZ: I'm going to renew my objection.



Page 42

However, to the extent you were seeking an institutional response.

BY MR. BRUNSON:

Q.    What about the supervisor position?  Did that supervisor position receive a salary?

MS. MENDEZ:    I'm going to object to the use of the term salary.  You may answer.

THE WITNESS:    As I understand, the supervisor position would be the positions -- the three positions that I just named the houseparent, the guidance coordinator, and the work coordinator.  Those names are somewhat subtitles to supervisor.

BY MR. BRUNSON:

Q.    Okay.  Can you explain to me why Paragraph 6 though just says houseparent?

MS. MENDEZ:    I'll object to the form of that question to the extent that the document speaks for itself.

THE WITNESS:    As I understand, the houseparents may be a supervisor, but does not necessarily need to be a supervisor.

BY MR. BRUNSON:

Q.    Okay.  Could a houseparent be both a houseparent and a supervisor?

A.    Yes.

MS. MENDEZ:    I'm going to object to the term



Page 43

supervisor.

BY MR. BRUNSON:

Q.    Okay.  Do you know how many formal position of the title supervisor there were at Liberty Ridge Farm?

MS. MENDEZ:    I'm going to renew my objection.  You may answer.

THE WITNESS:    I recall there's more positions than what I listed of those three.

BY MR. BRUNSON:

Q.    Okay.  If one were to serve as a houseparent, do they have to get approval from the Mission to be a houseparent?

MS. MENDEZ:    I'm going to object to the extent you're seeking an institutional response.  However, you may answer if you know.

THE WITNESS:    Can you restate that question again.

BY MR. BRUNSON:

Q.    Sure.  If someone wanted to be a house parent, did the Liberty Ridge Farm committee have to submit that person's name for approval to the Mission so that person could then be a house parent?

MS. MENDEZ:    I'm going to renew my previous objection.

THE WITNESS:    As I recall, most times that did take place.

Q.    Okay.  Do you know if that was a written that was a



Page 44

memorialized policy by the Mission?

A.    I'm not aware of that.

MS. MENDEZ:    I'm going to object that, to the extent that you were seeking an institutional response.

BY MR. BRUNSON:

Q.    So the Liberty Ridge Farm Committee did have meetings; is that correct?

MS. MENDEZ:    I'm going to renew my objection.  You may answer.

THE WITNESS:    Yes, as I understand.

BY MR. BRUNSON:

Q.    Did you participate in those meetings?

A.    Yes.

Q.    Do you know how often those meetings would occur?

A.    Mostly monthly.

Q.    Monthly.  I'm going to show you Secretary Exhibit 1.

(Whereupon, Secretary's Exhibit 1, Liberty Ridge Farm (LRF) Committee Meeting Minutes, was marked for identification.)

Take a look at that document.

MS. MENDEZ:    Do you have another copy.

MR. BRUNSON:    Probably.  I'm sorry.

BY MR. BRUNSON:

Q.    Did you have a chance to look at it?

A.    Yes.



Page 45

Q. What is that document in front of you?

A. The minutes from Liberty Ridge Farm Committee dated April 19.

Q. Have you seen this document before?

A. I'm sure I have.

Q. Okay. Was that one of the documents you reviewed in preparation of your deposition today?

A. I can't recall that specifically.

Q. Got you. So your name is listed on this document, correct?

A. Correct.

Q. Okay. Does that mean that you actually attended this meeting?

A. Yes.

Q. Okay. It also says that the same paragraph lists your name. It says the minutes of the previous meeting and the financial report were read and approved. Did I read that correctly?

A. Yes.

Q. Was it a common practice for the minutes from the previous meeting to be read at each -- at the subsequent meeting?

MS. MENDEZ: I'm going to object to the use of the term common practice.

THE WITNESS: Yes.



MAGNA

LEGAL SERVICES

Page 46

BY MR. BRUNSON:

Q.    And if there were any errors or omission with those meeting minutes, what would be done about that?

A.    They would be discussed, corrected, and approved pending or per those corrections.

Q.    Okay.  So all of this, let's say there was an error on this document, okay?  That it would have been discussed at the next meeting, right?

A.    Providing somebody remembered the error.

Q.    Of course.  So then that error would then be corrected.  Would you create a new meeting minutes, or would you just edit the original?

MS. MENDEZ:    Objection to the use of the term you.

THE WITNESS:    It's my understanding corrections would have been made by edits on the original document.

BY MR. BRUNSON:

Q.    I see.  Okay.          I'm going to ask you about the financial report that was read and approved.  What is the financial report?

A.    It's my understanding that is the income and expenses related to the operation of the program.

Q.    And how often were these reports generated?

A.    Typically, on a monthly basis.

Q.    Did you generate these reports?

A.    No.



Page 47

Q.    Do you know who generated these reports?

A.    Our treasurer, brother, Nelson Martin.

Q.    Nelson Martin.  Okay.  And just to be clear, in these minutes, the -- Nelson appears just as a singular name, not Nelson Martin, just Nelson.  To your knowledge, when there's a reference to Nelson or is that a reference to Nelson Martin?

MS. MENDEZ:    I'm going to object to the form of that question and ask for clarification.  Are you asking with respect to the reports?

MR. BRUNSON:    So I'm talking about the meeting minutes, yeah.

THE WITNESS:    I cannot recall of any other Nelson that would be referring to other than Nelson Martin.

BY MR. BRUNSON:

Q.    Okay.  Thanks.  And did you have to approve of these financial reports?

MS. MENDEZ:    I'm going to object to the use of the term you.  You may answer.

THE WITNESS:    It is my understanding in most meetings the financial reports were accepted, official approval maybe that's a technical term, but official approval is hardly -- was hardly in our place to do.

BY MR. BRUNSON:

Q.    But you would agree with me that it does say the word -- the phrase, was the financial report were read and


MAGNA
LEGAL SERVICES

Page 48

approved?

MS. MENDEZ: Objection to the extent the document speaks for itself. You may answer.

THE WITNESS: Yes.

BY MR. BRUNSON:

Q. Okay. So what does that mean to approve the financial report?

A. It means to accept it.

Q. Okay. Was there any discussion or debate about the financial reports?

A. There was opportunity for that.

Q. And why -- what was the purpose of discussing the financial reports?

A. The purpose was for clear understanding of the report.

Q. Okay. So it was -- is it fair to say, a clear understanding of the financial situation of the Liberty Ridge farm?

A. Correct.

Q. And were these reports shared with the Mission?

MS. MENDEZ: I'm going to object to the extent you're seeking an institutional response. However, you may answer if you know.

THE WITNESS: I'm not aware that these monthly reports were shared.



Page 49

BY MR. BRUNSON:

Q.    Did you personally ever send these reports to anyone from the Mission?

A.    Not that I'm aware of.

Q.    Okay.  Does the Liberty Ridge Farm Committee have a subcommittee or anything like that?

MS. MENDEZ:   I'm going to object, to the extent you're calling for an institutional response.  You may answer.

THE WITNESS:   My understanding is that Liberty Ridge Farm Committee assigned different brethren or committee members into different areas of the work.

BY MR. BRUNSON:

Q.    So would there be a separate committee?  So let me give an example, just maybe that will help explain my question. Let's say there's the Liberty Ridge Farm Committee, right?

A.    Correct.

Q.    Let's say there's a committee on, you know, education.  Was there like a subcommittee that focused solely on the education of the residents at Liberty Ridge?

A.    There were some assignments too, that I don't know that we referred to them, or I don't know that they were referred to as a committee as such, but maybe particular attention was given by one or two of the committee members to make sure that that took place.

Q.    Okay.  So the committee members would direct certain



Page 50

individuals to focus on particular areas of concern at the Liberty Ridge farm?

MS. MENDEZ:  I'm going to -- sorry, I'm going to object to that question to the extent you're calling for an institutional response, but you may answer if you know.

THE WITNESS:  As I understand, that describes the situation.

BY MR. BRUNSON:

Q.  Do you know if there were -- aside from the Mission and aside from the Liberty Ridge Farm Committee, were there any other board meetings that discussed or dealt with the Liberty Ridge Farm?

MS. MENDEZ:  I'm going to renew my objection, but you may answer.

THE WITNESS:  Is your question whether there are any other boards involved in giving direction to the work of the farm?

BY MR. BRUNSON:

Q.  Yeah, yeah, that's a good way to phrase it.

A.  To my knowledge, no.

Q.  Okay.  I'm going to just read off some questions here.  And we've sort of covered some of them, but more specific I guess.  Am I correct when I say that the Mission oversees the Liberty Ridge Farm?

MS. MENDEZ:  I'm going to object to the term



Page 51

oversee and to the extent that you're calling for an institutional response. However, you may answer if you know.

THE WITNESS: What is the definition of oversea?

BY MR. BRUNSON:

Q. I would define it oversea as -- let me -- supervise and direct. Yeah, I think those are the ways to put it.

MS. MENDEZ: I'm going to object to those terms as well, but you may answer.

THE WITNESS: My understanding is that they do not have any direct involvement in the day-to-day operations of the farm. That is solely the responsibility of the Liberty Ridge Farm Committee.

If oversee means being involved in approvals or discussion related to volunteers and that type of thing, as we previously discussed, possibly from that aspect that may apply.

BY MR. BRUNSON:

Q. Okay. Does the Mission determine or -- strike that. Does the Mission have any say in whether or not the individual is reimbursed for their expenses for their time at Liberty Ridge?

MS. MENDEZ: I'm going to object to the extent you're calling for an institutional response. But you may answer if you know.

THE WITNESS: Not that I'm aware of.

BY MR. BRUNSON:


MAGNA
LEGAL SERVICES

Page 52

Q. To your knowledge, was there anyone who started out as a volunteer at Liberty Ridge Farm who then received or, I guess, then a fellowship position?

A. Within the dates under focus, I can't say -- I do not recall.

Q. You don't recall? Okay.

A. No.

Q. And to your knowledge, I think we might have already asked this, and I apologize. Did the Mission have any say into what businesses the Liberty Ridge Farm could enter into business contracts with?

MS. MENDEZ: I'm going to object to the extent that you're calling for an institutional response to the term business contracts.

THE WITNESS: I don't recall specific decision or involvement.

BY MR. BRUNSON:

Q. I'm going to show you Secretary Exhibit 3.

(Whereupon, Secretary's Exhibit 3, 10/19/2021 LRF Committee Meeting Minutes, was marked for identification.)

MS. MENDEZ: Can I get one?

MR. BRUNSON: You want another one?

MS. MENDEZ: Yeah.

MR. BRUNSON: Sorry.

MS. MENDEZ: Okay.



Page 53

            MR. BRUNSON:    Do you want the one with the
(indiscernible)?

            MS. MENDEZ:    (Indiscernible).

BY MR. BRUNSON:

    Q.    Have you had a chance to look at that document?

    A.    Yes.

    Q.    Okay.  Do you recognize that document?

    A.    I do.

    Q.    What is that document?

    A.    The minutes from Liberty Ridge Farm, dated October
19th, 2021.

    Q.    Okay.  Have you seen this document before?

    A.    Yes.

    Q.    Okay.  is this one of the documents you reviewed
prior to testifying today?  Do you recall?

    A.    I don't recall specifically.

    Q.    Okay.  And it says your name is on the first
paragraph, correct?

    A.    Yes.

    Q.    Does that mean that you were present at this
meeting?

    A.    Yes.

    Q.    All right.  When -- I see the phrasing MMM a couple
of times; is MMM the Mission?

    A.    Yes.



Page 54

Q.   Okay.  And I'm going to show -- direct your attention to the farm report.  Do you know who would give the farm report at these meetings?

A.   Often it was Nelson Martin.

Q.   Okay.  Do you know if anyone else would give it?

A.   I can't recall anyone else other than Nelson.

Q.   Okay.  And I'm going to direct your attention to Paragraph C of the farm report.  So this is what I was talking about before.  It just says Nelson.  Do you see where I'm talking?

A.   Yes.

Q.   Okay.  Is Nelson -- is this Nelson, Nelson Martin?

MS. MENDEZ:   I'm going to object to the extent that the document speaks for itself.  But you may answer.

THE WITNESS:   To the best of my knowledge, this would be Nelson Martin.

BY MR. BRUNSON:

Q.   Okay.  And this Paragraph C is referring to the Mission giving approval to buy a forklift; is that correct?

MS. MENDEZ:   I'm going to object to the extent you're calling for an institutional response.  But you may know.

THE WITNESS:   As I understand, yes.

BY MR. BRUNSON:

Q.   Okay.  And this is a major expense.  So then -- strike that.  Because this is an a major expense, would the


MAGNA
LEGAL SERVICES

Page 55

Mission have to approve this expenditure from the Liberty Ridge Farm committee; is that correct?

MS. MENDEZ:   Sorry, I'm going to renew my objection.

THE WITNESS:   As I understand, yes.

BY MR. BRUNSON:

Q.   Okay.  I'm going to direct your attention to Paragraph 5, agenda, section -- Paragraph C, Section C, whatever you want to call it.  Are you looking at that?

A.   Yes.

Q.   If I'm reading this correctly, it says -- please tell me if I read this correctly.  It says we approved another mentor list to be submitted to MMM; did I read that right?

A.   Yes.

Q.   So does that mean that the mentors had to be approved by the Mission?

MS. MENDEZ:   I'm going to object to the extent you're calling for an institutional response, to the extent that the document speaks for itself.  However, you can answer if you know.

THE WITNESS:   As I understand, yes.

BY MR. BRUNSON:

Q.   Okay.  Section A, MMM is open to restructuring our relationship with them.  And will discuss this further; did I read that correctly?



A.    Yes.

Q.    What does that mean?

MS. MENDEZ:    I'm going to object to the extent the question calls for an institutional response.  But you can answer if you know.

THE WITNESS:    As I understand, there was consideration at that time on the floor to form an LLC.

MS. MENDEZ:    Let me just stop you.  I would like to also object to the extent that this is potentially encroaching on privileged conversations, attorney client privilege, I'll allow the line of questioning to continue, but perhaps more targeted questions would be better suited for this time.

MR. BRUNSON:    Sure, you don't need to tell me anything that attorney told you something like that.  So if there was.  This is about an attorney conversations you had with the attorney, privileged communications.  Then you don't need to say that.  But if it's not that, then I would ask that you answer the question.

Is that fair, counsel?

MS. MENDEZ:    That's fair.

THE WITNESS:    At this point, is reflecting consideration of forming a completely separate entity of Liberty Ridge Farm as an LLC.

BY MR. BRUNSON:



Page 57

Q.   So then is it fair to say then, that at this point in time, on October 19th, 2021, Liberty Ridge Farm Committee and the Mission were connected to one another?

MS. MENDEZ:   I'm going to object to the form of that question to the extent you're calling for an institutional response.

THE WITNESS:   As I understand, that would be to the extent, as we've discussed already.

BY MR. BRUNSON:

Q.   Did anything else happen?

A.   Unless you have more questions.

Q.   Okay.  I'm going to direct your attention to Paragraph G.  It says -- please correct me if I'm -- please tell me if I read this correctly.  We moved in favor, seeking permission from MMM to write another LRF report to be distributed across the church; did I read that correctly?

A.   Correct.

Q.   So LRF mean, Liberty Ridge Farm, right?

A.   Yes.

Q.   Okay.  What did -- can you explain this to me, what you were seeking permission to -- what -- let me strike that. What report were you trying to distribute across the church that you needed the Mission's approval for?

MS. MENDEZ:   I'll object to the extent you're seeking an institutional response.  But you may answer if you



Page 58

know.

THE WITNESS: As I understand, Liberty Ridge Farm was seeking permission to write a general report of what took place, very similar what -- to what every -- any charitable organization writes a newsletter to their contributees.

BY MR. BRUNSON:

Q. Okay. What would have been in this report that you were trying to approve?

MS. MENDEZ: I'm going to renew my objection, but you may answer.

THE WITNESS: It would have been a general report of what's happening to update what's happening at the farm.

BY MR. BRUNSON:

Q. Was this report trying to recruit potential residents for the Liberty Ridge Farm?

MS. MENDEZ: I'm going to renew my objection that the institutional response, and also to the term recruit.

THE WITNESS: As I understand, no.

BY MR. BRUNSON:

Q. Okay. Other than your position as chairman with the Liberty Ridge Farm Committee, do you have any other position or titles with Liberty Ridge Farm?

A. Possibly, responsibility would be better than title. I would have been assigned the responsibility to be in contact with the teaching, the spiritual instruction aspect of the Farm.



Q.    Are you saying that one of your personal responsibilities were that to direct the educational program at Liberty Ridge Farm?

MS. MENDEZ:    Objection.  Mischaracterization of witness.  You may answer.

THE WITNESS:    Particularly, the spiritual instruction where we would open the Bible and teach life lessons from the scriptures.

BY MR. BRUNSON:

Q.    Did you personally teach these Bible lessons to the residents?

A.    Most times, no.

Q.    So did you train the people who did teach these Bible lessons to the residents?

A.    I would not use the word training, but maybe coordinate.

Q.    Coordinate.  And when you say coordinate, you mean like you would pick out which verses should be taught to the residents on a particular day; is that fair?

A.    I did not have that specific responsibility.  My responsibility would have been a bit broader and more general than that.

Q.    Can you just elaborate what you mean by coordinate, I guess?

A.    So I was involved in selecting which scriptural



commentaries or aids or which -- or books may have also been studied alongside of the Bible, and that would have involved also subsequently, which Bible passages were looked at?

Q.    Anything else?

A.    Not that I can think of.

Q.    To your knowledge, did anyone from the Liberty Ridge Farm Committee speak to any attorneys about and when Liberty Ridge Farm was being set up?

MS. MENDEZ:    I'm going to object to the extent you're calling for an institutional response and to the extent you're calling for an information protected by attorney client privilege.  But you can answer if you know.

THE WITNESS:    I am not aware of that communication.

BY MR. BRUNSON:

Q.    To your knowledge, did anyone speak to the Department of Labor?  Did anyone from the Liberty Ridge Farm Committee speak to anyone from the Department of Labor prior to setting up the Liberty Ridge Farm?

MS. MENDEZ:    I'm going to renew my objection.  To the extent you're seeking an institutional response and to the extent that this is far outside of the time period of the instant litigation.

THE WITNESS:    I am not aware of communication.

BY MR. BRUNSON:



Page 61

Q.    To your knowledge, did anyone at the Liberty Ridge Farm Committee take any steps to ascertain the requirements of the Fair Labor Standards Act when setting up the Liberty Ridge Farm?

MS. MENDEZ:    I'm going to object, to the extent you're calling for an institutional response, to the extent you're seeking a legal conclusion from my client.

THE WITNESS:    To my knowledge, no.

BY MR. BRUNSON:

Q.    Did anyone from the Liberty Ridge Farm Committee speak with any social workers when setting up the Liberty Ridge Farm?

MS. MENDEZ:    I'm going to renew my objection.  To the extent you're seeking an institutional response and to the extent that this information -- this line of questioning in particular, is wholly irrelevant to the instant litigation, however you may answer if you know.

THE WITNESS:    To my knowledge, no.

BY MR. BRUNSON:

Q.    Okay.  To your knowledge, did anyone from the Liberty Ridge Farm Committee get any permits to run the Liberty Ridge farm?

MS. MENDEZ:    I'm going to renew my objection.

THE WITNESS:    To my knowledge, we secured a township permission for this project.



BY MR. BRUNSON:

Q.   What township was that?

A.   I can't recall.

Q.   Okay.  Have you personally been to Liberty Ridge?

A.   Yes.

Q.   How often have you gone?

A.   Approximately, monthly.

Q.   Monthly.  How come you go monthly?

A.   One reason would be for the monthly meetings.

Q.   Any other reasons?

A.   Not that I can think of or that would be relevant.

Q.   One second here.  Now I'll jump back a little -- we sort of discussed this a little bit, but I want to just come back to it.  I'm going to ask you to take a look at Secretary Exhibit 7.  All right.  Did you have an opportunity to look at that?

(Whereupon, Secretary's Exhibit 7, 11/16/2021 LRF Committee Meeting Minutes, was marked for identification.)

A.   Yes.

Q.   Have you seen that document before?

A.   Yes.

Q.   Okay.  What is this document?

A.   The minutes from the Liberty Ridge Farm Committee, November 16th, 2021.

Q.   And has your name that you were present at this



meeting?

A.    Yes.

Q.    Okay.  Does that mean you were present?

A.    Yes.

Q.    Okay.  I want to ask you about the Section 5 agenda regarding staff payments.  Do you see where I'm referring to Section A?

A.    Yes.

Q.    Okay.  Why, can you explain to why fill in house parents were paid $60-well, I guess now paid $70 a day?

MS. MENDEZ:    I'm going to object to the extent you're seeking an institutional response.  However, you may answer if you know.

THE WITNESS:    My understanding that this payment would have been a simple token to them of appreciation for their serving here.

BY MR. BRUNSON:

Q.    That's why they got $70 a day?

A.    Yes.

Q.    Do you know how many fill in houseparents were utilized by Liberty Ridge Farm?

A.    I don't know.

Q.    Fill in teacher pay, that remained the same for $70 per day, correct?

MS. MENDEZ:    I'm going to object to the extent



Page 64

this document speaks for itself. You may answer.

THE WITNESS: Yes, according to the document.

BY MR. BRUNSON:

Q. Okay. So when it says we moved in favor, that means that the Liberty Ridge Farm Committee approved this payment schedule?

MS. MENDEZ: I'm going to object to the extent you're seeking an institutional response, but you may answer.

THE WITNESS: Yes, as I understand.

MR. BRUNSON: Sorry. Just trying to organize.

BY MR. BRUNSON:

Q. Regarding the houseparents. Did the houseparents have anyone -- did the houseparents have a supervisor?

MS. MENDEZ: I'm going to object to the use of the term supervisor. But you may answer.

THE WITNESS: To my understanding, no.

BY MR. BRUNSON:

Q. Who do the houseparent then, if anyone, who do they take direction from?

MS. MENDEZ: I'm going to object to the form of that question. To the use of the term direction. You may answer.

THE WITNESS: That would have been one from our committee, as I understand, that would have been assigned responsibility to communicate what would be expected of them.


MAGNA
LEGAL SERVICES

BY MR. BRUNSON:

Q. Do you know who from the committee was designated to direct the house of parents -- the houseparents?

MS. MENDEZ: I'm going to object to the extent that you're seeking an institutional response, and again to the term direct.

THE WITNESS: As I recall, that would have been Gerald Nolt.

BY MR. BRUNSON:

Q. And regarding the mentors, do you know, is it the same situation, was there someone from the committee who directed them as well?

MS. MENDEZ: I'm going to renew my previous objection.

THE WITNESS: Depending on the definition of direct. It most likely would have been the houseparent or the work coordinator that would have given them guidance or shared expectations with them.

BY MR. BRUNSON:

Q. Okay. If a mentor wanted to not volunteer or work on a particular day, who would that mentor speak to, to get approval for that request?

MS. MENDEZ: I'm going to object to the extent you're asking my client to speculate, however you can answer if you have an answer.



Page 66

THE WITNESS:   I can't recall ever a mentor just wanting to arbitrarily not work.  Related to scheduling of when he would be there, when he would volunteer to be there, and when he would face off, that he often spoke to one of the committee members.

BY MR. BRUNSON:

Q.   And one of the committee members would then approve that request?

MS. MENDEZ:   I'm going to object to the form of that question.  You may answer?

THE WITNESS:   If the word approve is the right word, that may be indicates he coordinated.  Maybe it would be better to say he coordinated the days that this volunteer could serve alongside the day the next volunteer could serve.  And in that way made sure that there was a steady flow of volunteers.

BY MR. BRUNSON:

Q.   So this particular committee member would act as a scheduler; is that fair to say?

MS. MENDEZ:   I'm going to object to the form of that question.

THE WITNESS:   As I understand, yes.

BY MR. BRUNSON:

Q.   During the hiring -- sorry.  Well, I am going to use the term hiring.  During the hiring process of these volunteers and fellowship workers, as you describe them.  Is there an



Page 67

application process to become a volunteer or to have a fellowship position?

MS. MENDEZ: I'm going to object to the use of the term hiring. But you may answer if you know.

THE WITNESS: As I understand, for a volunteer to be brought into a position of service and contribution to the work, there would be an initial interview to seek to understand his desire to serve.

Often, he would respond with a way -- with a response. This is an opportunity that I have to serve my Lord and to express my faith to help someone else. Often, he would say, I've been helped, I would like to help someone else.

BY MR. BRUNSON:

Q. Do you know who would do these interviews?

MS. MENDEZ: I'm going to object to the term interview. However, you may answer.

THE WITNESS: As I would understand -- as I recall, there were no set committee members assigned, but often it would -- it would vary and rotate.

BY MR. BRUNSON:

Q. Maybe, depending on whoever's available from the committee; is that fair to say?

A. That was a factor. Geography was another factor as well.

Q. Do you know if anyone from the Mission conducted any



Page 68

of these interviews?

MS. MENDEZ: I'm going to object, to the extent you're calling for an institutional response to the -- end to the term interview. I'm sorry, but you may answer.

THE WITNESS: As I recall, no.

BY MR. BRUNSON:

Q. To your knowledge, could the Mission veto any prospective hire or selection of a volunteer, or I guess, fellowship member?

MS. MENDEZ: I'm going to renew my previous objection, you may answer.

THE WITNESS: I'm not sure if I understand the technical definition of veto, but if to the extent it means that they may express an opinion or a guiding word, be certain they would have that opportunity to do that.

BY MR. BRUNSON:

Q. Let me be more -- hopefully be more specific. Could the Mission, let's say the Liberty Ridge Farm Committee selected a volunteer that they would like to work with Liberty Ridge Farm. Could the Mission say, no, this person cannot be a volunteer?

MS. MENDEZ: I'm going to renew my previous objection and also object to the extent you're asking my client to speculate. But you may answer.

THE WITNESS: I can't answer it. I don't know.



BY MR. BRUNSON:

Q.   You don't know.  Okay.  Do you know if any of these volunteers or fellowship members, for lack of better phrasing, did they ever receive any training from the Liberty Ridge? Yeah.  Did they receive any training?

MS. MENDEZ:   I'm going to renew my objection.  You may answer.

THE WITNESS:   While the word training may not be the best word I would use, the word expectations were communicated.

BY MR. BRUNSON:

Q.   To your knowledge, did the Liberty Ridge Farm ever hire anyone or pay anyone an hourly rate to train individual volunteers or fellowship individuals at the Liberty Ridge Farm?

MS. MENDEZ:   I'm going to renew my objection once again.  But you may answer.

THE WITNESS:   I am not aware that that took place within this timeframe.

BY MR. BRUNSON:

Q.   I would ask that you look at Secretary Exhibit 1, please.  It should be the Liberty Farm Committee minutes from April 19th, 2022.  I'll direct your attention to Section 7.  If you could just read that to yourself, please.

A.   Okay.  Yes.

Q.   Okay.  So this -- correct me if I'm wrong, but this



Page 70

says that the Liberty Ridge Farm Committee would pay Loren Martin Halton (phonetic) to train -- to train the LRL staff; is that correct?

MS. MENDEZ: Objection. To the extent that the document speaks for itself. But you may answer.

THE WITNESS: My understanding is that he, Loren Martin, took the required training in preparation to train personnel at Liberty Ridge Farm.

BY MR. BRUNSON:

Q. Okay. But then you -- then the Liberty Ridge Farm Committee then paid him $25 an hour for his training and teaching time?

MS. MENDEZ: I'm going to renew my objection to the extent you're calling for an institutional response. But you may answer.

THE WITNESS: My understanding is that they were prepared to pay him that whenever that took place.

BY MR. BRUNSON:

Q. And did that have to get approved by the Mission?

MS. MENDEZ: Going to renew my objection. You may answer.

THE WITNESS: Is your question whether that $25 an hour needed to get approved?

