### IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LORI CHAVEZ-DEREMER,** | : | |
| **Secretary of Labor,** | : | **No. 1:22-cv-01355** |
| **United States Department of Labor,** | : | |
| **Plaintiff** | : | **(Judge Kane)** |
| | : | |
| **v.** | : | |
| | : | |
| **MENNONITE MESSIANIC MISSION** | : | |
| **OF THE EASTERN PENNSYLVANIA** | : | |
| **MENNONITE CHURCH,** | : | |
| **d/b/a Liberty Ridge Farm, and NELSON** | : | |
| **MARTIN,** | : | |
| **Defendants** | : | |

### MEMORANDUM

This case arises from the alleged violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq., by Defendant Mennonite Messianic Mission of the Eastern Pennsylvania Mennonite Church ("Defendant Mennonite Mission") and Defendant Nelson Martin ("Defendant Martin") (collectively "Defendants") in connection with their "rehabilitation" of young men at Liberty Ridge Farm. Before the Court are cross motions for summary judgment filed by Defendants (Doc. No. 43) and Plaintiff Lori Chavez-DeRemer, Secretary of Labor at the United States Department of Labor ("Plaintiff") (Doc. No. 42). For the following reasons, the Court will grant Plaintiff's motion for summary judgment and deny Defendants' motion for summary judgment.

I.      **BACKGROUND**

A.      **The Parties' Statements of Facts in Support of their Summary Judgment Motions**

The relevant facts of record set forth <u>infra</u> are taken from Plaintiff's Statement of Undisputed Material Facts (Doc. No. 44-2) ("PSUMF") and Defendants' response thereto (Doc. No. 52-1) ("DRSMF"), as well as Defendants' Statement of Undisputed Facts in Support of Their Motion for Summary Judgment (Doc. No. 48-1) ("DSUMF") and Plaintiff's Counter Statement of Undisputed Material Facts (Doc. No. 53-1) ("PCSMF").

Local Rule 56.1 provides that:

> A motion for summary judgment filed pursuant to Fed. R. Civ. P. 56, shall be accompanied by a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried.  The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts, responding to the numbered paragraphs set forth in the statement required in the foregoing paragraph, as to which it is contested that there exists a genuine issue to be tried.

<u>See</u> L.R. 56.1.  The rule further provides that "[s]tatements of material facts in support of, <u>or in opposition to, a motion shall include references to the parts of the record that support the statements</u>" and "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party."  <u>See</u> <u>id.</u> (emphasis added).

The Court notes that the DRSMF largely fails to cite to the record in the paragraphs in which Defendants purport to deny or dispute the facts asserted in the PSUMF, as required by Local Rule 56.1.  Only 18 out of 144 responsive paragraphs offer record citations in support of the response.  <u>See</u> (Doc. No. 52-1 at ¶¶ 11, 16, 23, 27–30, 35, 47, 62–64, 69–70, 92–94, 108).  In accordance with Local Rule 56.1, the Court will deem the facts in all other paragraphs of the PSUMF admitted.  <u>See</u> <u>Allen v. Foxway Transportation, Inc.</u>, 705 F. Supp. 3d 297, 305 (M.D. Pa.

2023) (citing Local Rule 56.1 and stating that "[i]f a party has not supported its stated fact or its denial of that fact with a record citation, then the Court will either assume that the fact is disputed or admitted accordingly").

In addition, the Court notes that the PSUMF, DRSMF, DSUMF, and PCSMF contain numerous legal conclusions or arguments. Such legal conclusions or arguments are inappropriate in a statement of material facts in support of or in opposition to a motion for summary judgment and will be disregarded by the Court. See Perez v. Great Wolf Lodge of the Poconos LLC, 200 F. Supp. 3d 471, 474 n.1 (M.D. Pa. 2016) (highlighting that statements of undisputed material facts should not contain "legal arguments or conclusions").

Finally, "[c]oncurrent resolution of cross-motions for summary judgment can present a formidable task." See Interbusiness Bank, N.A. v. First Nat'l Bank of Mifflintown, 318 F. Supp. 2d 230, 235 (M.D. Pa. 2004) (Conner, J.) (citing 10A Charles Alan Wright et al., Federal Practice and Procedure § 2720 (3d ed. 1998)). Federal Rule of Civil Procedure 56 requires that the court view all facts in the light most favorable to the non-moving party, drawing all reasonable inferences in favor of the non-moving party. See Fed. R. Civ. P. 56. However, in the circumstances of cross-motions for summary judgment, where both parties are moving and non-moving parties, "[i]nferences to which a party is entitled with respect to the opponent's motion may not be granted with respect to its own" and accordingly, "[i]n such circumstances, Rule 56 requires two statements of the 'facts' of the same case, a proposition that may counsel separate opinions on the respective motions." See Interbusiness Bank, N.A., 318 F. Supp. 2d at 235–36 (first citing United States v. Hall, 730 F. Supp. 646, 648 (M.D. Pa. 1990) and then citing Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)). In the instant case, the basic facts are substantially undisputed and therefore whether the evidence is viewed in the light most favorable

to Plaintiff or Defendants, the same conclusions generally prevail.  The few existing evidentiary

discrepancies are noted infra.

###### B.     Factual Background

Defendant Mennonite Mission is a 501(c)(3) organization,[1] consisting of a "group of

members of the Eastern Pennsylvania Mennonite Church Ministries" who together conduct the

mission activities of the church.  (Doc. Nos. 44-2 ¶ 1; 48-1 ¶ 2.)  In approximately 2011,

Defendant Mennonite Mission established the Family Support Committee ("FSC"), which was

tasked with finding land which would later become the Liberty Ridge Farm ("Liberty Ridge").

(Doc. No. 44-2 ¶ 2.)  Defendant Mennonite Mission formed the Liberty Ridge Farm Committee

("LRFC") to operate Liberty Ridge, the activities of which are the subject of this action.  See

(Doc. No. 48-1 ¶ 5.)  The LRFC is responsible for the day-to-day operations at Liberty Ridge.

(Doc. No. 44-2 ¶ 6.)  The LRFC consists of a Chairman, Assistant Chairman, Secretary, Assistant

Secretary, Treasurer, and Assistant Treasurer.  (Doc. No. 48-1 ¶ 6.)  Defendant Martin served as

the LRFC's Treasurer.  (Id. ¶ 7.)  In that capacity, he registered the "fictitious name of 'Liberty

Ridge Farm'" with the Pennsylvania Department of State.  (Doc. Nos.44-2 ¶ 4.)

---

[1]  501(c)(3)'s are:

> [c]orporations, and any community chest, fund, or foundation, organized and
> operated exclusively for religious, charitable, scientific, testing for public safety,
> literary, or educational purposes, or to foster national or international amateur sports
> competition (but only if no part of its activities involve the provision of athletic
> facilities or equipment), or for the prevention of cruelty to children or animals, no
> part of the net earnings of which inures to the benefit of any private shareholder or
> individual, no substantial part of the activities of which is carrying on propaganda,
> or otherwise attempting, to influence legislation (except as otherwise provided in
> subsection (h)), and which does not participate in, or intervene in (including the
> publishing or distributing of statements), any political campaign on behalf of (or in
> opposition to) any candidate for public office.

See 26 U.S.C. § 501(c)(3).

Defendant Mennonite Mission established Liberty Ridge to assist in the rehabilitation of young men who were struggling in life. (Doc. No. 48-1 ¶¶ 8–9.)[2]  Parents and guardians in the Mennonite community send their "troubled" children to Liberty Ridge.  (Doc. No. 44-2 ¶ 8.)  Liberty Ridge personnel informed the families that their children (hereafter the "Minors"), would be provided both food and shelter during their time at Liberty Ridge.  (Doc. Nos. 44-2 ¶ 9; 52-1 ¶ 9.)  Parents submit applications for Minors to participate in the Liberty Ridge program, which includes "tending the garden, planting, harvesting, to some extent processing the procedure and the product of the garden . . . tending of other animals at the farm and building pallets."  (Doc. No. 48-1 ¶ 10.)[3]  The parties dispute the role parental/guardian donations played at Liberty Ridge.  Defendants maintain that parents and/or guardians would offer Liberty Ridge daily donations at the amount of fifty-six dollars and sixty-seven cents ($56.67) per day, "to offset the costs of the program," (Doc. No. 48-1 ¶ 11 (citing Doc. No. 48-9 at 7)), while Plaintiff asserts that Defendants rely on inadmissible hearsay to support their factual assertion, and further maintain that the cited evidence does not support the idea that the daily payments made by parents/guardians were "donations" or offered to "offset the cost of operating the program" (Doc. No. 53-1 ¶ 11 (citing Doc. No. 44-9 at 4)).  The parties agree that Minors' parents completed power of attorney forms prior to Minors' arrival at Liberty Ridge (Doc. No. 48-1 ¶ 14), but

---

[2]  Plaintiff acknowledges that Defendants' witness so testified as to the purpose of Liberty Ridge but asserts her position that "Liberty Ridge Farm was a money-making commercial enterprise, and the work performed on Liberty Ridge Farm primarily benefited Defendants."  (Doc. No. 53-1 ¶¶ 8–9.)

[3]  Plaintiff admits only that Defendants' witness so testified but disputes that the Minors only engaged in these activities, stating that "[a]s the factual record shows, the Minors spent considerable time working in furtherance of the Defendants' commercial activities."  (Doc. No. 53-1 § 10.)

Plaintiff contends that any reference in the power of attorney form that contracts away the Minors' employment rights is invalid (Doc. No. 53-1 ¶ 14).

Upon arrival at Liberty Ridge and during their initial period of residence, Minors were not permitted to contact their families. (Doc. No. 44-2 ¶ 10.) Defendants' philosophy was "if you don't work, you don't eat," a philosophy Defendants concede was prevalent at Liberty Ridge, with the added context that such a philosophy has biblical origination. (Doc. Nos. 44-2 ¶ 11; 52-1 ¶ 11.)[4] The Liberty Ridge Handbook of Standard Operating Policy discusses the "therapeutic nature" of the Minors' activities, which include tending to chickens and building pallets. (Doc. No. 44-2 ¶ 12.) That policy also highlights that the activities "help to offset the cost of the program." (Id.)[5] Liberty Ridge's programming was regimented and subject to Defendants' control. (Id. ¶ 13.)

As part of Liberty Ridge's regimented programming, during a typical day at Liberty Ridge, Minors spent between four (4) and seven (7) hours building pallets,[6] tending to chickens, and chopping wood with a maul. (Id. ¶ 14.) Those activities of the Minors generated products that Defendants sold commercially. (Id.) Wengerd Pallets bought the pallets built by the Minors, while Clark's Feed paid Defendants to have the Minors tend to their chickens. (Id. ¶ 15.) Plaintiff maintains that Minors worked during school hours. (Id. ¶ 16.) Defendants claim that Plaintiff mischaracterizes that fact because the work of building pallets was done as part of a

---

[4] Specifically, Defendants cite 2 Thessalonians 3:10, which reads, in relevant part, "[i]f a man will not work, he shall not eat." See 2 Thessalonians 3:10.

[5] In response, Defendants state that "[a]s Plaintiff is aware, the handbook referenced is outside the relevant scope of this litigation." (Doc. No. 52-1 ¶ 12.) Defendants do not include additional explanation or a citation to the record in support of this assertion. See (id.).

[6] Pallets are generally made of wood, "rectangular in shape" and used to load and transport other products. See Tatko Bros. Slate Co. v. Capitol Slate Co., 221 F. Supp. 212, 213 (E.D. Pa. 1963).

vocational skills program.  (Doc. No. 52-1 ¶ 16.)  Minors worked both in the morning and afternoon (Doc. No. 44-2 ¶ 17) and worked on Saturdays (id. ¶¶ 18–19).

Liberty Ridge had rules for Minors governing their time on the farm including how Minors should act while furthering Liberty Ridge's commercial activities.  (Doc. No. 44-2 ¶¶ 20–21.)  Minors were not allowed to send text messages while at Liberty Ridge.  (Id. ¶ 31.)  If a Minor damaged a tool, they were forced to reimburse Liberty Ridge.  (Id. ¶ 22.)  If a Minor failed to comply with Liberty Ridge's rules, they were subjected to punishment, such as being forced to drag chains or being placed on involuntary restrictive dieting.  (Id. ¶ 23.)  Defendants dispute this statement, asserting that "Plaintiff[] [is] attempting to conflate the issues, as there were no consequences or punishments if a resident refused any of the vocational training, including building pallets."  (Doc. No. 52-1 ¶ 23.)  Because Minors worked four (4) to seven (7) hours a day during the week (Monday through Friday) and also worked on Saturday, these rules necessarily applied during the time the Minors worked.  (Doc. No. 44-2 ¶ 24.)[7]  Plaintiff asserts that some Minors were punished for being "slow" to perform tasks.  (Id. ¶¶ 25–26.)[8]

Defendant Martin personally participated in the punishment of Minors, including the dragging of chains.  (Id. ¶¶ 27–28.)[9]  Liberty Ridge and the LRFC were aware that Minors were being punished, and further considered other potential punishments for disciplinary violations such as having Minors build stone walls, having Minors press down on scales with outstretched

---

[7]  Defendants purport to dispute the fact; however, Defendants fail to cite to record evidence in support of their denial.  (Doc. No. 52-1 ¶ 24.)

[8]  Defendants again purport to dispute this fact, explaining that punishments were implemented for Minors who "used poor manners . . . and talked back"; however, Defendants fail to cite to record evidence in support of their denial.  (Doc. No. 52-1 ¶¶ 25–26.)

[9]  Defendants assert that the testimony reflects that Martin was "unaware if those punishments coincided with the time period of this litigation."  (Doc. No. 52-1 ¶ 27.)

arms, or forcing Minors to eat hot peppers. (Id. ¶ 29.) Defendants respond by stating that "Plaintiff[] [is] attempting to conflate the issues, as there were no consequences or punishment if a resident refused any of the vocational skills training, including building pallets." (Doc. No. 52-1 ¶ 29.) There were Minors who did not like the restrictions placed on them, and some who even attempted to escape Liberty Ridge. (Doc. No. 44-2 ¶¶ 33–34.) Plaintiff asserts that when Liberty Ridge implemented punishments, "it is reasonably inferred that they did so to send a message to the other Minors and keep them 'workable,'" while Defendants reiterate that "there were no consequences or punishments if a [Minor] refused any of the vocational skills training, including building pallets." (Doc. Nos. 44-2 ¶ 30; 52-1 ¶ 30.)

Liberty Ridge also "employed" Mentors to work with the Minors in a supervisory capacity. (Doc. No. 44-2 ¶ 35.) Defendants state that Mentors served to "walk beside the residents in order to show them honesty and integrity in the Anabaptist beliefs." (Doc. No. 52-1 ¶ 35.) Liberty Ridge informed Mentors, before they arrived at the farm, that they would be provided food and shelter upon arrival and subsequently paid them two hundred and fifty dollar ($250) monthly stipends for each month worked. (Doc. No. 44-2 ¶¶ 42–43, 45.) Defendants maintain that Mentors were volunteers, not employees, and further note that "Mentors were advised that they would receive tokens of appreciation for their volunteerism." (Doc. No. 52-1 ¶ 45.)

Liberty Ridge required Mentors to spend almost their entire day with the Minors. (Doc. No. 44-2 ¶ 36.) Another requirement of the Mentors was to supervise the Minors during the Liberty Ridge Farm program. (Id. ¶ 37.) The Liberty Ridge Handbook of Standard Operating Policy states that Mentors supervise Minors for twenty-four (24) hours per day. (Id. ¶ 38 (citing

Doc. No. 42-9 at 3).)[10]  Mentors typically "worked" from six (6) in the morning until nine (9) in

the evening, from Monday through Friday, "with few breaks."  (Id. ¶ 39.)  Mentors "worked" up

to six (6) days per week.  (Id. ¶ 40.)  Mentors, like Minors, built pallets, tended to chickens, and

chopped firewood, while Defendants "sold all of these products commercially."  (Id. ¶ 41.)

Mentors were also governed by Liberty Ridge's rules, which included limits on texting.  (Id. ¶

51.)