BY MR. BRUNSON:

Q. Yes.



MS. MENDEZ:    Same objection.

THE WITNESS:    I am not aware that it did.

BY MR. BRUNSON:

Q.    Okay.  But the -- correct me if I'm wrong.  Am I reading this correctly when it says approval to use him will be sought from the Mission board?  Last sentence of Section 7.

A.    As I understand that approval would be -- would relate to using that individual Loren Martin --

Q.    Okay.

A.    -- and not necessarily the $25 an hour.

Q.    I see.  Do you know if that was approved by the Mission?

MS. MENDEZ:    I'm going to renew my objection.  But you may answer if you know.

THE WITNESS:    As I understand, it was.

BY MR. BRUNSON:

Q.    Okay.  Does the Liberty Ridge Farm Committee perform any criminal background checks on any, what you described as volunteers and fellowship -- can I call them fellowship members; is that fair?

MS. MENDEZ:    Fellows.

MR. BRUNSON:    Fellows.  Okay.

BY MR. BRUNSON:

Q.    Any Fellows.

MS. MENDEZ:    I'm going to renew my objection and



Page 72

also object to the extent that this line of questioning is
irrelevant and outside of the scope of the current litigation.
But if you know, you may answer.

THE WITNESS:   The word does indicates current
procedure.  I can say that there have been, at some points in
the Liberty Ridge Farm work, there have been criminal checks
done.  Whether there were any of them done within this time
period, I do not know.

BY MR. BRUNSON:

Q.    Did you, in your capacity as chairman, perform any
criminal background checks on prospective volunteers and
fellows?

MS. MENDEZ:   Same objection renewed.

THE WITNESS:   No.

BY MR. BRUNSON:

Q.    Okay.  Do you know who would have performed these
criminal background checks?

MS. MENDEZ:   Same objection.  You may answer.

THE WITNESS:   As I understand, Nelson Martin would
have.

BY MR. BRUNSON:

Q.    You previously mentioned that some individuals will
get a token of appreciation; is that correct?

A.    Yes.

Q.    Who would decide from the Liberty Farm Committee



Page 73

whether someone would get a token of appreciation?

MS. MENDEZ: I'm going to object to the extent you're calling for an institutional response, but you may answer.

THE WITNESS: As I understand, that decision would have been via the Liberty Ridge Committee, and our treasurer simply would have been made that -- taking that action.

BY MR. BRUNSON:

Q. How would one get -- strike that. It is my understanding that the mentors would frequently get $250 a month for their time at Liberty Ridge Farm; is that correct?

MS. MENDEZ: I'm going to object as that is a mischaracterization of prior testimony, but I will allow my client to answer.

THE WITNESS: The $250 token was not looked at as compensation for time. $250 a month to the mentor was a standard token to give to these volunteer mentors.

BY MR. BRUNSON:

Q. So if you were a mentor, the -- you would expect to get a $250 a month while you were serving at Liberty Ridge; is that correct (indiscernible)?

MS. MENDEZ: I'm going to object. That's a mischaracterization of my client's testimony. I will allow you to answer.

THE WITNESS: The term expectation is probably one



Page 74

of the technical terms. When a mentor wishes to serve, he does so on a completely volunteer basis that he's coming and volunteering in the process of his experience when he receives that token which may be -- when he receives that token based upon precedence, that's up to him if he expects it the next month or not.

BY MR. BRUNSON:

Q.    So when you -- when someone from the Liberty Ridge Farm Committee was speaking to these mentors. Was it told to them, that they would be receiving $250 a month for their time at Liberty Ridge Farm?

MS. MENDEZ:    I'm going to object to the extent you're calling for an institutional response and as a mischaracterization -- a mischaracterization, sorry, of my client's prior testimony.

THE WITNESS:    Again, I would reiterate my understanding is, this is not for their time. This is a simple token of appreciation that may or may not be given by Liberty Ridge. There is no obligation for Liberty Ridge to get this. I cannot say whether it was or was not shared as a possibility when the volunteer first offered his volunteering.

BY MR. BRUNSON:

Q.    Just so I'm clear, then, is it your testimony that there was not any discussion with potential residents about receiving this $250 a month? Is that what you're saying today?



MS. MENDEZ:    I'm going to object.  And just for clarity of the record, I think we were talking about mentors and you mentioned residents.  So I want--.

MR. BRUNSON:    I'm sorry.

MS. MENDEZ:    -- to make sure that it's clear.

MR. BRUNSON:    Thank you.

THE WITNESS:    It would be my understanding that may have been part of that discussion, but it may not have been -- that could have -- I cannot say whether it was.  It was not considered to be a required part of the discussion.

BY MR. BRUNSON:

Q.    And if I recall correctly, you previously testified today that Nelson Martin had the primary responsibility of selecting these potential mentors; is that fair to say?

MS. MENDEZ:    Objection to the form of that question, to the extent that I believe it's a mischaracterization, but you may answer.

THE WITNESS:    No, that is not fair to say.

BY MR. BRUNSON:

Q.    Okay.  Do you know who had the primary responsibility of selecting the mentors to reside at the Liberty Ridge Farm, or to spend time at Liberty Ridge Farm?

A.    That would have been a committee joint effort.

Q.    Okay.  And then again, the Mission would have to approve those names, correct?



MAGNA
LEGAL SERVICES

Page 76

A.     That was --

MS. MENDEZ:     I'm going to object to the form of that question, and to the extent that you're seeking an institutional response, but you may answer.

THE WITNESS:     That was typically followed as a practice.

BY MR. BRUNSON:

Q.     Got you.  Did any of the mentors ever complain to the Liberty Ridge Farm that they were not receiving a minimum wage for their time at Liberty Ridge Farm?

MS. MENDEZ:     I'm going to object to the form of that question, to the extent also that you're seeking an institutional response and to the terms of art, such as minimum wage.

THE WITNESS:     According to my knowledge, that was never registered as a complaint because that was far from their expectation.

BY MR. BRUNSON:

Q.     And just yesterday, when I refer to minimum wage laws, are you familiar with minimum wage laws?

MS. MENDEZ:     I'm going to object to the extent that the question calls for a legal conclusion.

THE WITNESS:     I'm familiar with the term minimum wage, and I believe the Pennsylvania minimum wage is seven and a quarter.  I cannot profess to know all the other aspects of the


MAGNA
LEGAL SERVICES

minimum wage laws.

BY MR. BRUNSON:

Q.    But you do know, then, that minimum wage laws exist in both the Commonwealth of Pennsylvania and the United States. Is that fair?

A.    Yes.

MS. MENDEZ:    I'm going to renew my objection.

BY MR. BRUNSON:

Q.    And are you -- do you have any understanding of or any familiarity with overtime laws and either the Commonwealth of Pennsylvania or the United States?

MS. MENDEZ:    Same objection to the extent you're seeking the legal conclusion.  But you may answer.

THE WITNESS:    A basic -- I have a basic understanding.

BY MR. BRUNSON:

Q.    And with that basic understanding involved, knowing that if you work more than 40 hours a week, you are entitled to time and a half compensation?

MS. MENDEZ:    Same objection.

THE WITNESS:    Yes.

BY MR. BRUNSON:

Q.    Okay.  Did anyone -- did any mentor ever complain or complain to the Liberty Ridge Farm Committee about not being compensated for overtime work?



Page 78

MS. MENDEZ:   I'm going to object to this, that you're seeking an institutional response.

THE WITNESS:   No.  To my knowledge, there has never been a case like that again because there would have been no expectation for compensation.

BY MR. BRUNSON:

Q.   Okay.  And you kind of said this, but just to be clear, the mentors were not paid an hourly rate for their time at the Liberty Ridge farm; is that fair to say?

A.   That's correct.

MR. BRUNSON:   Okay.  Just want to get this right. I would just sort of break.

THE REPORTER:   Yeah.

(Thereupon, the above-entitled matter went off the record.)

BY MR. BRUNSON:

Q.   Okay.  We're back.  So how (indiscernible) -- about how minors -- well, actually, I'm not familiar yet.  To your knowledge, what does a typical day -- what's a typical day for a mentor who was at Liberty Ridge Farm?

A.   He would wake up with a resident, often would go out, take a walk in the woods or in the lanes around the farm there.  Just get a good fresh breath of -- good oxygen in their lungs.  Come in for breakfast and have family worship, family devotions where they read from the Bible and sing and pray



Page 79

together.

There might be some household duties sometimes after meals, like washing dishes, that kind of thing. Just whatever it takes to keep, you know, the normal flow going.

Q. Okay

A. One of the things we seek to teach the residents is that a lot of life is about picking up after yourself and fulfilling your own responsibilities. So laundry, that type of thing. There's a regular schedule to see to it that that works through.

So it may be that a mentor in his resident would put their wash through, say like right after breakfast and hang it up. And then part way through the day, they would pull it in from the line as well and put it away.

So a lot of household responsibilities often fell to the resident and mentor to do together as a team. They would -- often toward the beginning of the day, they would check up on the animals that are on the farm as well, often involved walking through the chicken flock, walking among the birds, making sure the health was good, checking the feed supply.

And one value of walking through the flock is to keep the birds motivated and active and nudge them toward the feed and water, just to ensure the health of the birds. Make sure the ventilation and everything was appropriate.

They would sometimes also in the summer time, go to


MAGNA
LEGAL SERVICES

Page 80

the garden and perform whatever gardening there was off the garden. They would -- as part of the -- also in tending to the animals they would -- often there was a small shed where a steer was kept grazing pasture. They would stop by and check, make sure that there was -- give them his feed and water.

And then they would head toward the shop, where they would assemble pallets for a -- an activity through the remainder of the morning. Often, they took a refresher break around 10:00. They would go into the house, have a snack, they drink, use the restroom, just to provide some structure to the day.

Then lunchtime there would be a dinner bell prior to a lunch at 12:00. So 10:00 or 10 minutes before 12:00 there would be a bell rung. They would come in for lunch, trying to keep the schedule as prompt as possible.

Again, to create -- to develop a rhythm within the boy's experience. One of the things that the troubled boys often have in common is from home a lack of structure and inability to work with schedule, inability to fulfill responsibilities in a timely way.

And so they -- all of these exercises are geared to help him find a place and balance him and create a wholeness with the young man and the mentor. As the question was asked, was the mentors place in this, he simply there to walk alongside and model the kind of structure and activity, to provide a moral



Page 81

support to the resident.

At lunchtime, there would have been a sitting around the table about this size, and there's a lot of open discussion going and back and forth, conversation over lunch hour, provides a very nice time of sharing.

After lunch, mentors, volunteers often caught up on voicemails.  Did any correspondence with home.  Then in the afternoon, there was a Bible class in which the mentors and residents all sat down together around a small table quite like this, but two rows of tables, and they all opened the Bible, and any study books that were associated with that.

And learned things from general life skills, how to deal with emotional responses of anger and that type of thing, how to work through these issues that most troubled boys face. After that, there may have been another midday walk through the chicken house at some point, whether that's late morning or mid-afternoon, I'm not quite sure.  I think there were maybe three times where they would have gone through the flock in the chicken house.

And after that, often there were exercises again resuming in the shop or the projects with either palettes, some of the palettes, or sometimes there were other woodworking projects or sometimes there were -- there may have been some general maintenance items of up keeping the farm equipment, that type of thing.


MAGNA
LEGAL SERVICES

And at supper time -- I believe there was a mid-afternoon break as well in that three o'clock range I think. But then at supper time, what we call supper, many people refer to it as dinner, but what we call supper. At 10 minutes till 6:00 the bell rang, and then they would enter the house in that time frame between 10:06 and 6:00. And then they'd be all ready to sit down at 6:00 as well.

So at the end they'd have probably the most leisurely time at supper takes an extra time to visit, chat and just keep up their social relationships. After supper was a good opportunity for reading. There would have been -- it could be some hobby projects. Often, games were played.

And then for bedtime, a mentor would sit down with his resident on a one on one basis and open their Bibles and read and pray together. Talk about the day, how things went, and how you feel. Just a little bit of a regrouping calibration type thing. And then, often around nine o'clock, they'd head upstairs to bed.

BY MR. BRUNSON:

Q. And so how often -- so what time did they -- how many hours a day did the mentors, I guess, spend participating in Liberty Ridge's program?

MS. MENDEZ: I'd like to object to the form of that question. But you may answer.

THE WITNESS: Participating in the program. If I



MAGNA
LEGAL SERVICES

Page 83

understand that, it would have involved the whole day of -- they did take off of an average several days per month. It averaged out to be between one and two days per week that they would take off. So then they were completely gone.

But they would have been when -- let's say, when they were -- technically speaking, when they were catching up on voicemails, they weren't really part of the program. But that was a small part right after lunch, I think that describe that. Other than that, they were pretty much at attention and just moving with the family.

Q. You know what time they normally woke up?

A. Around 6:00.

Q. It's usually about -- bedtime was around nine o'clock?

A. Yes.

Q. Okay. So between 6:00 and 9:00 they were participating in this program, with the exception of a few breaks and checking up on voicemails and whatnot; is that fair to say?

MS. MENDEZ: I'm going to object to the form of that question, but you may answer.

THE WITNESS: Yes, if I understand the question correctly. Yes.

BY MR. BRUNSON:

Q. Okay. Who would -- let's say a mentor did something



MAGNA
LEGAL SERVICES

Page 84

wrong in the course of their duties as a mentor, who would reprimand them?

MS. MENDEZ: I'm going to object to the extent you're asking my client to speculate. However, you can answer if you know.

THE WITNESS: Typically, if there were any difficulties in relationship or behavior of the mentor, that would fall to the responsibility of, and on the site supervisor to give them a word of correction and guidance. If that failed to produce desired results, possibly one of the committee members would have been involved in discussing it with them.

BY MR. BRUNSON:

Q. Okay. So and again, supervisor, you're referring to the houseparents?

A. Yes.

A. Okay. And then if that did not work, then a committee member would then reprimand the mentor?

MS. MENDEZ: I'm going to object to the form of that question, but you may answer.

THE WITNESS: I would not use the word reprimand, but guide and direct and convey expectations.

BY MR. BRUNSON:

Q. If a mentor just did a very terrible job, who would terminate the mentor services for Liberty Ridge?

MS. MENDEZ: I'm going to object to the extent



Page 85

you're asking my client to speculate and to the term terminate.

THE WITNESS:  If that were to happen, I would expect that the Liberty Ridge Committee would be involved in asking the volunteer to leave.

BY MR. BRUNSON:

Q.   And did that ever happen during your time with the committee?

A.   No, to my knowledge.

Q.   Okay.  Was there any protocol in place that the Mission would have to approve or sign off on the termination of the mentor's time at Liberty Ridge Farm?

MS. MENDEZ:   I'm going to object to the extent you're seeking an institutional response against the term termination.  But you may answer.

THE WITNESS:   To my knowledge, no.

BY MR. BRUNSON:

Q.   Okay.  Let's talk about how residents end up at Liberty Ridge.  Can you explain that process for me?

THE WITNESS:   Surely many times, if a young man was found difficult to work with in the parental home, the parents would seek some type of assistance in working with them.  Sometimes they would reach out to their ministry and ask them to come alongside and give them advice and counsel.

If an in-home remedy was not able to be found, sometimes they would seek the help of another home.  If that was



Page 86

not able to be found, often they would come to us as a committee, come to Liberty Ridge committee, and ask for assistance. Ask if their son could be involved and taken in as a resident at Liberty Ridge Farm.

BY MR. BRUNSON:

Q. Did the Liberty Ridge Farm Committee do any recruiting to recruit potential residents?

MS. MENDEZ: I'm going to renew my objection, and also object to the use of the term recruiting?

THE WITNESS: No.

BY MR. BRUNSON:

Q. Was the Liberty Ridge Farm Committee advertised at all to potential residents to come and stay at Liberty Ridge Farm?

MS. MENDEZ: I'm going to renew my objection and also object to the term advertise?

THE WITNESS: No.

BY MR. BRUNSON:

Q. Do you know anyone from the Mission advertise to get prospective residents to the Liberty Ridge farm?

MS. MENDEZ: I'm going to renew my objection as it relates to institutional response but you may answer.

THE WITNESS: No.

BY MR. BRUNSON:

Q. Do the residents have to live at the Liberty Ridge


MAGNA
LEGAL SERVICES

Page 87

Farm?

A.    Typically, they have lived there, there has been some consideration to a resident simply coming in for classes during the day.

Q.    But that was just consideration, (indiscernible).

A.    Consideration, that would be a rare exception.

Q.    So the standard practice, though, is that a resident would live at the Liberty Ridge Farm?

MS. MENDEZ:    I'm going to object to the term standard practice, but you may answer.

THE WITNESS:    To my understanding, correct.

BY MR. BRUNSON:

Q.    Okay.  And what are the -- well, let me ask you this.  If a parent said, I want my child to live with me so but also still participate in the Liberty Ridge Farm program, would have that been acceptable?

MS. MENDEZ:    I'm going to object to the extent that you're asking my client to speculate.  However, you may answer if you know.

THE WITNESS:    I don't recall any requests such as that coming.  And the reason is often the parents were seeking relief outside of their homes.

BY MR. BRUNSON:

Q.    So this was the parent's decision to send the residents there, correct?


MAGNA
LEGAL SERVICES

Page 88

A.    Very definitely.

Q.    Okay.  And if a resident said, I don't want to go, would the Farm Committee still accept him?

MS. MENDEZ:    I'm going to renew my objection and object to the extent you're calling for an institutional response.  But you may answer.

THE WITNESS:    It would be my understanding that no, the Liberty Ridge Farm would require all residents coming to come completely voluntarily.

BY MR. BRUNSON:

Q.    Okay.  Do you know the average -- sorry.  What was the age ranges for children that the residents that resided at Liberty Ridge?

A.    As I recall, the ages would have been from age 12 to 21 or 20 to 21.

Q.    Okay.

A.    I think there may have been a resident there that stayed beyond 20, but often they would arrive within the age of 12 to 20.

Q.    What factors go into determining whether a resident is ready to leave Liberty Ridge?

MS. MENDEZ:    I'm going to renew my objection.  You may answer.

THE WITNESS:    That would be a combination of inputs such as resident willingness, resident progress, parental



MAGNA
LEGAL SERVICES

Page 89

desire.  And -- that probably covers it.

BY MR. BRUNSON:

Q.    Who would make that decision for the Liberty Ridge Farm Committee whether a resident was ready to leave?

MS. MENDEZ:    I'm going to renew my objection, but you may answer.

THE WITNESS:    Often, the guidance coordinator, would report to the Liberty Ridge Committee sharing what he sees as progress.  The Liberty Ridge Committee kept close enough touch with the individual resident progress that they could sense as the young man was building his structure and getting his life put together.  And then they often arrived-in combination with the parents and possibly the parents' ministry, all would have a joint discussion and arrived at a mutually agreeable timeframe.

BY MR. BRUNSON:

Q.    Did the Mission have any say in whether a resident was ready to leave?

MS. MENDEZ:    I'm going to renew my objection?

THE WITNESS:    No.

BY MR. BRUNSON:

Q.    No.  Would a minor be allowed, when I say minor, I mean under the age of 18 be allowed to leave Liberty Ridge without a parent's approval?

MS. MENDEZ:    I'm going to object to the extent


MAGNA
LEGAL SERVICES

Page 90

you're asking my client to speculate.  You may answer if you know.

THE WITNESS:    The term allowed is probably a term that needs further definition.  They were allowed to walk down the road if they wanted to.  That took place -- parents of course would have -- would become responsible and were notified.  If the desire, since a minor would be responsible to his parents.  So that became a joint cooperative effort with the parents.

BY MR. BRUNSON:

Q.   Okay.  So if a resident went to his mentor or houseparent and said, I'm leaving, I'm done would the committee or anyone take any action to stop the resident from leaving Liberty Ridge Farm?

MS. MENDEZ:    Same objection.  You may answer.

THE WITNESS:    To the extent of contacting parents, keeping them advised to the extent of it, as I understand.

BY MR. BRUNSON:

Q.   Okay.  How often were the residents allowed to contact their parents or guardians while they were at Liberty Ridge?

MS. MENDEZ:    I'm going to object to the form of that question, but you may answer.

THE WITNESS:    So I understand there was a very frequent letter writing privileges.  There was no limit on



Page 91

letter writing back and forth. It often held out to have a call two times a month between the two. Sometimes the parents did not show that type of interest. We actually tried to encourage that, but they keep that up. And then there were visits, often took place on a monthly basis, when parents came to the farm and sat down and visited their son.

BY MR. BRUNSON:

Q. Was there a blackout period where the residents were not allowed to speak to their parents or guardians?

MS. MENDEZ: I'm going to renew my objection, and also note that this is treading on, you know, becoming outside of the scope of the present litigation. However, you may answer, if you have an answer.

THE WITNESS: I'm not sure if I fully understand the question, but in any type of emergency or crisis, we would have encouraged communication with home parents.

BY MR. BRUNSON:

Q. So let's say there wasn't an emergency or a crisis. Was there a period of time where the resident was just not allowed to call their parent or guardian while they're at the Liberty Ridge Farm?

MS. MENDEZ: I'm going to renew my objection, and also just to the extent you were asking my client to speculate. But you may answer.

THE WITNESS: I don't recall any such


MAGNA
LEGAL SERVICES

circumstances.

BY MR. BRUNSON:

Q.    You don't know if there was a policy though, in place?

MS. MENDEZ:    I'm going to object to the form of that question.  You may answer.

THE WITNESS:    No.

BY MR. BRUNSON:

Q.    Okay.  Do the parents and guardians have to pay a tuition for the residents to reside at Liberty Ridge?

MS. MENDEZ:    I'm going to object to the form of that question, but you may answer?

THE WITNESS:    Again, that becomes somewhat of a technicality.  The Liberty Ridge Farm has suggested a monthly support figure, which I believe is $1,700 a month.  There is no -- there is no force or pressure put on, if there is, parents are unable to meet that obligation.  But that does not mean we would -- that would not be the only factor.  We would not necessarily send the child home if they could not meet that.

BY MR. BRUNSON:

Q.    And what does that -- what does that tuition supposed to cover?

MS. MENDEZ:    I'm going to renew my objection once again.  You may answer if you know.

THE WITNESS:    As I understand, that would be



Page 93

general support for the program. I have no understanding that it's clearly defined in exactly which category or which expenses it covers.

BY MR. BRUNSON:

Q. Okay. I'm going to ask you to go look at Secretary Exhibit 12 again, the operating manual.

A. Yes.

Q. I'm going to direct your attention to MMM 2023, Page 5.

A. Yes.

Q. And I'm going to ask you to read at the very top above the Section 3 guidelines, Section 3. You could read that to yourself.

A. Do you want me to read beyond Page 5?

Q. No, no. Just that Section 3 did you read it?

A. In general.

Q. In general. Okay. Well, let me ask you this. Tell me if I read this incorrectly. While tending chickens and building pallets do have strong therapeutic value, these activities are also productive -- also productive, and help to offset the cost of the program, thereby allowing the boys to contribute to their own keep. Did I read that correctly?

A. Yes.

Q. Okay. So does that mean then, that when the residents were building pallets, tending to the chickens, that



Page 94

this -- these activities were designed to then basically pay the cost of their stay or at least help pay the cost of their stay at the Liberty Ridge Farm?

MS. MENDEZ: I'm going to object to the extent you're seeking an institutional response.

THE WITNESS: As I understand, the activities were not designed for a financial reason. Rather, they were designed for therapeutic exercises. In the whole -- in creating the wholeness of the young man Productivity and making one as an asset to society is an important building block of structuring his wholeness, his manhood.

And so if these exercises that are performed assist in helping him pedal his own bike, so to speak. We see a very mutual symbiotic relationship between the two, between having an opportunity for the boy to pedal his own bike, to propel his motion forward, versus riding a treadmill. I may use that illustration.

Q. Sure. So you use the term mutually symbiotic, right? So to me, and correct me if I'm wrong, you're saying that there's a benefit for these residents to both learn skills building, you know, pallets, these pallets for the time being.

But then also Liberty Ridge Farm gets the benefit of selling these pallets as well. And that that profit that comes from selling those then allows Liberty Ridge Farm to exist and then help these residents; is that fair?



Page 95

MS. MENDEZ: I'm going to object as a mischaracterization, but you may answer. And to the term profit. I'm sorry.

THE WITNESS: Again, the technical aspect of the word profit is probably in question here. I would rather refer to this again to my illustration that rather than getting towed around in a trailer behind a bike, these activities allow the young men to participate in the pedaling.

And there is really, if it's a nonprofit organization, I do not see any profit in the program. And so I would suggest -- I would not go on record as indicating that there is a profit.

BY MR. BRUNSON:

Q. Okay. Well, let's please break this down a little bit. The residents, as you've testified before, would build pallets as part of their activities, correct? And then these pallets were then later sold, right?

A. Correct.

Q. And Liberty Ridge Farm sold these pallets?

A. Yes.

Q. And they sold these pallets for money, right?

A. Yes.

Q. Do you know how much money was -- Liberty Ridge Farm got from each pallet?

A. I believe in that neighborhood of 10 to $12 per


MAGNA
LEGAL SERVICES

Page 96

pallet.

Q.    Per pallet.  And do you know how many pallets were sold by Liberty Ridge Farm each month, if you know?

A.    I don't know that number.

Q.    Okay.  So by the residents building these pallets then we'll be responding, also was able to sell these pallets and then make money, right?

A.    Correct.

Q.    Okay.  So does that explain your mutually symbiotic analogy that you gave?

MS. MENDEZ:    I'm going to object to the form of that question.  You may answer.

THE WITNESS:    I don't know if there's some hidden connection that you're trying to draw between that term symbiotic relationship, but it's this whole exercise.  Would be very similar, as I understand it, to the boys pulling weeds in the garden in which they derive benefit from the discipline and the exercise of physical exercise and exertion and sticking to a job.

But then they are allowed the reward of carrying that carrot from the garden to the house, preparing it, and then enjoying it at the table.

BY MR. BRUNSON:

Q.    So do you -- so in that analogy, did the residents sell those weeds?  I'm sorry, strike that.  In that analogy, did


MAGNA
LEGAL SERVICES

Page 97

Liberty Ridge Farm Committee sell those weeds that the residents picked?

A.    Do you mean sell the carrots?

Q.    Well, I'm going to start with the weeds first.  They picked the weeds, right?  That's what you said?

A.    Pulled the weeds.

Q.    Did they -- did Liberty Ridge Farm, did they sell those weeds?

A.    No.

Q.    Okay.  So let's go to the carrot now.  The carrot, did they sell that carrot?

A.    Not that I'm aware of.

Q.    Okay.  But the Liberty Ridge Farm did sell the pallets, right?

A.    Yes, correct.

Q.    So you do see the difference between the two examples that you're giving, right?

MS. MENDEZ:    I'm going to object to the extent that you're mischaracterizing early testimony and treading on the line of argumentative.  But you may answer.

THE WITNESS:    I see a difference.  Okay.

BY MR. BRUNSON:

Q.    Now, going back to earlier testimony, you did say that you helped to write this policy or this standard operating policy, correct?



Page 98

A.      Yes.

Q.      Did you write that section about the offsetting costs?

A.      It's very likely that I did.

Q.      Okay.  So then is it fair to say that when you wrote this, your intention was to communicate to the parent or actually strike that.  Who got this copy of this standard operating policy?

A.      Likely the parents got -- some parents got this copy.  I would say that this version is that part had not been in the handbook in the time frame that's under consideration.

Q.      You're saying this is not an accurate copy of the policy that was given to the residents who stayed at Liberty Ridge Farm between 2019 and 2022?

MS. MENDEZ:    I'm going to object to the form of that question, and also to the extent you're asking my client to speculate.  You may answer.