It is undisputed that Mentors did not receive federal minimum wage or overtime

payments for their work at Liberty Ridge.  (Doc. Nos. 44-2 ¶ 46; 52-1 ¶ 46.)  Mentors typically

"worked" at Liberty Ridge for six (6) months to a year and could take off six (6) days of work

per month.  (Doc. No. 44-2 ¶¶ 47–48.)  Defendants dispute the Mentors' length of "employment"

at Liberty Ridge, stating that "Mentors at Liberty Ridge Farm were able to decide how long they

felt they could volunteer their service without restriction."  (Doc. No. 52-1 ¶ 47.)  Mentors

received W-2 forms reflecting pay earned from Liberty Ridge.  (Doc. No. 44-2 ¶ 49.)  Liberty

Ridge documented the payments made to Mentors.  (Id. ¶ 50.)

The LRFC tried to involve Minors in vocational training, which included tasks such as

rebuilding tractor engines or assembling pallets.  (Doc. No. 48-1 ¶¶ 15–16.)  Plaintiff disputes

this factual assertion, insofar as she alleges that Liberty Ridge focused on general life skills, not

vocational skills, while also alleging that Defendants overstate the nature of their vocational

training, because "there is no evidence to support the claim [that] Defendants had a mechanics

program or woodworking program at Liberty Ridge Farm."  (Doc. No. 53-1 ¶¶ 15–16.)

Defendants maintain that their vocational skills program included building pallets and further

---

[10]  Defendants again respond by stating that "[a]s Plaintiff is aware, the handbook referenced is
outside the relevant scope of this litigation" (Doc. No. 52-1 ¶ 38); however, Defendants offer no
additional explanation or citation to the record in support of their assertion (id.).

assert that the goal of building pallets was to teach Minors "accuracy and structure." (Doc. No. 48-1 ¶¶ 17–18.) Defendant Martin testified to a "verbal agreement" between Liberty Ridge and Wengerd Pallets providing that Liberty Ridge would provide pallets to Wengerd Pallets. (Id. ¶ 19; Doc. No. 53-1 ¶ 19.) In addition to the "verbal agreement" with Wengerd Pallets, Liberty Ridge also maintained a verbal agreement with Clark's Feed Mill to raise chickens. (Doc. No. 44-2 ¶ 60.) Other businesses that sold chickens made offers to Liberty Ridge to raise their chickens, but Liberty Ridge rejected those other offers. (Doc. No. 52-1 ¶ 62.)

As mentioned supra, the LRFC runs the day-to-day operations of Liberty Ridge. (Doc. No. 44-2 ¶ 52.) In furtherance of that oversight, the LRFC holds regular meetings and produces meeting minutes to document the topics of conversation discussed at said meetings. (Id. ¶ 53.) At these meetings, the LRFC discusses their commercial activities and the income derived therefrom. (Id. ¶ 54.) Liberty Ridge thus documented that it "generated considerable revenue" due to the "work" of the Mentors and Minors. (Id. ¶ 55.)[11] In 2019, Liberty Ridge generated

---

[11] In response, Defendants state that:

> [t]he training received at Liberty Ridge, including building pallets and rebuilding engines, is identical to what would be provided at a similar farming-focused vocational school, and is incredibly beneficial to the Residents. The Residents did not displace regular employees, as Liberty Ridge Farm is not operating as a pallet company, nor does it have any contracts with a pallet company. Rather, Wengerd Pallet endorsed the same [Mennonite] Beliefs as the Farm and had an interest in helping the young men, and ultimately purchased the pallets that were building during the skills training portion of the program. In fact the vocational training portion of Liberty Ridge Farm is only a fraction of the activities taking place at the Farm, as the day-to-day activities also included schooling, bible study, recreation, tending to the garden, raising other animals at the farm, and sourcing firewood. Likewise, though the pallets were ultimately purchased, this was not an integral part of any 'alleged business,' as the Parents and/or Legal Guardians of residents would offer donations to Liberty Ridge to offset the costs of the program, at a suggested amount of $56.67 per day.

nine-hundred and thirty-seven thousand, one dollar and fifty-eight cents ($937,001.58) in revenue. (Id. ¶ 56.) In 2020, Liberty Ridge generated eight hundred and eighty-one thousand, two hundred and thirty-one dollars and eighty-five cents ($881,231.85) in revenue. (Id. ¶ 57.) In 2021, Liberty Ridge generated one million, two hundred and twelve thousand, four hundred and fifty dollars and eighty-three cents ($1,212,450.83) in revenue. (Id. ¶ 58.) Pallets created by Liberty Ridge, through the labor of Mentors and Minors, made their way across state lines to Baltimore, Maryland. (Id. ¶ 59.)

Plaintiff asserts that the LRFC "would also make employment related decisions for Liberty Ridge." (Id. ¶ 75.) Defendants, however, take issue with the characterization of Mentors and Minors as "employees," arguing that "[t]here were no employment decisions to be made, because Mentors and [Minors] were not employees." (Doc. No. 52-1 ¶ 75.) As described by Plaintiff, Liberty Ridge interviewed people for positions at Liberty Ridge. (Doc. No. 44-2 ¶¶ 63–65.) Liberty Ridge interviewed prospective Minors and prospective Mentors. (Id. ¶¶ 63–64.) This, according to Plaintiff, means that Liberty Ridge chose the Mentors and Minors tasked with working at Liberty Ridge. (Id. ¶¶ 69–70.) Additionally, Plaintiff states that Liberty Ridge determined the compensation for Mentors (id. ¶ 71), rewarded Minors "when they completed jobs efficiently" (id. ¶ 73), and provided food and shelter to both Mentors and Minors (id. ¶ 72). Liberty Ridge similarly interviewed prospective fellows, who would serve as house parents, work coordinators, or department heads. (Id. ¶¶ 65–66.) Department heads would also assist the Mentors and Minors in building pallets. (Id. ¶ 68.) Liberty Ridge made salary determinations for and paid the fellows a salary. (Id. ¶¶ 67, 74.)

---

(Doc. No. 52-1 ¶ 55.) Defendants do not provide any citation to the record in support of their lengthy response. See (id.).

Although Defendants dispute whether references to "contacts" describe a supervisor/supervisee relationship between LRFC members and Minors, it is undisputed that some LRFC members were assigned Minors as "contacts." (Doc. Nos. 44-2 ¶¶ 76–77; 52-1 ¶¶ 76–77.) LRFC members acted as supervisors for many of the fellows, including those who served as house parents. (Doc. No. 44-2 ¶ 78.) The Liberty Ridge house parents and work coordinators maintained "direct control" over Mentors and Minors. (Id. ¶ 79.) The house parents and work coordinators created task lists for each workday, while work coordinators were responsible for scheduling the Mentors and Minors to build pallets and tend to chickens. (Id. ¶¶ 80–81.)

At committee meetings, the LRFC discussed Minors' progress. (Id. ¶ 82.) Liberty Ridge discussed and evaluated Minors' work abilities outlined in the Minors' progress reports. (Id. ¶ 83.) Liberty Ridge also provided a regimented schedule for Minors, while also exerting control over Mentors' personal time. (Id. ¶¶ 84–85.) Liberty Ridge controlled Mentors and Minors' schedule from "morning to night." (Id. ¶ 86.) Mentors needed to speak to LRFC committee members to request a day off from "work." (Id. ¶ 87.) Liberty Ridge assigned Mentors to Minors. (Id. ¶ 88.) Liberty Ridge would also determine whether a Minor was ready to leave (id. ¶ 89), with Defendants offering the caveat that "if a parent wished to remove their child from the program, they could do so" (Doc. No. 52-1 ¶ 89).

Liberty Ridge drafted the Handbook of Standard Operating Policy, which provided rules for Minors while "working" at Liberty Ridge. (Doc. No. 44-2 ¶¶ 90–91.)[12] The LRFC also

_____

[12] In responding to this assertion, Defendants state that "[a]s Plaintiff is aware, the handbook referenced, however, was not in place during the relevant time period of this litigation." (Doc. No. 53-1 ¶ 90.) Defendants do not include additional explanation or a citation to the record in support of this assertion. See (id.).

discussed rules violations and the range of punishments for Minors.  (Id. ¶ 92 (citing Doc. Nos.

44-17, 44-30).)  By way of clarification, Defendants assert that, in citing the LRFC's ability to

implement punishments, "Plaintiff[] [is] attempting to conflate the issues, as there were no

consequences or punishments if a [Minor] refused any of the vocational skills training, including

building pallets."  (Doc. No. 52-1 ¶ 92 (citing Doc. No. 44-7 at 129–30).)  The parties similarly

dispute whether Minors were punished cruelly—Plaintiff maintains that Minors could be "forced

to drag chains" or be placed on restrictive diets, while Defendants assert that Plaintiff again

conflates the issues, because such punishments were not tied to a Minor's failure to participate in

vocational skills training.  (Doc. Nos. 44-2 ¶ 93 (citing Doc. Nos. 44-12, 44-17); 52-1 ¶ 93

(citing Doc. No. 44-7 at 129–30).)  Plaintiff asserts that Defendants forced Mentors to drag

chains alongside Minors, and that Minors were punished for being slow workers, while

Defendants respond that neither Minors nor Mentors were punished for the failure to participate

in vocational skills training, and further clarify that Minors were punished for an array of

reasons, but not solely because they worked slowly.  (Doc. Nos. 44-2 ¶¶ 94–95 (citing Doc. Nos.

44-12, 44-31); 52-1 ¶¶ 94–95 (citing Doc. No. 44-7 at 129–30).)  The parties dispute the

prevalence of discipline; Defendants cite the deposition testimony of Kenton Kreider for the

proposition that Minors did not face consequences or punishments if they refused any vocational

skills training, while Plaintiff maintains that Defendants' own internal documents state that

"Minors were punished, in part, for working too slowly."  (Doc. Nos. 48-1 ¶ 21; 53-1 ¶ 21.)

Liberty Ridge's rules also prohibit the taking of photographs (Doc. No. 44-2 ¶ 97), although

Defendants offer the clarification that photography was not universally prohibited, but rather

"[t]he Mentors required permission to take photographs of the minor residents."  (Doc. No. 52-1

¶ 97.)  Mentors received training on the prevention of child sexual abuse, as well as how to

"handle" Minors.  (Doc. No. 44-2 ¶ 98.)  Liberty Ridge also trained Minors on how to build pallets.  (Id. ¶ 99.)

As noted supra, Defendant Martin served as LRFC Treasurer and accordingly was a member of the LRFC.  (Id. ¶¶ 100–01.)  Plaintiff asserts that Defendant Martin participated in the "employment decisions made on behalf of Liberty Ridge," while Defendants respond that "neither the [Minors] nor the Mentors are employees" and thus Defendant Martin could not have participated in employment decisions.  (Id. ¶ 102; Doc. No. 52-1 ¶ 102.)  Defendant Martin had a role in determining whether a Mentor could take a day off and entered business arrangements on Liberty Ridge's behalf.  (Doc. No. 44-2 ¶¶ 103–04.)  Defendant Martin also reviewed the Handbook of Standard Operating Policy, interviewed prospective work coordinators before they were hired, supervised the work coordinators in the performance of their duties, and participated in the punishing and reprimanding of Minors.  (Id. ¶¶ 105–08.)[13]  Defendant Martin was involved in the selection process determining which Minors would "work" at Liberty Ridge, as well as the interview process for prospective Minors.  (Id. ¶ 109–10.)  Additionally, Defendant Martin participated in training the Minors at Liberty Ridge and signed checks for Mentors and fellows.  (Id. ¶¶ 111–12.)

It is undisputed that Minors did not receive payment for hours "worked" at Liberty Ridge, and Mentors did not receive minimum wage or overtime premiums for hours "worked" in excess of forty (40) hours in a week.  (Id. ¶¶ 113–15; Doc. No. 52-1 ¶¶ 113–15.)[14]  Defendants

---

[13]  Defendants dispute Martin's involvement in punishment by stating that "[t]he testimony reflects that Nelson Martin was unaware if those punishments coincided with the time period of this litigation.  Further, Plaintiff[] [is] attempting to conflate the issues, as there were no consequences or punishments if a resident refused any of the vocational skills training, including building pallets."  (Doc. No. 52-1 ¶ 108.)

[14]  Defendants posit that Minors and Mentors were not "employees" under the FLSA and thus they are not entitled to payment for hours worked.  (Doc. No. 52-1 ¶¶ 113–15.)  The Court

did not track the hours "worked" by Mentors and Minors, nor did they keep any pay records for Minors. (Doc. No. 44-2 ¶¶ 116–17.) Defendants have records showing "substandard monthly payments" to Mentors, insofar as the records reflect that Mentors did not receive proper minimum and overtime wages. (Id. ¶ 118.)

The Minors at Liberty Ridge ranged in age from twelve (12) to twenty (20). (Id. ¶ 119.) Minors often used mauls to chop firewood. (Id. ¶ 120.) Some Minors under the age of fourteen (14) "worked" during school hours, while other Minors "worked" more than eighteen (18) hours per week during months when school was in session and for more than three (3) hours in a day. (Id. ¶¶ 121–22.) Although Defendants do not dispute this, they assert that Minors were not "working" but "were learning." (Doc. No. 52-1 ¶ 122.) One example given by Plaintiff is the Minor C.T, who was a twelve (12) year old at Liberty Ridge during the relevant period. (Doc. No. 44-2 ¶ 123.) On October 5, 2019, C.T. arrived at Liberty Ridge, and while on the farm, he built pallets for Liberty Ridge's business. (Id. ¶¶ 124–25.)

Because Defendants did not keep track of hours "worked" by Mentors and Minors, Plaintiff utilized the information obtained through discovery to determine how much Mentors and Minors would be owed, should they be covered by the FLSA. (Id. ¶¶ 126–27.) Plaintiff asserts that the relevant time period is at least July 1, 2019 to May 15, 2022, and utilized the following in reconstructing the back wages owed to Mentors and Minors: (1) the deposition testimony of Kenton Kreider[15]; (2) the deposition testimony of Defendant Martin; and (3)

---

observes that this is a legal conclusion, which will be evaluated infra in the discussion section of this memorandum. See Verma v. 3001 Castor, Inc., 937 F.3d 221, 229 (3d Cir. 2019) (stating that determining whether a worker is an employee under the FLSA is "a mixed question of fact and law").

[15] Kreider was, at all relevant times, the Chairman of the LRFC. (Doc. No. 44-1¶ 142.)

documents such as business expense ledgers, LRFC meeting minutes, and interviews with

Mentors.  (Id. ¶¶ 128–29.)  Plaintiff maintains that a review of the evidence shows that Minors

"worked" an average of thirty (30) hours per week, while Mentors "worked" an average of sixty-

five and a half (65.5) hours per week, and the evidence shows how long each Minor and Mentor

worked at Liberty Ridge.  (Id. ¶¶ 130–32.)  Plaintiff determined that the Mentors are owed four

hundred and ninety-nine thousand, eighty-seven dollars and eighty-three cents ($499,087.83) in

back wages.  (Id. ¶ 133.)  Plaintiff further determined that Minors are owed one hundred and

seventy thousand, five hundred and twenty dollars ($170,520.00) in back wages.  (Id. ¶ 134.)[16]

Defendants failed to take steps to learn the requirements of the FLSA either before or

after the formation of Liberty Ridge.  (Id. ¶ 135.)  Plaintiff asserts, and Defendants do not

properly dispute, that "Defendants did not speak to anyone to determine whether running a de

facto child labor camp or paying the Mentors well below $7.25/hour violated the FLSA."  (Id. ¶

136.)  Defendant Martin did not speak to anyone or take steps to learn about the FLSA's

requirements either during the period where Liberty Ridge was formed or after it was

established.  (Id. ¶¶ 137–38.)  Defendant Martin "did not take any steps to learn what goes into a

501(c)(3) or how the FLSA applies to a 501(c)(3) organization."  (Id. ¶ 139.)  Some employees at

Liberty Ridge, namely department heads, were paid for their work.  (Id. ¶ 140.)  And more

broadly, Defendant Martin and Kenton Kreider are both aware that minimum wage laws exist in

the United States.  (Id. ¶¶ 141–42.)  Defendants acknowledge that, in December of 2021,

Plaintiff informed them that they needed to pay workers "fair wages."  (Id. ¶ 143.)  Despite this,

---

[16]  Plaintiff alleges that Defendants owe a total of six hundred and sixty-nine thousand, six
hundred and seven dollars and eighty-three cents ($669,607.83) in back wages.  See (Doc. No.
44-2 (proposed order outlining the back wages owed)).