THE WITNESS:    I do know there were adjustments made to our guidelines as we go along.  In other words, these were not -- these are different than when we started up in 2011.  And I know that this part right here --

BY MR. BRUNSON:

Q.      I don't know what part you're referring to.  I'm sorry.  Can you be more specific?

A.      Number 3.


MAGNA
LEGAL SERVICES

Q.    Okay.

A.    The part that we are -- that we have under focus, according to my memory, this would not have been part of the standard operating procedure in all of this time frame under consideration, I cannot say exactly when this part was added.

Q.    So this -- are you saying that this isn't accurate, standard operating policy that was provided to us?

MS. MENDEZ:    Objection.  That is -- I'm sorry. Objection to the form of the question.  And to the extent that you're mischaracterizing his testimony and to the extent you're asking him to speculate, and to the extent that this is asked and answered, you've asked the same question.  You've gone down this line for two or three questions now, and he's providing the same response.

MR. BRUNSON:    Well, I'm trying to clarify if this is the act is the accurate policy that seems to be in confusion to me now, that is what I'm trying to clarify.

BY MR. BRUNSON:

Q.    So if I may, sir, is this an accurate version of the standard operating policy?

MS. MENDEZ:    And I want to object again, same objections that I've already put on the record, but also to the extent that we are speaking about a specific time period in this instant litigation.  And so when you're saying accurate, accurate as to the time period, accurate in general, those are



MAGNA

LEGAL SERVICES

Page 100

two different things. So I just want to make sure that it's clear because that's how he's, you know, responding.

BY MR. BRUNSON:

Q. My apologies. Let me rephrase my question, then. Was this the -- to your knowledge, was this the Handbook of Standard Operating Policy from 2019 to 2022?

A. No.

Q. No? To your knowledge, then when was -- what timeframe was this policy written for?

A. I can't say what date this would have been adjusted.

Q. And to your knowledge then, if you know, was the section that we discussing this Paragraph 3. Are you saying that that is not in the revised version that was provided to the parents for the years 2019 to 2022?

MS. MENDEZ: I'm going to object to the extent that this has been asked and answered. But you may answer again.

THE WITNESS: I don't understand the question.

BY MR. BRUNSON:

Q. If you know, so we've been talking about this Section 3 right here.

A. Yeah.

Q. While attending checking the ability pallets, et cetera, et cetera. Was this section that I -- we've been talking about. Do you know if that was in the revised version



Page 101

of the Handbook of Standard Operating Policy that was provided to the parents and guardians of the residents that stayed at Liberty Ridge Farm between the years of 2019 and 2022?

MS. MENDEZ:    Same objection, but you may answer.

THE WITNESS:    I do not know.

BY MR. BRUNSON:

Q.    Let me ask you this then.  Was it the Liberty Ridge Farm Committee's intent for the miners to help offset their costs of staying at Liberty Ridge by building pallets?

MS. MENDEZ:    I'm going to object once again to the extent that you're seeking an institutional response.  You may answer if you know.

THE WITNESS:    No.

BY MR. BRUNSON:

Q.    And was it -- they had said there was no intention whatsoever that they would -- strike that.  Let me ask you this.  Before you were giving the -- I'll show you that one -- who would have revised the operating policy manual if you know?

MS. MENDEZ:    I'm going to object to the extent it requires my client to speculate.  But you may answer if you know.

THE WITNESS:    I would have been involved in revising the manual.

BY MR. BRUNSON:

Q.    So you would have been involved in revising the



manual that was given to the parents and guardians of the residents between 2019 and 2022?

MS. MENDEZ:   Objection.  Asked and answered.  But you may answer.

THE WITNESS:   I don't recall when that revision took place.  This is my problem.  You're asking a three-year window.

BY MR. BRUNSON:

Q.   Yes.

A.   And if you are asking me to answer a question, a blanket question about that window, that's my difficulty.  I don't know if you can sense that in the last number of responses that I've given.

Q.   I sense the difficulty and I sense confusion.  Do you have a copy of the most -- would you personally have a copy of the operating manual policy that was given to the residents between 2019 and 2022?

A.   I think I would.

Q.   Would it be -- where would it be at?

A.   My home office or my desk.

Q.   Okay.  I'm going to --

MS. MENDEZ:   Let me quick note on the record (indiscernible).

MR. BRUNSON:   Yeah.

MS. MENDEZ:   If we have that, we'll send it.  We



have already sent it.

MR. BRUNSON:   I don't -- I only have this copy.

MS. MENDEZ:   Okay.

MR. BRUNSON:   So that's the confusion now.

MS. MENDEZ:   That's no problem.

BY MR. BRUNSON:

Q.   All right.

A.   And I just want to be -- I want to try to be fair to the question and yet try to answer accurately.  This part right here was added likely partway through that three year window.  So that's why I can't just give a blanket statement saying that this was or this wasn't.

Q.   So then you're saying, I'm sorry, if you've finished?

A.   (No audible response.)

Q.   So then you're saying that is it possible that some of the residents who were there during 2019 to 2022 received this copy, the one that I've shown you today, whereas other residents who were there between 2019 and '22 received a different copy?

MS. MENDEZ:   I'm going to object the sentence of the mischaracterization of my client's testimony, but you may answer.

THE WITNESS:   It is possible, but I do not know.

BY MR. BRUNSON:



MAGNA
LEGAL SERVICES

Page 104

Q.    You don't know?

A.    I do not know.

MS. MENDEZ:    Can we just take a quick break?    It's like two minutes, let me the restroom.

(Off the record.)

Q.    Okay.    We're back.    One final question about -- well, for at least, about good policy.    Who gave the final approval of the operating policy?

MS. MENDEZ:    I'm going to object to the form of that question.    But you may answer.

THE WITNESS:    My understanding typically is the Liberty Ridge Committee would have approved the policy.

BY MR. BRUNSON:

Q.    So you revised it, right?

A.    Correct.

Q.    And then you would have to submit those revisions to the Liberty Ridge Farm Committee for final approval?

MS. MENDEZ:    Same objection.    You may answer.

THE WITNESS:    Correct.

BY MR. BRUNSON:

Q.    Okay.    I'm going to show you what's marked as Secretary Exhibit 26.

(Whereupon, Secretary's Exhibit 26, Power of Atorney Form, was marked for identification.)

A.    Okay.    That's fine.



Page 105

Q.    I'll let somebody else do the --.  Have you had the opportunity to look at it?

A.    Yes.

Q.    Have you seen this document before?

A.    Yes.

Q.    Okay.  What is this document?

A.    The power of attorney to Liberty Ridge Farm for Braeden Zimmerman (phonetic).

Q.    I'm not going to focus on Zimmerman.  I'm going to focus on the form itself.  Who drafted this form?

MS. MENDEZ:    I'm going to object to the extent you're asking for a legal conclusion.  But you may answer, if you know.

THE WITNESS:    I do not know.

BY MR. BRUNSON:

Q.    Did you draft this form?

MS. MENDEZ:    I'm going to renew my objection and also object to the extent that you're calling for attorney client privilege and also information?

THE WITNESS:    No.

BY MR. BRUNSON:

Q.    To your knowledge, and I'm not asking for the actual conversations, but to your knowledge, did anyone from the Liberty Ridge Farm Committee consult with attorney when drafting this form?



Page 106

MS. MENDEZ:    I'm going to renew my objection.

THE WITNESS:    I do not know.

BY MR. BRUNSON:

Q.    To your knowledge, did anyone from the Mission consult with an attorney when drafting this form?

MS. MENDEZ:    I'm going to renew my objection and also object to the extent you're seeking an institutional response.

THE WITNESS:    I don't know.

BY MR. BRUNSON:

Q.    So you have no idea how this form came to be; is that fair to say?

MS. MENDEZ:    Objection.  Asked and answered.  You may answer.

THE WITNESS:    I didn't say that.

BY MR. BRUNSON:

Q.    Okay.  Do you have -- do you have any idea who generated this one?

MS. MENDEZ:    Objection to the form of the question.  You may answer.

THE WITNESS:    I can take some guesses, but I didn't think that was not the question.

BY MR. BRUNSON:

Q.    I'm not asking you to guess.

A.    Then I do not know.


MAGNA
LEGAL SERVICES

Page 107

Q.   Okay.  What do you -- what do you know about the creation of this form?

MS. MENDEZ:   Same objection.

THE WITNESS:   I understand this was in place before I came on the committee or right around that time, but I do not have recollection of -- who drafted it.

BY MR. BRUNSON:

Q.   So to be clear, the Liberty Ridge Farm Committee did not take any steps while you were on the Liberty Ridge Farm Committee to create this power of attorney form?

MS. MENDEZ:   I object to the extent you're calling for an institutional response.  But you may answer.

THE WITNESS:   I do not recall.

BY MR. BRUNSON:

Q.   Did anyone while you were at the Liberty Ridge -- while you were on the Liberty Ridge Farm Committee, did you or anyone take any steps to see if these powers of attorney forms were legally valid?

MS. MENDEZ:   I'm going to renew my objection and also object to the extent that you're asking for a legal conclusion.  You may answer.

THE WITNESS:   I am not aware that we did.

BY MR. BRUNSON:

Q.   With this form, what responsibilities -- but with this form, what did the Liberty Ridge Farm Committee believe


MAGNA
LEGAL SERVICES

Page 108

they were legally allowed to do with the residents who resided at Liberty Ridge Farm?

MS. MENDEZ: I'm once again going to renew my objection to the extent you're seeking an institutional response and to the extent that these -- the answer would tread on privileged communications between attorney and client. But you may answer if you know.

THE WITNESS: It would be my understanding that the -- if a miner is in charge -- in the charge of someone other than the parents, the parents would need to give their due authorization to that other charge.

BY MR. BRUNSON:

Q. When you say charge, what do you mean by that, just so I'm clear?

A. Responsibility.

Q. Would it be fair to say that the parents and guardians were still responsible for the medical decisions of the residents while they were at the Liberty Ridge Farm?

A. They certainly carry responsibility.

Q. So if there was a non-emergency medical situation with the parents be responsible parents or guardians, be responsible for that or would the Liberty Ridge Farm be responsible for that?

MS. MENDEZ: I'm going to object to the extent you're asking my client to speculate and to the extent that



Page 109

you're asking for an institutional response, but you may answer if, you know.

THE WITNESS:    According to my understanding, the parents would be responsible.

BY MR. BRUNSON:

Q.    Okay.  Now, while at Liberty Ridge Farm, were the residents told that they would be provided basic necessities while staying at Liberty Ridge.  And when I say basic necessities, I mean food, clothing, and shelter?

MS. MENDEZ:    Objection, to the extent you're asking for an institutional response.  But you may answer.

THE WITNESS:    I recall that they were specifically told that.

BY MR. BRUNSON:

Q.    Do you recall if the parents were -- and guardians were told that their children would be provided those basic necessities while residing in Liberty Ridge Farm?

MS. MENDEZ:    Same objection.  You may answer.

THE WITNESS:    No.

BY MR. BRUNSON:

Q.    Is it fair to say that the Liberty -- that the miners could not get food anywhere else other than from the Liberty Ridge Farm while they were staying at the Liberty Ridge Farm?

MS. MENDEZ:    Objection -- same objection.  And



also objection is a mischaracterization of witness testimony. But you may answer.

THE WITNESS:   No.

BY MR. BRUNSON:

Q.   They couldn't get -- no as, and they couldn't get food anywhere else; is that what you're saying?

A.   No.  You said, is it fair to say that they could not?  And I'm replying, no, it is not fair to say that.

Q.   Okay.  So the residents could get food from somewhere else other than the Liberty Ridge Farm while they were residing at Liberty Ridge Farm?

A.   Often parents would bring some treats along, provide, you know, they were welcome to bring whatever along they cared to bring.

Q.   Did the parents, provide food to their children each day while they were at Liberty -- while their children were at Liberty Ridge Farm.

A.   No.

Q.   Okay.  And so during -- so then Liberty Ridge Farm would then provide them then being the residents with food during that time, right?

A.   Yes.

MS. MENDEZ:   Objection to form.

BY MR. BRUNSON:

Q.   And Liberty Ridge Farm would also provide the



Page 111

residents shelter as well; is that fair to say?

A.    Yes.

Q.    Is it also fair to say that the -- if they -- resident needed work clothing or something for physical activities, however you want to describe them, that if they didn't have those that clothing, Liberty Ridge Farm would provide that clothing to them?

MS. MENDEZ:    Objection to the use of the term work or clothing.  But you may answer.

THE WITNESS:    If there was an article of clothing needed many times, Liberty Ridge Farm would help to secure that, and parents would then cover the cost of that (indiscernible).

BY MR. BRUNSON:

Q.    To your knowledge, were the parents or guardians ever informed that their children would be creating goods that would be later sold?

MS. MENDEZ:    Objection to the extent that this calls for an institutional response into the term goods.  But you may answer if you know.

THE WITNESS:    No.

BY MR. BRUNSON:

Q.    Were the parents or guardians ever told that their children would be working for, or be providing goods or services to, private companies?

MS. MENDEZ:    I'm going to renew my objection.



THE WITNESS: To my knowledge, they were never told that in those terms. They had a very full understanding of what was happening at that time, in what activities they were involved in.

BY MR. BRUNSON:

Q. So just to be clear, you're saying that they would not be saying they have a full understanding, but they are saying that they were not told that they'd be working for private companies; is that what you're saying? Sorry, I was confused by your answer.

MS. MENDEZ: I'm going to object, for mischaracterization. And to the term working, but you may answer if you know.

THE WITNESS: I'm sure parents awareness was very clear that they were at fault in attending chickens and building pallets and those exercises to what involvement they knew of the fact that the pallets were sold. I'm sure they were knowledgeable of that, did we ever -- like, I am not aware of how specific Liberty Ridge Farm was in telling them who and what arrangements were made.

BY MR. BRUNSON:

Q. When you say arrangements, you mean for the selling of those goods? Is that what you're answering?

A. Correct.

MS. MENDEZ: I'm going to object.


MAGNA
LEGAL SERVICES

Page 113

BY MR. BRUNSON:

Q.    And -- but then the same time, to your knowledge, the parents or guardians were not informed about the residents working for companies such as Snyder Gates or (indiscernible) a Lumber company as well; is that fair to say?

MS. MENDEZ:    I'm going to renew my objection, and also object to the extent that this is a mischaracterization, and to the extent that my client has answered at length this line of questioning.

THE WITNESS:    Could you repeat that question again?

MR. BRUNSON:    Sure.  I'm going to stick with Snyder Gate, that's the one that's coming to mind right now.

BY MR. BRUNSON:

Q.    Were the parents or guardians of the residents ever informed that their children would be working or producing goods or performing services for private companies such as Snyder Gates?

MS. MENDEZ:    I'm going to object as asked and answered.  Counsel, you've asked this question or some iteration of it about three times now.  I'm going to instruct my client not to answer any further.

MR. BRUNSON:    He asked me to repeat the question, that's why I asked it again.

MS. MENDEZ:    Continue if you have an answer,



Page 114

provide it.

THE WITNESS:   I am not aware.

BY MR. BRUNSON:

Q.   Okay.  How many hours a day -- well, you already discussed a typical day for a mentor, right?

A.   Yes.

Q.   Would it be fair to say that a typical day for a resident, mirrors what a typical day is for a mentor as well?

MS. MENDEZ:   I'm going to object to the form of that question, but you may answer if you know.

THE WITNESS:   Very closely.

BY MR. BRUNSON:

Q.   And I don't know if we specify this, but I mean, how many hours a day do you think a resident was -- would spend building pallets?

MS. MENDEZ:   I'm going to object to the form of that question.  You may answer, if you know.

THE WITNESS:   I am not able to answer.  I don't know that answer.

BY MR. BRUNSON:

Q.   Did the residents ever build pallets or tended chickens on the weekends?

MS. MENDEZ:   Same objection.  You may answer.

THE WITNESS:   To my knowledge, whatever was done would have been very minimal.  We believe as part of our faith



Page 115

that we should not work on Sunday.  And yet we know chickens need to live and to be humane to the animals entrusted to our care.  Of course, we would do the normal duties to provide for their health and upkeep.  I can say there were no pallets built on Sunday, I knew that.

BY MR. BRUNSON:

Q.    What about Saturday?

A.    I don't know the specifics of that.  Sometimes, there may have been a little bit of that activity, but not typically.

Q.    And the residents would be the ones who would be doing that activity on Saturdays; is that what you're saying?

MS. MENDEZ:    Objection. Mischaracterization.  And to the extent that it's been asked and answered, you may answer if you know.

THE WITNESS:    The residents may have been involved, but I cannot say how much.

BY MR. BRUNSON:

Q.    I'm going to have you look at Secretary Exhibit 13. Have you seen this document before?

(Whereupon, Secretary's Exhibit 13, 9/24/2019 LRF Committee Meeting Minutes, was marked for identification.)

A.    Yes.

Q.    What is that document?

A.    The Liberty Ridge, minutes from September 24th,



2019.

Q. Okay. I'm going to direct your attention to Section 3, Paragraph -- let's say Section 3, Paragraph H. It says to help meet the need of profitable activities on Saturdays, we move that Kenton Kreider would initiate bringing speakers in perhaps once or twice a month on Saturdays to give informative character-building talks. Did I read that correctly?

A. Yes.

Q. When you say profitable activities, what exactly does that mean?

MS. MENDEZ: Objection, to the extent that the document speaks for itself. But you may answer if you know.

THE WITNESS: That means activities beneficial to the educational and further development of the young men's horizons and learning and development.

BY MR. BRUNSON:

Q. Does that mean profitable in a business sense?

MS. MENDEZ: Objection. Asked and answered.

THE WITNESS: No.

BY MR. BRUNSON:

Q. I also want to turn your attention to Paragraph B. It says Wayne Troyer from Wengerd Pallet has a wood-miser sawmill he would like to donate to the farm. We feel this donation is a real Godsend. It comes at a time when we need more work for our six residents and their mentors. We moved in


MAGNA
LEGAL SERVICES

Page 117

favor of accepting this donation.  Did I read that correctly?

A.    Yes.

Q.    And just to be clear, you were at this meeting, right?

A.    Yes.

Q.    Okay.  Can you explain, was there a shortage of work for the residents at some point in time, for the mentors?

MS. MENDEZ:    Objection to the form and to the extent the document speaks for itself, but you may answer.

THE WITNESS:    There have been times at which boys got bored, and they said, what can we do?  And in an effort to provide constructive activity for them.  This was an effort to assist in that.

MR. BRUNSON:    Sorry, may I have one moment.  I have an animal situation potentially.

MS. MENDEZ:    We can go off the record.  Take your time.

MR. BRUNSON:    Thank you.

(Thereupon, the above-entitled matter went off the record.)

MR. BRUNSON:    So that's good.  Okay.  I'll be good to go.  Yeah.  Thank you.  Okay.  So sorry.

BY MR. BRUNSON:

Q.    You were basically saying that because sometimes there was -- can you repeat your answer to my question?  I'm



Page 118

sorry.  Or if you want to have it read back to me, that's easier.  I'm sorry.

A.   Are you referring to the question about the sawmill?

Q.   Yes.  The question was, you know, why did you -- why was there a need for more work for the residents and mentors?

MS. MENDEZ:   Can we have -- can we have that read back?

THE REPORTER:   The question?

MS. MENDEZ:   Yes.  Before the quick break.

THE REPORTER:   Yes.  Can you explain, is there a shortage for the residents, I'm going to listen to that back?

MR. BRUNSON:   It should be a shortage of work.

THE REPORTER:   Yeah.  Shortage of work.  That might be the one word that's missing there.  Can you explain was there a shortage of work for the residents at some point in time?

MS. MENDEZ:   Objection to the form.

THE REPORTER:   Okay.  And then the answer.  There have been times in which boys got bored, saying what can we do?  And in an effort to provide constructive activity for them, this was an effort to assist in that.  And then the break.

MR. BRUNSON:   Okay.  Thank you.  Sorry about that again.

BY MR. BRUNSON:

Q.   So will the residents be using the sawmill?



A.    No, residents would not have operated a sawmill. They would have possibly handed pieces of wood that came from the sawmill --

Q.    Okay.

A.    -- and stacked them.

Q.    Do you know if any residents use power tools?

A.    Particularly minors were not allowed to use the power tools related to constructing pallets.  If a minor turned 18, there may have been some customized permission for that.

Q.    Okay.  But it was Liberty Ridge Farms policy that no one under the age of 18 would use a power tool?

MS. MENDEZ:   I'm going to object to the extent that you're asking for an institutional response, but you may answer.

THE WITNESS:   It was a standard practice that no minor would be allowed to use power tools in the shop in the construction of the pallets.

BY MR. BRUNSON:

Q.    Did residents ever use like axes or anything like that?

A.    As I recall, that may have been a possibility.  I do not know that there was a policy established one way or another.

Q.    I asked about the minors working on the weekends, is it -- oh, sorry.  Let me strike that.  Did the mentors ever perform -- let me say they work.  Did the mentors ever work on



Page 120

weekends?

MS. MENDEZ:    I'm going to object to this term work and to the extent you're asking for an institutional response. But you may answer.

THE WITNESS:    To the point of chores or animal husbandry, upkeep is just that, maintenance of those activities. The mentors were involved with that.

BY MR. BRUNSON:

Q.    Did they ever assist with building pallets on the weekends, they being the mentors?

A.    On some rare occasions, they may have on a Saturday morning.

Q.    Okay.  This might be a silly question, but did the Liberty Ridge Farm generate income from their activities, building pallets and selling chickens?

MS. MENDEZ:    I'm going to object to the extent you're asking for an institutional response, and to the extent that it's also been asked and answered, but you may answer.

THE WITNESS:    Could you define what is meant by generate income?

BY MR. BRUNSON:

Q.    Sure.  Will the Liberty Ridge sell some pallets and then would they to a customer, and then would they receive money for those pallets in exchange?

A.    Yes.



MAGNA
LEGAL SERVICES

Page 121

Q.    Okay.  And the same is true for the chickens, correct?

A.    There would have been money paid for the care of the chickens.

Q.    Okay.  And then those chickens would then be shipped somewhere, correct?

A.    Correct.

Q.    Okay.  Do you know where those chickens were shipped to?

A.    No.

Q.    Okay.  Do you know if they were shipped across state lines?

MS. MENDEZ:    Objection to the extent it calls for an institutional response, and to the extent that it is not relevant to this litigation.  However, you may answer it if you know.

THE WITNESS:    No.

BY MR. BRUNSON:

Q.    Do you know where Clark Feed is at?

A.    Generally, in Pennsylvania somewhere, but I can't say what town they are close to.

Q.    Did Liberty Ridge Farm ever solicit offerings?

MS. MENDEZ:    I'm going to object to the use of the term solicit.  You may answer.

THE WITNESS:    If I understand the question



Page 122

correctly, no.

BY MR. BRUNSON:

Q.    So was there ever a time where in the various churches that (indiscernible) that would donate to the Mission? Was there ever a time where they would, I believe the phrase is lift an, offering for Liberty Ridge.  Did that ever happen?

A.    Yes.

Q.    Okay.  And would someone from the Liberty Ridge Farm Committee ask to lift an offering?

MS. MENDEZ:    Objection, to the extent you're asking for an institutional response.  But you may answer if you know.

THE WITNESS:    I am not aware of any such occasion.

BY MR. BRUNSON:

Q.    Just to be clear, because it was addressed yesterday, but not today.  What does lift an offering mean?

A.    So among our churches, among the pews, there would be a simple little basket passed back and forth, and anyone who wishes to contribute is allowed to put in a donation.

Q.    Okay.  Did you have access to the finances of the Liberty Ridge Farm?

MS. MENDEZ:    Same objection, but you may answer.

THE WITNESS:    Could you clarify what access you're referring to?

BY MR. BRUNSON:



Page 123

Q.    So previously we talked about reviewing the financial reports, right?

A.    Yes.

Q.    So you did actually were able to see how much profit and money was being generated from the business activities of the Liberty Ridge Farm; is that correct?

MS. MENDEZ:    I object to the use of the term profits or business activities, but you may answer.

THE WITNESS:    I had access to seeing the income and expenses, but I -- there was no profit generated from the farm in terms of, you know, this is -- as a non-profit organization, there is not -- there are no proceeds that exit (indiscernible).

BY MR. BRUNSON:

Q.    So to your knowledge, the Liberty Ridge Farm never sent money to the mission; is that what you're saying?

MS. MENDEZ:    Objection, that's a mischaracterization of his testimony.  You may answer.

THE WITNESS:    That is a different question.  As we had previously talked, there would have been reimbursement, some monies sent from Liberty Ridge Farm to the mission for reimbursement for real estate.  Beyond that, I'm not aware of anything else.

BY MR. BRUNSON:

Q.    Only reimbursement expenses that you're saying??



Page 124

MS. MENDEZ: Objection. Asked and answered.

BY MR. BRUNSON:

Q. So where did all the revenue go? So -- strike that. Liberty Ridge obtains money for selling pallets, tending to chickens, and other activities, right?

A. Correct.

Q. Where did all this money that Liberty Ridge collected, where did it go then?

MS. MENDEZ: Objection, to the extent you're asking for an institutional response. But you may answer.

THE WITNESS: As I understand it, would have contributed to putting food on the table, would have contributed to other costs involved, everything from vehicle, maintaining the vehicles to maintain the buildings and further supporting the program.

BY MR. BRUNSON:

Q. And is supporting the program also include paying these fellows, salaries for the fellows as well?

MS. MENDEZ: Objection to the form, but you may answer.

THE WITNESS: That could likely have been part of that as well, yes.

BY MR. BRUNSON:

Q. Was it -- is Nelson Martin, is he the one who handled the paying of all the bills at the Liberty Ridge Farm?


MAGNA
LEGAL SERVICES

MS. MENDEZ:    Same objection.  You may answer.

THE WITNESS:    To the best of my knowledge, he would have handled most of those bills.

BY MR. BRUNSON:

Q.    Just to be clear, the residents did not receive any financial compensation for their time at the Liberty Ridge Farm; is that correct?

MS. MENDEZ:    Objection to the form, and to the extent you're calling for an institutional response and to the extent that this has been asked and answered.  You may answer if you know.

THE WITNESS:    According to my knowledge, they have not been compensated.

BY MR. BRUNSON:

Q.    And if a resident -- did a resident have a quota of how many pallets that needed to be built each day, week, month, et cetera?

MS. MENDEZ:    Objection to the use of the term quota and to the extent you're calling for an institutional response, but you may answer if you know.

THE WITNESS:    No.

BY MR. BRUNSON:

Q.    Did a mentor have any quotas for how many pallets that needed to be built each day, month, et cetera?

MS. MENDEZ:    Same objection.  You may answer.



Page 126

THE WITNESS:  Not to my knowledge.

BY MR. BRUNSON:

Q.  Were the minors -- sorry, were the residents, excuse me, offered any incentives to potentially build more pallets or take care of more chickens or anything like that?

MS. MENDEZ:  Objection to the use of the term incentive, but you may answer.

THE WITNESS:  Not that I'm aware of.

BY MR. BRUNSON:

Q.  Let me turn to Secretary Exhibit 21.  Have you had a chance to look at that?

(Whereupon, Secretary's Exhibit 21, 10/20/20 Liberty Ridge Farm Committee Meeting Minutes, was marked for identification.)

A.  Yes, I have.

Q.  Have you seen a document before?

A.  I'm sure I have.

Q.  Okay.  What is this document?

A.  The meeting minutes from Liberty Ridge Farm Committee meeting, October 2021.

Q.  I'm going to direct your attention to Section 2, Paragraph A, it says, and tell me if I'm reading this correctly.  It says the boys fulfilled the large pallet order for this month as a reward for completing this order, excuse me, the family is planning a field trip.  Did I read that correctly?



A.    Yes.

Q.    So if the -- did the minor -- did the residents get any incentives for working extra hard with field trips or anything like that?

MS. MENDEZ:    Objection, to the extent that the document speaks for itself.  You can answer if you know.

THE WITNESS:    According to this document, there would have been a reward for diligence.