Defendants continued to pay Mentors two-hundred and fifty ($250) dollar monthly stipends, not the FLSA minimum wage.  (Id. ¶ 144.)

### C.    Procedural Background

On August 31, 2022, Plaintiff initiated the instant action against Defendants, alleging that Defendants violated the following FLSA provisions: Section Six (6), the minimum wage provision; Section Seven (7), the overtime provision; Section Eleven (11)(c), the recordkeeping provision; and Sections Twelve (12)(a) and (12)(c), as well as Section Fifteen (15)(a)(4), the oppressive child labor provisions.  (Doc. No. 1.)  On October 31, 2022, Defendants filed a motion to dismiss Plaintiff's complaint.  (Doc. No. 9.)  On January 4, 2023, the Court denied Defendants' motion and scheduled a case management conference for February 15, 2023.  (Doc. Nos. 15, 16.)  On January 16, 2023, Defendants filed an answer.  (Doc. No. 19.)  Following the case management conference, the Court set a close of fact discovery date of August 31, 2023.  (Doc. Nos. 20, 22.)  The Court then received and granted numerous motions to extend discovery and postpone a post discovery status conference.  (Doc. Nos. 24, 25, 26, 28, 29, 33, 34, 36.)  Following a post discovery status conference, on April 2, 2024, the Court set a dispositive motion deadline of May 7, 2024.  (Doc. No. 39.)  On May 2, 2024, Plaintiff filed an unopposed motion to exceed the page limits for summary judgment filings as delineated in the Local Rules of this Court, while also requesting that the dispositive motion deadline be extended to May 17, 2024.  (Doc. No. 40.)  That same day, the Court granted Plaintiff's motion.  (Doc. No. 41.)

On May 17, 2024, Plaintiff filed her motion for summary judgment.  (Doc. No. 42.)  That same day, Defendants filed their motion for summary judgment.  (Doc. No. 43.)  On May 21, 2024, Plaintiff filed a brief in support of her motion (Doc. No. 44), the PSUMF (Doc. No. 44-2), as well as dozens of exhibits (Doc. Nos. 44-3 through 44-42).  On May 31, 2024, Defendants

filed a brief in support of their motion (Doc. No. 48), along with the DSUMF (Doc. No. 48-1), as well as several exhibits (Doc. Nos. 48-2 through 48-23).  On June 6, 2024, Plaintiff filed an unopposed motion to exceed the page limitations for responsive briefing (Doc. No. 50), which the Court granted later that day (Doc. No. 51).  On June 17, 2024, Defendants filed a brief opposing Plaintiff's motion for summary judgment (Doc. No. 52), as well as the DRSMF (Doc. No. 52-1).  On July 1, 2024, Plaintiff filed a brief opposing Defendants' motion for summary judgment (Doc. No. 53), as well as the PCSMF (Doc. No. 53-1).  That same day, Plaintiff filed a reply brief supporting her own motion for summary judgment.  (Doc. No. 54.)  On July 15, 2024, Defendants filed a reply brief in support of their motion for summary judgment.  (Doc. No. 56.)

After the record closed, the Court directed the parties to file supplemental briefs addressing the import of Johnson v. National Collegiate Athletic Association, 108 F.4th 163 (3d Cir. 2024), a precedential opinion issued by the Third Circuit Court of Appeals just days before the parties completed briefing on the motions for summary judgment.  (Doc. No. 57.)  Plaintiff subsequently filed her supplemental brief (Doc. No. 58), and Defendants filed their supplemental brief (Doc. No. 59), which attached numerous exhibits (Doc. No. 59-1 through 59-12). Thereafter, Plaintiff filed a motion to strike Defendants' supplemental brief (Doc. No. 60), with a brief in support (Doc. No. 61), arguing that Defendants' supplemental brief should be stricken from the docket as violative of the Court's Order permitting supplemental briefing (Doc. No. 57), as well as Local Rules 56.1 and 7.8(b), in that the brief contains "new factual allegations and new exhibits" (Doc. No. 61 at 1).  Defendants filed a brief in response to Plaintiff's motion to strike.  (Doc. No. 62.)  Plaintiff's motion to strike will be addressed by separate Order.  The parties' summary judgment motions are fully briefed and ripe for disposition.

## II.    LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  See Fed. R. Civ. P. 56(a).  A factual dispute is material if it might affect the outcome of the suit under the applicable law, and it is genuine only if there is a sufficient evidentiary basis that would allow a reasonable factfinder to return a verdict for the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–49 (1986).  At summary judgment, the inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.  See id. at 251-52.  In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion."  See A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact.  See Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004).  Once the moving party has shown that there is an absence of evidence to support the non-moving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."  See Berckeley Inv. Grp. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is warranted.  See Celotex, 477 U.S. at 322.  With respect to the sufficiency of the evidence that the non-moving party must provide, a court should grant a motion for summary judgment when the

non-movant's evidence is merely colorable, conclusory, or speculative.  See Anderson, 477 U.S.

at 249–50.  There must be more than a scintilla of evidence supporting the non-moving party and

more than some metaphysical doubt as to the material facts.  See id. at 252; see also Matsushita

Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Further, a party may not

defeat a motion for summary judgment with evidence that would not be admissible at trial.  See

Pamintuan v. Nanticoke Mem'l Hosp., 192 F.3d 378, 387 (3d Cir. 1999).

## III.    DISCUSSION

The Court first examines the applicable legal standards and relevant FLSA provisions

before addressing the motions for summary judgment.

### A.    The FLSA's Coverage and Relevant Provisions

The FLSA was enacted in 1938 "to protect covered workers from substandard wages and

oppressive working hours."  See Friedrich v. U.S. Computer Servs., 974 F.2d 409, 412 (3d Cir.

1992).  Pursuant to 29 U.S.C. § 206(a)(1)(C), employees "who, in any workweek, are engaged in

commerce or the production of goods for commerce[] or are employed in an enterprise engaged

in commerce or in the production of goods for commerce" must be paid at least seven dollars and

twenty-five cents ($7.25) in hourly wages.  See Rui Tong v. Henderson Kitchen Inc., No. 17-cv-

01073, 2018 WL 4961622, at *3 (E.D. Pa. Oct. 12, 2018) (cleaned up) (citing 29 U.S.C. §

206(a)(1)(C)).  "The FLSA's minimum wage provisions apply to those that fall under the

statutory definition of 'employees' and 'employers.'"  Burrell v. Staff, 60 F.4th 25, 43 (3d Cir.

2023).  "When determining whether someone is an employee under the FLSA, 'economic reality

rather than technical concepts is to be the test of employment.'"  In re Enter. Rent-A-Car Wage &

Hour Emp. Pracs. Litig., 683 F.3d 462, 467 (3d Cir. 2012) (citation omitted).  Because the FLSA

was "part of the large body of humanitarian and remedial legislation enacted during the Great

Depression," see Brock v. Richardson, 812 F.2d 121, 123 (3d Cir. 1987), courts generally recognize the liberal definitions of employer and employee contained therein. See Burrell, 60 F.4th at 43.

To that end, the FLSA defines an employer as "any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency, but does not include any labor organization (other than when acting as an employer) or anyone acting in the capacity of officer or agent of such labor organization," see 29 U.S.C.§ 203(d), and defines an employee as "any individual employed by an employer." See 29 U.S.C. § 203(e)(1). "Because of the breadth of the FLSA, the employer need not necessarily have ultimate control for an employer-employee relationship to exist; even indirect control may be sufficient. In other words, the alleged employer must exercise significant control." Solis v. A-1 Mortg. Corp., 934 F. Supp. 2d 778, 788 (W.D. Pa. 2013) (cleaned up). Additionally, in order to determine whether a joint employment relationship exists under the FLSA, insofar as multiple entities can simultaneously be classified as someone's "employer," the United States Court of Appeals for the Third Circuit ("Third Circuit") has set forth a four-part test in which courts should consider the alleged employer's "(1) 'authority to hire and fire' the relevant employees; (2) 'authority to promulgate work rules and assignments' and to set the employees' conditions of employment; (3) 'involvement in day-to-day employee supervision, including employee discipline;' and (4) 'actual control of employee records, such as payroll, insurance, or taxes.'" See Sec'y United States Dep't of Lab. v. Mosluoglu, Inc., No. 22-2749, 2023 WL 5972044, at *2 (3d Cir. Sept. 14, 2023) (unpublished) (citing In re Enter. Rent-A-Car Wage & Hour Emp. Pracs. Litig., 683 F.3d at 469–70; see also Thompson v. Real Est. Mortg. Network, 748 F.3d 142, 153 (3d Cir. 2014)

(noting that "[a]side from the corporate entity itself, a company's owners, officers, or supervisory personnel may also constitute 'joint employers' for purposes of liability under the FLSA").

The FLSA minimum wage provision applies to employers and employees who are "engaged in commerce or the production of goods for commerce, or . . . employed in an enterprise engaged in commerce or in the production of goods for commerce." See 29 U.S.C. § 206(a). Additionally, the FLSA defines an "enterprise engaged in commerce or in the production of goods for commerce" as one who:

> (A)(i) has employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person; and
>
> (ii) is an enterprise whose annual gross volume of sales made or business done is not less than $500,000 (exclusive of excise taxes at the retail level that are separately stated);
>
> (B) is engaged in the operation of a hospital, an institution primarily engaged in the care of the sick, the aged, or the mentally ill or defective who reside on the premises of such institution, a school for mentally or physically handicapped or gifted children, a preschool, elementary or secondary school, or an institution of higher education (regardless of whether or not such hospital, institution, or school is public or private or operated for profit or not for profit); or
>
> (C) is an activity of a public agency.

See 29 U.S.C. § 203(s)(1).

Furthermore, as it pertains to overtime wages, 29 U.S.C. § 207(a)(1) provides that:

> no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

See 29 U.S.C. § 207(a)(1). Accordingly, the triggering language in the FLSA overtime provision is identical to that contained in the minimum wage provision: employers and employees engaged in commerce are subject to the FLSA's overtime provision. See id.

The principal requirement of FLSA coverage, upon finding that an entity is a covered employer, is that claimants are "employees."  To that end, the Court observes that the FLSA "covers trainees, beginners, apprentices, or learners if they are employed to work for an employer for compensation."  See Walling v. Portland Terminal Co., 330 U.S. 148, 151 (1947) (hereinafter "Walling").  "But the FLSA does not transform every training relationship into an employer-employee relationship.  As broad as the terms 'employee' and 'employ' are, 'they cannot be interpreted . . . to make a person whose work serves only his own interest an employee of another person who gives him aid and instruction.'"  Jochim v. Jean Madeline Education Center of Cosmetology, Inc., 98 F. Supp. 3d 750, 756 (E.D. Pa. 2015) (citation omitted).  In other words, "an individual may work for a covered enterprise under the FLSA and not be an employee within the ambit of the statute."  See id. (citing Tony & Susan Alamo Found. v. Sec'y of Lab., 471 U.S. 290, 299–300 (1985) (hereinafter "Alamo Foundation")).  Ultimately, "[t]he test of employment under the [FLSA] is one of 'economic reality.'"  See Alamo Foundation, 471 U.S. at 301.

"An economic realities test is used as the basis for determining an individual's employment status: 'Employees are those who as a matter of economic reality are dependent upon the business to which they render service.'"  Todaro v. Township of Union, 27 F. Supp. 2d 517, 534 (D.N.J. 1998) (quoting Bartels v. Birmingham, 332 U.S. 126, 130 (1985)).  When considering the economic realities test, courts must look to the totality of the circumstances instead of "technical concepts of the employment relationship."  See Johnson v. Nat'l Collegiate Athletic Assoc., 108 F.4th 163, 176 (3d Cir. 2024) (quoting Haybarger v. Lawrence Cnty. Adult Prob. & Parole, 667 F.3d 408, 418 (3d Cir. 2012)).  To aid in that determination, courts have devised multifactor tests for evaluating different employment relationships.  See, e.g., Donovan

v. DialAmerica Mktg., Inc., 757 F.2d 1376, 1382 (3d Cir. 1985) (adopting a test to determine

whether a worker is an employee or independent contractor); In re Enterprise Rent-A-Car Wage

& Hour Emp't Prac. Litig., 683 F.3d at 469 (adopting a test to determine whether alleged

employers are joint employers); Johnson, 108 F. 4th at 180 (crafting a four-factor test to

determine whether college athletes are employees under the FLSA).

In Walling and Alamo Foundation, the Supreme Court fashioned a test to determine

whether workers are either FLSA-exempt trainees or volunteers, respectively.  See Walling, 330

U.S. at 149; Alamo Foundation, 471 U.S. at 291–92.  The Supreme Court instructed that courts

should first determine whether the commercial activities of an entity fall within FLSA's

definition of enterprise, and then courts should determine whether the workers alleged to be

trainees or volunteers worked in expectation of compensation.  See Alamo Foundation, 471 U.S.

at 299–301; Walling, 330 U.S. at 152.

When determining whether a worker is an apprentice, trainee, or learner and not an

employee, the Supreme Court provided in Walling that a worker who works without any express

or implied compensation agreement and "whose work serves only his own interest" will not be

deemed an employee "of another who gives him aid and instruction."  See Walling, 330 U.S. at

152.  In addition, where an employer receives no immediate advantage from any work done by

trainees, the trainees are not employees within the Act's meaning.  See id. at 153.

When determining whether a worker is a volunteer, the Supreme Court has similarly

directed courts to look at the economic realities and expectation of compensation which can take

the form of workers' dependency upon the employer for long periods of time (e.g., several years)

and expectation of in-kind benefits in exchange for services provided.  See Alamo Foundation,

471 U.S. at 301.  Moreover, Alamo Foundation and Walling instruct that a worker who is exempt

from FLSA coverage as a volunteer or trainee must work for their own "personal purpose or pleasure." See id. at 295; Walling, 330 U.S. at 152; see also Acosta v. Paragon Contractors Corp., 884 F.3d 1225, 1231–32 (10th Cir. 2018) (finding that children who are coerced to perform work are not working for their own personal pleasure, purpose, or profit as required by the Alamo Foundation and Walling standard).

Before addressing the parties' motions for summary judgment and the central issue of whether the Minors or Mentors can be considered employees under the FLSA, the Court first addresses the question as to which "economic reality" test to apply to determine this issue. In Plaintiff's initial brief in support of her motion for summary judgment, she relies on Alamo Foundation in arguing that the Minors and Mentors should be considered employees, not volunteers. (Doc. No. 44 at 21–24.) In their brief in opposition to Plaintiff's motion, as well as in their brief in support of their own summary judgment motion, Defendants rely on Alamo Foundation in arguing that the Mentors are volunteers and not employees and on Walling to argue that the Minors are trainees and not employees. See (Doc. No. 52 at 4–9; Doc. No. 48 at 8–12, 14–18.) As to the Minors, Defendants cite a six-factor test articulated by the Tenth Circuit in Reich v. Parker Fire Prot. Dist., 992 F.2d 1023 (10th Cir. 1993), which relies on Walling and the "Wage and Hour Manual" as promulgated by the Wage and Hour Division of the United States Department of Labor. (Doc. No. 48 at 10.)[17]

---

[17] The Reich test assesses the following factors:

> (1) Whether the training, even though it includes actual operation of the facilities of the employer, is similar to that which would be given in a vocational school;
> (2) Whether the training is for the benefit of the trainee;
> (3) Whether the trainees do not displace regular employees, but work under close observation;

After the parties completed briefing on their summary judgment motions, the Third

Circuit issued its opinion in Johnson v. National Collegiate Athletic Association, 108 F.4th 163

(3d Cir. 2024), which considered whether student athletes are employees under the FLSA.  See

Johnson, 108 F.4th at 167.  The Third Circuit held that student athletes could be employees for

FLSA purposes and announced a four-factor test to determine employment status of those

athletes.  See Johnson, 108 F.4th at 167, 180.  Due to the date of its publication, the parties did

not have the opportunity to opine on the potential applicability of Johnson to this case in their

briefs; accordingly, the Court directed the parties to file supplemental briefs addressing the

impact of the Third Circuit's precedential opinion in Johnson on the pending motions for

summary judgment (Doc. No. 57), and the parties subsequently filed those supplemental briefs

(Doc. Nos. 58, 59).  In her supplemental brief, Plaintiff maintains that, although the Third Circuit

created a new four-factor test for the "sui generis" fact pattern addressed in Johnson, it

reaffirmed the tests used to evaluate the employee status of trainees and volunteers;  accordingly,

Plaintiff contends that "[t]hose precedents, rather than [Johnson], should guide the Court in

determining whether the Minors and Mentors are employees."  (Doc. No. 58 at 1–2.)  However,

Plaintiff argues that, even if the Court applies the Johnson test to the facts of the instant case,

"the Minors and Mentors were undisputedly employees."  (Id. at 2.)  In their supplemental brief,

Defendants simply utilize the Johnson framework in arguing that they are entitled to summary

---

(4) Whether the employer that provides the training derives no immediate advantage
    from the activities of the trainees and on occasion his operations may actually be
    impeded;
(5) Whether the trainees are not necessarily entitled to a job at the completion of the
    training period; and
(6) The employer and the trainees understand that the trainees are not entitled to wages
    for the time spent in training.