BY MR. BRUNSON:

Q.    Okay.  So, if the let me ask you this, do you recall any other times where the residents received a reward for their diligent work?

MS. MENDEZ:    Same objection and objection to the extent this has been asked and answered, but you may answer.

THE WITNESS:    Not that I recall.

BY MR. BRUNSON:

Q.    Did any residents make any complaints to the Liberty Ridge Farm committee that they were not getting paid minimum wage?

MS. MENDEZ:    I'm going to object to the extent you're seeking an institutional response and to the term of art minimum wage, but you may answer.

THE WITNESS:    According to my memory, no.  And that would have been far from any expectations, because that was well understood that they were coming for help, not



Page 128

reimbursement.

BY MR. BRUNSON:

Q.    And was this -- when you say that, was that communicated to the residents themselves?

A.    I am not aware how that was communicated or (indiscernible).

Q.    Was there ever any discussion among the Liberty Ridge Farm committee to set aside money for the residents' activities, building pallets and whatnot, set aside for them?

MS. MENDEZ:    I'm going to renew my objection, but you may answer if you know.

THE WITNESS:    Not that I'm aware of.

BY MR. BRUNSON:

Q.    Was there any discussion between or among the Liberty Ridge Farm committee about giving money to the parents or guardians for the residents' efforts in building pallets and tending to the chickens?

MS. MENDEZ:    Same objection.  You may answer if you know.

THE WITNESS:    Not that I'm aware of.

BY MR. BRUNSON:

Q.    Okay.  Did the resident -- did anyone at the Liberty Ridge Farm committee keep records of how many hours, the minors and mentors spent building pallets?

MS. MENDEZ:    Same objection, and also objection to



the use of the term hours.  But you may answer if you know.

THE WITNESS:   Not that I'm aware of.

BY MR. BRUNSON:

Q.   Did anyone from the Liberty Ridge Farm committee keep track of, or any records of how many pallets, the residents built each day?

MS. MENDEZ:   Same objection.  You may answer.

THE WITNESS:   Not that I'm aware of.

BY MR. BRUNSON:

Q.   Do you know if anyone in Liberty Ridge Farm committee kept track of how many pallets the mentors created each day?

MS. MENDEZ:   Same objection.  You may answer.

THE WITNESS:   Not that I'm aware of.

BY MR. BRUNSON:

Q.   I'll just ask a catchall.  Is it fair to say that no one from the Liberty Ridge Farm Committee kept track of how many hours each day the residents and the mentors performed what tasks that are assigned?

MS. MENDEZ:   I'm going to object as a mischaracterization.  But you may answer.

THE WITNESS:   If I understand you correct -- the question correctly, yes, that's correct.

BY MR. BRUNSON:

Q.   Okay.  Were there any consequences for a resident,



Page 130

if a resident refused to participate in any of the occupational exercises, such as building pallets or tending chickens?

MS. MENDEZ: I'm going to object to the form of that question, and to the extent that this question, and I believe perhaps the questions that might follow fall outside of the scope of the present litigation. I'll allow this question, but I'll go on the question-by-question basis with this one. So you may answer if you know.

THE WITNESS: If I remember the question correctly, not that I'm aware of.

BY MR. BRUNSON:

Q. Now, Counsel knows where I'm going. To your knowledge, were residents ever put on a restrictive diet?

MS. MENDEZ: Same objection. You may answer if you know.

THE WITNESS: What do you mean by restricted diet?

BY MR. BRUNSON:

Q. By being put on a diet of rice and beans.

A. As I recall, there would have been some occasions in which the extras of the meals, such as dessert, may have been eliminated, and possibly rice and beans as a diet for a certain amount of time.

Q. Why would a resident be put on a rice and bean diet?

MS. MENDEZ: I'm going to renew my objection. And again, another objection on the record that I believe that this



Page 131

line of questioning is outside of the scope of the current and present litigation.

THE WITNESS: As I recall, that would have been totally unrelated to activities, the exercises that we're speaking of or rather unruliness and unconditional, that type of thing.

BY MR. BRUNSON:

Q. So you do -- you were aware that some residents were given a rice and bean diet as a consequence for being unruly for some other infraction.

MS. MENDEZ: Objection asked and answered, and I won't -- I will instruct my client not to answer any more questions down this line of questioning (indiscernible).

MR. BRUNSON: On what basis?

MS. MENDEZ: On the basis, as I've mentioned, I think perhaps two times in the past minute and a half, because it's outside of the scope of the present litigation, the wage and hour claims that are being brought under the FLSA.

So I believe any questioning into any potential consequences, the presence thereof, the lack thereof, I believe that those are wholly outside of the scope. And as you are aware, we do have a current discovery dispute pending before the judge to kind of discuss whether questioning into these issues or specifically whether the documents that you're trying to get into in the underlying trafficking claim are relevant here. And



so I'm just trying to, you know, remind you of that.

MR. BRUNSON: No, I understand that. I -- you know, you keep saying -- you guys keep saying the term trafficking. I have not mentioned that term once. That's been you guys. And so I don't agree with you in the sense that in asking about this stuff, because you said that there are volunteers and whatnot, that this isn't relevant to go to your argument that these residents were volunteers.

MS. MENDEZ: Okay. And we push back on that. And again, with the current issue that we have pending before the judge, I'm happy to just -- if you want to put a note in this and bring this particular issue in this particular line of questioning to the judge, I'm fine to do that, but at this time I will instruct my client not to answer any further questions.

MR. BRUNSON: Regarding just punishments, you're saying.

MS. MENDEZ: Regarding the punishments and the consequences that you're talking about. And also, I have been reasonable in allowing questioning into a lot of issues that fall outside of the specific scope of the FLSA claims that are listed in the complaint.

And so, you know, I'm going to instruct him not to answer these questions currently. And then if it comes up that you're asking questions that, again, are falling outside of the scope, then I will have to do that as well.



Page 133

MR. BRUNSON: So just so I'm clear, because you're not, you're instructing your client not to answer in regards to these punishments and whatnot. We discussed this with the judge. Are you fine with that and recalling him to be deposed again about these specific issues? Is that what --

MS. MENDEZ: That's not what I'm saying. I'm saying that I believe that this line of questioning falls within what is currently pending in chambers. The letter that we have to write, you're aware.

MR. BRUNSON: Yeah.

MS. MENDEZ: And so I am not going to continue to allow questioning, as I've done this whole time, into matters that I believe fall outside of the scope of this litigation. Same thing for the witness yesterday. I just -- I'm not going to allow it. But I'm not saying, you know, in specific terms that I will consent to calling him in at a later date either.

MR. BRUNSON: Okay, we'll address it with the judge then.

MS. MENDEZ: All right.

BY MR. BRUNSON:

Q. To your knowledge, why was -- (indiscernible). Why -- were you aware that DHS was at a Liberty Ridge farm?

A. Yes.

Q. Okay. Why was DHS at Liberty Ridge farm?

MS. MENDEZ: I'm going to object to the extent



Page 134

you're asking for an institutional response.  And to the extent the question reaches into attorney client privilege.  But you may answer.  Also objected to the extent that this falls outside of the timeframe of the current litigation.

THE WITNESS:  As I understand, DHS came to the farm to advise us that if we have minors there at the farm overnight, we would be required to conform to the 3800 -- Pennsylvania 3800 requirements, which we were not aware of prior to this, but are taking steps presently to come under that license.

BY MR. BRUNSON:

Q.    So when did DHS come (indiscernible).

MS. MENDEZ:    Same objection but you may answer.

THE WITNESS:    Sure, there was DHS or Children and Youth Services that first -- that was there in August of 2021.  But sometime in the timeframe from August 2021 to December of 21, DHS would have been involved at some point.

BY MR. BRUNSON:

Q.    So you mentioned the 3800 rights.  Is that what you said?

A.    Correct.

Q.    Okay.  Can you go back, just Secretary Exhibit 12 then, please?  Offering policy.  Can I direct your attention to Page MMM2023/7?  Yes.  And if you go to the very bottom of that page, it has the 55PA code 3,800.32?



A.    Yes.

Q.    So is it fair to say that you inserted these rights into the policy after the DHS meeting?

MS. MENDEZ:    Objection to the extent you're calling for an institutional response, to the extent that also to the extent that you're asking about privileged communications between attorney and client, and to the extent that you're asking my client to make a legal conclusion.  But you may answer.

THE WITNESS:    As I understand, in preparation to come under -- come into compliance with 3,800, this would have been added along with various other additions.

BY MR. BRUNSON:

Q.    Okay.  So these additions would have come after December 2021 then.  Is that fair to say?

MS. MENDEZ:    Same objection.  You may answer if you know.

THE WITNESS:    As I cited in the process of becoming compliant and seeking licensure.  We would have added that.  Exactly when that was added, I can't say -- I do not recall.

BY MR. BRUNSON:

Q.    You don't recall, but it would have been after the after DHS became involved with Liberty Ridge.  Is that correct?

MS. MENDEZ:    Same objections, but you may answer.



Page 136

THE WITNESS:    Correct.

BY MR. BRUNSON:

Q.    Okay.  So then is it fair to say then, that this operating policy was in place after December 2021 then?

MS. MENDEZ:    Same objection.  You may answer if you know.

THE WITNESS:    No, that's not fair to say.  Because I can't -- I cannot set the time.  I'm not sure of the timeframe when this became our standard policy.  It may have been, I know that we were working at coming into compliance for months after DHS's visit.

BY MR. BRUNSON:

Q.    Uh-huh (affirmative).

A.    We did adjust our program to remove minors from the program immediately at the DHS'S request.  And then in the interim, sought to become compliant with 3,100 so we could bring minors back in, at which point we are -- we're still in that process.

MR. BRUNSON:    (Indiscernible) checks but I asked about that.  Yeah, so.  Okay, I have a couple more questions I would ask.  I would like to take a break and speak to Mr. Harvey and wrap up some things, and maybe can be done if that works for everyone.

MS. MENDEZ:    Sure.

BY MR. BRUNSON:



Page 137

Q.    Do you know, Jacob Brubaker is?

A.    Yes.

Q.    Who is Jacob Brubaker?

A.    He would be our assistant chairman.

Q.    You say our, do you mean at Liberty Ridge farm?

A.    The Liberty Ridge farm assistant chairman?  Yes.

Q.    Does he have any connection with the Mission?

A.    Yes.  He would be a member of the Mission as well.

Q.    Do you know who Marvin Gehman is?

A.    Yes.  He would be the guidance coordinator on the farm.

Q.    Okay.  Is he affiliated with the Mission as well, too?

A.    No.

Q.    And we previously mentioned, do you know Mark Torkelson?

A.    Yes.

Q.    Does he have any official capacity with Liberty Ridge Farm Committee?

A.    No.

Q.    Why was he at the Liberty Ridge Farm Committee meetings then?

MS. MENDEZ:   I'm going to object to the form of this question and to the extent you're asking my client to speculate.  However, you may answer if you know.


MAGNA
LEGAL SERVICES

Page 138

THE WITNESS:  As I understand, out of his personal interest in the work, and we -- or the Liberty Ridge Farm appreciated his interest.

BY MR. BRUNSON:

Q.    Was -- so is it fair to say that the Liberty Ridge Farm Committee invited Mr. Torkelson to these meetings?

MS. MENDEZ:  Objection, characterization.  But you may answer.

THE WITNESS:   I cannot say whether that happened or not.

BY MR. BRUNSON:

Q.    What was his role with Liberty Ridge?

MS. MENDEZ:  Same objection, you may answer.

THE WITNESS:   I'm not aware that he had a role.

BY MR. BRUNSON:

Q.    Did he serve as an adviser to the Liberty Ridge Farm Committee?

MS. MENDEZ:  Same objection and objection to the extent it's been asked and answered.  You may answer again if you know.

THE WITNESS:   He had no formal role.

BY MR. BRUNSON:

Q.    No formal.  Did he have any informal roles?

MS. MENDEZ:   Same objection.  You may answer if you know.



Page 139

THE WITNESS:  I'm not sure if I understand what an informal role is.

BY MR. BRUNSON:

Q.   Well, you said you didn't have any formal roles, right?  So the opposite of what a formal is, right?  So what is informal?  Did he -- would you like an example?

A.   Sure.

Q.   Did he serve as maybe an unofficial liaison between the Liberty Ridge Farm Committee and the Mission?

MS. MENDEZ:  I'm going to object to the extent you're asking for an institutional response.  But you may answer if you know.

THE WITNESS:  I don't know the answer to that question.

BY MR. BRUNSON:

Q.   Do you know who Ethan Weaver (phonetic) is?

A.   Yes.

Q.   What's his role with Liberty Ridge?

A.   Oh, he does not -- he has been a committee member. And he is -- he has no formal role anymore.

Q.   Does he have any role with the Mission?

A.   No.

Q.   Has the Liberty Ridge Farm Committee taking any steps to come in compliance with the Fair Labor Standards Act since wage and hours investigation has begun?



Page 140

MS. MENDEZ:   Same objection to the extent it calls for an institutional response, and to the extent that there may be privileged conversations that you're treading into, and to the extent that this investigation is still ongoing.  So maybe reframe the question.

BY MR. BRUNSON:

Q.   In regards to -- has anyone from the Liberty Ridge farm taken any steps to learn the requirements of the Fair Labor Standards Act?

MS. MENDEZ:   I'm going to object, and I'm going to instruct my client not to answer.

BY MR. BRUNSON:

Q.   Okay.  Have you informed any of the mentors or residents who were at Liberty Ridge from 2019 to 2022 about this pending lawsuit?

A.   Not that I'm aware of.

Q.   Did you personally inform anyone, any of the residents, any of the mentors who served in 2019 to 2022 of this lawsuit?

A.   No.

MR. BRUNSON:   Okay.  If it's okay with you guys, can we go back to that place we went to last time it's open.

MS. MENDEZ:   Sure, yeah.  I'll walk --

MR. BRUNSON:   I'll just say it's a maze.

MS. MENDEZ:   Make sure (indiscernible).



MAGNA

LEGAL SERVICES

BY MR. BRUNSON:

Q.   Okay.  I think we're going to wrap this up here just a little bit.  Just a few more questions.  Can you speak to the education?  What education do you residents received while they were at Liberty Ridge?

A.   Yes.  Resident that would have been within their schooling received schooling at Liberty Ridge in throughout the school year.  The school term, which is typically defined from basically Labor Day to the independence days.

Q.   Do you know how many hours each day the resident would attend schooling?

A.   I don't know that offhand.

Q.   And would these residents -- would they all be who attended schooling under the age of 14, or would they do schooling beyond the age of 14?

Q.   Residents under the age of 14 would have had that regular schooling.  Yes.  Above the age of 14, there were some that were above the age of 14 also reflect that schooling.

A.   Okay.  And whose decision was that for the resident to participate in schooling?

MS. MENDEZ:   Objection to the form.  But you may answer if you know.

THE WITNESS:   Typically, the -- typically the -- a corporate effort between the parents and the guidance coordinator.



Page 142

BY MR. BRUNSON:

Q.   Was there ever a time where Liberty Ridge was having difficulty fulfilling its requirements, its business -- let's call it business obligations, and contracted with outside help to fulfill those obligations?

MS. MENDEZ:   Objection, to the extent you're seeking an institutional response to the term business obligations.  But you may answer if you know.  In the term contract.  I'm sorry.

THE WITNESS:   As I understand and recall, there would have been volunteers that would have come in to assist with the program outside of that normal flow.  But they came in on their own goodwill and free will.

BY MR. BRUNSON:

Q.   I'm going to show you Secretary Exhibit 14.  I'll also note that this is that counsel for the defense has provided the actual unredacted one.  Again, it's just me in my haste to prepare these documents for the (indiscernible) I did not.  But I do have that for the record.  Have you had an opportunity to look at this?

(Whereupon, Secretary's Exhibit 14, 5/17/2022 Liberty Ridge Farm Meeting Minutes, was marked for identification.)

A.   Yes.

Q.   What is this document?



Page 143

A.   That's from Liberty Ridge Farm Committee meeting, May 17/22.

Q.   Were you present or did you participate in this meeting via a conference call?

A.   Apparently so.  Yes.

Q.   Okay.  And turn your attention to Section 2, Paragraph B.  Please tell me if I'm reading this correctly.  It says Wengerd Pallet is building two loads of pallet for us for the month of May to assist us during this time of fewer personnel.  Did I read that correctly?

A.   Yes.

Q.   Why did Wengerd Pallet do this for you?  Do this for you, I mean, the Liberty Ridge Farm Committee.

MS. MENDEZ:   Objection, to the extent it calls for an institutional response.  You may answer if you know.

THE WITNESS:   This may be -- this may be misleading on the terminology that's used here.  It is simply that instead of those pallets being built at Liberty Ridge, Wengerd Pallets offered to take care of that on their end.  But these pallets were not in any way associated with the Liberty -- did not get bought or sold by the Liberty Ridge, so.

BY MR. BRUNSON:

Q.   I'm going to turn your attention now to Paragraph 6 of the agenda?

A.   Yes.



Page 144

Q.    Section B, it says some youth helped in the pallet shop on Saturdays in the month of May because of our reduced workforce.  Did I read that correctly?

A.    Yes.

Q.    Who are these youth that helped in the pallet shop? And on Saturdays.

A.    They would have been the volunteers that I was referring to earlier that stepped in just to volunteer their help.

Q.    Volunteer youth?

A.    Yes.

Q.    And so these youth were not paid for their work that was done on the pallet shop on Saturdays?

MS. MENDEZ:   Objection.  Asked and answered and objection to the term work.  You may answer if you know.

THE WITNESS:   I'm not aware that they were paid. Yes.

BY MR. BRUNSON:

Q.    Okay.  It says reduced workforce.  Can you elaborate more on that?

A.    This would have been in May of 22.  So the size of the family there would have been smaller and not as many participants in something of the caliber.

Q.    Did you ever object so -- and do you recall when the next meeting was after this May 17th, 2022?



Page 145

A.    I don't know.

Q.    Did you ever object to the term workforce or calling any of the mentors or residents, workers and any of the meeting minutes?

MS. MENDEZ:    Objection to the extent you're asking my client to speculate.  But you can answer if you know.

THE WITNESS:    I don't recall that I did.

BY MR. BRUNSON:

Q.    And we're getting there, I promise.  I know we talked a little bit about Nelson Martin.  To your knowledge, what exactly were -- what powers or did he have at Liberty Ridge Farm.

MS. MENDEZ:    I'm going to object to that form of the questions and the use of the term powers, but you may answer if you know.

THE WITNESS:    If I'm understanding the question correctly and also understand his responsibilities, he would have been given the privilege to sign checks as treasurer to make payments of bills that came in on in that capacity as well.

Beyond that, my understanding is he is -- his decision-making responsibility depended very heavily on backing up to the committee's work or decision.  In other words, he would have brought various decisions that needed to be made to the committee to dispose of, and then he was simply executing those decisions.



Page 146

BY MR. BRUNSON:

Q.   So he executed it -- so basically, if I understood you correctly.  There would be some decision that would get approval by other Liberty Ridge Farm committee, and then he would have the authority to then execute that decision.  Is that what you're saying?

MS. MENDEZ:   Same objection.  But you may answer if you know.

THE WITNESS:   If I'm understanding correctly, yes.

BY MR. BRUNSON:

Q.   And to your knowledge, does Nelson Martin ever -- I know we previously talked about know some people would, you know, for lack of better phrasing, supervise the houseparents or be responsible for the houseparents?  Did he ever have a responsibility like that for particular group of individuals at Liberty Ridge Farm?

MS. MENDEZ:   Objection to the form of that question.  But you may answer if you know.

THE WITNESS:   I would use the word contact. Nelson was a contact with the work coordinator or the activities coordinator --

BY MR. BRUNSON:

Q.   But he-- I'm sorry I didn't interrupt you.  Would he direct the work coordinator in any capacity?

MS. MENDEZ:   Objection to the use of the term


MAGNA
LEGAL SERVICES

Page 147

direct. But you may answer if you know.

THE WITNESS: I'm not sure if I understand the technicality of direct, but he would convey expectations with the work coordinator from the committee to the coordinator.

BY MR. BRUNSON:

Q. Well, if I say, he acted as a liaison between the committee and the work coordinator?

A. That may be the right term.

Q. Okay. And the work coordinator, I know-I don't think we actually ever specified. What exactly does the work coordinator do?

A. He guides the activities of the gardening, the animal husbandry, the pallet assembly, any other projects that are part of the vocational activities of the farm?

Q. So would the word coordinator say. Okay, residents, you're going to be doing pallet building today; would that be fair?

MS. MENDEZ: Objection to the extent you're asking my client to speculate, but you can answer if you know.

THE WITNESS: If I'm understanding the question correctly, he would have scheduled those activities through the day.

BY MR. BRUNSON:

Q. And who was the work coordinator from 2019 to 2022 if you know?


MAGNA
LEGAL SERVICES

Page 148

A. Phillip Danner would have been the main coordinator, as I recall.

Q. Okay. And how did he become the work coordinator?

A. That would have been a committee decision or the Liberty Ridge Farm committee decision.

Q. Did the Mission have to approve Phillip Danner to becoming the work coordinator?

MS. MENDEZ: Objection, to the extent you're asking for an institutional response. But you may answer if you know.

THE WITNESS: I recall that the Mission would have approved him.

BY MR. BRUNSON:

Q. Resetting. Okay. Mr. Kreider, are there any answers that you have given today that you would like to change?

A. Not that I can recall, and I want -- I also want to give some space for if I didn't understand the question properly, which I tried to be fair with.

Q. I understand that. Is there anything that you previously said that you didn't remember, but that you now do remember?

A. Nothing comes to mind.

MR. BRUNSON: All right. No questions.

MS. MENDEZ: That's great. We don't have any questions either.



MR. BRUNSON:    Okay.

MS. MENDEZ:    And you want this transferred too, right?

MS. WYNKOOP:    Yes.

MS. MENDEZ:    So yes, I'll have you fill the form.

(Recording stopped.

(Thereupon, the above-titled deposition was concluded.)



Page 150

CERTIFICATE

I, David Frisco, certify that I was authorized to

and did transcribe the above hearing and that the transcript is

a true and correct record of the audio provided.

I further certify that I am not a relative,

employee, attorney, or counsel of any of the parties, nor am I a

relative or employee of any of the parties' attorneys or counsel

connected with the action, nor am I financially interested in

the action.

Dated this 27th day of November 2023.

*David Frisco*

David Frisco

Transcriber



# Magna
## Key Contacts

**Schedule a Deposition:**
Scheduling@MagnaLS.com | 866-624-6221

**Order a Transcript:**
CustomerService@MagnaLS.com | 866-624-6221

**General Billing Inquiries:**
ARTeam@MagnaLS.com | 866-624-6221

**Scheduling Operations Manager:**
Patricia Gondor (E: PGondor@MagnaLS.com | C: 215-221-9566)

**Customer Care:**
Cari Hartley (E: CHartley@MagnaLS.com | C: 843-814-0841)

**Director of Production Services:**
Ron Hickman (E:RHickman@MagnaLS.com | C: 215-982-0810)

**National Director of Discovery Support Services:**
Carmella Mazza (E: CMazza@MagnaLS.com | C: 856-495-1920)

**Billing Manager:**
Maria Capetola (E: MCapetola@MagnaLS.com | C: 215-292-9603)

**Director of Sales Operations:**
Kristina Moukina (E: KMoukina@MagnaLS.com | C: 215-796-5028)



| **A** | | | |
|---|---|---|---|
| **ability** | 147:12,14,21 | 88:12,14,18 89:23 | 15:18 |
| 100:23 | **activity** | 119:11 141:14,15 | **answer** |
| **able** | 80:7,25 115:9,12 | 141:16,17,18 | 6:13,20 7:7 13:20 |
| 7:20 34:14 85:24 | 117:12 118:20 | **agenda** | 14:6,16 17:22 19:9 |
| 86:1 96:6 114:18 | **actual** | 55:8 63:5 143:24 | 19:23 22:10,25 |
| 123:4 | 105:22 142:17 | **ages** | 24:10 28:12,18 |
| **above-entitled** | **added** | 88:14 | 29:14,14 30:1,21 |
| 78:14 117:19 | 99:5 103:10 135:12 | **agree** | 31:15,25 32:9,20 |
| **above-titled** | 135:19,20 | 47:24 132:5 | 34:11 35:6 36:19 |
| 149:7 | **additions** | **agreeable** | 37:10,18 38:4 39:3 |
| **accept** | 135:12,14 | 89:15 | 39:15 40:15 41:11 |
| 48:8 88:3 | **address** | **agreed** | 41:18 42:7 43:6,14 |
| **acceptable** | 33:24 133:17 | 40:23 | 44:9 47:18 48:3,23 |
| 87:16 | **addressed** | **ahead** | 49:8 50:5,14 51:2,8 |
| **accepted** | 122:15 | 14:20 24:24 25:22 | 51:23 54:14 55:19 |
| 28:7 47:20 | **adjust** | **aids** | 56:5,19 57:25 58:10 |
| **accepting** | 136:14 | 60:1 | 59:5 60:12 61:17 |
| 13:22 117:1 | **adjusted** | **allow** | 63:13 64:1,8,15,22 |
| **access** | 100:10 | 56:11 73:13,23 95:7 | 65:24,25 66:10 67:4 |
| 122:20,23 123:9 | **adjustments** | 130:6 133:12,15 | 67:16 68:4,11,24,25 |
| **accurate** | 98:18 | **allowed** | 69:7,16 70:5,15,21 |
| 7:20 17:16,18 24:6 | **advertise** | 89:22,23 90:3,4,19 | 71:14 72:3,18 73:4 |
| 98:12 99:6,16,19,24 | 86:16,19 | 91:9,20 96:20 108:1 | 73:14,24 75:17 76:4 |
| 99:25,25 | **advertised** | 119:7,16 122:19 | 77:13 82:24 83:21 |
| **accurately** | 86:12 | **allowing** | 84:4,19 85:14 86:22 |
| 7:11 103:9 | **advice** | 93:21 132:19 | 87:10,19 88:6,23 |
| **act** | 24:16 85:23 | **allows** | 89:6 90:1,15,23 |
| 61:3 66:17 99:16 | **advise** | 94:24 | 91:13,13,24 92:6,12 |
| 139:24 140:9 | 17:23 134:6 | **alongside** | 92:24 95:2 96:12 |
| **acted** | **advised** | 60:2 66:14 80:24 | 97:20 98:17 100:16 |
| 147:6 | 90:17 | 85:23 | 101:4,12,20 102:4 |
| **ACTING** | **adviser** | **Alyssa** | 102:10 103:9,23 |
| 1:4 | 138:16 | 4:25 | 104:10,18 105:12 |
| **action** | **advisory** | **amount** | 106:14,20 107:12 |
| 38:16 73:7 90:13 | 16:5 | 40:23 130:22 | 107:21 108:5,7 |
| 150:8,9 | **affiliated** | **analogy** | 109:1,11,18 110:2 |
| **active** | 11:13,16 137:12 | 96:10,24,25 | 111:9,19 112:10,13 |
| 79:22 | **affirm** | **anger** | 113:22,25 114:10 |
| **activities** | 4:5,6,7 6:14,15 | 81:13 | 114:17,18,19,23 |
| 93:20 94:1,6 95:7,16 | **affirmative** | **animal** | 115:14 116:12 |
| 111:5 112:3 116:4,9 | 136:13 | 117:15 120:5 147:13 | 117:9,25 118:18 |
| 116:13 120:6,14 | **afternoon** | **animals** | 119:14 120:4,18 |
| 123:5,8 124:5 128:9 | 81:8 | 79:18 80:3 115:2 | 121:15,24 122:11 |
| 131:4 146:20 | **Ag** | **annual** | 122:22 123:8,18 |
| | 9:2,13 | 26:13 | 124:10,20 125:1,10 |
| | **age** | **annually** | 125:20,25 126:7 |