See Reich, 992 F.2d at 1026.

judgment without offering any analysis regarding whether <u>Johnson</u> provides the appropriate test to apply in the instant case.  <u>See</u> (Doc. No. 59).

The Court has carefully reviewed <u>Johnson</u> and the supplemental briefing of the parties, and notes that, as Plaintiff represents, <u>Johnson</u> reaffirms the tests devised by the United States Supreme Court to evaluate whether trainees or volunteers may be considered employees under the FLSA.  The Third Circuit stated as follows in this regard:

> Under this framework, the employer-employee "relationship does not depend on . . . isolated factors but rather upon the circumstances of the whole activity." <u>McComb</u>, 331 U.S. at 730, 67 S. Ct. 1473; <u>see also</u> <u>Haybarger . Lawrence Cnty. Adult Prob. & Parole</u>, 667 F.3d 408, 418 (3d Cir. 2012) (holding that "whether a person functions as an employer depends on the totality of the circumstances rather than on 'technical concepts of the employment relationship'") (citation omitted). Limitations articulated by the Supreme Court include that independent contractors are not employees under the FLSA, <u>see McComb</u>, 331 U.S. at 729, 67 S. Ct. 1473, and "[a]n individual who, 'without promise or expectation of compensation, but solely for his personal purpose or pleasure worked in activities carried on by other persons either for their pleasure or profit,' is outside the sweep of the Act," <u>Tony & Susan Alamo Found.</u>, 471 U.S. at 295, 105 S. Ct. 1953 (quoting <u>Walling v. Portland Terminal Co.</u>, 330 U.S. 148, 152, 67 S. Ct. 639, 91 L. Ed. 809 (1947)).

> Importantly, in determining that the <u>Alamo</u> "volunteers" were actually employees because they expected "in-kind" compensation for services performed, <u>Tony & Susan Alamo Found.</u>, 471 U.S. at 301, 105 S. Ct. 1953, the Court distinguished their situation from that of a group of trainees in <u>Walling</u>. <u>Id.</u> at 299–301, 105 S. Ct. 1953.  In <u>Walling</u>, the trainees participated in a week-long course, during which they performed some work under close supervision without receiving or expecting remuneration beyond the possibility of future employment. 330 U.S. at 149–150, 67 S. Ct. 639.  But the Court held that the trainees did not qualify as "employees" under the FLSA, as their work did not confer an "immediate advantage" to the purported employer. <u>Id.</u> at 153, 67 S. Ct. 639.  Instead, as the Court in <u>Alamo</u> explained, the trainees in <u>Walling</u> were akin to "students in a school," whose activities are driven by the educational benefits. <u>Tony & Susan Alamo Found.</u>, 471 U.S. at 300, 105 S. Ct. 1953.  By contrast, the <u>Alamo</u> "volunteers" engaged in work over extended periods, sometimes years, and received "in-kind benefits" like food, clothing, shelter, and other benefits as compensation. <u>Id.</u> at 292, 105 S. Ct. 1953. These benefits were "wages in another form." <u>Id.</u> at 301, 105 S. Ct. 1953.  Even though the <u>Alamo</u> "volunteers" claimed they expected no compensation, the Court explained that a compensation agreement can be either "express" or "implied," and "[i]f an exception to the Act were carved out for employees willing to testify that they performed work "voluntarily," employers might be able to use superior

bargaining power to coerce employees to make such assertions, or to waive their protections under the Act." Id. at 301–02, 105 S. Ct. 1953.

Since McComb, we and other courts of appeal have adopted multifactor tests to analyze, based on the circumstances of the whole relationship between the parties, whether individuals are employees or independent contractors, whether entities are joint employers, and whether individuals are employees or interns.  See, e.g., Donovan v. DialAmerica Mktg., Inc., 757 F.2d 1376, 1382 (3d Cir. 1985) (adopting a six-factor test developed to determine whether an individual is an employee or an independent contractor); In re Enterprise Rent-A-Car, 688 F.3d at 469 (adopting a four-factor test to determine whether entities are joint employers); Glatt, 811 F.3d at 536–37 (adopting a non-exhaustive set of seven factors to determine whether an individual is a student intern or an employee).  Here, we confront circumstances unlike those previously addressed, but core principles that traditionally define an employee-employer relationship are no less applicable.

See Johnson, 108 F.4th at 176–77.  Upon consideration of the sui generis nature of the Third Circuit's analysis in Johnson, as well as Johnson's reaffirmation of the utility of the Walling and Alamo Foundation tests to assess the employment status of trainees and volunteers, and given Defendants' characterization of the Minors and Mentors as trainees and volunteers, the Court will utilize the tests from Walling and Alamo Foundation to evaluate the employment status of the Minors and Mentors, respectively, when assessing the parties' motions for summary judgment.

## B.     Plaintiff's Motion for Summary Judgment[18]

Plaintiff moves for summary judgment on the following issues: (1) Defendant Mennonite Mission is a covered enterprise engaged in commerce pursuant to the FLSA; (2) Defendant Martin is jointly liable as an employer pursuant to the FLSA; (3) Defendants' employees are entitled to minimum wages pursuant to the FLSA; (4) Defendants' employees are entitled to overtime wages pursuant to the FLSA; (5) Defendants engaged in oppressive child labor; (6)

---

[18]  The Court notes that, in opposing Plaintiff's motion for summary judgment, Defendants rely not only on the arguments made in their opposing brief but also their briefing in support of their motion for summary judgment.  (Doc. No. 52 at 3.)  Accordingly, the Court considers arguments made in both sets of briefing in assessing Plaintiff's motion for summary judgment.

Defendants violated the FLSA's recordkeeping provision; (7) Defendants' FLSA violations were willful; (8) Defendants are jointly and severally liable for six hundred and sixty-nine thousand, six hundred and seven dollars and eighty-three cents ($669,607.83) in back wages; (9) Defendants are jointly and severally liable for six hundred and sixty-nine thousand, six hundred and seven dollars and eighty-three cents ($669,607.83) in liquidated damages; and (10) Defendants should be permanently enjoined from violating the FLSA.  (Doc. No. 42-4.)  The Court addresses each issue in turn.

### 1. Defendant Mennonite Mission's Mentors and Minors Coverage Under the FLSA

Plaintiff asserts that Defendant Mennonite Mission, which does business as Liberty Ridge, is an enterprise engaged in interstate commerce pursuant to the FLSA.  (Doc. No. 44 at 16.)  Plaintiff maintains that Liberty Ridge's annual volume sales are greater than five-hundred thousand dollars ($500,000), and further notes that the pallets built by Minors and Mentors crossed state lines into Baltimore, Maryland.  (Id.)  It follows, according to Plaintiff, that Liberty Ridge is a covered enterprise under the FLSA.  (Id.)

In further support of her position that Defendant Mennonite Mission is a covered enterprise, and that the Mentors and Minors are employees under the FLSA, Plaintiff discusses the details of Liberty Ridge's operations.  Plaintiff relies on the facts of record indicating that the LRFC interviews prospective Mentors and Minors, supervises them, determines their payrates, sets their schedules, and evaluates their work progress.  (Id. at 18–19.)  Plaintiff also points to the undisputed facts of record that the LRFC offered incentives to Minors to work efficiently and provided training to both Mentors and Minors.  (Id. at 19.)  Plaintiff maintains that the Mentors and Minors are not volunteers.  (Id. at 20.)  Plaintiff argues that the facts of this case are analogous to the United States Supreme Court's opinion in Alamo Foundation, in which the

Supreme Court held that church volunteers were actually employees under the FLSA because compensation agreements can be express or implied, and, as in that case, the Mentors and Minors had the expectation of some sort of compensation for their work, thus rendering them employees pursuant to the FLSA.  (Id. at 21 (citing Alamo Foundation, 471 U.S. at 290, 293, 301).)

Plaintiff further maintains that the Court should, in accordance with the relevant authority, consider the coercive elements of Defendants' working arrangement, which she claims points towards a finding that Mentors and Minors are employees.  (Doc. No. 44 at 21.)  Plaintiff asserts that Minors had an expectation of compensation, in the form of housing and food, and this fact, combined with the philosophy of "if you don't work, you don't eat," renders them employees under the FLSA.  (Id. at 22.)  Plaintiff notes that: (1) Minors were placed at Liberty Ridge by their parents; (2) Minors were punished if they did not work quickly enough or comply with the Liberty Ridge rules; and (3) Minors could not leave Liberty Ridge unless their parents and Liberty Ridge approved.  (Id. at 23.)  Plaintiff maintains that these facts all suggest that the Minors' work was not voluntary.  (Id.)  Plaintiff additionally asserts that Mentors are employees and not volunteers, noting that Mentors "expected compensation" in the form of monetary payments as well as room and board.  (Id. at 24.)  It follows, according to Plaintiff, that Alamo Foundation dictates a finding that Mentors were employees under the FLSA.  See (id.).

In response, Defendants offer several arguments opposing Plaintiff's motion on this question.  Defendants first observe that their status as an "enterprise engaged in commerce" is not relevant to Plaintiff's motion, and instead the operative inquiry is whether the Mentors and Minors are employees under the FLSA.  (Doc. No. 52 at 3.)  To that end, Defendants assert that the Minors are not employees but rather are "student-trainees in a Faith-based schooling and vocational skills program."  (Id. at 4.)  Defendants maintain that the Minors receive training,

"identical to what would be provided at a similar farming-focused vocational school." (Id. at 6.)

Defendants argue that Minors "did not displace regular employees," and further note that

"Liberty Ridge Farm is not operating as a pallet company, nor does it have contracts with a pallet

company." (Id. at 6–7.) Defendants maintain that Minors partake in a wide range of activities at

Liberty Ridge and further note that even though the pallets made by Mentors and Minors were

ultimately purchased, "this was not an integral part of any alleged business." (Id. at 7.)

Defendants assert that the Minors and their parents knew and acknowledged that Minors were

not employees and thus not entitled to be paid. (Id.)

Defendants cite Walling's holding that "prospective railroad brakemen who received on-

the-job training, but were not paid during the training period, were not entitled to wages under

the FLSA," in arguing that here, as in Walling, the Court should find that the Minors were

student trainees who are not entitled to wages. (Doc. No. 48 at 10 (citing Walling, 330 U.S. at

153).) As noted supra, Defendants rely on Walling and Reich, a Tenth Circuit case, in arguing

that the Minors were trainees, not employees. Defendants argue that: (1) Minors built pallets and

rebuilt engines, similar to activities done by farming focused vocational school students; (2)

Minors did not displace Liberty Ridge's other employees; (3) the vocational training was only a

small portion of the activities taking place at Liberty Ridge; and (4) Minors' parents would

donate to Liberty Ridge, and the farm did not rely on income derived from external sources

purchasing the pallets to fund its programming. (Doc. No. 48 at 11.)

Defendants argue that the Mentors who worked at Liberty Ridge are volunteers and thus

not employees under the FLSA. (Id. at 16.) Defendants maintain that Mentors determined the

length of time for which they would serve, indicated that they did not expect payment, and were

merely volunteers "for a nonprofit organization with a religious or humanitarian objective," and

pursuant to Department of Labor guidance, should appropriately be classified as volunteers. (Id.)

Defendants further cite United States Department of Labor, Wage & Hour Division, Fact Sheet

#14A, particularly noting language which reads that:

> the FLSA recognizes the generosity and public benefits of volunteering and allows individuals to freely volunteer in many circumstances for charitable and public purposes. A volunteer generally will not be considered an employee for FLSA purposes if the individual volunteers freely for public service, religious or humanitarian objectives, and without contemplation or receipt of compensation.

(Id. at 15.) It follows, according to Defendants, that Mentors are more appropriately classified as

volunteers, given the religious objective of their organization. See (id. at 15–16).

Plaintiff asserts in response that Defendants do not cite any evidence of record reflecting

that Minors received an education similar to what they would receive in other schools and further

note that Liberty Ridge was not an accredited school during the relevant period. (Doc. No. 53 at

13.) Plaintiff contends that Defendants provide no evidence that the "education Minors received

is similar to that in other schools," and further maintains that Defendants provide no "curriculum,

certifications, [or] any documents from Mennonite/Anabaptist run schools, or any evidence to

support their argument that the students could have received a similar education at a different

school." (Id.)

Plaintiff also responds that there is no evidence that Liberty Ridge's programming

benefitted Minors, especially considering the harsh punishments Minors were forced to endure.

(Id. at 14.) Plaintiff maintains that the only evidence supporting the proposition that Minors

benefitted from Liberty Ridge's training is a self-serving statement from one of Defendants'

witnesses, which is insufficient to support their motion for summary judgment. (Id.) Defendants

cite the deposition testimony of Mr. Mark Torkelson ("Mr. Torkelson"), a member of Defendant

Mennonite Mission's board, in which he discusses how Liberty Ridge tries to provide Minors

with vocational skills "that they could use in their life further beyond Liberty Ridge."  (Doc. No. 48-6 at 88.)

Plaintiff also argues that the evidence of record supports the conclusion that the pallet building program displaced regular Liberty Ridge employees, insofar as Defendants discussed needing to recruit additional workers to aid department heads in building pallets after the Department of Labor initiated its investigation, because "they (supposedly) no longer had children to do the work."  (Doc. No. 53 at 15.)  Plaintiff notes that Defendants benefitted from Minors' labor, deriving "significant revenue from selling pallets, tending to chickens, and engaging in other commercial activities."  (Id.)  Plaintiff also maintains that Minors expected compensation, namely in the form of housing and food, such that this factor too points in favor of a finding that Minors were employees.  (Id. at 16.)

### a.    Enterprise Coverage

Upon consideration of the foregoing, the Court first determines that it is generally undisputed that Defendant Mennonite Mission, in operating Liberty Ridge, "is an enterprise whose annual gross volume of sales made or business done is not less than $500,00.00."  See 29 U.S.C. § 203(s)(1); see also (Doc. Nos. 44-2 ¶¶ 56–58 (discussing Liberty Ridge's revenue for the years 2019 through 2021); 42-23 through 42-24 (containing the income statements for Liberty Ridge)).  Accordingly, the Court determines that, viewing the record as a whole, and construing all facts in the light most favorable to Defendants, Defendants fail to raise a genuine dispute of material fact sufficient to permit a reasonable finder of fact to conclude that Defendant Mennonite Mission is not a covered enterprise under the FLSA.  See (Doc. No. 53 at 3 (highlighting Defendants' failure to contest this issue)).

####       b.       The Minors

As it pertains to the Minors' status as employees, the Court is principally guided by the economic realities test and the expectation of compensation as explained by the Supreme Court in Walling and Alamo Foundation.  First, the Court considers whether the Minors' work is performed in expectation of express or implied compensation and for their "personal purpose or pleasure" before turning to whether Defendants received an "immediate advantage" from the Minors' work.  See Walling, 330 U.S. at 152–53.

The Court determines that the Minors' work was done with the expectation of implied compensation.  In Walling, the Supreme Court concluded that the trainees were not employees under FLSA because they worked "without promise or expectation of compensation" because the yard brakemen did not expect express or implied compensation for learning the work of a brakeman over the course of seven to eight days on average.  See id. at 149, 152.  In Alamo Foundation, the Supreme Court concluded that, unlike in Walling, the economic realities revealed that the workers were entirely dependent on the Foundation for long periods of time.  See Alamo Foundation, 471 U.S. at 301.  Further, the Supreme Court held that the food, clothing, and other benefits that the workers received for those long periods of time constituted in-kind benefits that the workers expected in exchange for their services.  See id.