MAGNA
LEGAL SERVICES

127:6,14,22 128:11
128:18 129:1,7,13
129:21 130:8,14
131:12 132:14,23
133:2 134:3,13
135:9,16,25 136:5
137:25 138:8,13,19
138:24 139:11,13
140:11 141:22
142:8 143:15
144:15 145:6,14
146:7,18 147:1,19
148:9
**answered**
27:19 32:19 99:12
100:16 102:3
106:13 113:8,20
115:14 116:18
120:18 124:1
125:10 127:14
131:11 138:19
144:14
**answering**
7:11 14:11 22:9
25:23 112:23
**answers**
148:15
**anymore**
139:20
**apologies**
100:4
**apologize**
52:9
**Apparently**
143:5
**appearances**
2:1 4:14
**appears**
47:4
**application**
67:1
**apply**
51:15
**appoint**
13:1,4
**appreciate**

31:7
**appreciated**
138:3
**appreciation**
63:15 72:23 73:1
74:18
**appropriate**
79:24
**approval**
18:17,23 19:7,12
43:11,19 47:20,21
54:19 57:23 65:22
71:5,7 89:24 104:8
104:17 146:4
**approvals**
51:13
**approve**
16:6,19,25 32:12
47:15 48:6 55:1
58:8 66:7,11 75:25
85:10 148:6
**approved**
31:11,18,22 32:6,17
32:22 41:14 45:17
46:4,18 48:1 55:12
55:16 64:5 70:19,23
71:11 104:12
148:12
**approximate**
15:7
**approximately**
22:21 62:7
**April**
8:13 45:3 69:22
**arbitrarily**
66:2
**area**
14:25
**areas**
33:12 49:11 50:1
**argument**
132:8
**argumentative**
97:20
**arm**
11:2

**arrangement**
30:17 31:18 32:2,6
34:3
**arrangements**
30:13 31:21 112:20
112:22
**arrive**
88:18
**arrived**
34:22 37:6 89:14
**arrived-in**
89:12
**art**
76:13 127:21
**article**
111:10
**ascertain**
61:2
**ascribed**
36:22
**aside**
50:9,10 128:8,9
**asked**
6:14 12:24 13:5 27:9
27:12,21 28:4 32:19
52:9 80:23 99:11,12
100:16 102:3
106:13 113:19,20
113:23,24 115:14
116:18 119:23
120:18 124:1
125:10 127:14
131:11 136:19
138:19 144:14
**asking**
6:12 7:6 18:18 29:13
39:14 47:8 65:24
68:23 84:4 85:1,4
87:18 90:1 91:23
98:16 99:11 102:6
102:10 105:12,22
106:24 107:20
108:25 109:1,11
119:13 120:3,17
122:11 124:10
132:6,24 134:1

135:6,8 137:24
139:11 145:5
147:18 148:9
**aspect**
51:15 58:25 95:4
**aspects**
76:25
**assemble**
80:7
**assembly**
147:13
**assert**
28:9
**asset**
94:10
**assigned**
33:23 49:10 58:24
64:24 67:18 129:19
**assignments**
49:20
**assist**
10:19 94:12 117:13
118:21 120:9
142:11 143:9
**assistance**
35:24 85:21 86:3
**assistant**
20:18,19 26:8,8,9,14
137:4,6
**assisted**
34:2
**associated**
81:11 143:20
**assuming**
17:10
**Atorney**
104:23
**attend**
15:4,6,17,17,20 21:3
141:11
**attended**
15:9 45:12 141:14
**attending**
100:23 112:15
**attend-how**
15:16



MAGNA
LEGAL SERVICES

**attention**
41:1 49:23 54:2,7
55:7 57:12 69:22
83:9 93:8 116:2,21
126:21 134:23
143:6,23
**attorney**
5:24 6:12 56:10,15
56:16,17 60:11
105:7,18,24 106:5
107:10,17 108:6
134:2 135:7 150:6
**attorneys**
8:1 60:7 150:7
**audible**
25:24 103:15
**audio**
1:21 150:4
**August**
134:15,16
**Austin**
2:13 4:20 5:8
**authority**
30:7 146:5
**authorization**
108:11
**authorized**
150:2
**available**
67:21
**Ave**
2:16
**avenues**
33:25
**average**
83:2 88:11
**averaged**
83:2
**aware**
18:11 19:3,16 20:21
22:5 24:23 36:21
44:2 48:24 49:4
51:24 60:13,24
69:17 71:2 97:12
107:22 112:18
114:2 122:13

123:22 126:8 128:5
128:12,20 129:2,8
129:14 130:10
131:8,22 133:9,22
134:8 138:14
140:16 144:16
**awareness**
24:1 39:21 112:14
**axes**
119:19

---

**B**

**B**
116:21 143:7 144:1
**back**
12:10 14:21,22 22:2
36:14 62:12,14
78:17 81:4 91:1
97:23 104:6 118:1,7
118:11 122:18
132:9 134:22
136:17 140:22
**background**
71:18 72:11,17
**backing**
145:21
**balance**
80:22
**base**
33:11
**based**
74:4
**basic**
13:6 77:14,14,17
109:7,8,16
**basically**
6:11 94:1 117:24
141:9 146:2
**basis**
24:25 26:13 40:24
46:23 74:2 82:14
91:5 130:7 131:14
131:15
**basket**
122:18
**bean**

130:23 131:9
**beans**
130:18,21
**becoming**
91:11 135:19 148:7
**bed**
82:18
**bedtime**
82:13 83:13
**beginning**
79:17
**begins**
5:8
**begun**
139:25
**behalf**
4:16,18,21 5:11
11:20,22 12:2 22:9
30:7
**behavior**
84:7
**beliefs**
7:24
**believe**
7:19 11:12 18:24
39:16 75:16 76:24
82:1 92:15 95:25
107:25 114:25
122:5 130:5,25
131:19,20 133:7,13
**bell**
80:12,14 82:5
**beneficial**
116:13
**benefit**
94:20,22 96:17
**best**
5:22 7:1 39:10 54:15
69:9 125:2
**better**
56:12 58:23 66:13
69:3 146:13
**beyond**
35:24 88:18 93:14
123:22 141:15
145:20

**Bible**
59:7,10,14 60:2,3
78:25 81:8,10
**Bibles**
82:14
**bike**
94:13,15 95:7
**bills**
124:25 125:3 145:19
**birds**
79:19,22,23
**birth**
8:12
**bit**
24:24 59:21 62:13
82:16 95:15 115:9
141:3 145:10
**blackout**
91:8
**blanket**
102:11 103:11
**block**
94:10
**board**
15:4,9,14 16:14 17:7
20:9,11,14,15,20,22
20:23 21:2,5,11
34:6 50:11 71:6
**boards**
50:16
**body**
25:4
**books**
60:1 81:11
**bored**
117:11 118:19
**bottom**
134:24
**bought**
143:21
**boy**
94:15
**boys**
33:12,23 34:1 80:17
81:14 93:21 96:16
117:10 118:19



126:23
**boy's**
80:17
**Braeden**
105:8
**brainchild**
33:21
**break**
7:4,7,8 33:4,5 78:12
80:8 82:2 95:14
104:3 118:9,21
136:21
**breakfast**
78:24 79:12
**breaks**
7:5 83:18
**breath**
78:23
**brethren**
33:22 49:10
**bring**
110:12,13,14 132:12
136:16
**bringing**
116:5
**broad**
25:3
**broader**
59:21
**brother**
47:2
**brought**
67:6 131:18 145:23
**Brubaker**
137:1,3
**Brunson**
2:13 3:4 4:20,20 5:3
5:12,14,16 13:23
14:10 17:25 18:9,13
19:13 20:1 22:13
23:2 24:13,18 26:5
27:19,20 28:2,14,24
29:17 30:5,15,23
31:5,9,19 32:4,13
32:23 33:4,7,8
34:16 35:8 36:23

37:14,20,25 38:7
39:6,18 40:20 41:13
41:20 42:3,13,21
43:2,9,16 44:5,11
44:22,23 46:1,16
47:10,14,23 48:5
49:1,12 50:8,18
51:4,16,25 52:17,22
52:24 53:1,4 54:17
54:23 55:6,22 56:14
56:25 57:9 58:6,13
58:19 59:9 60:15,25
61:9,19 62:1 63:17
64:3,10,11,17 65:1
65:9,19 66:6,16,22
67:13,20 68:6,16
69:1,11,19 70:9,18
70:24 71:3,16,22,23
72:9,15,21 73:8,18
74:7,22 75:4,6,11
75:19 76:7,18 77:2
77:8,16,22 78:6,11
78:16 82:19 83:24
84:12,22 85:5,16
86:5,11,18,24 87:12
87:23 88:10 89:2,16
89:21 90:10,18 91:7
91:17 92:2,8,20
93:4 95:13 96:23
97:22 98:22 99:15
99:18 100:3,19
101:6,14,24 102:8
102:24 103:2,4,6,25
104:13,20 105:15
105:21 106:3,10,16
106:23 107:7,14,23
108:12 109:5,14,20
110:4,24 111:13,21
112:5,21 113:1,12
113:14,23 114:3,12
114:20 115:6,18
116:16,20 117:14
117:18,21,23
118:12,22,24
119:18 120:8,21
121:18 122:2,14,25

123:14,24 124:2,16
124:23 125:4,14,22
126:2,9 127:9,16
128:2,13,21 129:3,9
129:15,24 130:11
130:17 131:7,14
132:2,15 133:1,10
133:17,20 134:11
134:18 135:13,22
136:2,12,19,25
138:4,11,15,22
139:3,15 140:6,12
140:21,24 141:1
142:1,14 143:22
144:18 145:8 146:1
146:10,22 147:5,23
148:13,23 149:1
**Brunson.austin.s@...**
2:19
**build**
95:15 114:21 126:4
**building**
89:11 93:19,25 94:10
94:21 96:5 101:9
112:15 114:15
120:9,15 128:9,16
128:24 130:2 143:8
147:16
**buildings**
124:14
**built**
115:4 125:16,24
129:6 143:18
**business**
1:15 6:2 8:24 9:1
23:21 24:10 29:22
30:2,7,10 52:10,14
116:17 123:5,8
142:3,4,7
**businesses**
9:3,4,6,8,14 29:8
52:10
**buy**
54:19

————— C —————

**C**
54:8,18 55:8,8
**caliber**
144:23
**calibration**
82:16
**call**
55:9 71:19 82:3,4
91:1,20 142:4 143:4
**called**
4:11 9:1
**calling**
31:14,24 32:9 34:11
49:8 50:4 51:1,22
52:13 54:21 55:18
57:5 60:10,11 61:6
68:3 70:14 73:3
74:13 88:5 105:18
107:11 125:9,19
133:16 135:5 145:2
**calls**
56:4 76:22 111:18
121:13 140:1
143:14
**campaign**
26:16
**capacity**
72:10 137:18 145:19
146:24
**care**
38:17 115:3 121:3
126:5 143:19
**cared**
110:14
**carrot**
96:21 97:10,10,11
**carrots**
97:3
**carry**
108:19
**carrying**
96:20
**case**
1:7 6:9 37:13 78:4
**cases**
34:3



catchall
129:16
catching
83:6
category
93:2
caught
81:6
Cell
2:6
certain
49:25 68:14 130:21
certainly
108:19
CERTIFICATE
150:1
certify
150:2,5
cetera
100:24,24 125:17,24
chairman
20:17,18 21:18,19,20
25:12,13,19 26:8,10
26:14,14,16,18,20
26:22 58:20 72:10
137:4,6
chambers
133:8
chance
44:24 53:5 126:11
change
148:15
changed
18:24
character
33:12
characterization
138:7
character-building
116:7
charge
108:9,9,11,13
charitable
11:3 22:17 28:22,25
58:4
chat

82:9
check
79:17 80:4
checking
79:20 83:18 100:23
checks
71:18 72:6,11,17
136:19 145:18
chicken
79:19 81:16,19
chickens
93:18,25 112:15
114:22 115:1
120:15 121:1,4,5,8
124:5 126:5 128:17
130:2
child
87:14 92:19
children
88:12 109:16 110:15
110:16 111:15,23
113:16 134:14
choice
28:5,7
chores
120:5
Chris
6:5
Christopher
5:4
church
1:14 6:2 9:18,22 11:2
21:1 22:17 33:22
34:17,17,19 57:16
57:22
churches
22:19 122:4,17
circle
14:21
circumstances
92:1
cited
135:18
claim
131:25
claims

131:18 132:20
clarification
47:8
clarify
25:2 99:15,17 122:23
clarity
75:2
Clark
121:19
Clark's
32:2,7,18
class
81:8
classes
87:3
clear
4:23 5:3 10:15 21:9
22:14 34:9 41:4
47:3 48:14,16 74:23
75:5 78:8 100:2
107:8 108:14 112:6
112:15 117:3
122:15 125:5 133:1
clearly
93:2
clerks
4:24
client
30:20 35:6 56:10
60:11 61:7 65:24
68:23 73:14 84:4
85:1 87:18 90:1
91:23 98:16 101:20
105:19 108:6,25
113:8,21 131:12
132:14 133:2 134:2
135:7,8 137:24
140:11 145:6
147:19
client's
73:23 74:15 103:22
close
89:9 121:21
closely
114:11
clothing

109:9 111:4,6,7,9,10
code
134:25
collected
124:8
collective
11:2
Columbia
2:17
combination
88:24 89:13
come
10:18 14:14 20:2
29:11 62:8,13 78:24
80:14 85:23 86:1,2
86:13 88:9 134:9,12
135:11,11,14
139:24 142:11
comes
94:23 116:24 132:23
148:22
comfortable
4:4
coming
39:22 74:2 87:3,21
88:8 113:13 127:25
136:10
comment
14:2
commentaries
60:1
committee
12:17,20,21,25 13:2
13:7,11,15,18 14:5
14:18 16:7,15,20,23
17:1,11,20 18:16
19:18 23:10 25:1,6
25:8,11,14 26:7,11
26:14 27:7,10,13,22
28:10,16,21 29:1,3
29:7,10,22 30:8,16
31:11,17,18,22 32:6
32:15,21,22,25 34:6
34:8 36:16 38:25
39:11 41:21 43:18
44:6,18 45:2 49:5


MAGNA
LEGAL SERVICES

49:10,10,13,15,17
49:22,23,25 50:10
51:12 52:20 55:2
57:2 58:21 60:7,18
61:2,10,21 62:18,23
64:5,24 65:2,11
66:4,7,17 67:18,22
68:18 69:21 70:1,11
71:17 72:25 73:6
74:9 75:23 77:24
84:10,17 85:3,7
86:2,2,6,12 88:3
89:4,8,9 90:12 97:1
104:12,17 105:24
107:5,8,10,16,25
115:22 122:9
126:13,20 127:18
128:8,15,23 129:4
129:11,17 137:19
137:21 138:6,17
139:9,19,23 143:1
143:13 145:24
146:4 147:4,7 148:4
148:5
**committee's**
101:8 145:22
**common**
19:10,14,17,20,23
45:20,24 80:18
**Commonwealth**
77:4,10
**communicate**
64:25 98:6
**communicated**
31:17 69:10 128:4,5
**communication**
17:8,9,12,14 60:14
60:24 91:16
**communications**
56:17 108:6 135:6
**companies**
111:24 112:9 113:4
113:17
**company**
2:14 31:12 113:5
**compensated**

77:25 125:13
**compensation**
41:8,10 73:16 77:19
78:5 125:6
**complain**
76:8 77:23,24
**complaint**
76:16 132:21
**complaints**
127:17
**completely**
56:23 74:2 83:4 88:9
**completing**
126:24
**compliance**
135:11 136:10
139:24
**compliant**
135:19 136:16
**concern**
50:1
**concerned**
31:3
**concluded**
149:8
**conclusion**
24:9 34:2 61:7 76:22
77:13 105:12
107:21 135:8
**conducted**
67:25
**conference**
143:4
**conform**
134:7
**confused**
112:10
**confusion**
99:16 102:14 103:4
**congregations**
22:12
**connected**
57:3 150:8
**connection**
96:14 137:7
**consent**

133:16
**consequence**
131:9
**consequences**
129:25 131:20
132:18
**consider**
12:1,4
**consideration**
14:9 16:2,4,15,20,23
17:1,7 56:7,23 87:3
87:5,6 98:11 99:5
**considered**
16:7 40:17 75:10
**constituency**
22:17
**Constitution**
2:16
**constructing**
119:8
**construction**
119:17
**constructive**
117:12 118:20
**consult**
105:24 106:5
**contact**
58:24 90:20 146:19
146:20
**contacting**
90:16
**context**
39:4
**continue**
56:11 113:25 133:11
**contract**
29:11 142:9
**contracted**
142:4
**contracts**
29:8 52:11,14
**contribute**
93:22 122:19
**contributed**
36:5 124:12,12
**contributees**

58:5
**contribution**
22:16 67:6
**control**
18:2
**controls**
20:8
**conversation**
81:4
**conversations**
56:10,16 105:23
140:3
**convey**
84:21 147:3
**conveyed**
36:7
**convicted**
7:16
**Cooper**
21:24
**cooperative**
90:8
**coordinate**
25:15 59:16,17,17,23
**coordinated**
66:12,13
**coordinator**
40:5,6 42:10,11
65:17 89:7 137:10
141:25 146:20,21
146:24 147:4,4,7,9
147:11,15,24 148:1
148:3,7
**copy**
44:21 98:7,10,12
102:15,15 103:2,18
103:20
**Corbin**
5:1
**corporate**
141:24
**correct**
12:15,17,19 16:12,16
16:17 17:13 18:3
20:5 22:20 23:7,20
24:7,14 32:5 38:14



38:24 39:24 40:1
44:7 45:10,11 48:19
49:16 50:23 53:18
54:19 55:2 57:13,17
63:24 69:25 70:3
71:4 72:23 73:11,21
75:25 78:10 87:11
87:25 94:19 95:16
95:18 96:8 97:15,25
104:15,19 112:24
121:2,6,7 123:6
124:6 125:7 129:22
129:23 134:21
135:24 136:1 150:4
**corrected**
46:4,11
**correction**
84:9
**corrections**
46:5,14
**correctly**
5:22 38:22 45:18
55:11,12,25 57:14
57:16 71:5 75:12
83:23 93:22 116:7
117:1 122:1 126:22
126:25 129:23
130:10 143:7,10
144:3 145:17 146:3
146:9 147:21
**correspondence**
81:7
**cost**
93:21 94:2,2 111:12
**costs**
98:3 101:9 124:13
**counsel**
4:11,14 56:20 85:23
113:20 130:12
142:16 150:6,7
**counselor**
40:6
**couple**
53:23 136:20
**course**
46:10 84:1 90:6

115:3
**court**
1:1 6:14,19
**cover**
92:22 111:12
**covered**
50:22
**covers**
89:1 93:3
**create**
46:11 80:16,22
107:10
**created**
12:20 129:11
**creating**
94:8 111:15
**creation**
107:2
**Creek**
9:11
**crime**
7:17
**criminal**
71:18 72:6,11,17
**crisis**
91:15,18
**current**
35:7 37:9 72:2,4
131:1,22 132:10
134:4
**currently**
132:23 133:8
**customer**
120:23
**customized**
119:9

---

**D**

**Danner**
148:1,6
**date**
8:12 15:7 100:10
133:16
**dated**
45:2 53:10 150:10
**dates**

52:4
**David**
150:2,11,12
**day**
21:6 59:19 63:10,18
63:24 65:21 66:14
78:19,19 79:13,17
80:11 82:15,21 83:1
87:4 110:16 114:4,5
114:7,8,14 125:16
125:24 129:6,12,18
141:9,10 147:22
150:10
**days**
26:23 66:13 83:2,3
141:9
**day-to-day**
51:10
**deal**
29:22 30:2 31:12,14
32:17 81:13
**deals**
30:7,10
**dealt**
50:11
**debate**
48:9
**December**
134:16 135:15 136:4
**decide**
72:25
**decision**
14:13,13 24:20 52:15
73:5 87:24 89:3
141:19 145:22
146:3,5 148:4,5
**decisions**
25:15 108:17 145:23
145:25
**decision-making**
145:21
**declined**
28:7
**defendants**
1:18 2:2 4:17,19 9:20
**defense**

142:16
**define**
36:16,24 39:9 40:8
51:5 120:19
**defined**
19:1 93:2 141:8
**definitely**
88:1
**definition**
27:25 36:21 51:3
65:15 68:13 90:4
**Department**
1:5 2:14 5:24 11:6
23:23 24:22 60:17
60:18
**depended**
145:21
**depending**
65:15 67:21
**deposed**
6:7 133:4
**deposition**
5:2,25 6:11 7:23 45:7
149:7
**derive**
96:17
**describe**
19:4 66:25 83:8
111:5
**described**
71:18
**describes**
50:6
**designate**
18:19
**designated**
65:2
**designed**
94:1,7,7
**designee**
5:9
**desire**
67:8 89:1 90:7
**desired**
84:10
**desk**


MAGNA
LEGAL SERVICES

102:20
**dessert**
130:20
**details**
28:22
**determine**
51:17
**determined**
21:7
**determining**
88:20
**develop**
80:16
**development**
33:13 116:14,15
**devotions**
78:25
**DHS**
133:22,24 134:5,12
  134:14,17 135:3,24
**DHS's**
136:11,15
**diet**
130:13,16,18,21,23
  131:9
**difference**
97:16,21
**different**
49:10,11 98:20 100:1
  103:20 123:19
**difficult**
85:20
**difficulties**
84:7
**difficulty**
102:11,14 142:3
**diligence**
127:8
**diligent**
127:12
**dinner**
80:12 82:4
**direct**
3:4 5:15 11:3 13:11
  49:25 51:6,10 54:1
  54:7 55:7 57:12

59:2 65:3,6,16
69:22 84:21 93:8
116:2 126:21
134:23 146:24
147:1,3
**directed**
65:12
**direction**
13:13 18:11 34:7
  50:16 64:19,21
**director**
41:2,5,6,7,14,23
**disapprove**
16:19,22
**discipline**
96:17
**discovery**
131:22
**discuss**
55:24 131:23
**discussed**
18:10 21:10 46:4,7
  50:11 51:15 57:8
  62:13 114:5 133:3
**discussing**
48:12 84:11 100:12
**discussion**
15:21 21:8 25:18
  48:9 51:14 74:24
  75:8,10 81:3 89:14
  128:7,14
**dishes**
79:3
**dishonesty**
7:17
**disobedience**
37:1
**dispose**
145:24
**dispute**
131:22
**disrespect**
36:25
**distribute**
57:22
**distributed**

57:16
**District**
1:1,2 2:17
**Division**
5:5 6:6
**document**
19:15 35:10,15,17,20
  35:22 36:2 39:3
  42:17 44:20 45:1,4
  45:9 46:7,15 48:2
  53:5,7,9,12 54:14
  55:19 62:20,22 64:1
  64:2 70:5 105:4,6
  115:20,24 116:12
  117:9 126:16,18
  127:6,7 142:25
**documentation**
13:15
**documents**
8:2,8 45:6 53:14
  131:24 142:18
**doing**
1:15 6:2,21 28:5
  115:12 147:16
**doings**
26:21
**donate**
116:23 122:4
**donation**
116:24 117:1 122:19
**draft**
105:16
**drafted**
105:10 107:6
**drafting**
35:19,22 36:1,4
  105:24 106:5
**draw**
96:14
**drink**
80:10
**drugs**
7:10
**due**
108:10
**duly**

4:12
**duties**
79:2 84:1 115:3

---

**E**

**earlier**
97:23 144:8
**early**
97:19
**easier**
30:24 118:2
**easily**
13:8,9
**Eastern**
1:13 6:1 9:17,21
  34:19
**edit**
46:12
**edits**
46:15
**education**
49:18,19 141:4,4
**educational**
59:2 116:14
**effective**
28:23
**efficient**
28:22
**effort**
25:21 28:25 34:4,21
  75:23 90:8 117:11
  117:12 118:20,21
  141:24
**efforts**
11:3 21:1 22:17
  28:22 128:16
**either**
19:5 21:18 28:7
  77:10 81:21 133:16
  148:25
**elaborate**
24:2 59:23 144:19
**election**
26:12
**elects**
26:14



eliminated
130:21
**Email**
2:7,11,20
**emergency**
91:15,18
**emotional**
37:2 81:13
**employee**
40:15,18 150:6,7
**employees**
40:12
**employer**
11:8
**encourage**
91:3
**encouraged**
91:16
**encroaching**
56:10
**engaging**
38:21
**enjoying**
96:22
**ensure**
79:23
**entail**
36:25
**enter**
29:8,10 30:7 52:10
82:5
**entered**
29:22 31:21 34:25
**entities**
9:4
**entitled**
77:18
**entity**
5:11 23:21 24:4
56:23
**entrusted**
115:2
**equipment**
81:24
**error**
46:6,9,10

**errors**
46:2
**establish**
24:25
**established**
119:22
**estate**
123:22
**estimate**
15:15
**et**
100:23,24 125:17,24
**Ethan**
139:16
**evaluation**
38:20
**evaluations**
37:7
**exactly**
93:2 99:5 116:9
135:20 145:11
147:10
**examination**
3:4 4:11 5:15
**examined**
4:12
**example**
20:15 29:10,18 49:14
139:6
**examples**
97:17
**exception**
83:17 87:6
**exchange**
120:24
**excuse**
126:3,24
**execute**
146:5
**executed**
146:2
**executing**
145:24
**exercise**
96:15,18,18
**exercises**

80:21 81:20 94:8,12
112:16 130:2 131:4
**exertion**
96:18
**Exhibit**
35:10,11 38:9 44:16
44:17 52:18,19
62:15,17 69:20 93:6
104:22,23 115:19
115:21 126:10,12
134:22 142:15,21
**exist**
13:7 77:3 94:24
**exists**
25:6
**exit**
123:12
**expect**
73:19 85:3
**expectation**
73:25 76:17 78:5
**expectations**
65:18 69:9 84:21
127:24 147:3
**expected**
64:25
**expects**
74:5
**expenditure**
55:1
**expenditures**
18:3,11,21,23
**expense**
54:24,25
**expenses**
23:16 46:21 51:19
93:2 123:10,25
**experience**
74:3 80:17
**explain**
22:15 26:12 42:14
49:14 57:20 63:9
85:18 96:9 117:6
118:10,14
**express**
67:11 68:14

**expressed**
36:7,10,11
**extent**
22:8 24:8 27:23
28:17,19 29:12,25
30:10 31:14,23 32:8
34:10,13 36:17 39:2
39:13 41:16 42:1,17
43:12 44:4 48:2,21
49:7 50:4 51:1,21
52:12 54:13,20
55:17,18 56:3,9
57:5,8,24 60:9,10
60:21,22 61:5,6,14
61:15 63:11,25 64:7
65:4,23 68:2,13,23
70:4,14 72:1 73:2
74:12 75:16 76:3,12
76:21 77:12 84:3,25
85:12 87:17 88:5
89:25 90:16,17
91:23 94:4 97:18
98:16 99:9,10,11,23
100:15 101:11,19
105:11,18 106:7
107:11,20 108:4,5
108:24,25 109:10
111:17 113:7,8
115:14 116:11
117:9 119:12 120:3
120:16,17 121:13
121:14 122:10
124:9 125:9,10,19
127:5,14,20 130:4
133:25 134:1,3
135:4,5,6,7 137:24
138:19 139:10
140:1,2,4 142:6
143:14 145:5
147:18 148:8
**extra**
82:9 127:3
**extras**
130:20

---
**F**
---



F
38:10,12
face
66:4 81:14
fact
5:9 112:17
factor
67:23,23 92:18
factors
88:20
failed
84:9
fair
33:15 48:16 56:20,21
57:1 59:19 61:3
66:18 67:22 71:20
75:14,18 77:5 78:9
83:18 94:25 98:5
103:8 106:12
108:16 109:21
110:7,8 111:1,3
113:5 114:7 129:16
135:2,15 136:3,7
138:5 139:24 140:8
147:17 148:18
faith
67:11 114:25
fall
84:8 130:5 132:20
133:13
falling
132:24
falls
133:7 134:3
familiar
76:20,23 78:18
familiarity
77:10
family
78:24,24 83:10
126:25 144:22
far
8:14 36:4 60:22
76:16 127:24
farm
1:16 6:2 7:25 8:20