Comparing Walling and Alamo Foundation to the instant case, Defendants, a religious nonprofit, operated a behavioral rehabilitation farm where the Minors, as residents, worked.  Similar to the Alamo Foundation volunteers, the Minors worked tending animals (i.e., chickens), chopping wood, and building pallets for approximately four to seven hours per day.  See Alamo Foundation, 471 U.S. at 292 (detailing that the volunteers worked at service stations, hog farms, and roofing and electrical construction companies).  Further, the Minors worked for months to

years at Liberty Ridge—as the volunteers in <u>Alamo Foundation</u> did— whereas the trainees in <u>Walling</u> worked for seven to eight days on average.  See <u>Alamo Foundation</u>, 471 U.S. at 301 ("[I]n this case the associates were 'entirely dependent upon the Foundation for long periods, in some cases several years.'" (internal citations omitted)); <u>Walling</u>, 330 U.S. at 149 (stating that the preliminary training was seven to eight days on average).  Most importantly, Defendants promised, and the Minors received, food and shelter for the entirety of the Minors' stay at Liberty Ridge as promised to the Minors' parents.  (Doc. No. 44-2 ¶ 9.)  The provision of food and shelter distinguishes this case from <u>Walling</u> because it demonstrates that the Minors expected "wages in another form."  See <u>Alamo Foundation</u>, 471 U.S. at 301 n.23 (noting that the FLSA defines food and lodging as wages).  Therefore, the undisputed evidence of record demonstrates that the Minors expected implied compensation, in the form of food and shelter, for the months to years long stay at Liberty Ridge.

The Court also determines that undisputed evidence of record demonstrates that the Minors did not work for their own personal purpose or pleasure.  Defendants assert that the Minors built pallets, repaired tractors, built gates, tended to animals, and gardened in furtherance of improving their interpersonal and vocational skills.  (Doc. No. 48-1 ¶¶ 10, 15–17, 30.) Despite Defendants' arguments, even if the vocational training is seen as legitimate—which is not borne out in the record—the undisputed facts indicate that the Minors did not voluntarily join or participate in Liberty Ridge Farm.  (Doc. No. 44-2 ¶ 8 (stating that parents send their "troubled" children to Liberty Ridge).)

The Minors' circumstances are similar to the circumstances of the children in <u>Acosta v. Paragon Contractors Corp.</u>, 884 F.3d 1225 (10th Cir. 2018).  In <u>Acosta</u>, children of community members of the Fundamentalist Church of Jesus Christ of Latter-Day Saints gathered fallen

pecans on the Southern Utah Pecan Ranch.  See id. at 1230–31.  The children were ordered to attend the pecan harvest, and the church facilitated the harvesting by closing schools when it was time for harvesting.  See id. at 1231.  At trial, the parents and children testified that they felt required to attend the harvest or face consequences, such as excommunication, from the church. See id.  The United States Court of Appeals for the Tenth Circuit ("Tenth Circuit") concluded that pursuant to Alamo Foundation and Walling the children did not work for their own personal pleasure but rather were coerced by the church into working.  See id. at 1231–32.  Here, the Minors were residents in a religious disciplinary rehabilitation program.  (Doc. No. 48-1 ¶¶ 8–9.) The parents of the Minors placed them in the care of Defendants with the expectation that the Minors would receive religious disciplinary rehabilitation, food, and shelter.  See (id.; Doc. No. 44-2 ¶ 9.)  At Liberty Ridge, the Minors could not leave the farm, worked for nearly a full eight-hour workday building pallets and tending chickens, stayed for months to years until they graduated from the program, and faced punishments, such as dragging chains or being placed on a restrictive diet of rice and beans for disobedience, which included slow work.  Therefore, just like the children in Acosta, the Court determines that the Minors cannot be said to have worked for their own pleasure.

Lastly, the Court considers whether Defendants received an "immediate advantage" from the work of the Minors.  Defendants argue that they received no immediate advantage because: (1) the Minors' work only represented "a fraction of the activities" taking place at Liberty Ridge; and (2) the donations of the parents and/or legal guardians of the Minors offset the cost of the program as opposed to the pallet purchases.  (Doc. No. 52 at 7.)  The Court is unpersuaded. First, the undisputed evidence of record demonstrates that the donations of parents and legal guardians of the Minors totaled $77,720.82 in 2019, $118,663.46 in 2020, and $91,657.77 in

2021. (Doc. No. 48-9 at 125, 127, 129.) Second, the undisputed evidence of record shows that Liberty Ridge generated nearly a million dollars in revenue in 2019 ($937,001.58), hundreds of thousands of dollars in 2020 ($881,231.85), and over a million dollars in 2021 ($1,212,450.83) largely from the Minors tending chickens, splitting firewood with a maul, and building pallets. See (Doc. Nos. 44-2 ¶¶ 55–58; 44-18 (noting the monies paid to Liberty Ridge by a range of companies)). In fact, the results of the Minors' products and services made up $818,445.03 out of $937,001.58 in revenue in 2019, $717,354.77 out of $881,231.85 in revenue in 2020, and $1,079,431.04 out of $1,212,450.83 in revenue in 2021. See (Doc. No. 48-9 at 125–30). Thus, the record reflects that the Minors contributed 87% of Defendants' revenue in 2019, 81% in 2020, and 89% in 2021, whereas the Minors' parents and legal guardians contributed approximately 8.2% in 2019, 13.4% in 2020, and 7.5% in 2021. See (id.). Because the undisputed evidence of record demonstrates that the Minors' work generated the bulk of Defendants' revenue, the Court determines that the Minors' unpaid work provided an "immediate advantage" to Defendants.

Thus, viewing the undisputed evidence of record as a whole, and construing all facts in the light most favorable to Defendants, the Court determines that Defendants fail to raise a genuine dispute of material fact as to the Minors' status as employees under the FLSA.[19]

---

[19] The Court notes that the Reich test, cited by Defendants in their briefing in support of their argument that the Minors are not employees, does not constitute governing authority. However, even assessing the undisputed facts of record under the Reich test, the Court comes to the same conclusion that the Minors should be classified as employees, not trainees, for purposes of the FLSA. First, as to whether the training provided at Liberty Ridge is akin to vocational school training, Defendants cite only Mr. Torkelson's deposition testimony, which merely discusses Liberty Ridge's program and provides no comparison or insight as to how the training received by Minor is "similar to that which would be given in a vocational school." See Reich, 992 F.2d at 1026. Second, as to whether the Minors benefit from the training, Defendants again offer only the self-serving testimony of Mr. Torkelson, who testified that the vocational training Minors received, in the form of building pallets and rebuilding engines, was "incredibly beneficial" to

Accordingly, the Court will grant Plaintiff's motion for summary judgment on this question. The Court next addresses whether the Mentors can be classified as employees pursuant to the FLSA.

### c.    The Mentors

As it pertains to the Mentors' status as employees, the Court considers whether the Mentors' work is performed in expectation of express or implied benefits, for their personal purpose or pleasure, and for an "immediate advantage" to Defendants. See Walling, 330 U.S. at 152–53. The undisputed evidence of record, construed in the light most favorable to Defendants, suggests that the Mentors' work was done with the expectation that they would receive the

---

them. (Doc. No. 48 at 11.) As Plaintiff notes, Defendants "could have submitted declarations to that effect from the Minors themselves about the skills they supposedly learned and how those skills benefited them in future jobs. They did not. They could have submitted declarations to that effect from the Minors' parents. They did not." (Doc. No. 53 at 14.) Ultimately, Defendants fail to support their position on this point with any record evidence beyond Mr. Torkelson's self-serving deposition testimony. The general rule that "conclusory self-serving affidavits are insufficient to withstand a motion for summary judgment . . . has been extended to self-serving deposition testimony." See Martin J. Walsh v. Fusion Japanese Steakhouse, 548 F. Supp. 3d 512, 530 (W.D. Pa. 2021) (citations omitted) (citing Irving v. Chester Water Auth., 439 F. App'x 125, 127 (3d Cir. 2011) (unpublished)) As to whether Minors displaced regular employees, Defendants assert that they did not displace regular employees, but Plaintiff cites LRFC meeting minutes discussing how "they needed to recruit additional help to satisfy their pallet obligations" because they "no longer had children to do the work." (Doc. No. 53 at 15 (citing Doc. No. 44-24 (containing LRFC meeting minutes stating "[s]ome youth helped in the pallet shop on Saturdays in the month of May because of our reduced work force").) The Court concludes that, without additional context, it is unclear whether Minors displaced regular employees and therefore this factor is neutral. As to whether the employer derives an immediate advantage from the activities of the trainees, the undisputed evidence of record reflects that Defendants derived an immediate advantage from the Minors' labor in the form of significant revenue from selling pallets and tending to chickens. See (Doc. No. 44-23 (containing Liberty Ridge income ledger)). With regard to whether the trainees are entitled to a job at the conclusion of training, the record is devoid of any evidence that the Minors are engaged in a training period that may lead to a paid position. Finally, as to whether the Minors expected compensation for their work, the Court agrees with Plaintiff's position that the Minors expected compensation in the form of food and housing, which are "wages in another form," see Alamo Foundation, 471 U.S. at 301. Accordingly, assessing the evidence of record under the Reich test cited by Defendants, the Court concludes that five of the six Reich factors weigh in favor of a finding that the Minors were employees, not trainees.

express benefit in the form of a monthly two hundred and fifty dollar ($250) stipend, and the implied benefits-in-kind of food and shelter while at Liberty Ridge.  (Doc. Nos. 44-26 at 3 (containing Defendants' admission that they provided food and shelter to the Minors and Mentors); 52 at 9 n.4 (admitting that the Mentors received a two hundred and fifty dollar stipend).)

The Mentors' position at Liberty Ridge Farm mirrors the position of the <u>Alamo Foundation</u> volunteers.  The Supreme Court noted that the volunteers in <u>Alamo Foundation</u> were employees because: (1) the Foundation relied on the volunteers for long periods up to "several years"; (2) the volunteers received food, shelter, clothing, and other benefits; and (3) the volunteers worked for ten to fifteen hours a day, six to seven days per week.  <u>See</u> <u>Alamo Foundation</u>, 471 U.S. at 293, 301, 301 n.22.  In this case, the Mentors spent at least three months to a year working for and dependent on Defendants.  (Doc. Nos. 44-6 at 127 ("Q. how long is a normal stay for a mentor at the Liberty Ridge Farm? [The Witness]: six months to a year."); 48-1 ¶ 24 (stating that Mentors spent from at least three months to a year at Liberty Ridge Farm).) They were promised, and received, food and lodging from Defendants for the entirety of their stay at Liberty Ridge.  (Doc. No. 44-2 ¶ 42.)  The Mentors additionally worked six days a week from 6:00 AM to 9:00 PM "with few breaks".  (<u>Id.</u> ¶¶ 38, 39.)  One of the principal differences between <u>Alamo Foundation</u> and this case is the Mentors' two-hundred-and-fifty-dollar ($250) monthly stipend, which Defendants promised them in advance of their stay.  The existence of the stipend supports the determination that the Mentors were employees who worked in expectation of compensation because it is an express compensation agreement.  Therefore, the undisputed facts demonstrate both an express and implied compensation agreement.  Although Defendants, and the Mentors themselves, argue that the Mentors are volunteers, <u>see</u> (Doc. Nos. 52 at 10; 42-

42 at 1, 4), "the purposes of the Act require that it be applied even to those who would decline its protections."  See Alamo Foundation, 471 U.S. at 302.

As to the issue of immediate economic advantage, the Mentors also built pallets and tended chickens with the Minors.  (Doc. No. 44-2 ¶ 41.)  Therefore, their work contributed to the $818,445.03 in revenue in 2019, $717,354.77 in revenue in 2020, and $1,079,431.04 in revenue in 2021.  Because those products and services made up approximately 87% of Defendants' revenue in 2019, 81% in 2020, and 89% in 2021, the Court determines that Defendants reaped immediate economic advantage from the work of the Mentors.  Accordingly, the Court determines that, although the Mentors volunteered for their own "personal purpose or pleasure," they nevertheless worked in expectation of both express and implied compensation such that they are not exempt from the FLSA's protections.

The economic realities of the Mentors, when all circumstances are considered, reflect that of an employer-employee relationship.  Therefore, the Court, viewing the undisputed evidence of record as a whole, and construing all facts in the light most favorable to Defendants, determines that Defendants fail to raise a genuine dispute of material fact as to the Mentors' status as employees under the FLSA.  Accordingly, the Court will grant Plaintiff's motion for summary judgment on this question as well.  The Court next examines whether Defendant Martin should be jointly liable as an employer for any FLSA violations.

### 2.   Defendant Martin's Coverage Under the FLSA

Plaintiff maintains that Defendant Martin is a joint employer under the FLSA and should thus be liable for any FLSA violations of Defendant Mennonite Mission and Liberty Ridge. (Doc. No. 44 at 19.)  Plaintiff asserts that Defendant Martin had "operational control," and was "directly involved in running Liberty Ridge."  (Id.)  Plaintiff further maintains that Defendant Martin participated in decisions by the LRFC and had primary responsibility for supervising the

work coordinators tasked with scheduling the Minors and Mentors for their duties.  (Id. at 19–20.)  Additionally, Plaintiff asserts that Defendant Martin: (1) admitted to training Minors; (2) signed the checks for Mentor stipends; and (3) directly participated in the reprimanding of Minors by forcing them to drag chains.  (Id. at 20.)  Defendants did not respond to Plaintiff's arguments on this issue.

As discussed supra, the Third Circuit has articulated a four-part test for courts to utilize when examining "a potential joint employment relationship under the FLSA."  See In re Enter. Rent-A-Car Wage & Hour Emp. Pracs. Litig., 683 F.3d at 469.  This Court accordingly considers:

> (1) the alleged employers authority to hire and fire the relevant employees; (2) the alleged employer's authority to promulgate work rules and assignments and to set the employees' conditions of employment: compensation, benefits, and work schedules, including the rate and method of payment; (3) the alleged employer's involvement in day-to-day employee supervision, including employee discipline; and 4) the alleged employer's actual control of employee records, such as payroll, insurance, or taxes.

See id. (hereinafter the "Enterprise" factors).

As to the first factor, Defendant Martin indisputably served as the Treasurer (a board position) of the LRFC which, as reflected by the facts of record, interviewed prospective Mentors and Minors before ultimately deciding whether to welcome them to Liberty Ridge.  See (Doc. Nos. 44-6 at 61 (deposition testimony of Defendant Martin wherein he identifies himself as the treasurer of the LRFC); 48-1 ¶ 6 (describing the members of the LRFC as a Chairman, Assistant Chairman, Secretary, Assistant Secretary, Treasurer, and Assistant Treasurer); 44-16 at 1 (LRFC meeting minutes discussing an interview undertaken with a prospective Minor)).  However, in his deposition, Defendant Martin stated that he had interviewed maybe "one or two" potential Minors.  (Doc. No. 44-6 at 55.)  The Court observes that there is very little discussion

of this element in the parties' briefing or the evidence of record, and accordingly, this factor does not point towards or against a finding of a joint employment relationship.  Without more evidence indicating that Defendant Martin was personally involved in the admittance decisions for Mentors and Minors, the Court cannot conclude that this factor weighs in favor of a finding of joint employment.  However, given Defendant Martin's role on the LRFC and the LRFC's documented role in vetting prospective Mentors and Minors, the Court determines that this factor is neutral.

As to the second Enterprise factor—the alleged employer's authority to promulgate work rules and assignments and to set the employees' conditions of employment, including compensation, benefits, and work schedules, including the rate and method of payment, see In re Enter. Rent-A-Car Wage & Hour Emp. Pracs. Litig., 683 F.3d at 469—the Court determines that this factor weighs in favor of finding Defendant Martin to be a joint employer with Defendant Mennonite Mission.  It is undisputed that Defendant Martin was "primarily responsible just for the work coordinator," who would set Mentor and Minor schedules.  (Doc. No. 44-6 at 95 (deposition testimony of Defendant Martin identifying himself as responsible for the work coordinator).)  Additionally, Defendant Martin testified that, in his role on the LRFC, he helped set the stipend amount for Mentors.  (Id. at 107–08.)  Defendant Martin further testified that, in his role on the LRFC, he was part of the decision-making process for determining whether to grant a Mentor's request for a day off from Liberty Ridge.  (Id. at 102–03.)  Finally, it was Defendant Martin who signed the stipend checks sent to Mentors.  See (Doc. No. 44-19 (containing Defendant Martin's signature on stipend checks)).  To that end, the overwhelming weight of the evidence points in favor of a finding of a joint employer relationship as to this factor.