10:18 11:25 12:3,4
12:7,13,16,20 13:7
13:11,15,18,22,25
14:5,14,18 15:1
16:7,12,15,19,23
17:1,11,19 18:3,16
18:22 19:18 21:8,10
23:3,7,9,13,15,22
24:14,21,25 25:5,6
25:8,10,14 26:7,11
26:13 27:7,10,13,22
28:16,21 29:1,3,7,9
29:10,22 30:8,16
31:11,17,22 32:6,7
32:21,24 33:10,11
33:15,19 34:5,22,24
35:2 36:15,22 38:15
38:25 39:1,11,21,24
40:3,22 41:8,21
43:4,18 44:6,18
45:2 48:18 49:5,10
49:15 50:2,10,12,17
50:24 51:11,12 52:2
52:10 53:10 54:2,3
54:8 55:2 56:24
57:2,18 58:2,12,15
58:21,22,25 59:3
60:7,8,17,19 61:2,4
61:10,12,21,22
62:23 63:21 64:5
68:18,20 69:12,14
69:21 70:1,8,10
71:17 72:6,25 73:11
74:9,11 75:22,22
76:9,10 77:24 78:9
78:20,22 79:18
81:24 85:11 86:4,6
86:12,14,20 87:1,8
87:15 88:3,8 89:4
90:14 91:5,21 92:14
94:3,22,24 95:19,23
96:3 97:1,7,13
98:14 101:3,8
104:17 105:7,24
107:8,9,16,25 108:2
108:18,22 109:6,17

109:23,24 110:10
110:11,17,19,25
111:6,11 112:19
116:23 120:14
121:22 122:8,21
123:6,11,15,21
124:25 125:6
126:13,19 127:18
128:8,15,23 129:4
129:10,17 133:22
133:24 134:6,6
137:5,6,11,19,21
138:2,6,16 139:9,23
140:8 142:22 143:1
143:13 145:12
146:4,16 147:14
148:5
farmer
8:19,20
farmers
8:23
Farms
119:10
Farmstead
9:11
fault
112:15
favor
57:14 64:4 117:1
feed
32:2,7,18 79:20,23
80:5 121:19
feel
82:16 116:23
feeling
7:13
feelings
37:2
fell
79:15
fellows
71:21,22,24 72:12
124:18,18
fellowship
40:7,8,9,17,17 52:3
66:25 67:2 68:9

69:3,14 71:19,19
fewer
143:9
field
126:25 127:3
figure
92:15
file
24:4
filed
23:25
filing
24:5
fill
63:9,20,23 149:5
final
104:6,7,17
finances
122:20
financial
41:7 45:17 46:18,19
47:16,20,25 48:7,10
48:13,17 94:7 123:2
125:6
financially
150:8
find
33:25 39:7 80:22
fine
15:10 30:20 31:5
104:25 132:13
133:4
finished
25:23 103:14
first
4:12 7:7 34:21 53:17
74:21 97:4 134:15
flock
79:19,21 81:18
floor
56:7
flow
66:15 79:4 142:12
FLSA
131:18 132:20
focus



50:1 52:4 99:2
105:9,10
**focused**
49:18
**follow**
130:5
**followed**
76:5
**follows**
4:12
**food**
109:9,22 110:6,9,15
110:20 124:12
**force**
92:16
**forklift**
54:19
**form**
13:20 14:6 17:21
22:2 23:25,25 28:11
38:17 40:14 41:9
42:16 47:7 56:7
57:4 64:20 66:9,19
75:15 76:2,11 82:23
83:20 84:18 90:22
92:5,11 96:11 98:15
99:9 104:9,24
105:10,10,16,25
106:5,11,19 107:2
107:10,24,25
110:23 114:9,16
117:8 118:17
124:19 125:8 130:3
137:23 141:21
145:13 146:17
149:5
**formal**
17:3 43:3 138:21,23
139:4,5,20
**formation**
24:10
**formed**
34:25
**forming**
34:23 56:23
**forms**

107:17
**forth**
81:4 91:1 122:18
**forward**
94:16
**found**
85:20,24 86:1
**frame**
82:6 98:11 99:4
**fraud**
7:17
**free**
22:11 142:13
**frequent**
90:25
**frequently**
6:25 73:10
**fresh**
78:23
**Frisco**
150:2,11,12
**front**
45:1
**fulfill**
80:19 142:5
**fulfilled**
126:23
**fulfilling**
79:8 142:3
**full**
23:25 28:6 39:21
112:2,7
**fully**
91:14
**funds**
23:12
**further**
55:24 90:4 113:22
116:14 124:14
132:14 150:5

_____
**G**
_____

**G**
57:13
**Gabriel**
6:4

**games**
82:12
**garden**
80:1,2 96:17,21
**gardening**
80:1 147:12
**Gate**
113:13
**Gates**
29:9,16 113:4,18
**geared**
80:21
**Gehman**
35:23 137:9
**general**
7:25 58:3,11 59:21
81:12,24 93:1,16,17
99:25
**Generally**
121:20
**generate**
9:6 22:7,22 46:24
120:14,20
**generated**
46:22 47:1 106:18
123:5,10
**Geography**
67:23
**Gerald**
65:8
**getting**
89:11 95:6 127:18
145:9
**give**
7:20 23:3 34:7 49:14
54:2,5 73:17 80:5
84:9 85:23 103:11
108:10 116:6
148:17
**given**
35:23 49:23 65:17
74:18 98:13 102:1
102:13,16 131:9
145:18 148:15
**giving**
50:16 54:19 97:17

101:17 128:15
**go**
7:8 8:14 15:23,25
16:3,14 17:6 21:5
21:10 25:22 29:2
36:14 62:8 78:21
79:25 80:9 88:2,20
93:5 95:11 97:10
98:19 117:16,22
124:3,8 130:7 132:7
134:22,24 140:22
**Godsend**
116:24
**going**
7:5,7 9:16,20,22 10:3
10:9,10 14:21,22
15:15 17:21 18:5
19:8,22 20:22 21:15
22:8,24 24:8,15
27:17 29:2,12,24
30:9,19 31:13 33:9
34:10 35:5,9 36:17
37:8,22 38:3 39:2
39:13 40:14 41:1,9
41:16,25 42:6,25
43:5,12,21 44:3,8
44:16 45:23 46:17
47:7,17 48:21 49:7
50:3,3,13,21,25
51:7,21 52:12,18
54:1,7,13,20 55:3,7
55:17 56:3 57:4,12
58:9,16 60:9,20
61:5,13,23 62:14
63:11,25 64:7,14,20
65:4,13,23 66:9,19
66:23 67:3,15 68:2
68:10,22 69:6,15
70:13,20 71:13,25
73:2,12,22 74:12
75:1 76:2,11,21
77:7 78:1 79:4 81:4
83:20 84:3,18,25
85:12 86:8,15,21
87:9,17 88:4,22
89:5,19,25 90:22



91:10,22 92:5,11,23 93:5,8,11 94:4 95:1 96:11 97:4,18,23 98:15 100:15 101:10,19 102:21 103:21 104:9,21 105:9,9,11,17 106:1 106:6 107:19 108:3 108:24 111:25 112:11,25 113:6,12 113:19,21 114:9,16 115:19 116:2 118:11 119:12 120:2,16 121:23 126:21 127:20 128:10 129:20 130:3,12,24 132:22 133:11,14,25 137:23 139:10 140:10,10 141:2 142:15 143:23 145:13 147:16

**good**
4:20 5:17 7:16 50:19 78:23,23 79:20 82:11 104:7 117:21 117:21

**goods**
111:15,18,23 112:23 113:16

**goodwill**
142:13

**governing**
25:4

**grade**
8:15,16

**granted**
40:10,11

**grazing**
80:4

**great**
10:23 148:24

**ground**
12:8

**group**
33:22 41:22 146:15

**grow**
10:19 33:12

**growth**
33:13

**guardian**
91:20

**guardians**
90:20 91:9 92:9 101:2 102:1 108:17 108:21 109:15 111:14,22 113:3,15 128:16

**guess**
5:3 6:19 50:23 52:3 59:24 63:10 68:8 82:21 106:24

**guesses**
106:21

**guidance**
40:5 42:10 65:17 84:9 89:7 137:10 141:24

**guide**
24:16 84:21

**guidelines**
7:25 93:12 98:19

**guides**
147:12

**guiding**
68:14

**guys**
132:3,5 140:21

---
**H**
---

**H**
116:3

**half**
77:19 131:16

**Halton**
70:2

**hand**
4:4

**handbook**
35:11,16 98:11 100:5 101:1

**handed**

119:2

**handled**
124:25 125:3

**hang**
79:12

**happen**
57:10 85:2,6 122:6

**happened**
138:9

**happening**
17:17,19 58:12,12 112:3

**happy**
27:3 132:11

**hard**
127:3

**Harvey**
5:4 6:5 136:21

**haste**
142:17

**head**
6:21,21 26:2 80:6 82:17

**health**
37:7,12 79:20,23 115:4

**healthy**
7:13

**heard**
18:1

**hearing**
150:3

**heavily**
145:21

**held**
91:1

**help**
11:3 33:11,14 49:14 67:11,12 80:22 85:25 93:20 94:2,25 101:8 111:11 116:4 127:25 142:4 144:9

**helped**
67:12 97:24 144:1,5

**helping**
10:19 94:13

**hidden**
96:13

**highest**
25:20,20

**hire**
13:19 14:5 19:6,8 39:11,15 68:8 69:13

**hiring**
14:13 66:23,24,24 67:4

**history**
38:21

**hobby**
82:12

**home**
34:1,2 37:1 80:18 81:7 85:20,25 91:16 92:19 102:20

**homes**
87:22

**hopefully**
68:17

**horizons**
116:15

**hour**
5:5 6:6 70:11,23 71:10 81:4 131:18

**hourly**
69:13 78:8

**hours**
40:11 77:18 82:21 114:4,14 128:23 129:1,18 139:25 141:10

**house**
43:17,20 63:9 65:3 80:9 81:16,19 82:5 96:21

**household**
79:2,15

**houseparent**
42:10,15,22,22 43:10 43:11 64:18 65:16 90:12

**houseparents**
40:5 42:18 63:20



MAGNA
LEGAL SERVICES

64:12,12,13 65:3
84:14 146:13,14
**HQ**
2:15
**humane**
115:2
**husbandry**
120:6 147:13

**I**

**ID**
11:8
**idea**
33:18,21 106:11,17
**ideas**
36:7
**identification**
35:12 44:19 52:20
62:18 104:24
115:22 126:14
142:23
**illustration**
94:17 95:6
**immediately**
136:15
**importance**
38:20
**important**
6:18 17:9 94:10
**inability**
80:19,19
**incentive**
126:7
**incentives**
126:4 127:3
**include**
124:17
**included**
11:25
**income**
9:6 22:7,22 46:20
120:14,20 123:9
**incorrectly**
93:18
**independence**
141:9

**INDEX**
3:1
**indicates**
66:12 72:4
**indicating**
95:11
**indiscernible**
5:5 18:5 22:2 30:19
53:2,3 73:21 78:17
87:5 102:23 111:12
113:4 122:4 123:13
128:6 131:13
133:21 134:12
136:19 140:25
142:18
**individual**
51:18 69:13 71:8
89:10
**individuals**
12:24 13:5 39:20
40:22 50:1 69:14
72:22 146:15
**inform**
140:17
**informal**
138:23 139:2,6
**information**
36:18 60:11 61:15
105:19
**informative**
116:6
**informed**
111:15 113:3,16
140:13
**infraction**
131:10
**initial**
12:21 33:21 34:15
67:7
**initiate**
116:5
**input**
14:8 16:5 18:6,7
21:12
**inputs**
88:25

**insecurity**
37:2
**inserted**
135:2
**instant**
60:23 61:16 99:24
**institution**
5:11
**institutional**
29:13,25 30:11,20
31:15,24 32:9 34:11
36:18 39:14 41:17
42:1 43:13 44:4
48:22 49:8 50:5
51:2,22 52:13 54:21
55:18 56:4 57:5,25
58:17 60:10,21 61:6
61:14 63:12 64:8
65:5 68:3 70:14
73:3 74:13 76:4,13
78:2 85:13 86:22
88:5 94:5 101:11
106:7 107:12 108:4
109:1,11 111:18
119:13 120:3,17
121:14 122:11
124:10 125:9,19
127:21 134:1 135:5
139:11 140:2 142:7
143:15 148:9
**institutions**
20:3
**instruct**
35:5 113:21 131:12
132:14,22 140:11
**instructing**
133:2
**instruction**
8:1 58:25 59:7
**intended**
39:5
**intense**
34:3
**intent**
101:8
**intention**

98:6 101:15
**interest**
91:3 138:2,3
**interested**
150:8
**interim**
136:16
**intern**
5:6 6:5
**interns**
5:1
**interrupt**
146:23
**interview**
67:7,16 68:4
**interviews**
67:14 68:1
**investigation**
139:25 140:4
**investigator**
5:4 6:6
**invitation**
21:4
**invited**
21:3 138:6
**involved**
8:5 26:25 32:2 33:20
34:14 35:22 36:1,3
37:12 50:16 51:13
59:25 60:2 77:17
79:18 83:1 84:11
85:3 86:3 101:22,25
112:4 115:17 120:7
124:13 134:17
135:24
**involvement**
14:22 24:20 35:2,19
35:24 51:10 52:16
112:16
**involving**
7:17
**in-home**
85:24
**irrelevant**
61:16 72:2
**issue**



132:10,12
**issues**
 17:24 81:14 131:23
  132:19 133:5
**item**
 21:7,9,12
**items**
 81:24
**iteration**
 113:20

### J

**Jacob**
 137:1,3
**jmendez@margoli...**
 2:11
**job**
 84:23 96:19
**Jocelyn**
 2:8 4:16
**joined**
 4:25 6:4
**joint**
 75:23 89:14 90:8
**judge**
 131:23 132:11,13
  133:4,18
**JULIE**
 1:4
**JULY**
 1:22
**jump**
 62:12
**jumped**
 14:20 24:24

### K

**Kanona**
 9:13
**keep**
 17:8,9,11,14 27:2
  79:4,22 80:15 82:10
  91:4 93:22 128:23
  129:5 132:3,3
**keeping**
 81:24 90:17

**Kenton**
 1:21 3:3 4:10 116:5
**kept**
 80:4 89:9 129:11,17
**kind**
 25:3 78:7 79:3 80:25
  131:23
**knew**
 20:4 112:16 115:5
**know**
 7:5 8:6 9:25 10:7,12
  10:21,24 11:8,10
  14:12,15,16,19,20
  15:7,8,8,9,10,11
  17:22 19:4,20 20:8
  21:5,21 22:2,10,25
  23:1,5,6,21 25:6
  27:9 28:19 29:13,19
  30:1 31:15,20,25
  32:10 33:2 35:1,3
  36:1,4,20 37:10,15
  38:5 41:18 43:3,14
  43:25 44:14 47:1
  48:23 49:17,20,21
  50:5,9 51:2,23 54:2
  54:5,21 55:20 56:5
  58:1 60:12 61:17
  63:13,20,22 65:2,10
  67:4,14,25 68:25
  69:2,2 71:11,14
  72:3,8,16 75:20
  76:25 77:3 79:4
  83:11 84:5 86:19
  87:19 88:11 90:2
  91:11 92:3,24 94:21
  95:23 96:2,3,4,13
  98:18,21,23 100:2
  100:11,20,25 101:5
  101:12,18,21
  102:12 103:24
  104:1,2 105:13,14
  106:2,9,25 107:1
  108:7 109:2 110:13
  111:19 112:13
  114:10,13,17,19
  115:1,8,15 116:12

118:4 119:6,22
  121:8,11,16,19
  122:12 123:11
  125:11,20 127:6
  128:11,19 129:1,10
  130:8,15 132:1,3,22
  133:15 135:17
  136:6,9 137:1,9,15
  137:25 138:20,25
  139:12,13,16
  141:10,12,22 142:8
  143:15 144:15
  145:1,6,9,15 146:8
  146:12,12,13,18
  147:1,19,25 148:10
**knowing**
 77:17
**knowledge**
 11:5 12:12 13:9 22:6
  22:7 23:3,9,14
  29:21 30:6,12,22
  37:19,24 38:6 39:10
  40:21 41:12,19 47:5
  50:20 52:1,8 54:15
  60:6,16 61:1,8,18
  61:20,24 68:7 69:12
  76:15 78:3,19 85:8
  85:15 100:5,8,11
  105:22,23 106:4
  111:14 112:1 113:2
  114:24 123:15
  125:2,12 126:1
  130:13 133:21
  145:10 146:11
**knowledgeable**
 112:18
**knowledgeably**
 17:23
**knows**
 130:12
**know-I**
 147:9
**Kreider**
 1:21 3:3 4:10 5:8,17
  5:19,20 6:7 22:9
  116:5 148:14

### L

**Labor**
 1:6 2:14 5:24,25
  60:17,18 61:3
  139:24 140:8 141:9
**lack**
 14:22 69:3 80:18
  131:20 146:13
**Lancaster**
 8:11
**lanes**
 78:22
**large**
 126:23
**late**
 81:16
**laundry**
 79:8
**Laurel**
 2:4
**laws**
 76:20,20 77:1,3,10
**lawsuit**
 140:15,19
**Leabrook**
 9:2,9
**learn**
 18:14,16 20:6 94:20
  140:8
**learned**
 81:12
**learning**
 116:15
**leave**
 85:4 88:21 89:4,18
  89:23
**leaving**
 90:12,13
**legal**
 8:16 24:9,16 39:5
  61:7 76:22 77:13
  105:12 107:20
  135:8
**legally**
 107:18 108:1



**leisurely**
82:9
**length**
113:8
**lessons**
59:7,10,14
**letter**
90:25 91:1 133:8
**let's**
10:23 11:17 13:10
35:10 46:6 49:15,17
68:18 83:5,25 85:17
91:18 95:14 97:10
116:3 142:3
**liaison**
139:8 147:6
**liberty**
1:16 6:2 7:25 10:4,10
11:24 12:3,11,12,13
12:16,20 13:6,11,14
13:18,22,25 14:4,14
14:18,25 15:22,24
16:1,4,7,12,15,19
16:23 17:1,10,19
18:2,16,21,22 19:5
19:5,18 20:3 23:3,7
23:9,13,15,22 24:4
24:21,25 25:4,6,8
25:10 26:6,11,13
27:7,10,12,13,21
28:15,21 29:1,3,4,7
29:9,10,21 30:8,16
30:23 31:11,11,17
31:21 32:5,7,17,21
32:24 33:10,10,15
33:18 34:4,20,24
35:2,4 36:15,15
37:5,6,13,15 38:2
38:15,25 39:1,11,21
39:24 40:3,12,22
41:8,21 43:4,18
44:6,17 45:2 48:17
49:5,9,15,19 50:2
50:10,11,24 51:11
51:19 52:2,10 53:10
55:1 56:23 57:2,18

58:2,15,21,22 59:3
60:6,7,17,19 61:1,3
61:10,11,21,21 62:4
62:23 63:21 64:5
68:18,19 69:4,12,14
69:21 70:1,8,10
71:17 72:6,25 73:6
73:11,20 74:8,11,18
74:19 75:21,22 76:9
76:10 77:24 78:9,20
82:22 84:24 85:3,11
85:18 86:2,4,6,12
86:13,20,25 87:8,15
88:8,13,21 89:3,8,9
89:23 90:14,20
91:21 92:10,14 94:3
94:22,24 95:19,23
96:3 97:1,7,13
98:13 101:3,7,9
104:12,17 105:7,24
107:8,9,15,16,25
108:2,18,22 109:6,8
109:17,21,23,23
110:10,11,16,17,19
110:25 111:6,11
112:19 115:25
119:10 120:14,22
121:22 122:6,8,21
123:6,15,21 124:4,7
124:25 125:6
126:12,19 127:17
128:7,15,22 129:4
129:10,17 133:22
133:24 135:24
137:5,6,18,21 138:2
138:5,12,16 139:9
139:18,23 140:7,14
141:5,7 142:2,22
143:1,13,18,20,21
145:11 146:4,16
148:5
**license**
134:10
**licensure**
135:19
**life**

59:7 79:7 81:12
89:12
**lift**
122:6,9,16
**lifted**
22:12
**limit**
90:25
**line**
37:9 56:11 61:15
72:1 79:14 97:20
99:13 113:9 131:1
131:13 132:12
133:7
**lines**
121:12
**list**
55:13
**listed**
43:8 45:9 132:21
**listen**
118:11
**lists**
45:15
**litigation**
35:7 36:19 37:10
60:23 61:16 72:2
91:12 99:24 121:15
130:6 131:2,17
133:13 134:4
**little**
14:22 24:25 62:12,13
82:16 95:14 115:9
122:18 141:3
145:10
**live**
8:10 86:25 87:8,14
115:2
**lived**
87:2
**living**
8:18
**LLC**
56:7,24
**loads**
143:8

**Location**
2:16
**long**
11:10 34:20
**look**
12:7 33:23 35:10,13
38:8,9,10 44:20,24
53:5 62:14,15 69:20
93:5 105:2 115:19
126:11 142:20
**looked**
60:3 73:15
**looking**
18:7 40:25 55:9
**Lord**
38:16 67:10
**Loren**
70:1,6 71:8
**lost**
31:10
**lot**
79:7,15 81:3 132:19
**love**
38:15,16
**loving**
38:17
**LRF**
35:11 44:18 52:19
57:15,18 62:17
115:21
**LRL**
70:2
**Lumber**
113:5
**lunch**
80:13,14 81:4,6 83:8
**lunchtime**
80:12 81:2
**lungs**
78:24

_____
**M**
_____
**M**
2:8
**main**
148:1



maintain
124:14
maintaining
124:13
maintenance
81:24 120:6
major
18:3,10,21 54:24,25
majority
26:15
making
28:22 79:19 94:9
man
80:23 85:19 89:11
94:9
manhood
94:11
manual
93:6 101:18,23 102:1
102:16
Mark
21:24 35:1 36:1
137:15
marked
35:9,12 44:18 52:20
62:18 104:21,24
115:22 126:13
142:22
Martin
1:17 6:3 21:24 30:3,6
31:16,21 47:2,3,5,6
47:13 54:4,12,16
70:2,7 71:8 72:19
75:13 124:24
145:10 146:11
Martin's
23:24
Marvin
35:23 137:9
matter
5:25 16:1 78:14
117:19
matters
133:12
maze
140:24

meals
79:3 130:20
mean
11:16 12:10,22 13:4
16:10 25:3 36:6
39:19 45:12 48:6
53:20 55:15 56:2
57:18 59:17,23 63:3
89:23 92:17 93:24
97:3 108:13 109:9
112:22 114:13
116:10,17 122:16
130:16 137:5
143:13
means
39:23 40:23 48:8
51:13 64:4 68:13
116:13
meant
24:1 120:19
medical
38:1 108:17,20
medications
7:10
meet
92:17,19 116:4
meeting
15:9,14 21:11,15
44:18 45:13,16,21
45:22 46:3,8,11
47:10 52:20 53:21
62:18 63:1 115:22
117:3 126:13,19,20
135:3 142:22 143:1
143:4 144:25 145:3
meetings
15:4,6,17,20,23 16:3
16:14 20:22,23 21:2
25:14 44:7,12,14
47:20 50:11 54:3
62:9 137:22 138:6
Meghan
2:3 4:18
member
20:11 25:20 26:15
66:17 68:9 84:17

137:8 139:19
members
49:11,23,25 66:5,7
67:18 69:3 71:19
84:11
member's
38:20
memorialized
19:14 44:1
memory
99:3 127:23
men
33:12,22 95:8
Mendez
2:8 4:16,16,23 5:7,13
13:20 14:6 17:21
18:5 19:8,22 22:8
22:24 24:8,15 27:17
27:23 28:11,17
29:12,24 30:9,19
31:3,7,8,13,23 32:8
32:19 33:6 34:10
35:5 36:17 37:8,17
37:22 38:3 39:2,13
40:14 41:9,16,25
42:6,16,25 43:5,12
43:21 44:3,8,21
45:23 46:13 47:7,17
48:2,21 49:7 50:3
50:13,25 51:7,21
52:12,21,23,25 53:3
54:13,20 55:3,17
56:3,8,21 57:4,24
58:9,16 59:4 60:9
60:20 61:5,13,23
63:11,25 64:7,14,20
65:4,13,23 66:9,19
67:3,15 68:2,10,22
69:6,15 70:4,13,20
71:1,13,21,25 72:13
72:18 73:2,12,22
74:12 75:1,5,15
76:2,11,21 77:7,12
77:20 78:1 82:23
83:20 84:3,18,25
85:12 86:8,15,21

87:9,17 88:4,22
89:5,19,25 90:15,22
91:10,22 92:5,11,23
94:4 95:1 96:11
97:18 98:15 99:8,21
100:15 101:4,10,19
102:3,22,25 103:3,5
103:21 104:3,9,18
105:11,17 106:1,6
106:13,19 107:3,11
107:19 108:3,24
109:10,18,25
110:23 111:8,17,25
112:11,25 113:6,19
113:25 114:9,16,23
115:13 116:11,18
117:8,16 118:6,9,17
119:12 120:2,16
121:13,23 122:10
122:22 123:7,17
124:1,9,19 125:1,8
125:18,25 126:6
127:5,13,20 128:10
128:18,25 129:7,13
129:20 130:3,14,24
131:11,15 132:9,17
133:6,11,19,25
134:13 135:4,16,25
136:5,24 137:23
138:7,13,18,24
139:10 140:1,10,23
140:25 141:21
142:6 143:14
144:14 145:5,13
146:7,17,25 147:18
148:8,24 149:2,5
Mennonite
1:12,14 6:1,2 9:17,18
9:21,22 34:19
mental
37:6,12
mentioned
72:22 75:3 131:15
132:4 134:19
137:15
mentor



55:13 65:20,21 66:1 73:16,19 74:1 77:23 78:20 79:11,16 80:23 82:13 83:25 84:1,7,17,23,24 90:11 114:5,8 125:23

**mentors**
10:10,13,17,18,21 55:15 65:10 73:10 73:17 74:9 75:2,14 75:21 76:8 78:8 80:24 81:6,8 82:21 116:25 117:7 118:5 119:24,25 120:7,10 128:24 129:11,18 140:13,18 145:3

**mentor's**
85:11

**men's**
116:14

**Messianic**
1:12 6:1 9:17,21

**midday**
81:15

**MIDDLE**
1:2

**mid-afternoon**
81:17 82:2

**Mill**
32:2

**mind**
33:2 113:13 148:22

**miner**
108:9

**miners**
101:8 109:22

**minimal**
114:25

**minimum**
76:9,13,19,20,23,24 77:1,3 127:18,22

**ministry**
85:22 89:13

**minor**
89:22,22 90:7 119:8

119:16 127:2

**minors**
10:3 33:16 36:14 78:18 119:7,23 126:3 128:23 134:6 136:14,17

**minute**
131:16

**minutes**
8:4,6,7 44:18 45:2,16 45:20 46:3,11 47:4 47:11 52:20 53:10 62:18,23 69:21 80:13 82:4 104:4 115:22,25 126:13 126:19 142:22 145:4