Pertaining to the third Enterprise factor, it is undisputed that Minors were sometimes forced to drag chains as punishment while at Liberty Ridge, and Defendant Martin, at least once, personally approved a Minor's chain dragging punishment and helped him to drag said chains. (Doc. No. 44-6 at 172–73.) As discussed supra, Defendant Martin also identified himself as being "primarily responsible . . . for the work coordinator" who would set Mentor and Minor schedules, (Doc. No. 44-6 at 95), while also noting that he would have participated in the interviews for the work coordinator positions (id. at 99–100). The Court determines that the undisputed evidence of record as to the third Enterprise factor weighs in favor of finding the existence of a joint employment relationship between Defendant Mennonite Mission and Defendant Martin.

The final Enterprise factor requires examining the "alleged employer's actual control of employee records, such as payroll, insurance, or taxes." See In re Enter. Rent-A-Car Wage & Hour Emp. Pracs. Litig., 683 F.3d at 469. Upon review of the undisputed evidence of record, the Court determines that, as the Treasurer of the LRFC, Defendant Martin entered into business agreements on behalf of Liberty Ridge, while also managing payroll. See (Doc. Nos. 44-6 at 37, 149 (deposition testimony of Defendant Martin discussing using Liberty Ridge funds to pay real estate taxes and how he maintained personal control over Liberty Ridge's back account information); 44-7 (deposition testimony of Mr. Kreider explaining that Defendant Martin made business arrangements on behalf of Liberty Ridge); 44-19 (containing Defendant Martin's signature on stipend checks to Mentors)). Accordingly, the Court determines that this fourth and final factor suggests a joint employment relationship between Defendant Mennonite Mission and Liberty Ridge and Defendant Martin.

The Third Circuit has stated that the four <u>Enterprise</u> factors are "not exhaustive" and "cannot be 'blindly applied' as the sole considerations necessary to determine joint employment."  <u>See</u> <u>In re Enter. Rent-A-Car Wage & Hour Emp. Pracs. Litig.</u>, 683 F.3d at 469 (citation omitted).  To that end, the Court examines whether "other indicia of 'significant control' are present to suggest that a given employer was a joint employer of an employee," because "that determination may be persuasive, when incorporated with the individual factors" outlined <u>supra</u>.  <u>See</u> <u>id.</u> at 470.  On this question, the "other indicia," <u>see</u> <u>id.</u> at 469, also weigh in favor of finding the existence of a joint employment relationship between Defendant Mennonite Mission and Defendant Martin.  In particular, the Court observes that Defendant Martin registered Liberty Ridge's paperwork with the Pennsylvania Department of State.  (Doc. No. 44-6 at 30.)  In considering the foregoing, the Court observes that three out of the four <u>Enterprise</u> factors, as well as additional "indicia" of control, favor a finding of joint employment.  Accordingly, because Defendants fail to provide evidence raising a genuine dispute of material fact on this issue, the Court, viewing all facts in the light most favorable to Defendants, will grant Plaintiff's motion for summary judgment on the question of whether Defendant Martin is liable for FLSA violations as a joint employer with Defendant Mennonite Mission.

### 3.    Whether Defendants Violated the FLSA's Minimum Wage Provision

Plaintiff moves for summary judgment on the question of whether Defendants violated the FLSA's minimum wage provision, set forth at 29 U.S.C. § 206.  Plaintiff asserts and Defendants do not contest that Defendants did not pay Mentors the federal minimum wage and did not pay Minors any wages at all.  (Doc. Nos. 44-2 ¶¶ 46, 117; 52-1 ¶¶ 46, 117.)  Accordingly, viewing the record as a whole, and construing all facts in the light most favorable to Defendants, the Court will grant Plaintiff's motion for summary judgment on this issue.  Defendants do not offer any argument on this point and appear to rest on the assertion that Mentors and Minors are

volunteers and thus not employees under the FLSA.  (Doc. No. 52 at 4–10.)  However, the Court has determined <u>supra</u> that Defendant Mennonite Mission, doing business as Liberty Ridge, and Defendant Martin, are jointly liable as employers for FLSA violations, and that Minors and Mentors are employees pursuant to the FLSA.  Because there is no factual dispute that Mentors did not receive a minimum wage salary, and Minors also did not receive a minimum wage salary (because they did not receive any salary at all), the Court will grant Plaintiff's motion for summary judgment as to Defendants' violation of the FLSA minimum wage provision.  The Court next reviews whether Defendants violated the FLSA's overtime provision.

### 4.    Whether Defendants Violated the FLSA's Overtime Provision

It is undisputed that Defendants failed to pay Mentors overtime wages, as required by the FLSA.  <u>See</u> 29 U.S.C. § 207(a); <u>see also</u> (Doc. Nos. 44-2 ¶¶ 46, 118; 52-1 ¶ 46).  Accordingly, viewing the record as a whole, and construing all facts in the light most favorable to Defendants, the Court determines that summary judgment as to Plaintiff's overtime claim is proper. Defendants again rest on the position that Mentors are volunteers and thus not employees under the FLSA.  (Doc. No. 52 at 7–10.)  However, for the reasons outlined <u>supra</u>, the Court determines that Mentors are employees under the FLSA.  Because there is no factual dispute, insofar as Defendants concede that Mentors did not receive overtime premiums (Doc. No. 52-1 ¶ 46), the Court will grant Plaintiff's motion for summary judgment on the question of whether Defendants violated the FLSA's overtime provision.

### 5.    Whether Defendants Engaged in Oppressive Child Labor

"Oppressive child labor in any industry is a reversion to an outmoded and degenerate code of economic and social behavior."  <u>W. Union Tel. Co. v. Lenroot</u>, 323 U.S. 490, 510 (1945) (Murphy, J., dissenting).  Accordingly, the FLSA provides that "[n]o employer shall employ any oppressive child labor in commerce or in the production of goods for commerce or in any

enterprise engaged in commerce or in the production of goods for commerce."  See 29 U.S.C. §

212(c).  "Subject to certain exceptions . . . employment of any child under the age of sixteen

constitutes oppressive child labor."  Acosta v. Cent. Laundry, Inc., No. 18-cv-00190, 2019 WL

3413514, at *10 (E.D. Pa. July 29, 2019) (citing 29 U.S.C. § 203(l)).  Under the FLSA,

oppressive child labor refers to, in relevant part:

> a condition of employment under which (1) any employee under the age of sixteen
> years is employed by an employer (other than a parent or a person standing in place
> of a parent employing his own child or a child in his custody under the age of
> sixteen years in an occupation other than manufacturing or mining or an occupation
> found by the Secretary of Labor to be particularly hazardous for the employment
> of children between the ages of sixteen and eighteen years or detrimental to their
> health or well-being) in any occupation.

See 29 U.S.C. § 203(l).

Plaintiff maintains that Minors were forced to engage in several activities which the

Secretary of Labor has defined as being too dangerous for children to undertake.  (Doc. No. 44 at

25.)  Plaintiff asserts that the Secretary has disallowed children from chopping firewood pursuant

to 29 C.F.R. § 570.34.  (Id.)  Plaintiff further maintains that some of the Minors were under the

age of fourteen (14), and worked during school hours at Defendants' direction, in direct violation

of 29 C.F.R. § 570.35.  (Id. at 25–26.)  Plaintiff asserts that Defendants are in violation of the

FLSA's prohibition against oppressive child labor because they forced some Minors to work

longer than eighteen (18) hours in a week and more than three (3) hours during a day when

school was in session, all in violation of a validly promulgated regulation.  (Id. at 26.)  Finally,

Plaintiff requests injunctive relief and asks the Court to enjoin Defendants from "continuing to

violate the FLSA's prohibition against oppressive child labor."  (Id.)  In response, Defendants

merely assert that because "Minor residents were not employees," the oppressive child labor

section of the FLSA does not apply to them.  (Doc. No. 52 at 4.)

The Court determines that, upon careful review of the evidence of record, Defendants fail to raise a genuine dispute of material fact as to the question of their engagement in oppressive child labor as defined by the Secretary of Labor because the record clearly supports a finding that children under the age of fourteen (14) worked in the Liberty Ridge pallet shop. 29 C.F.R. § 570.34 is titled "Occupations that may be performed by minors 14 and 15 years of age," and the regulation discusses the permissibility of fourteen and fifteen-year-olds working "inside and outside of places of business where machinery is used to process wood products." See 29 C.F.R. § 570.34 (m)(1). The regulation defines "places of business" as "sawmills, lath mills, shingle mills, cooperage stock mills, furniture and cabinet making shops, gazebo and shed making shops, toy manufacturing shops, and pallet shops." See 29 C.F.R. § 570.34(m)(3) (emphasis added). The regulation does not permit activities for minors under the age of fourteen (14). See 29 C.F.R. § 570.2(a) (noting that the FLSA "sets a general 16-year age minimum" and provides the Secretary with the authority to "provide by regulation or by order that the employment of employees between the ages of 14 and 16 years in occupations other than manufacturing and mining shall not be deemed to constitute oppressive child labor").

Upon consideration of the foregoing, and construing all facts in the light most favorable to Defendants, the Court concludes that the undisputed evidence of record indicates that Liberty Ridge operated de facto as a pallet shop, insofar as it had agreements with several local businesses to purchase the pallets made by Minors and Mentors. (Doc. No. 44-26 at 8 (containing Defendants' responses to Plaintiff's requests for admission)); see also (Doc. No. 44-28 (LRFC minutes referring to the Liberty Ridge "pallet shop")). The undisputed evidence of record further reveals that Liberty Ridge houses Minors "within the ages 12-20." (Doc. Nos. 44-8 at 2 (containing the Liberty Ridge Handbook of Standard Operating Procedure); 44-32

47

(delineating the age of a Minor as twelve (12) in his progress report); see also (Doc. No. 44-28 (LRFC minutes identifying a Minor as celebrating his thirteenth birthday and complimenting his previous work "in the pallet shop").)  The Court determines that, drawing all reasonable inferences in favor of Defendants and looking at the evidence of record in the light most favorable to them, Defendants have not presented evidence sufficient to permit a reasonable finder of fact to conclude that they did not engage in oppressive child labor as defined by the Secretary of Labor.  To the contrary, the undisputed evidence of record confirms that Minors under the age of fourteen (14) were permitted to work in the "pallet shop" at Liberty Ridge, which is a clear violation of 29 C.F.R. § 570.2(a).  Accordingly, the Court will grant Plaintiff's motion for summary judgment on the issue of Defendants' engagement in oppressive child labor.

### 6.    Whether Defendants Violated the FLSA's Recordkeeping Provision

In evaluating Plaintiff's motion for summary judgment as to Defendants' alleged violation of the FLSA's recordkeeping provision, 29 U.S.C. § 211(c), the Court views the record as a whole and construes all facts in the light most favorable to the non-movant Defendants.  To that end, Defendants concede that they did not keep records for the hours worked by Mentors and Minors.  (Doc. Nos. 44-2 ¶¶ 117–18; 52-1 ¶¶ 117–18.)  Defendants merely assert that "[b]ecause the Mentors and [Minor]s were not employees, Defendants were under no obligation to maintain records."  (Doc. No. 52 at 3.)  However, for the reasons outlined supra, the Court determines that Mentors and Minors are employees under the FLSA, and it follows that the Court will grant Plaintiff's motion for summary judgment on this question because Defendants fail to raise a genuine dispute of material fact as to their noncompliance with the FLSA's recordkeeping provision.  The Court next turns to Defendants' motion for summary judgment before addressing the issue of Plaintiff's remedies for Defendants' FLSA violations.

### C.    Defendants' Motion for Summary Judgment

Defendants argue that they are entitled to summary judgment for two reasons: (1) the Minors and Mentors are not covered as employees under the FLSA; and (2) the Department of Labor lacks the authority to pursue this investigation.  (Doc. No. 48 at 6–7.)[20]  As to Defendants' second argument, the Court notes that Defendants raise the novel argument that Acting Secretary of Labor Julie A. Su "has no standing or actual authority to bring enforcement actions, especially if those enforcement actions are predicated upon a policy decision by Ms. Su."  (Doc. No. 48 at 21.)  However, on March 11, 2025, Secretary Lori Chavez-DeRemer was sworn in as the Secretary of Labor after being confirmed by the United States Senate.  See Press Release, Office of the Secretary, Lori Chavez-DeRemer Sworn in as 30th U.S. Sec'y of Labor (March 11, 2025), https://www.dol.gov/newsroom/releases/osec/osec20250311.  Accordingly, Defendants' argument in this regard is moot, and the Court addresses only Defendants' argument as to the Mentors and Minors infra.

### 1.    Minors

As to the Minors, Defendants argue that they are entitled to summary judgment on two principal bases: (1) the totality of the circumstances indicates that Minors are student trainees and not employees; and (2) to designate the Minors as employees violates the Due Process Clause of the Fourteenth Amendment.  As to the first issue, the Court has determined supra in connection with its analysis of Plaintiff's summary judgment motion that the undisputed facts of

---

[20]  Defendants also address willfulness and the appropriate look back period for damages calculations (Doc. No. 48 at 18–21), which the Court examines infra in the remedies section of this memorandum.

record support the conclusion that the Minors were employees, not student trainees, for purposes

of the FLSA.[21]  Accordingly, the Court addresses only Defendants' due process argument <u>infra</u>.

As an alternative argument, Defendants assert that designating Minors as employees

under the FLSA violates the Due Process Clause of the Fourteenth Amendment.[22]  (Doc. No. 48

at 12.)  Defendants maintain that Minors' parents decided to send Minors to Liberty Ridge to

"learn the necessary skills and structure contemplated by the program as a whole," which

included vocational and religious training.  (<u>Id.</u> at 13.)  Defendants rely on several Supreme

Court cases dealing with compulsory education laws in arguing that parents have a due process

right to educate their children "in accordance with their beliefs."  (<u>Id.</u> (citing <u>Wisconsin v. Yoder</u>,

406 U.S. 205, 232–34 (1972) (holding that the First and Fourteenth Amendments are violated

when a state compels parents to send their children to formal high school) and <u>Pierce v. Soc'y of</u>

<u>the Sisters of the Holy Names of Jesus & Mary</u>, 268 U.S. 510, 534–35 (1925) (finding that a

compulsory education law "unreasonably interferes with the liberty of parents and guardians to

direct the upbringing of children").)  It follows, according to Defendants, that "failing to allow

---

[21]  The Court notes that the analysis differs slightly insofar as in evaluating Defendants' motion, the Court views the facts and draws all reasonable inferences in the light most favorable to Plaintiff and in evaluating Plaintiff's motion, the Court views the facts and draws all reasonable inferences in the light most favorable to Defendants.  However, given the largely undisputed nature of the factual record, the Court concludes that whether it views the facts in the light most favorable to Defendants or to Plaintiff, the same conclusion prevails.  Therefore, the Court finds it unnecessary to repeat the analysis here.

[22]  The Court also notes that "[t]he Due Process Clause of the Fifth Amendment applies to actions of the federal government, while the Due Process Clause of the Fourteenth Amendment applies to state actors."  <u>See</u> <u>Seldomridge v. Penn State Hershey Med. Ctr.</u>, 24 F. Supp. 3d 425, 432 (M.D. Pa. 2014).  The "Due Process Clause of the Fifth Amendment, like the Due Process Clause of the Fourteenth Amendment, protects 'liberty' interests," <u>see</u> <u>Paul v. Davis</u>, 424 U.S. 693, 723 n.10 (1976), and the analysis does not change whether the Court assesses Defendants' arguments under either amendment.

the parents to control the rearing and education of their children in this manner would be an absolute violation of the Due Process Clause." (Doc. No. 48 at 14.)