**mirrors**
114:8

**mischaracterization**
59:4 73:13,23 74:14 74:14 75:17 95:2 103:22 110:1 112:12 113:7 115:13 123:18 129:21

**mischaracterizing**
97:19 99:10

**misleading**
143:17

**missing**
118:14

**mission**
1:12 6:1 9:17,18,21 9:23,25 10:23,24 11:1,2,5,10,13,18 11:20,23,25 12:2,5 12:12,20,21,24 13:1 13:7,10,11,16,24 14:2,4,8,12,23,24 15:4,13 16:6,14,18 17:4,7,10,16,18 18:2,15,17,23 19:3 19:7,11,18 20:9,12 20:15,23 21:1,2,5 21:11,14 22:1,4,7,9

22:18,20,22 23:4,6 23:10,13,15 24:20 27:6,9 34:6,6,8,13 34:14 41:15 43:11 43:19 44:1 48:20 49:3 50:9,23 51:17 51:18 52:9 53:24 54:19 55:1,16 57:3 67:25 68:7,18,20 70:19 71:6,12 75:24 85:10 86:19 89:17 106:4 122:4 123:16 123:21 137:7,8,12 139:9,21 148:6,11

**Mission's**
57:23

**misstating**
16:13

**MMM**
38:9 41:4 53:23,24 55:13,23 57:15 93:8

**MMM2023/7**
134:24

**model**
80:25

**moment**
117:14

**money**
11:3 23:4 95:21,23 96:7 120:23 121:3 123:5,16 124:4,7 128:8,15

**monies**
123:21

**month**
73:10,16,20 74:6,10 74:25 83:2 91:2 92:15 96:3 116:6 125:16,24 126:24 143:9 144:2

**monthly**
15:17 40:10,24 44:15 44:16 46:23 48:24 62:7,8,8,9 91:5 92:14

**months**

136:10

**moral**
80:25

**morning**
4:20 5:17 80:8 81:16 120:12

**motion**
94:16

**motivated**
79:22

**Mount**
2:4

**mouthing**
6:19

**move**
116:5

**moved**
57:14 64:4 116:25

**moving**
83:10

**mutual**
94:14

**mutually**
89:14 94:18 96:9

**mwynkoop@marg...**
2:7

---

### N

**name**
5:18 23:24 24:4,5 43:19 45:9,16 47:4 53:17 62:25

**named**
9:20 42:10

**names**
19:11 21:21,23 42:11 75:25

**Nathans**
6:4

**necessarily**
9:5 12:5 42:19 71:10 92:19

**necessities**
109:7,9,17

**need**
7:4 17:18 19:6 24:16



24:24 25:15 26:2 28:6 42:19 56:14,17 108:10 115:2 116:4 116:24 118:5
**needed** 18:19,19 21:7,9 24:4 34:5 57:23 70:23 111:4,11 125:16,24 145:23
**needs** 33:23,24 90:4
**negotiate** 29:7
**neighborhood** 95:25
**Nelson** 1:17 6:3 23:24 24:3 30:3,6,12 31:16,21 32:1 47:2,3,4,5,5,6 47:6,12,13 54:4,6,9 54:12,12,12,16 72:19 75:13 124:24 145:10 146:11,20
**never** 33:2 76:16 78:4 112:1 123:15
**new** 46:11
**newsletter** 58:5
**nice** 33:4 81:5
**nine** 82:17 83:13
**NJ** 2:4
**nodded** 26:1
**nodding** 6:20
**Nolt** 65:8
**nonprofit** 95:9
**non-emergency** 108:20

**non-profit** 123:11
**normal** 28:3 79:4 115:3 142:12
**normally** 83:11
**note** 91:11 102:22 132:11 142:16
**notified** 90:6
**November** 62:24 150:10
**nudge** 79:22
**number** 11:8 18:24 96:4 98:25 102:12
**NW** 2:16

---

**O**

**object** 5:10 17:21 18:5 19:8 19:22 22:8,24 24:8 27:17 29:12 30:19 31:13 34:10 35:5 36:17 38:4 39:2,13 40:14 41:9,16 42:6 42:16,25 43:12 44:3 45:23 47:7,17 48:21 49:7 50:4,25 51:7 51:21 52:12 54:13 54:20 55:17 56:3,9 57:4,24 60:9 61:5 63:11,25 64:7,14,20 65:4,23 66:9,19 67:3,15 68:2,23 72:1 73:2,12,22 74:12 75:1 76:2,11 76:21 78:1 82:23 83:20 84:3,18,25 85:12 86:9,16 87:9 87:17 88:5 89:25 90:22 92:5,11 94:4

95:1 96:11 97:18 98:15 99:21 100:15 101:10,19 103:21 104:9 105:11,18 106:7 107:11,20 108:24 112:11,25 113:7,19 114:9,16 119:12 120:2,16 121:23 123:7 127:20 129:20 130:3 133:25 137:23 139:10 140:10 144:24 145:2,13
**objected** 134:3
**objection** 13:20 14:6 22:25 24:15 27:23,24 28:11,17 29:24 30:1 30:9,25 31:23 32:8 32:19 37:8,17,22 38:3 41:25 43:5,22 44:8 46:13 48:2 50:13 55:4 58:9,16 59:4 60:20 61:13,23 65:14 68:11,23 69:6 69:15 70:4,13,20 71:1,13,25 72:13,18 75:15 77:7,12,20 86:8,15,21 88:4,22 89:5,19 90:15 91:10 91:22 92:23 99:8,9 101:4 102:3 104:18 105:17 106:1,6,13 106:19 107:3,19 108:4 109:10,18,25 109:25 110:1,23 111:8,17,25 113:6 114:23 115:13 116:11,18 117:8 118:17 121:13 122:10,22 123:17 124:1,9,19 125:1,8 125:18,25 126:6 127:5,13,13 128:10

128:18,25,25 129:7 129:13 130:14,24 130:25 131:11 134:13 135:4,16 136:5 138:7,13,18 138:18,24 140:1 141:21 142:6 143:14 144:14,15 145:5 146:7,17,25 147:18 148:8
**objections** 99:22 135:25
**obligation** 28:8 74:19 92:17
**obligations** 142:4,5,8
**observing** 5:2
**obtains** 124:4
**occasion** 122:13
**occasions** 120:11 130:19
**occupational** 130:1
**occur** 44:14
**October** 53:10 57:2 126:20
**offered** 74:21 126:4 143:19
**offering** 22:14,15,16 122:6,9 122:16 134:23
**offerings** 22:12,20,23 121:22
**offhand** 141:12
**office** 2:4,9 5:1,6 6:5 102:20
**officers** 26:15
**official** 47:20,21 137:18



MAGNA
LEGAL SERVICES

**offset**
93:21 101:8
**offsetting**
98:2
**oh**
28:6 33:2 119:24
139:19
**okay**
4:8,22 5:12,14 6:9,11
6:13,24 7:4,13,23
8:2,8,10,12,14,18
8:20,22,24 9:3,6,8
9:10,16,18,25 10:3
10:4,6,9,10,15,20
10:23 11:1,5,8,15
12:6,15,19,22 13:1
13:14 14:11,20 15:6
15:13,16,20,23 16:6
16:22 17:3,6,9,14
17:18 18:1,9,25
19:20 20:6,11,20
21:14,17,19,25 22:4
22:6,22 23:21 24:7
24:24 25:8,13,25
26:22 27:16 28:9,15
29:21 30:23 31:5,20
32:11,14 33:2,18
34:17,23 35:1,4,17
35:19 36:14,24 38:8
38:14 39:11 40:2,25
41:7,14,21 42:14,22
43:3,10,25 45:6,12
45:15 46:6,7,17
47:3,15 48:6,9,16
49:5,25 50:21 51:17
52:6,25 53:7,12,14
53:17 54:1,5,7,12
54:18,24 55:7,23
57:12,20 58:7,20
61:20 62:4,22 63:3
63:5,9 64:4 65:20
69:2,24,25 70:10
71:4,9,17,22 72:16
75:20,24 77:23 78:7
78:11,17 79:5 83:16
83:25 84:13,16 85:9

85:17 87:13 88:2,11
88:16 90:11,19 92:9
93:5,17,24 95:14
96:5,9 97:10,13,21
98:5 99:1 102:21
103:3 104:6,21,25
105:6 106:17 107:1
109:6 110:9,19
114:4 116:2 117:6
117:21,22 118:18
118:22 119:4,10
120:13 121:1,5,8,11
122:8,20 126:18
127:10 128:22
129:25 132:9
133:17,24 134:22
135:14 136:3,20
137:12 140:13,21
140:21 141:2,19
143:6 144:19 147:9
147:15 148:3,14
149:1
**omission**
46:2
**once**
15:19 31:13 37:17
69:15 92:23 101:10
108:3 116:6 132:4
**ones**
115:11
**ongoing**
140:4
**open**
17:8,10,12,15 20:22
35:4 55:23 59:7
81:3 82:14 140:22
**opened**
81:10
**operated**
119:1
**operating**
35:12,16 36:12 93:6
97:24 98:8 99:4,7
99:20 100:6 101:1
101:18 102:16
104:8 136:4

**operation**
46:21
**operations**
51:10
**opinion**
68:14
**opportunity**
14:2,8 16:8,9 35:13
38:10 48:11 62:15
67:10 68:15 82:11
94:15 105:2 142:19
**opposite**
139:5
**options**
31:17
**order**
18:7 126:23,24
**organization**
29:11 58:5 95:10
123:12
**organizational**
28:18
**organize**
25:14 64:10
**organized**
12:21,22,23 33:11
34:4,21
**organizer**
25:21
**original**
46:12,15
**originally**
27:4
**other's**
26:21
**outside**
23:25 35:6 36:18
37:9 60:22 72:2
87:22 91:11 130:5
131:1,17,21 132:20
132:24 133:13
134:3 142:4,12
**overnight**
134:7
**overrule**
14:13

**oversea**
51:3,5
**oversee**
51:1,13
**oversees**
50:23
**overtime**
77:10,25
**owner**
24:5,14
**owns**
23:7,21
**oxygen**
78:23
**o'clock**
82:2,17 83:14

---

**P**

**PA**
2:4,9
**page**
3:2 10:16,20 93:8,14
134:24,25
**paid**
40:24 63:10,10 70:11
78:8 121:3 127:18
144:12,16
**palettes**
81:21,22
**pallet**
31:12 95:24 96:1,2
116:22 126:23
143:8,8,12 144:1,5
144:13 147:13,16
**pallets**
29:18,19,23 30:4,13
30:14 80:7 93:19,25
94:21,21,23 95:16
95:17,19,21 96:2,5
96:6 97:14 100:23
101:9 112:16,17
114:15,21 115:4
119:8,17 120:9,15
120:22,24 124:4
125:16,23 126:4
128:9,16,24 129:5



129:11 130:2
143:18,19,20
**paragraph**
38:14 41:1 42:14
45:15 53:18 54:8,18
55:8,8 57:13 100:12
116:3,3,21 126:22
143:7,23
**Pardon**
26:19
**parent**
43:17,20 87:14 91:20
98:6
**parental**
85:20 88:25
**parents**
33:13,24 34:1 37:1
63:10 65:3 85:21
87:21 89:13,13 90:5
90:8,9,16,20 91:2,5
91:9,16 92:9,16
98:9,9 100:14 101:2
102:1 108:10,10,16
108:21,21 109:4,15
110:12,15 111:12
111:14,22 112:14
113:3,15 128:15
141:24
**parent's**
87:24 89:24
**part**
32:14 75:8,10 79:13
80:2 83:7,8 95:16
98:10,21,23 99:2,3
99:5 103:9 114:25
124:21 147:14
**participants**
144:23
**participate**
29:4 44:12 87:15
95:8 130:1 141:20
143:3
**participating**
82:21,25 83:17
**participation**
24:19 34:23

**particular**
18:18 21:6,12 49:22
50:1 59:19 61:16
65:21 66:17 132:12
132:12 146:15
**Particularly**
59:6 119:7
**particulars**
29:15
**parties**
150:6,7
**partway**
103:10
**pass**
19:10
**passages**
60:3
**passed**
23:12 122:18
**pasture**
80:4
**pay**
63:23 69:13 70:1,17
92:9 94:1,2
**paying**
124:17,25
**payment**
63:14 64:5
**payments**
63:6 145:19
**pedal**
94:13,15
**pedaling**
95:8
**pending**
46:5 131:22 132:10
133:8 140:15
**Pennsylvania**
6:1 8:11 9:17,21 11:6
23:22 24:21 34:19
76:24 77:4,11
121:20 134:8
**PENNYSLVANIA**
1:2
**PENNYSYLVANIA**
1:13

**people**
6:25 13:1 21:21
38:15 40:2 59:13
82:3 146:12
**perform**
71:17 72:10 80:1
119:25
**performed**
72:16 94:12 129:18
**performing**
113:17
**period**
60:22 72:8 91:8,19
99:23,25
**perjury**
7:17
**permission**
13:19 18:16,19 19:7
57:15,21 58:3 61:25
119:9
**permits**
61:21
**person**
14:5 41:22 43:19
68:20
**personal**
21:4 59:1 138:1
**personally**
21:3 49:2 59:10 62:4
102:15 140:17
**personnel**
18:3,7,8 39:8,9,12
70:8 143:10
**person's**
43:18
**pertain**
20:25
**pertains**
24:9
**pews**
122:17
**Philadelphia**
2:4,9
**Phillip**
148:1,6
**Phone**

2:5,10,15
**phonetic**
4:25 70:2 105:8
139:16
**phrase**
47:25 50:19 122:5
**phrasing**
53:23 69:3 146:13
**physical**
96:18 111:4
**pick**
59:18
**picked**
97:2,5
**picking**
79:7
**picture**
17:16,19
**pieces**
119:2
**Pine**
9:11
**pivot**
18:1
**place**
40:7 43:24 47:22
49:24 58:4 69:17
70:17 80:22,24 85:9
90:5 91:5 92:4
102:6 107:4 136:4
140:22
**plaintiff**
4:11,21 6:12
**Plaintiffs**
1:8 2:12
**planning**
126:25
**played**
82:12
**please**
4:4 6:20,24 7:4 13:10
27:18,24 35:10
38:10 55:11 57:13
57:13 69:21,23
95:14 134:23 143:7
**point**


MAGNA
LEGAL SERVICES

7:4 18:24 33:5
56:22 57:1 81:16
117:7 118:15 120:5
134:17 136:17
**points**
72:5
**policy**
18:2,12 19:3 20:24
35:12,16 36:12 44:1
92:3 97:24,25 98:8
98:13 99:7,16,20
100:6,9 101:1,18
102:16 104:7,8,12
119:10,22 134:23
135:3 136:4,9
**position**
17:3 25:10 26:16
40:7,8,9,10,11 41:5
41:14 42:4,5,9 43:3
52:3 58:20,21 67:2
67:6
**positions**
11:17 20:14,20 26:6
40:4 42:9,9 43:7
**possibility**
74:20 119:21
**possible**
80:15 103:16,24
**possibly**
51:15 58:23 84:10
89:13 119:2 130:21
**potential**
58:14 74:24 75:14
86:7,13 131:19
**potentially**
56:9 117:15 126:4
**poultry**
32:3
**power**
104:23 105:7 107:10
119:6,8,11,16
**powers**
107:17 145:11,14
**practice**
19:10,14,17,21,23
45:20,24 76:6 87:7

87:10 119:15
**pray**
78:25 82:15
**precedence**
74:5
**prep**
7:23
**preparation**
35:2 45:7 70:7
135:10
**prepare**
142:18
**prepared**
70:17
**preparing**
96:21
**presence**
4:25 131:20
**present**
16:3,14,18 17:6
53:20 62:25 63:3
91:12 130:6 131:2
131:17 143:3
**presently**
134:9
**president**
20:15 25:20
**pressure**
28:9,13 92:16
**pretty**
83:9
**prevent**
7:11
**previous**
43:21 45:16,21 65:13
68:10,22
**previously**
51:15 72:22 75:12
123:1,20 137:15
146:12 148:20
**primary**
75:13,20
**prior**
8:2 37:13 38:21
53:15 60:18 73:13
74:15 80:12 134:8

**private**
29:8 111:24 112:9
113:17
**privilege**
56:11 60:12 105:19
134:2 145:18
**privileged**
56:10,17 108:6 135:6
140:3
**privileges**
90:25
**probably**
7:5 44:22 73:25 82:8
89:1 90:3 95:5
**problem**
5:23 102:6 103:5
**procedure**
72:5 99:4
**proceeds**
123:12
**process**
13:21 26:12 66:24
67:1 74:3 85:18
135:18 136:18
**processes**
36:4,6
**produce**
8:23 84:10
**produced**
5:9
**producing**
113:16
**productive**
93:20,20
**Productivity**
94:9
**profess**
76:25
**professional**
37:7,12
**professionals**
38:1
**profit**
94:23 95:3,5,10,12
123:4,10
**profitable**

116:4,9,17
**profits**
123:8
**program**
29:5 46:21 59:2
82:22,25 83:7,17
87:15 93:1,21 95:10
124:15,17 136:14
136:15 142:12
**progress**
4:2 88:25 89:9,10
**project**
32:3 61:25
**projects**
81:21,23 82:12
147:13
**promise**
145:9
**prompt**
80:15
**pronounce**
5:17
**propel**
94:15
**properly**
148:18
**property**
12:12 23:7,11,19
**prospective**
19:11 68:8 72:11
86:20
**protected**
60:11
**protocol**
85:9
**provide**
13:15 14:8 22:20
24:11 30:13 80:10
80:25 110:13,15,20
110:25 111:7 114:1
115:3 117:12
118:20
**provided**
99:7 100:13 101:1
109:7,16 142:16
150:4



**provides**
81:4
**providing**
46:9 99:13 111:23
**psychiatrist**
37:16
**psychologists**
37:21
**public**
20:23
**pull**
79:13
**Pulled**
97:6
**pulling**
27:2 96:16
**punishments**
132:15,17 133:3
**purchased**
34:5
**purpose**
25:5 48:12,14
**push**
132:9
**put**
5:7 24:5 30:1 38:16
51:6 79:11,14 89:12
92:16 99:22 122:19
130:13,18,23
132:11
**putting**
124:12
**P-R-O-C-E-ED-I-...**
4:1

**Q**

**qualifications**
38:19,21
**quarter**
76:25
**question**
7:6,7 12:11 13:6
14:11,12,17 16:11
17:22 18:21 25:2,3
27:17 28:6,12 29:9
39:16 41:10 42:17

43:15 47:8 49:14
50:4,15 56:4,19
57:5 64:21 66:10,20
70:22 75:16 76:3,12
76:22 80:23 82:24
83:21,22 84:19
90:23 91:15 92:6,12
95:5 96:12 98:16
99:9,12 100:4,18
102:10,11 103:9
104:6,10 106:20,22
113:10,20,23
114:10,17 117:25
118:3,4,8 120:13
121:25 123:19
129:23 130:4,4,6,9
134:2 137:24
139:14 140:5
145:16 146:18
147:20 148:17
**questioning**
5:8 37:9 56:11 61:15
72:1 113:9 131:1,13
131:19,23 132:13
132:19 133:7,12
**questions**
5:10 6:12,13 7:11
29:2 50:21 56:12
57:11 99:13 130:5
131:13 132:14,23
132:24 136:20
141:3 145:14
148:23,25
**question-by-questi...**
130:7
**quick**
102:22 104:3 118:9
**quickly**
4:25 5:7
**quite**
81:9,17
**quota**
125:15,19
**quotas**
125:23

**R**

**raise**
4:3
**rang**
82:5
**range**
82:2
**ranges**
88:12
**ranking**
25:20
**rare**
87:6 120:11
**rate**
69:13 78:8
**rationale**
7:24
**reach**
85:22
**reaches**
134:2
**read**
8:4,6 38:14,15,22
45:17,17,21 46:18
47:25 50:21 55:12
55:13,25 57:14,16
69:23 78:25 82:15
93:11,12,14,15,18
93:22 116:7 117:1
118:1,6 126:25
143:10 144:3
**reading**
55:11 71:5 82:11
126:22 143:7
**ready**
5:12 82:6 88:21 89:4
89:18
**real**
116:24 123:22
**really**
14:11 24:1,5 28:5
83:7 95:9
**reason**
7:19 15:25 62:9
87:21 94:7

**reasonable**
132:19
**reasons**
62:10
**recall**
13:13 15:12 16:24
21:4 23:14 27:11
28:13 29:15 30:3
32:1 33:1,21 34:21
35:23,24 36:9 37:11
43:7,23 45:8 47:12
52:5,6,15 53:15,16
54:6 62:3 65:7 66:1
67:18 68:5 75:12
87:20 88:14 91:25
102:5 107:13
109:12,15 119:21
127:10,15 130:19
131:3 135:21,23
142:10 144:24
145:7 148:2,11,16
**recalling**
133:4
**receive**
22:1 41:7 42:5 69:4,5
120:23 125:5
**received**
40:22 52:2 103:17,19
127:11 141:4,7
**receives**
74:3,4
**receiving**
74:10,25 76:9
**recognize**
53:7
**recollection**
23:18 107:6
**record**
4:15,23 5:8 30:2 41:4
75:2 78:15 95:11
99:22 102:22 104:5
117:16,20 130:25
142:19 150:4
**recorded**
40:11
**Recording**



4:2 149:6
**records**
128:23 129:5
**recruit**
58:14,17 86:7
**recruiting**
86:7,9
**reduced**
144:2,19
**refer**
9:23 10:3,6,10,12,21
76:19 82:3 95:5
**reference**
47:6,6
**referred**
49:21,22
**referring**
9:16 34:18 47:13
54:18 63:6 84:13
98:23 118:3 122:24
144:8
**reflect**
141:18
**reflecting**
56:22
**reframe**
140:5
**refresher**
80:8
**refused**
130:1
**regarding**
21:25 38:8 63:6
64:12 65:10 132:15
132:17
**regards**
133:2 140:7
**register**
24:21
**registered**
11:6 23:22 76:16
**regrouping**
82:16
**regular**
40:24 79:9 141:17
**reimburse**

23:10
**reimbursed**
23:15 51:19
**reimbursement**
23:13,18 123:20,22
123:25 128:1
**reiterate**
74:16
**relate**
71:8
**related**
8:4 15:21 29:16
46:21 51:14 66:2
119:8
**relates**
40:17 86:22
**relationship**
55:24 84:7 94:14
96:15
**relationships**
38:21 82:10
**relative**
150:5,7
**relevant**
62:11 121:15 131:25
132:7
**relief**
87:22
**remainder**
80:8
**remained**
63:23
**remedy**
85:24
**remember**
6:18 15:3,10 31:20
130:9 148:20,21
**remembered**
46:9
**remind**
132:1
**remove**
136:14
**renew**
24:15 29:24 30:9
37:8,22 38:3 41:25

43:5,21 44:8 50:13
55:3 58:9,16 60:20
61:13,23 65:13
68:10,22 69:6,15
70:13,20 71:13,25
77:7 86:8,15,21
88:4,22 89:5,19
91:10,22 92:23
105:17 106:1,6
107:19 108:3
111:25 113:6
128:10 130:24
**renewed**
31:23 72:13
**renewing**
37:17
**repeat**
113:10,23 117:25
**rephrase**
13:10 18:15 24:19
27:18 100:4
**replying**
110:8
**report**
45:17 46:18,19 47:25
48:7,15 54:2,3,8
57:15,22 58:3,7,11
58:14 89:8
**reporter**
4:3,6,13,22 6:14,19
26:1,4 78:13 118:8
118:10,13,18
**reports**
15:21,24 17:6 46:22
46:24 47:1,9,16,20
48:10,13,20,25 49:2
123:2
**reprimand**
84:2,17,20
**request**
65:22 66:8 136:15
**requesting**
33:13
**requests**
33:23 87:20
**require**

5:11 88:8
**required**
70:7 75:10 134:7
**requirements**
61:2 134:8 140:8
142:3
**requires**
101:20
**reserving**
5:10
**Resetting**
148:14
**reside**
75:21 92:10
**resided**
10:4 88:12 108:1
**resident**
37:6 78:21 79:11,16
81:1 82:14 86:4
87:3,7 88:2,17,20
88:25,25 89:4,10,17
90:11,13 91:19
111:4 114:8,14
125:15,15 128:22
129:25 130:1,23
141:6,10,19
**residents**
10:4,6,19 34:22
37:12 49:19 58:15
59:11,14,19 74:24
75:3 79:6 81:9
85:17 86:7,13,20,25
87:25 88:8,12 90:19
91:8 92:10 93:25
94:20,25 95:15 96:5
96:24 97:1 98:13
101:2 102:2,16
103:17,19 108:1,18
109:7 110:9,20
111:1 113:3,15
114:21 115:11,16
116:25 117:7 118:5
118:11,15,25 119:1
119:6,19 125:5
126:3 127:2,11,17
128:4,8,16 129:5,18



130:13 131:8 132:8 140:14,18 141:4,13 141:16 145:3 147:15
**residing** 109:17 110:11
**respect** 47:9
**respond** 67:9
**responding** 96:6 100:2
**response** 5:11 25:24 28:18 29:13,25 30:11,20 31:15,24 32:9 34:11 36:18 39:14 41:17 42:2 43:13 44:4 48:22 49:8 50:5 51:2,22 52:13 54:21 55:18 56:4 57:6,25 58:17 60:10,21 61:6 61:14 63:12 64:8 65:5 67:10 68:3 70:14 73:3 74:13 76:4,13 78:2 85:13 86:22 88:6 94:5 99:14 101:11 103:15 106:8 107:12 108:4 109:1 109:11 111:18 119:13 120:3,17 121:14 122:11 124:10 125:9,20 127:21 134:1 135:5 139:11 140:2 142:7 143:15 148:9
**responses** 81:13 102:12
**responsibilities** 28:15 59:2 79:8,15 80:20 107:24 145:17
**responsibility** 26:25 27:1 28:21 51:11 58:23,24

59:20,21 64:25 75:13,21 84:8 108:15,19 145:21 146:15
**responsible** 29:3 90:6,7 108:17 108:21,22,23 109:4 146:14
**restate** 9:19 16:11 43:15
**restricted** 130:16
**restrictive** 130:13
**restroom** 80:10 104:4
**restructuring** 55:23
**results** 84:10
**resuming** 81:21
**revenue** 124:3
**reverse** 18:7
**review** 8:2,8 13:21
**reviewed** 45:6 53:14
**reviewing** 123:1
**revised** 100:13,25 101:18 104:14
**revising** 101:23,25
**revision** 102:5
**revisions** 104:16
**reward** 96:20 126:24 127:8 127:11
**re-answer** 28:6

**rhythm** 80:16
**rice** 130:18,21,23 131:9
**Ridge** 1:16 6:2 7:25 10:4,10 11:25 12:3,13,16,20 13:7,11,14,18,22,25 14:4,14,18 15:1,22 15:24 16:1,4,7,12 16:15,19,23 17:1,11 17:19 18:2,16,22 19:5,18 20:3 23:3,7 23:9,13,15,22 24:4 24:21,25 25:4,6,8 25:10 26:7,11,13 27:7,10,12,13,22 28:16,21 29:1,3,7,9 29:10,22 30:8,16 31:11,17,22 32:6,7 32:21,24 33:10,10 33:19 34:4,20,24 35:2,4 36:15,15 37:5,6,13,15 38:2 38:15,25 39:1,11,21 39:24 40:3,12,22 41:8,21 43:4,18 44:6,17 45:2 48:17 49:5,10,15,19 50:2 50:10,12,24 51:11 51:20 52:2,10 53:10 55:1 56:24 57:2,18 58:2,15,21,22 59:3 60:6,8,17,19 61:1,3 61:10,11,21,22 62:4 62:23 63:21 64:5 68:18,19 69:4,12,14 70:1,8,10 71:17 72:6 73:6,11,20 74:8,11,19,19 75:22 75:22 76:9,10 77:24 78:9,20 84:24 85:3 85:11,18 86:2,4,6 86:12,13,20,25 87:8 87:15 88:8,13,21 89:3,8,9,23 90:14