In response, Plaintiff first argues that Defendants' constitutional argument, insofar as they assert that the due process rights of the Minors' parents are infringed upon by classifying the Minors as employees, is waived because such an argument is an affirmative defense that was not pleaded. (Doc. No. 53 at 6.) As to the substance of Defendants' due process argument, Plaintiff contends that Defendants lack standing to raise such an argument. (Id. at 17.) Plaintiff maintains that "Defendants assert not that paying the Minors wages would violate Defendants' due process right, but rather that of the Minors' parents – but the Minors' parents are not parties to this matter and the Defendants have not" sufficiently argued that they have third party standing on behalf of the Minors' parents. (Id.) Plaintiff next argues that, even assuming Defendants have standing to assert the due process defense on behalf of Minors' parents, Defendants still fail to articulate how exactly Minors' parents' rights would be infringed by requiring Defendants to pay the Minors minimum wages for their work. (Id. at 18.) Plaintiff maintains that "Defendants cite no cases recognizing a due process right to have ones' children engage in free labor for a third party. Defendants are asking this Court to create one and it should not." (Id. at 19.)

First, the Court observes that "[a]n affirmative defense is an assertion raising new facts and arguments that, if proven, defeat[s] the plaintiff's claim even if the allegations in her complaint are true." See Sterten v. Option One Mortg. Corp., 479 F. Supp. 2d 479, 482 (E.D. Pa. 2007). Accordingly, the Court finds that Defendants' due process argument is an affirmative defense because Defendants in effect argue that, even if the Court concludes that the Minors should be considered employees for purposes of the FLSA, the application of the Due Process Clause would not permit a finding that Minors were employees. The Court notes that

"[a]ffirmative defenses must be raised as early as practicable, not only to avoid prejudice, but also to promote judicial economy. If a party has a successful affirmative defense, raising that defense as early as possible, and permitting a court to rule on it, may terminate the proceedings at that point without wasting precious legal and judicial resources." See Robinson v. Johnson, 313 F.3d 128, 137 (3d Cir. 2002); see also Moody v. Atl. City Bd. of Educ., 870 F.3d 206, 218 (3d Cir. 2017) (finding that "[a]n affirmative defense which is neither pleaded as required by Rule 8(c) nor made the subject of an appropriate motion under Rule 12(b) is waived") (cleaned up); Fed R. Civ. P. 8(c) (noting that affirmative defenses must be raised "responding to a pleading"). However, "affirmative defenses can be raised by motion, at any time (even after trial), if [the adverse party] suffer[s] no prejudice." See Cetel v. Kirwan Fin. Grp., Inc., 460 F.3d 494, 506 (3d Cir. 2006).

The Court concludes that Defendants' failure to plead a due process affirmative defense renders that affirmative defense waived. On October 31, 2022, Defendants filed a motion to dismiss Plaintiff's complaint for failure to state a claim upon which relief could be granted. (Doc. No. 9.) In the brief supporting said motion to dismiss, Defendants argued that classifying them as employers under the FLSA violates their First Amendment rights under the Free Exercise Clause. (Doc. No. 10 at 7–9.) A due process affirmative defense is not mentioned anywhere in Defendants' brief in support of their motion to dismiss, their reply brief (Doc. No. 14) in further support of that motion, nor is it mentioned in Defendants' answer (Doc. No. 19) filed after the Court denied Defendants' motion to dismiss Plaintiff's complaint. Defendants argue that their first responsive pleading discussed how "Plaintiff's lawsuit and request for injunction infringes on Defendants' constitutional rights." (Doc. No. 56 at 2.) This statement mischaracterizes the nature of Defendants' responsive pleadings. As discussed supra, Defendants

raised a First Amendment defense in their answer, and first raised their due process argument in their brief supporting their motion for summary judgment. Plaintiff is prejudiced by Defendants' failure to raise this affirmative defense "as early as possible" see Robinson, F.3d at 147, insofar as Plaintiff did not have "notice and the opportunity to demonstrate why the affirmative defense should not succeed" see In re Sterten, 546 F.3d 278, 285 (3d Cir. 2008). Accordingly, the Court concludes that Defendants have waived any due process defense. See Fed R. Civ. P. 8(c) (noting that affirmative defenses must be raised "responding to a pleading").

However, even assuming arguendo that Defendants did not waive their due process affirmative defense, the Court concludes that Defendants lack standing to raise such a defense. As a general matter, "a litigant 'must assert his own legal rights and interests, [sic] and cannot rest his claim to relief on the legal rights or interests of third parties.'" See U.S. Dep't of Lab. v. Triplett, 494 U.S. 715, 720 (1990) (citing Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 474 (1982)). "When, however, enforcement of a restriction against the litigant prevents a third party from entering into a relationship with the litigant (typically a contractual relationship), to which relationship the third party has a legal entitlement (typically a constitutional entitlement), third-party standing has been held to exist." Triplett, 494 U.S. at 720. More generally, "third-party standing requires the satisfaction of three preconditions: (1) the plaintiff must suffer injury; (2) the plaintiff and the third party must have a 'close relationship'; and (3) the third party must face some obstacles that prevent it from pursuing its own claims." See Pennsylvania Psychiatric Soc. v. Green Spring Health Servs., Inc., 280 F.3d 278, 288–89 (3d Cir. 2002); see also Warth v. Seldin, 422 U.S. 490, 500 n.12 (1975) (discussing the prudential considerations when "the litigant asserts the rights of third parties defensively, as a bar to judgment against" them).

In this case, Defendants assert that, if the Court permits Minors to be classified as employees under the FLSA, thus requiring them to be paid appropriate wages, such a ruling would impede the due process rights of the Minors' parents to direct the upbringing of their children. (Doc. No. 48 at 14.) Defendants do not explain how classifying Minors as employees would prevent parents from sending their children to Liberty Ridge, or what, if any, constitutional deprivation the Minors' parents would suffer. Instead, Defendants assert that it is their constitutional rights, not the rights of the Minors' parents, which "would be violated by Plaintiff's requested relief." (Doc. No. 56 at 19.) While Defendants emphasize components of Anabaptist faith, and cite "congregants, community members, participants, parents, mentors, and committee members" as being impacted by Plaintiff's enforcement of the FLSA (id. at 18–19), the Court finds that Defendants' assertion of their own constitutional injury is devoid of evidentiary or factual support.

Furthermore, Defendants offer only a footnote discussing third-party standing and maintain that they are able to raise a due process defense "where the rights of the parents, mentors, and those congregants otherwise participating in the mission of Liberty Ridge are at issue." (Id. at 19 n.7.) Even assuming Defendants can satisfy the first two preconditions of third-party standing, the Court finds that Defendants fail to explain what, if any, obstacles the third-party, in this case the Minors' parents, face that would impede them from pursuing their own constitutional claims. Accordingly, the Court finds that Defendants do not have third-party standing to raise this affirmative defense on behalf of Minors' parents.

However, even if Defendants had not waived their due process affirmative defense and had standing to raise such a defense in the first place, the Court is unpersuaded by the merits of Defendants' position. As an initial matter, "[t]o prevail on a substantive due process claim

challenging a state actor's conduct, 'a plaintiff must establish as a threshold matter that he [or she] has a protected property interest to which the . . . due process protection applies.'" See Musila v. Lock Haven Univ., 970 F. Supp. 2d 384, 391 (M.D. Pa. 2013) (citing Nicholas v. Pennsylvania State Univ., 227 F.3d 133, 139–40 (3d Cir. 2000)).  Defendants have failed to provide, on behalf of themselves or the Minors' parents, any "protected property interest" to which the Due Process Clause applies.  See Musila, 970 F. Supp. at 391.  Plaintiff correctly notes that "Defendants cite no cases recognizing a due process right to have ones' children engage in free labor for a third party" (Doc. No. 53 at 19), and the Court has found none.  The Third Circuit has recognized that "[p]arents have a Fourteenth Amendment substantive due process right to raise their children without undue state interference."  See Miller v. Mitchell, 598 F.3d 139, 150 (3d Cir. 2010) (collecting cases discussing the rights of parents).  However, that right is not unlimited, and to implicate due process, it must be clear that the Government has implemented some "constraint or compulsion" such that the parents' rights are impeded.  See Anspach ex rel. Anspach v. City of Philadelphia, Dep't of Pub. Health, 503 F.3d 256, 264 (3d Cir. 2007).  In this case, Defendants do not articulate any "constraint or compulsion" see id., which interferes with the Minors' parents' rights to raise their children.  As noted supra, Defendants also fail to explain how the enforcement of the FLSA against them would infringe their own constitutional rights.

For all of these reasons, the Court finds that Defendants have not demonstrated the applicability of a due process defense on behalf of the Minors as a matter of law, and accordingly, the Court will deny Defendants' motion for summary judgment on this issue.  The Court next evaluates Defendants' motion as it pertains to the Mentors' status as employees or volunteers.

### 2.    Mentors

As an initial matter, for the reasons discussed <u>supra</u> pertaining to Plaintiff's motion for summary judgment on the same issue, the Court finds that the undisputed evidence of record supports a determination that the Mentors are employees and not volunteers.  However, in their motion for summary judgment, Defendants raise an argument not discussed in their opposition to Plaintiff's motion for summary judgment—whether classifying Mentors as employees violates the Mentors' free exercise rights.  Accordingly, the Court addresses that defense.

Defendants maintain that Mentors "chose to practice servitude to their Church as part of their sincerely held religious beliefs," and it follows that classifying them as employees would impede their ability to pursue their service driven mission "without government intrusion." (Doc. No. 48 at 18.)

In response, Plaintiff argues that Defendants have waived their free exercise defense, but that even if they have not, they also lack standing to raise this defense.  (Doc. No. 53 at 22.) Plaintiff asserts that, if Mentors were both members of a religious organization and employees, then perhaps Defendants would have standing to raise a First Amendment defense on their behalf, but because Defendants argue that the Mentors "are not their employees," it follows that Defendants do not have a sufficiently close relationship to Mentors to raise this third-party defense.  (<u>Id.</u>)  Plaintiff next maintains that, even if Defendants can raise Mentors' free exercise defense, the Supreme Court in <u>Alamo Foundation</u> explained that paying workers FLSA mandated wages does not violate the free exercise rights of employees.  (<u>Id.</u> at 23.)  Finally, Plaintiff asserts that Defendants fail to provide any evidence indicating that a sincere religious belief precluded the acceptance of wages for work performed by Mentors at Liberty Ridge.  (<u>Id.</u>)

As discussed <u>supra</u>, "[a]ffirmative defenses must be raised as early as practicable, not only to avoid prejudice, but also to promote judicial economy.  If a party has a successful

affirmative defense, raising that defense as early as possible, and permitting a court to rule on it, may terminate the proceedings at that point without wasting precious legal and judicial resources." See Robinson, 313 F.3d at 137; see also Moody, 870 F.3d at 218 (finding that "[a]n affirmative defense which is neither pleaded as required by Rule 8(c) nor made the subject of an appropriate motion under Rule 12(b) is waived"); Fed R. Civ. P. 8(c) (noting that affirmative defenses must be raised "responding to a pleading").  "[A]ffirmative defenses can be raised by motion, at any time (even after trial), if [the adverse party] suffer[s] no prejudice." Cetel, 460 F.3d at 506.  Additionally, "an affirmative defense generally 'need not be articulated with any rigorous degree of specificity, and is sufficiently raised for purposes of [Federal] Rule [of Civil Procedure] 8 by its bare assertion.'"  See Moody, 870 F.3d at 218 (citing Zotos v. Lindbergh Sch. Dist., 121 F.3d 356, 361 (8th Cir. 1997)).

Here, in the brief in support of their motion to dismiss Plaintiff's complaint (Doc. No. 10), Defendants raised a free exercise defense (id. at 7–10).  However, in that brief, Defendants asserted a free exercise affirmative defense on their own behalf, not on behalf of the Mentors. See (id. (stating "[t]hese views adopted by Plaintiff are starkly in violation of Defendants' First Amendment right to the free exercise of religion")).  Defendants assert that enforcing the FLSA "on Defendants would be a clear infringement on their free exercise of religion."  (Id. at 8.)  For the first time in the brief supporting their motion for summary judgment, Defendants allege that Plaintiff's enforcement of the FLSA is an attempt to burden "the Mentors' freedom to exercise their religious rights." (Doc. No. 48 at 18.)  While this is similar to the argument raised in their initial motion to dismiss, the Court observes that this is a distinct affirmative defense.  Plaintiff is prejudiced by Defendants' failure to raise this affirmative defense "as early as possible" see Robinson, F.3d at 147, insofar as Plaintiff was "specifically deprived . . . of an opportunity to

rebut that defense or to alter her litigation strategy accordingly," see In re Sterten, 546 F.3d at 285, and pursuant to Federal Rule of Civil Procedure 8(c), Defendants have waived their third-party free exercise affirmative defense on behalf of Mentors.

However, even assuming arguendo that Defendants did not waive this defense, the Court concludes that Defendants lack standing to raise this free exercise defense on the Mentors' behalf.  In the brief in support of their motion for summary judgment, Defendants assert that "any attempts to burden the Mentors' freedom to exercise their religious rights is an egregious violation of the First Amendment."  (Doc. No. 48 at 18.)  The Court reiterates that, as a general matter, "a litigant 'must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'"  See Triplett, 494 U.S. at 720.  "When, however, enforcement of a restriction against the litigant prevents a third party from entering into a relationship with the litigant (typically a contractual relationship), to which relationship the third party has a legal entitlement (typically a constitutional entitlement), third-party standing has been held to exist."  Id.  More generally, "third-party standing requires the satisfaction of three preconditions: (1) the plaintiff must suffer injury; (2) the plaintiff and the third party must have a 'close relationship'; and (3) the third party must face some obstacles that prevent it from pursuing its own claims."  See Pennsylvania Psychiatric Soc., 280 F.3d at 288–89.

In arguing that they have third-party standing to raise this free exercise defense, Defendants essentially reiterate the arguments discussed supra related to their contention that they have third-party standing to raise a due process defense on behalf of the Minors' parents. The Court again finds that Defendants fail to explain how requiring them to pay Mentors the appropriate wages under the FLSA would prevent Mentors (the third party) from entering into a contractual relationship with Defendants.  See Triplett, 494 U.S. at 720.  More broadly, the Court

finds that Defendants do not explain how the third party, in this instance the Mentors, "face some obstacles that prevent it from pursuing its own claims." See Pennsylvania Psychiatric Soc., 280 F.3d at 288–89. Accordingly, the Court finds that Defendants do not have standing to raise a free exercise defense on behalf of the Mentors.

However, even if Defendants had not waived this defense and had standing to raise such a defense in the first place, the Court is unpersuaded by the merits of Defendants' position. As the Supreme Court stated in Alamo Foundation, requiring a religious employer to pay laborers does not "interfere" with the laborers "right to freely exercise their religious beliefs," because "there is nothing in the [FLSA] to prevent the associates from returning the amounts to the [employer], provided that they do so voluntarily." See Alamo Foundation, 471 U.S. at 304–05. Defendants also fail to explain how their free exercise rights would be impeded if they are required to pay workers appropriate wages under the FLSA.

For all of these reasons, the Court finds that Defendants have not demonstrated the applicability of a fair exercise defense on behalf of the Mentors as a matter of law and will therefore deny Defendants' motion for summary judgment on this issue. Having concluded that Plaintiff is entitled to summary judgment on its FLSA claims against Defendants and that Defendants' motion for summary judgment should be denied, the Court turns to the issue of the appropriate remedies in this case.

## D.    Remedies

Because the Court will grant Plaintiff's motion for summary judgment on the questions of whether: (1) Defendant Mennonite Mission is a covered enterprise engaged in commerce pursuant to the FLSA; (2) Defendant Martin is jointly liable as an employer pursuant to the FLSA; (3) Mentors and Minors are employees pursuant to the FLSA; (4) Defendants' employees are entitled to minimum wages pursuant to the FLSA; (5) Defendants' employees are entitled to

overtime wages pursuant to the FLSA; (6) Defendants engaged in oppressive child labor; and (7) Defendants violated the FLSA's recordkeeping provision, and will deny Defendants' motion for summary judgment, the Court must assess the appropriate remedies for Defendants' violations. The Court first determines the appropriate statute of limitations for the calculation of damages, and evaluates Plaintiff's damage calculation formula, before assessing Plaintiff's entitlement to liquidated damages and injunctive relief.