90:21 91:21 92:10 92:14 94:3,22,24 95:19,23 96:3 97:1 97:7,13 98:14 101:3 101:7,9 104:12,17 105:7,24 107:8,9,15 107:16,25 108:2,18 108:22 109:6,8,17 109:23,23 110:10 110:11,17,19,25 111:6,11 112:19 115:25 119:10 120:14,22 121:22 122:6,8,21 123:6,15 123:21 124:4,7,25 125:6 126:13,19 127:18 128:8,15,23 129:4,10,17 133:22 133:24 135:24 137:5,6,19,21 138:2 138:5,12,16 139:9 139:18,23 140:7,14 141:5,7 142:2,22 143:1,13,18,21 145:11 146:4,16 148:5
**Ridge's** 29:5 82:22
**riding** 94:16
**right** 5:7,10 6:18 7:10,19 9:1 10:7 11:10 16:18 33:7,9 41:1 46:8 49:15 53:23 55:13 57:18 62:15 66:11 78:11 79:12 83:8 94:19 95:17,21 96:7 97:5,14,17 98:21 100:21 103:7 103:9 104:14 107:5 110:21 113:13 114:5 117:4 123:2 124:5 133:19 139:5 139:5 147:8 148:23 149:3



rights
134:19 135:2
road
90:5
role
13:9 19:3 138:12,14
138:21 139:2,18,20
139:21
roles
138:23 139:4
rotate
67:19
rows
81:10
rule
19:25
rules
18:18
run
61:21
rung
80:14
runs
20:9
Ryan
5:1

**S**

s
150:11
salaried
40:12
salaries
40:22 124:18
salary
40:10,23 41:5 42:5,7
sale
23:19
sat
81:9 91:6
Saturday
115:7 120:11
Saturdays
115:12 116:4,6 144:2
144:6,13
save

9:22 30:25
sawmill
116:23 118:3,25
119:1,3
saying
13:24 14:1 36:8,11
40:13 59:1 74:25
94:19 98:12 99:6,24
100:12 103:11,13
103:16 110:6 112:6
112:7,8,9 115:12
117:24 118:19
123:16,25 132:3,3
132:16 133:6,7,15
146:6
says
41:2 42:15 45:15,16
53:17 54:9 55:11,12
57:13 64:4 70:1
71:5 116:3,22
126:22,23 143:8
144:1,19
schedule
64:6 79:9 80:15,19
scheduled
147:21
scheduler
66:18
scheduling
66:2
school
8:14 141:8,8
schooling
141:7,7,11,14,15,17
141:18,20
scope
35:6 36:19 37:9 72:2
91:12 130:6 131:1
131:17,21 132:20
132:25 133:13
scriptural
59:25
scriptures
59:8
second
62:12

secretary
1:4 5:25 20:15,18,18
21:18 26:8,8 35:9
38:9 44:16 52:18
62:14 69:20 93:5
104:22 115:19
126:10 134:22
142:15
Secretary's
35:11 44:17 52:19
62:17 104:23
115:21 126:12
142:21
section
38:9,12 55:8,8,23
63:5,7 69:22 71:6
93:12,12,15 98:2
100:12,21,24 116:2
116:3 126:21 143:6
144:1
secure
111:11
secured
61:24
see
22:4 28:21 41:2
46:17 53:23 54:9
63:6 71:11 79:9
94:13 95:10 97:16
97:21 107:17 123:4
seed
8:23
seeing
123:9
seek
18:22 67:7 79:6
85:21,25
seeking
24:9 28:18 29:25
30:10 36:18 41:17
42:1 43:13 44:4
48:22 57:14,21,25
58:3 60:21 61:7,14
63:12 64:8 65:5
76:3,12 77:13 78:2
85:13 87:21 94:5

101:11 106:7 108:4
127:21 135:19
142:7
seen
20:25 34:5 35:17
45:4 53:12 62:20
105:4 115:20
126:16
sees
89:8
selected
41:22 68:18
selecting
29:4 59:25 75:14,21
selection
68:8
sell
96:6,25 97:1,3,7,11
97:13 120:22
selling
94:23,24 112:22
120:15 124:4
send
49:2 87:24 92:19
102:25
sense
89:11 102:12,14,14
116:17 132:5
sent
103:1 123:16,21
sentence
71:6 103:21
separate
49:13 56:23
September
15:9 115:25
serve
12:25 13:5 14:3,23
43:10 66:14,14 67:8
67:10 74:1 138:16
139:8
served
20:11 140:18
service
38:17 67:6
services



84:24 111:23 113:17 134:15
**serving** 13:22 39:20 63:16 73:20
**set** 34:6,8,13 60:8 67:18 128:8,9 136:8
**setting** 37:1 60:19 61:3,11
**seven** 76:24
**shaking** 6:21
**share** 15:21,23
**shared** 48:20,25 65:17 74:20
**sharing** 81:5 89:8
**shed** 80:3
**shelter** 109:9 111:1
**shipped** 121:5,8,11
**shop** 80:6 81:21 119:16 144:2,5,13
**shortage** 117:6 118:11,12,13 118:15
**show** 35:9 44:16 52:18 54:1 91:3 101:17 104:21 142:15
**showing** 36:12
**shown** 103:18
**side** 4:24 5:4 40:18
**sign** 85:10 145:18
**significant** 25:17

**silly** 120:13
**similar** 20:3 58:4 96:16
**simple** 63:15 74:17 122:18
**simply** 25:21 73:7 80:24 87:3 143:17 145:24
**sincerely** 38:16
**sing** 78:25
**singular** 47:4
**sir** 4:3 99:19
**sit** 82:7,13
**site** 12:8,10 84:8
**sitting** 81:2
**situation** 48:17 50:7 65:11 108:20 117:15
**six** 116:25
**size** 81:3 144:21
**skills** 81:12 94:20
**slightly** 18:1
**small** 33:22 80:3 81:9 83:8
**smaller** 144:22
**smith.john@dol.gov** 2:20
**snack** 80:9
**Snyder** 29:9,16 113:4,13,17
**social** 61:11 82:10

**society** 94:10
**sold** 95:17,19,21 96:3 111:16 112:17 143:21
**solely** 49:18 51:11
**solicit** 121:22,24
**solution** 33:25
**somebody** 46:9 105:1
**somewhat** 40:6 42:11 92:13
**son** 86:3 91:6
**sorry** 5:21 12:9 25:22,25 27:13,18,23 29:14 39:7 41:10 44:22 50:3 52:24 55:3 64:10 66:23 68:4 74:14 75:4 88:11 95:3 96:25 98:24 99:8 103:13 112:9 117:14,22 118:1,2 118:22 119:24 126:3 142:9 146:23
**sort** 50:22 62:13 78:12
**sought** 33:25 71:6 136:16
**space** 148:17
**Spadel** 4:25
**speak** 17:24 40:18 60:7,16 60:18 61:11 65:21 91:9 94:13 136:21 141:3
**speakers** 116:5
**speaking**

14:25 74:9 83:6 99:23 131:5
**speaks** 39:3 42:17 48:3 54:14 55:19 64:1 70:5 116:12 117:9 127:6
**special** 16:1
**specific** 13:13 18:11 19:19 33:12 35:24 39:17 50:22 52:15 59:20 68:17 98:24 99:23 112:19 132:20 133:5,15
**specifically** 33:20 45:8 53:16 109:12 131:24
**specifics** 36:9 115:8
**specified** 147:10
**specify** 114:13
**speculate** 65:24 68:24 84:4 85:1 87:18 90:1 91:23 98:17 99:11 101:20 108:25 137:25 145:6 147:19
**spend** 75:22 82:21 114:14
**spent** 128:24
**spiritual** 33:13 58:25 59:6
**spoke** 66:4
**spoken** 19:17 30:4
**stacked** 119:5
**staff** 37:16 38:1,4,8,13,19



38:25,25 39:4,7
63:6 70:2
**staffed**
38:15
**standard**
20:24 35:12,16 73:17
87:7,10 97:24 98:7
99:4,7,20 100:6
101:1 119:15 136:9
**Standards**
61:3 139:24 140:9
**standing**
19:25 30:25
**start**
10:23 34:15 97:4
**started**
52:1 98:20
**state**
4:14,24 11:6 23:23
24:22 121:11
**statement**
103:11
**States**
1:1,5 2:18 77:4,11
**stay**
37:13 86:13 94:2,2
**stayed**
88:18 98:13 101:2
**staying**
101:9 109:8,23
**steady**
66:15
**steer**
80:3
**stepped**
144:8
**steps**
18:14,15 24:7 61:2
107:9,17 134:9
139:24 140:8
**stick**
113:12
**sticking**
96:18
**stop**
56:8 80:4 90:13

**stopped**
149:6
**strike**
12:11 13:10 20:8
21:25 33:3 37:5
51:17 54:25 57:21
73:9 96:25 98:7
101:16 119:24
124:3
**strong**
93:19
**structure**
80:10,18,25 89:11
**structuring**
94:10
**studied**
60:2
**study**
81:11
**stuff**
14:21 20:15 31:1
132:6
**SU**
1:4
**subcommittee**
49:6,18
**submit**
43:18 104:16
**submitted**
55:13
**subsequent**
45:21
**subsequently**
60:3
**subtitles**
42:11
**suggest**
95:11
**suggested**
92:14
**suited**
56:12
**summer**
79:25
**Sunday**
115:1,5

**supervise**
51:5 146:13
**supervisor**
42:4,5,8,12,19,20,23
43:1,4 64:13,15
84:8,13
**supper**
82:1,3,3,4,9,10
**supply**
79:20
**support**
22:17 81:1 92:15
93:1
**supporting**
124:14,17
**supposed**
24:14 92:22
**sure**
6:20 9:20 10:16 13:3
33:6 35:24 43:17
45:5 49:24 56:14
66:15 68:12 75:5
79:19,24 80:5 81:17
91:14 94:18 100:1
112:14,17 113:12
120:22 126:17
134:14 136:8,24
139:1,7 140:23,25
147:2
**Surely**
85:19
**swear**
4:7 6:15
**sworn**
4:12
**symbiotic**
94:14,18 96:9,15

---
**T**
---

**table**
81:3,9 96:22 124:12
**tables**
81:10
**take**
7:5,6,8 18:14,15
30:24 33:5 35:10

43:24 44:20 61:2
62:14 64:19 78:22
83:2,3 90:13 104:3
106:21 107:9,17
117:16 126:5
136:21 143:19
**taken**
24:7 34:1 86:3 140:8
**takes**
79:4 82:9
**talk**
6:24,25 7:1 33:9
82:15 85:17
**talked**
123:1,20 145:10
146:12
**talking**
6:25 10:1,7,12,15,21
47:10 54:8,10 75:2
100:20,25 132:18
**talks**
116:7
**targeted**
56:12
**tasks**
129:19
**taught**
59:18
**teach**
59:7,10,13 79:6
**teacher**
63:23
**teaching**
38:18 58:25 70:12
**team**
79:16
**technical**
39:5 40:18 47:21
68:13 74:1 95:4
**technicality**
92:14 147:3
**technically**
40:18 83:6
**tell**
6:15 10:16 15:11
21:14,17 55:12



| | | | |
|---|---|---|---|
| 56:14 57:13 93:17 126:22 143:7 | **testifying** 8:3 53:15 | **three-year** 102:6 | 122:16 147:16 148:15 |
| **telling** 112:19 | **testimony** 7:20 73:13,23 74:15 74:23 97:19,23 99:10 103:22 110:1 123:18 | **threshold** 19:1 | **token** 63:15 72:23 73:1,15 73:17 74:4,4,18 |
| **tended** 114:21 | | **till** 82:4 | **told** 56:15 74:9 109:7,13 109:16 111:22 112:2,8 |
| **tender** 38:17 | **Thank** 4:13 26:4 75:6 117:18,22 118:22 | **time** 9:22 11:3 15:7,12,13 30:24 41:8 51:19 56:7,13 57:2 60:22 70:12 72:7 73:11,16 74:10,17 75:22 76:10 77:19 78:8 79:25 81:5 82:1,3,6 82:9,9,20 83:11 85:6,11 91:19 94:21 98:11 99:4,23,25 107:5 110:21 112:3 113:2 116:24 117:7 117:17 118:16 122:3,5 125:6 130:22 132:13 133:12 136:8 140:22 142:2 143:9 | |
| **tending** 80:2 93:18,25 124:4 128:17 130:2 | **Thanks** 33:7 47:15 | | **Tony** 5:1 |
| **term** 19:22,23 27:24 29:14 30:2,10 38:4 39:4,5 39:15 40:15 41:10 42:7,25 45:24 46:13 47:18,21 50:25 52:13 58:17 64:15 64:21 65:6 66:24 67:4,15 68:4 73:25 76:23 85:1,13 86:9 86:16 87:9 90:3,3 94:18 95:2 96:14 111:8,18 112:12 120:2 121:24 123:7 125:18 126:6 127:21 129:1 132:3 132:4 141:8 142:7,8 144:15 145:2,14 146:25 147:8 | **therapeutic** 93:19 94:8 | | **tool** 119:11 |
| | **thereof** 14:22 131:20,20 | | **tools** 119:6,8,16 |
| | **they'd** 40:16 82:6,8,17 112:8 | | **top** 93:11 |
| | **thing** 27:14,22 51:14 79:3 79:9 81:13,25 82:17 131:6 133:14 | | **Torkelson** 21:24,25 35:1 36:1 137:16 138:6 |
| | **things** 16:14,25 17:7 20:3 79:6 80:17 81:12 82:15 100:1 136:22 | | **totally** 131:4 |
| | | | **touch** 89:10 |
| | | **timeframe** 8:4 69:18 89:15 100:9 134:4,16 136:8 | **towed** 95:6 |
| | **think** 8:9 10:20 12:6 19:1 19:19 25:17 37:4 51:6 52:8 60:5 62:11 75:2 81:17 82:2 83:8 88:17 102:18 106:22 114:14 131:16 141:2 147:10 | | **town** 121:21 |
| | | **timely** 80:20 | **township** 61:25 62:2 |
| **terminate** 84:24 85:1 | | **times** 23:15 43:23 53:24 59:12 81:18 85:19 91:2 111:11 113:21 117:10 118:19 127:11 131:16 | **track** 22:2 129:5,11,17 |
| **termination** 85:10,14 | | | **tradition** 19:24 20:2,6 |
| **terminology** 143:17 | **thorough** 38:20 | | **trafficking** 131:25 132:4 |
| **terms** 19:8 51:7 74:1 76:13 112:2 123:11 133:15 | **thought** 7:24 31:10 36:3,6 | **title** 43:4 58:23 | **trailer** 95:7 |
| | | **titled** 38:12 | **train** 31:10 59:13 69:13 70:2,2,7 |
| | **thoughts** 36:10,11 | **titles** 58:22 | |
| **terrible** 84:23 | | | **trained** 37:7 |
| **tested** 14:15 | **three** 40:4 42:9 43:8 81:18 82:2 99:13 103:10 113:21 | **today** 7:14,21 8:3 9:16 35:4 45:7 53:15 74:25 75:13 103:18 | **training** 8:16 38:17 59:15 69:4,5,8 70:7,11 |
| **testified** 4:12 75:12 95:15 | | | |



MAGNA
LEGAL SERVICES

**transcribe**
150:3
**Transcriber**
150:13
**transcript**
150:3
**TRANSCRIPTION**
1:21
**transferred**
149:2
**transport**
9:9
**tread**
108:5
**treading**
91:11 97:19 140:3
**treadmill**
94:16
**treasurer**
20:18,19 24:3 26:9,9
47:2 73:6 145:18
**treats**
110:12
**tried**
91:3 148:18
**trip**
126:25
**trips**
127:3
**trouble**
36:16,22
**troubled**
33:16,16,23 36:14,24
36:25 80:17 81:14
**Troyer**
116:22
**true**
121:1 150:4
**truth**
6:15,16
**truthful**
7:20
**try**
6:24 103:8,9
**trying**
17:11,14 19:5 30:25

31:1,4 57:22 58:8
58:14 64:10 80:14
96:14 99:15,17
131:24 132:1
**tuition**
92:10,21
**turn**
41:1 116:21 126:10
143:6,23
**turned**
119:8
**twice**
15:19 116:6
**two**
49:23 81:10 83:3
91:2,2 94:14 97:16
99:13 100:1 104:4
131:16 143:8
**type**
27:14,22 51:14 79:8
81:13,25 82:17
85:21 91:3,15 131:5
**typical**
78:19,19 114:5,7,8
**typically**
46:23 76:5 84:6 87:2
104:11 115:10
141:8,23,23

———————————————
U
———————————————

**Uh-huh**
136:13
**unable**
92:17
**unconditional**
131:5
**undergo**
37:6
**underlying**
131:25
**understand**
6:16,22 7:2,8 9:23
22:11 24:3 31:16
39:19,23 42:8,18
44:10 50:6 54:22
55:5,21 56:6 57:7

58:2,18 64:9,24
66:21 67:5,7,17
68:12 71:7,15 72:19
73:5 83:1,22 90:17
90:24 91:14 92:25
94:6 96:16 100:18
107:4 121:25
124:11 129:22
132:2 134:5 135:10
138:1 139:1 142:10
145:17 147:2
148:17,19
**understanding**
11:9 12:16 13:3,4
14:7 17:24 18:6,22
20:5,17 22:19 23:12
23:24 28:4,20 32:11
40:16 46:14,20
47:19 48:14,17 49:9
51:9 63:14 64:16
70:6,16 73:10 74:17
75:7 77:9,15,17
87:11 88:7 93:1
104:11 108:8 109:3
112:2,7 145:16,20
146:9 147:20
**understood**
40:21 127:25 146:2
**United**
1:1,5 2:17 77:4,11
**unofficial**
139:8
**unredacted**
142:17
**unrelated**
131:4
**unruliness**
36:25 131:5
**unruly**
131:9
**unselfish**
38:16
**update**
58:12
**upkeep**
115:4 120:6

**upstairs**
82:18
**use**
4:5,7 19:22 31:13
33:16 38:4 39:14
40:15 41:10 42:6
45:23 46:13 47:17
59:15 64:14,21
66:23 67:3 69:9
71:5 80:10 84:20
86:9 94:16,18 111:8
119:6,7,11,16,19
121:23 123:7
125:18 126:6 129:1
145:14 146:19,25
**usually**
33:15 83:13
**utilized**
63:21
**utmost**
38:19
**U.S**
2:14

———————————————
V
———————————————

**v**
1:10 5:25
**valid**
107:18
**value**
79:21 93:19
**various**
8:7 12:24 37:12
122:3 135:12
145:23
**vary**
67:19
**vehicle**
124:13
**vehicles**
124:14
**ventilation**
79:24
**verbal**
26:2
**verbally**



6:20
**verses**
59:18
**version**
98:10 99:19 100:13
100:25
**versus**
94:16
**veto**
68:7,13
**vice**
20:18
**view**
12:9
**visible**
12:8
**visit**
82:9 136:11
**visited**
91:6
**visits**
91:4
**vocational**
147:14
**voice**
9:22 30:25 31:3
**voicemails**
81:7 83:7,18
**voluntarily**
88:9
**voluntary**
22:16
**volunteer**
11:22 14:13,18,24
19:6 27:13 39:22,24
41:6 52:2 65:20
66:3,13,14 67:1,5
68:8,19,21 73:17
74:2,21 85:4 144:8
144:10
**volunteering**
11:24,25 12:2,4,7
74:3,21
**volunteers**
10:18 13:22,25 14:3
14:9 19:11,11 29:4

39:21 40:3 51:14
66:15,24 69:3,14
71:19 72:11 81:6
132:7,8 142:11
144:7
**voluntold**
27:14,16,22,24 28:1
**vote**
32:24,25
**voting**
26:11

---

**W**

**wage**
5:5 6:6 76:10,14,19
76:20,24,24 77:1,3
127:19,22 131:17
139:25
**wake**
78:21
**walk**
78:22 80:24 81:15
90:4 140:23
**walking**
79:18,19,21
**Wang**
5:1
**want**
7:6 15:7 26:22 34:12
36:14 52:22 53:1
55:9 62:13 63:5
75:3 78:11 87:14
88:2 93:14 99:21
100:1 103:8,8 111:5
116:21 118:1
132:11 148:16,16
149:2
**wanted**
31:5 43:17 65:20
90:5
**wanting**
66:2
**wants**
33:5
**wash**
79:12

**washing**
79:3
**Washington**
2:17
**wasn't**
91:18 103:12
**water**
79:23 80:5
**way**
22:23 28:7 33:11
50:19 66:15 67:9
79:13 80:20 119:22
143:20
**Wayne**
116:22
**ways**
51:6
**Weaver**
139:16
**weeds**
96:16,25 97:1,4,5,6,8
**week**
77:18 83:3 125:16
**weekends**
114:22 119:23 120:1
120:10
**welcome**
110:13
**Wengerd**
29:18,19,22 30:4,13
31:12 116:22 143:8
143:12,19
**went**
15:10,13 21:2 78:14
82:15 90:11 117:19
140:22
**weren't**
83:7
**we'll**
4:6 10:20 96:6
102:25 133:17
**we're**
10:16 14:21 17:11
40:25 78:17 104:6
131:4 136:17 141:2
145:9

**we've**
50:22 57:8 100:20,24
**whatnot**
83:18 128:9 132:7
133:3
**whatsoever**
101:16
**whoever's**
67:21
**wholeness**
80:22 94:9,11
**wholly**
35:6 61:16 131:21
**willingness**
88:25
**window**
102:7,11 103:10
**wishes**
74:1 122:19
**witness**
3:2 4:5,8 5:9 13:21
14:7 17:23 18:6,10
19:10,24 22:11 23:1
24:12,16 26:3 27:25
28:13,20 29:15 30:3
30:12,22 31:16 32:1
32:11,21 34:13
36:21 37:11,19,24
38:6 39:4,16 40:16
41:12,19 42:8,18
43:7,15,23 44:10
45:25 46:14 47:12
47:19 48:4,24 49:9
50:6,15 51:3,9,24
52:15 54:15,22 55:5
55:21 56:6,22 57:7
58:2,11,18 59:5,6
60:13,24 61:8,18,24
63:14 64:2,9,16,23
65:7,15 66:1,11,21
67:5,17 68:5,12,25
69:8,17 70:6,16,22
71:2,15 72:4,14,19
73:5,15,25 74:16
75:7,18 76:5,15,23
77:14,21 78:3 82:25


MAGNA
LEGAL SERVICES

83:22 84:6,20 85:2
85:15,19 86:10,17
86:23 87:11,20 88:7
88:24 89:7,20 90:3
90:16,24 91:14,25
92:7,13,25 94:6
95:4 96:13 97:21
98:18 100:18 101:5
101:13,22 102:5
103:24 104:11,19
105:14,20 106:2,9
106:15,21 107:4,13
107:22 108:8 109:3
109:12,19 110:1,3
111:10,20 112:1,14
113:10 114:2,11,18
114:24 115:16
116:13,19 117:10
119:15 120:5,19
121:17,25 122:13
122:23 123:9,19
124:11,21 125:2,12
125:21 126:1,8
127:7,15,23 128:12
128:20 129:2,8,14
129:22 130:9,16
131:3 133:14 134:5
134:14 135:10,18
136:1,7 138:1,9,14
138:21 139:1,13
141:23 142:10
143:16 144:16
145:7,16 146:9,19
147:2,20 148:11
**woke**
83:11
**wood**
119:2
**woods**
78:22
**woodworking**
81:22
**wood-miser**
116:22
**word**
33:16 40:23 41:10

47:25 59:15 66:11
66:12 68:14 69:8,9
69:9 72:4 84:9,20
95:5 118:14 146:19
147:15
**words**
98:19 145:22
**work**
9:3 11:20,22 12:2
14:14,18 19:6,9,23
34:7 40:5 42:11
49:11 50:16 65:17
65:20 66:2 67:7
68:19 72:6 77:18,25
80:19 81:14 84:16
85:20 111:4,8 115:1
116:25 117:6 118:5
118:12,13,15
119:25,25 120:2
127:12 138:2
144:12,15 145:22
146:20,24 147:4,7,9
147:10,24 148:3,7
**worked**
26:12
**workers**
61:11 66:25 145:3
**workforce**
144:3,19 145:2
**working**
9:5 38:25 85:21
111:23 112:8,12
113:4,16 119:23
127:3 136:10
**works**
29:9,14 79:9 136:22
**worship**
78:24
**wrap**
136:22 141:2
**write**
57:15 58:3 97:24
98:2 133:9
**writes**
58:5
**writing**

36:5 90:25 91:1
**written**
43:25 100:9
**wrong**
12:15 16:13 69:25
71:4 84:1 94:19
**wrote**
98:5
**Wynkoop**
2:3 4:18,18 149:4
**W-2**
22:1,2,4

---
**Y**
---

**yeah**
5:13 29:8 31:8 47:11
50:19,19 51:6 52:23
69:5 78:13 100:22
102:24 117:22
118:13 133:10
136:20 140:23
**year**
15:15,19 103:10
141:8
**years**
15:10 100:14 101:3
**yesterday**
18:1 76:19 122:16
133:14
**young**
33:12 80:23 85:19
89:11 94:9 95:8
116:14
**youth**
134:15 144:1,5,10,12

---
**Z**
---

**Zimmerman**
105:8,9

---
**$**
---

**$1,700**
92:15
**$12**
95:25
**$2,000**

18:23
**$25**
70:11,22 71:10
**$250**
73:10,15,16,20 74:10
74:25
**$6,000**
18:24
**$60-well**
63:10
**$70**
63:10,18,23

---
**1**
---

**1**
38:14 44:16,17 69:20
**1st**
15:9
**1:22-cv-01355-YK**
1:8
**10**
80:13 82:4 95:25
**10th**
8:15,16
**10/19/2021**
52:19
**10/20/20**
126:12
**10:00**
80:9,13
**10:06**
82:6
**11/16/2021**
62:17
**12**
35:10,11 38:9 88:14
88:19 93:6 134:22
**12:00**
80:13,13
**13**
115:19,21
**14**
141:14,15,16,17,18
142:15,21
**15th**
8:13



**16th**
62:24
**17th**
144:25
**17/22**
143:2
**18**
89:23 119:9,11
**19**
45:3
**19th**
53:11 57:2 69:22
**1972**
11:12,13
**1981**
8:13

---
**2**
---

**2**
126:21 143:6
**20**
1:22 88:15,18,19
**200**
2:16
**2011**
34:22 98:20
**2019**
8:7 15:9 98:14 100:6
100:14 101:3 102:2
102:17 103:17,19
116:1 140:14,18
147:24
**2021**
53:11 57:2 62:24
126:20 134:15,16
135:15 136:4
**20210**
2:17
**2022**
8:7 69:22 98:14
100:6,14 101:3
102:2,17 103:17
140:14,18 144:25
147:24
**2023**
1:22 38:9 93:8

150:10
**2023-3**
41:4
**21**
88:15,15 126:10,12
134:17
**215**
2:10
**215-931-5828**
2:5
**22**
103:19 144:21
**23**
15:16
**24th**
115:25
**26**
104:22,23
**27th**
150:10

---
**3**
---

**3**
38:9 52:18,19 93:12
93:12,15 98:25
100:12,21 116:3,3
**3,100**
136:16
**3,800**
135:11
**3,800.32**
134:25
**380-7699**
2:6
**3800**
134:7,8,19

---
**4**
---

**4**
41:2
**40**
77:18
**487-9243**
2:15

---
**5**
---

**5**
3:4 55:8 63:5 93:9,14
**5/17/2022**
142:21
**55PA**
134:25

---
**6**
---

**6**
42:14 143:23
**6:00**
82:5,6,7 83:12,16

---
**7**
---

**7**
62:15,17 69:22 71:6

---
**8**
---

**80**
22:19
**813**
2:6
**866**
2:15

---
**9**
---

**9/24/2019**
115:21
**9:00**
83:16
**931-5812**
2:10


MAGNA
LEGAL SERVICES