### 1.    Willfulness

As a general matter, the statute of limitations for the initiation of claims for "unpaid minimum wages" and "unpaid overtime compensation, or liquidated damages" is two (2) years. See 29 U.S.C. § 255.  However, the statute expressly provides that, when a cause of action arises from a "willful violation" of the FLSA, the statute of limitations increases to three (3) years.  See id.  An employer willfully violates the FLSA when they "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute."  See McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988).  Further, a claimant need not show that the employer acted egregiously to establish the employer's willfulness.  See Stone v. Troy Constr., LLC, 935 F.3d 141, 149 (3d Cir. 2019) (discussing how "Supreme Court case law and our own precedent counsel against a standard for willfulness that requires a showing of egregiousness"). However, "[a]cting only 'unreasonably' is insufficient—some degree of actual awareness is necessary."  See Souryavong v. Lackawanna County, 872 F.3d 122, 126 (3d Cir. 2017) (citation omitted).  Although willfulness is generally a question of fact, it can be treated as a question of law where "there is no legally sufficient evidentiary basis for a reasonable jury to find for the non-moving party."  See Fusion, 548 F. Supp. 3d at 527 (quoting id.).

In the instant case, Plaintiff pursues three (3) years of liquidated damages, for the years 2019 through May of 2022, thus requiring her to demonstrate that Defendants willfully violated the FLSA.  (Doc. No. 1); see also Richland Shoe Co., 486 U.S. at 135 (discussing that "to obtain the benefit of the 3–year exception, the Secretary must prove that the employer's conduct was willful" in discussing the FLSA look back period).  Plaintiff asserts that Defendants have conceded that they took no steps to learn whether Minors and Mentors were entitled to appropriate wages under the FLSA, and further maintains that "[g]enerating revenue from forced child labor and simply assuming the law did not apply to them is, at best, [a] reckless disregard of the FLSA."  (Doc. No. 44 at 27–28.)  Finally, Plaintiff maintains that Liberty Ridge's decision to pay some, but not all, employees a salary for their work is indicative of their willful disregard of the FLSA.  (Id. at 28.)

In response, Defendants argue that Plaintiff fails to show that they acted in a voluntary, deliberate, or intentional way, so as to establish their willfulness.  (Doc. No. 52 at 11.)  Defendants maintain that the only reason Plaintiff pursues liquidated damages is because Defendants "did not choose to pay the initial amount sought" by Plaintiff when she initiated this action.  (Id.)

Upon consideration of the foregoing and viewing the record evidence in the light most favorable to Defendants as the non-moving party, the Court will grant Plaintiff's motion for summary judgment as to Defendants' willfulness.  To reiterate, an employer willfully violates the FLSA when they "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute."  See Richland Shoe Co., 486 U.S. at 133.  In this case, the undisputed evidence indicates that Defendants did not consult with "any individuals or third parties, including accountants, attorneys, and representatives of other business" pertaining to

their FLSA obligations.  (Doc. No. 44-9 at 4.)  Additionally, in December of 2021, Defendants were informed by the Department of Labor that they needed to pay workers "fair wages" and yet Mentors indicated that, even after being so informed, Defendants continued to pay them only a monthly stipend far below the appropriate wage total based on their hours worked.  (Doc. Nos. 44-35 (LRFC meeting minutes noting "Department of Labor (DOL) comments" that "[w]orkers need to be paid fair wages" and "[t]hey will further investigate LRF regarding their concerns"); 44-41 (records of Mentor interviews with Department of Labor Investigator Christopher Harvey); 44-42 (Declaration of Christopher Harvey).)  The Court finds that Defendants' continued failure to pay appropriate wages, even after being informed by the Department of Labor that they needed to make such payments, accompanied by their failure to take steps to ascertain their FLSA obligations, demonstrates that Defendants cannot meet their burden of establishing a genuine dispute of material fact on the question of whether they showed a "reckless disregard" for the FLSA.  See Richland Shoe Co., 486 U.S. at 133.  Accordingly, the Court will grant Plaintiff's motion for summary judgment as to Defendants' willful violations of FLSA, thus permitting a three-year statutory lookback period.[23]

### 2.    Calculation of Appropriate Damages

Considering the Court's finding supra that Defendants failed to accurately keep records of Mentor and Minor hours worked, the Court next determines whether to grant summary judgment as to Plaintiff's calculation of the appropriate back wages.  To that end,

> [i]n the absence of adequate employer records of employees' wages and hours, as required by the FLSA, the solution is not to penalize the employees by denying recovery based on an inability to prove the extent of undercompensated work, but rather to allow the employee or the Secretary to submit sufficient evidence from

---

[23] Because the Court has determined that Plaintiff is entitled to summary judgment on the issue of Defendants' willfulness, it will necessarily deny Defendants' motion on this point.

which violations of the Act and the amount of an award may be reasonably inferred.

See Martin v. Selker Bros., 949 F.2d 1286, 1297 (3d Cir. 1991). Plaintiff's burden is "merely to present a prima facie case," and the Court may award damages even if the total "may only be approximate." See Reich v. Gateway Press, Inc., 13 F.3d 685, 701 (3d Cir. 1994). Plaintiff must provide evidence that the employees have "in fact performed work for which [they were] improperly compensated and . . . to show the amount and extent of that work as a matter of just and reasonable inference." See id. If Plaintiff satisfies her burden, the burden shifts to Defendants to rebut that inference by coming forward "with evidence of the precise amount of work performed or with evidence to negat[e] the reasonableness of the inference to be drawn from the [claimant]'s evidence." See Selker Bros., 949 F.2d at 1297 (citing Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687–88 (1946)).

In support of her position that the Court can reasonably infer the amount of back wages owed at six hundred and sixty-nine thousand, six hundred and seven dollars and eighty-three cents ($669,607.83), Plaintiff asserts that the evidence of record shows that Minors worked for four (4) to seven (7) hours daily in furtherance of Defendants' commercial pursuits, and further that Mentors and Minors worked, in some capacity, nearly every day besides Sunday. (Doc. No. 44 at 29.) Plaintiff maintains that she looked at Defendants' admissions, estimated that Minors worked thirty (30) hours per week, then multiplied those hours worked by the minimum wage to calculate the appropriate weekly Minors' salary. (Id. at 30.) Plaintiff further asserts that she conducted a similar calculation for the Mentors, basing the estimated back wages owed on a sixty-five and a half (65.5) hour workweek, and calculating both minimum wage and overtime in accordance with that hour estimation. (Id.) Plaintiff notes that she subtracted the two-hundred and fifty (250) dollar stipends received by Mentors when calculating Mentor back pay. (Id.)

Plaintiff accordingly argues that, because Defendants have not kept any records, it follows that they cannot rebut Plaintiff's inference of the appropriate back wages owed.  (Id. at 31–32.) Defendants do not offer any arguments opposing Plaintiff's position.

Upon consideration of the foregoing, the Court determines that summary judgment as to the reasonably inferred calculation of back wages is proper.  Plaintiff provides the Court with a detailed explanation of how she calculated the estimated back wages, which involved analyzing Defendants' admissions, interviews with Mentors, and deposition testimony.  (Doc. No. 44 at 29–32.)  The Court determines that Plaintiff has pointed to record evidence establishing a "prima facie" case, as well as "evidence that the employees have 'in fact performed work for which [they were] improperly compensated.'"  See Reich, 13 F.3d at 701; see also (Doc. No. 44 at 29–30 (discussing Defendants' request for admissions, depositions, and Minor interviews, and including citations to PSUMF and the evidence of record)).  Additionally, because Defendants do not make any attempt to refute Plaintiff's estimated back wages owed, the Court determines that Defendants cannot meet their burden to rebut Plaintiff's reasonably inferred calculation.  To that end, upon review of the record evidence and construing all facts in the light most favorable to the non-moving Defendants, the Court will grant Plaintiff's motion for summary judgment on this question.

### 3.    Liquidated Damages

The award of liquidated damages is mandatory under the FLSA, should a plaintiff prevail.  See 29 U.S.C. § 260.  To avoid liquidated damages, "an employer must show that it acted in good faith and that it had reasonable grounds for believing that it was not violating the Act."  See Sec'y United States Dep't of Lab. v. Am. Future Sys., Inc., 873 F.3d 420, 433 (3d Cir. 2017).  "The good faith requirement is 'a subjective one that requires that the employer have an

honest intention to ascertain and follow the dictates of the Act.'" <u>Id.</u> (citing <u>Martin v. Cooper</u>

<u>Elec. Supply Co.</u>, 940 F.2d 896, 907 (3d Cir. 1991)).  However, the reasonableness inquiry is

objective, insofar as the employer must provide evidence permitting a reasonable finder of fact to

conclude that that the employer objectively believed they complied with the FLSA.  <u>See</u>

<u>Marshall v. Brunner</u>, 668 F.2d 748, 753 (3d Cir. 1982) (discussing the objective nature of the

reasonableness inquiry).  The Third Circuit has held that "a defendant employer bears the 'plain

and substantial' burden of proving he is entitled to discretionary relief from the FLSA's

mandatory liquidated damages provision" which generally requires an employer to show that "he

took affirmative steps to ascertain the Act's requirements, but nonetheless, violated its

provisions."  <u>See</u> <u>Cooper Elec. Supply Co.</u>, 940 F.2d at 907–08.  Defendants bear a heavy burden

because upon a finding of liability, "[d]ouble damages are the norm, single damages the

exception."  <u>See</u> <u>id.</u> at 908 (citing <u>Walton v. United Consumers Club, Inc.</u>, 786 F.2d 303, 310 (7th

Cir. 1986)).

Plaintiff argues that she is entitled to summary judgment as to the issue of Defendants'

lack of good faith compliance with the FLSA.  (Doc. No. 44 at 33–34.)  Plaintiff asserts that

Defendants cannot and have not shown any affirmative steps taken to ensure that they

understood their FLSA responsibilities, simply assuming that because they operated as a

religious 501(c)(3), then they did not have to pay workers.  (<u>Id.</u> at 33.)  Plaintiff maintains that

Defendants' admission that they "took no steps" to ensure compliance "makes liquidated

damages mandatory in this case."  (<u>Id.</u>)  Additionally, Plaintiff asserts that Defendants also

cannot demonstrate that their belief—that they had no FLSA obligations—was objectively

reasonable.  (<u>Id.</u>)  Plaintiff maintains that no reasonable employer could believe that having

Mentors, who effectively worked "almost every waking hour," earn only two-hundred and fifty dollar ($250) monthly stipends was legally sufficient.  (Id. at 34.)

In response, Defendants argue that they reasonably believed that Mentors and Minors were not covered by the FLSA.  (Doc. No. 52 at 12.)  Defendants cite their status as a religiously affiliated non-profit in arguing that they genuinely believed that FLSA did not apply to them or those who worked at Liberty Ridge.  (Id.)

Upon review of the record evidence and construing all facts in the light most favorable to the non-moving Defendants, the Court determines that Defendants fail to raise a genuine dispute of material fact on the issue of their lack of subjective good faith or objective reasonableness in failing to comply with the FLSA.  First, as it pertains to good faith, the Court determines that Defendants have not cited sufficient evidence to permit a reasonable finder of fact to conclude that they subjectively believed that their actions complied with the FLSA.  See Am. Future Sys., Inc., 873 F.3d at 433 (discussing how an employer must have "an honest intention to ascertain and follow the dictates" of the FLSA).  There is nothing in the record indicating that Defendants attempted to contact anyone at the Department of Labor, nor did Defendants consult with "any individuals or third parties, including accountants, attorneys, and representatives of other business" pertaining to their FLSA obligations.  (Doc. No. 44-9 at 4.)

However, even if Defendants could satisfy their burden of demonstrating subjective good faith, the Court further determines that Defendants have failed to present evidence that they objectively believed that they were complying with the FLSA.  As discussed supra, the reasonableness inquiry requires an employer to provide evidence permitting a reasonable finder of fact to conclude that that the employer objectively believed they complied with the FLSA.  See Brunner, 668 F.2d at 753.  Even viewing the facts in the light most favorable to Defendants,

the Court still determines that Defendants have not carried their burden.  The evidence of record indicates that, even after being informed by the Department of Labor that they needed to pay workers "fair wages," Mentors indicated that Defendants continued to only pay them a monthly stipend far below the appropriate wage total would be based on their hours worked.  (Doc. Nos. 44-35 (LRFC meeting minutes noting that "Department of Labor (DOL) comments" that "[w]orkers need to be paid fair wages" and "[t]hey will further investigate LRF regarding their concerns"); 44-41 (Mentor interviews with Department of Labor Investigator Christopher Harvey); 44-42 (Declaration of Christopher Harvey).)   Accordingly, because Defendants have not met their burden, and observing that "[d]ouble damages are the norm, single damages the exception," see Cooper, F.2d at 908 (citation omitted), the Court will grant Plaintiff's motion for summary judgment on the question of Plaintiff's entitlement to liquidated damages in the amount of six hundred and sixty-nine thousand, six hundred and seven dollars and eighty-three cents[24] ($669,667.83).[25]

### 4.    Injunctive Relief

The question of whether injunctive relief is warranted "rests within the Court's sound discretion."  See Walsh v. E. Penn Mfg. Co., 555 F. Supp. 3d 89, 137 (E.D. Pa. 2021) (citing 29 U.S.C. § 517).  "Factors that district courts consider in deciding whether to issue an injunction include the employer's past conduct, current conduct, and, most importantly, whether the

---

[24]   Defendants' total backpay owed is as follows: six hundred and sixty-nine thousand, six hundred and seven dollars and eighty-three cents ($669,607.83) in minimum wage and overtime back wages for Mentors and Minors and six hundred and sixty-nine thousand, six hundred and seven dollars and eighty-three cents ($669,607.83) in liquidated damages, for a total of one million, three hundred and thirty-nine thousand, two-hundred and fifteen dollars and sixty-six cents ($1,339,215.66).

[25]  Because the Court has determined that Plaintiff is entitled to summary judgment on the issue of liquidated damages, it will necessarily deny Defendants' motion on this point.

employer can be counted on to comply with the FLSA in the future." Mosluoglu, Inc., 2023 WL 5972044, at *5 (citing Solis, 934 F. Supp. 2d at 815). Accordingly, the Court may permanently enjoin Defendants from violating the FLSA pursuant to 29 U.S.C. § 517. "Some courts have recognized that FLSA violations should be enjoined when the court is not fully convinced that a recurrence of the violation is not probable." Solis, 934 F. Supp. 2d at 815.

Plaintiff asserts that Defendants' behavior reflects an ongoing disregard for labor laws and cruelty towards children. (Doc. No. 44 at 35.) Plaintiff maintains that Defendants: (1) forced children deemed "troubled" to work in "furtherance of their commercial activities;" (2) punished these children if they did not comply with rules or work at a sufficient pace; (3) paid Mentors substandard wages, despite being forced to work roughly six (6) days per week; and (4) were aware of the Department of Labor's investigation and still chose not to pay workers appropriate wages. (Id. at 34–35.)

The Court is persuaded by Plaintiff's argument that permanent injunctive relief is warranted here. In undertaking this inquiry, the Court considers "the employer's past conduct, current conduct, and, most importantly, whether the employer can be counted on to comply with the FLSA in the future." See Mosluoglu, Inc., 2023 WL 5972044, at *5. Here, the employer's past conduct is troublesome. While the Court need not recite facts that have been repeated throughout this memorandum, the Court finds most telling the fact that, after the Department of Labor informed Defendants that they needed to pay workers "fair wages," Defendants continued to pay Mentors only a monthly stipend far below the appropriate wage total based on their hours worked, according to several Mentors. (Doc. Nos. 44-35 (LRFC meeting minutes noting that "Department of Labor (DOL) comments" that "[w]orkers need to be paid fair wages" and "[t]hey will further investigate LRF regarding their concerns"); 44-41 (Mentor interviews with

Department of Labor Investigator Christopher Harvey); 44-42 (Declaration of Christopher Harvey).)  The Court also reiterates that, as discussed <u>supra</u>, the Court granted Plaintiff's motion for summary judgment as to Defendants' engagement in oppressive child labor because Defendants failed to raise a genuine dispute of material fact on that issue.  Thus, viewing all evidence in the light most favorable to Defendants, the Court concludes that, in light of their open defiance of the Department of Labor's investigation, Defendants cannot "be counted on to comply with the FLSA in the future."  <u>See</u> <u>Mosluoglu, Inc.</u>, 2023 WL 5972044, at *5. Accordingly, injunctive relief is warranted here, and the Court will grant Plaintiff's motion on this issue.

## IV.     CONCLUSION

For the foregoing reasons, the Court will grant Plaintiff's motion for summary judgment and will deny Defendants' motion for summary judgment.   An appropriate Order follows.


<u>s/ Yvette Kane</u>
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania